IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

GARY GILLARD,

                       Plaintiff,        Civil Action No.
                                       9:08-CV-1104 (LEK/DEP)

        v.

CRAIG ROSATI, GREGORY BEECHER,
MICHAEL PAIGE, JEREMY BURCH,
KELLY DOYLE, RICHARD LAPAN, ARTHUR
HARRIS, ANDREW FRAZIER, MICHAEL
HOY, KEITH HENDRY, PETER BESSON,
FISHER NESMITH, KEN VERIO, MICHELE
CZERWINSKI, HOWARD SILVERBERG,
WILLIAM  REDMOND[1], and ROBERTA
LABRUM,

                       Defendants.

_____

<u>APPEARANCES</u>                  <u>OF COUNSEL</u>

<u>FOR THE PLAINTIFF:</u>

GARY GILLARD, *Pro Se*
01-A-1613
Attica Correctional Facility
Box 149
Attica, New York 14011

_____

[1]     In his amended complaint plaintiff names "William Redmen" as a defendant.
Dkt. No. 33; *see also* Dkt. No. 35.  Although defendants identify this defendant as both
"William Redman" and "William Redmond" in their motion, *see, e.g.,* Dkt. No. 82-2 at p.
18, service was accepted by "William Redmond", *see* Dkt. No. 41, the name reflected
on the court's docket sheet.  Accordingly, I will refer to this defendant by that name.

FOR THE DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN    ROGER W. KINSEY, ESQ.
Attorney General of the         Assistant Attorney General
State of New York
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Gary Gillard, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights.[2] Although his initial complaint in this matter was significantly more far-reaching his claims have been winnowed substantially, and now stem principally from two incidents involving the alleged use of excessive force by prison personnel and the failure of prison medical employees to

---

[2]    Since 2000, plaintiff has proven himself to be a prodigious litigator in the federal courts. During that period Gillard has filed nine civil rights suits in this district, four of which were commenced in 2009, and has initiated eight other similar civil rights actions in the Eastern District of New York and two in the Western District of New York. *See* http://www.pacer.gov/. Based upon the court's review of the dockets in the previously filed lawsuits, it appears that at least two were dismissed for failure to state cause of action. *See Gillard v. Mahoney, et al.*, Civil Action No. 2:00-CV-5420 (E.D.N.Y.) Dkt. No. 3; *Gillard v. Kirwin*, Civil Action No. 2:01-CV-2125 (E.D.N.Y.) Dkt. No. 109. Since the commencement of this lawsuit, yet another complaint filed by Gillard has been dismissed for failure to state a claim, *see Gillard v. Gaffney*, No. 2:00-CV-5945 (E.D.N.Y.) Dkt. No. 131, thereby potentially subjecting him to the three strikes provision of 28 U.S.C. § 1915(g).

provide him with adequate treatment for his resulting injuries.  As relief,

plaintiff seeks compensatory and punitive damages ranging into the

hundreds of millions of dollars against the seventeen named defendants.

Currently pending before the court is a motion brought by

defendants requesting summary judgment dismissing plaintiff's remaining

claims.  In their motion, defendants argue that no reasonable factfinder

could conclude that they violated plaintiff's Eighth Amendment rights, and

further that they are shielded from suit in their official capacities under the

Eleventh Amendment, and as individuals by qualified immunity.  For the

reasons set forth below, I recommend that defendants' motion be granted

in part, but otherwise denied.

I.      BACKGROUND[3]

Plaintiff is a prison inmate entrusted to the care and custody of the

New York State Department of Corrections and Community Supervision

("DOCCS") (formerly known as the New York State Department of

Correctional Services, or the "DOCS").  *See generally* Am. Compl. (Dkt.

No. 33).  Plaintiff is currently confined within the Attica Correctional

_____

[3]      In light of the procedural posture of the case, the following recitation is derived
from the record now before the court with all inferences drawn and ambiguities
resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

Facility, *see* Dkt. No. 74, although at the times relevant to his claims he was incarcerated within the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York.  *See generally* Am. Compl. (Dkt. No. 33).  At the heart of plaintiff's claims are incidents occurring at Great Meadow on or about September 17, 2007 and January 31, 2008.

 A. <u>September 17, 2007 Incident</u>

 On September 17, 2007, Gregory Beecher, a corrections officer at Great Meadow, ordered the plaintiff to proceed to an interview room to meet with Corrections Lieutenant Peter Besson in order to discuss a pending grievance filed by Gillard.  Beecher Decl. (Dkt. No. 82-3) ¶ 5; Besson Decl. (Dkt. No. 82-6) ¶ 18; Gillard Decl. (Dkt. No. 87) ¶ 4.  Plaintiff alleges that he was accompanied to the interview room by defendant Beecher, who became hostile and threatening during the escort, giving Craig Rosati, another corrections officer, "the signal to move into action against" Gillard.  Gillard Decl. (Dkt. No. 87) ¶ 4.  According to plaintiff he was then kicked, punched, and kneed by defendant Rosati, while defendant Beecher stood idly by.  *Id.*

 In their motion papers defendants offer starkly contrary accounts of the events of September 17, 2007.  While defendant Rosati admits to

4

conducting a pat and frisk of the plaintiff, and escorting the plaintiff to the interview, he denies having assaulting him. Rosati Decl. (Dkt. No. 89) ¶¶ 5-9.[4]  In contrast to plaintiff's claims that defendant Beecher stood by during the assault, that defendant claims his role was limited to providing Gillard with a pass and that he had no involvement in escorting plaintiff as alleged.  Beecher Decl. (Dkt. No. 82-3) ¶ 6.  Beecher also denies assaulting or threatening the plaintiff in any way.[5]  *Id.* at ¶ 7.

When questioned regarding the grievance which was to be the subject of the interview, plaintiff became uncooperative and, according to Besson, refused to answer any of his questions. Besson Decl. (Dkt. No. 82-6) ¶ 20.  Plaintiff stated to Besson that he had been beaten on the way to the interview room, although Besson did not observe any obvious injuries to the plaintiff.  *Id.* at ¶¶ 21-22.  According to Besson, he

---

[4]     The declaration of Craig Rosati as well as another given by defendant Roberta Labrum are cited in defendants' Local Rule 7.1(a)(3) Statement, *see* Dkt. No. 82-1, filed in support of this pending motion, but were not included in their motion submission.  When advised of that fact by the court, defendants' counsel submitted those declarations, both of which are dated from July 2010.  Dkt. Nos. 88, 89.  While plaintiff objects to the court's consideration of these documents, *see* Dkt. No. 90, I recommend that they be considered, in the court's discretion, given that it appears likely the failure to submit them with the original motion was a mere oversight.  *Cooper Industries v. Agway, Inc.*, 987 F. Supp. 92, 101 (N.D.N.Y. 1997) (recognizing court's discretion under N.D.N.Y.L.R. 7.1(b)(3) to accept or reject untimely affidavits).

[5]     Plaintiff's escort to the interview room by defendant Rosati was necessitated in light of his refusal to obey the order to go speak with defendant Besson.  Besson Decl. (Dkt. No. 82-6) ¶ 19.

5

attempted to have plaintiff examined by medical personnel in light of his allegations of being beaten, but plaintiff refused the opportunity.  *Id.* at ¶ 24.  At the conclusion of the session, plaintiff was personally escorted by Corrections Lieutenant Besson back to his cell.  *Id.* at ¶ 23.

Plaintiff also spoke with Corrections Lieutenant Keith Hendry concerning the alleged incident.  Am. Compl. (Dkt. No. 33) ¶ 100.  Plaintiff claims that defendant Hendry ignored his requests for medical attention and disregarded his complaints.[6]  *Id.*

Plaintiff was examined by defendant Michael Hoy, a corrections sergeant, and Roberta Labrum, a nurse, on September 20, 2007.  Hoy Decl. (Dkt. No. 82-11) ¶¶ 5-6; Labrum (Dkt. No. 88) ¶¶ 4-5.  According to those individuals, no visible bruising was observed during that examination.  *See id.*  Plaintiff refutes those findings, claiming them to have been false and misleading, designed to cover up the beating and his resulting injuries, including the inability to stand, walk, or lift anything due to pain in his arm, ankle, back, and neck.  Gillard Decl. (Dkt. No. 87) ¶ 6.

B.    January 31, 2008 Incident

---

[6]     Although defendants' Local Rule 7.1.(a)(3) Statement makes reference to a declaration given by Lieutenant Hendry, that declaration is not included among the motion papers now before the court.

6

On January 31, 2008, while in his cell, plaintiff was instructed by Corrections Officers Jeremy Burch and Kelly Doyle to dress and participate in an interview by a corrections sergeant.  Am. Compl. (Dkt. No. 33) ¶ 84.  Upon entering the office of Corrections Sergeant Andrew Frazier plaintiff was asked about his grievances and whether Gillard smelled alcohol on Frazier's breath. *Id*. at ¶¶ 85-86.  During the session, defendant Jeremy Burch slammed plaintiff's face into a cabinet, and defendant Andrew Frazier threatened to break both of plaintiff's legs and arms if he continued to submit grievances.  *Id.* at ¶¶ 86-87.  Plaintiff was then struck in the face by defendant Frazier and on the right side of the head and in his jaw area by Jeremy Burch, while defendant Kelly Doyle punched him in the back; all three persisted, striking the plaintiff in the face, neck, back, ribs, and lower back areas.  *Id.* at ¶ 87.  Plaintiff was then returned to his cell where he requested medical attention from Corrections Officer Richard Lapan, who refused to provide emergency treatment despite the fact that plaintiff was throwing up blood and had bruises on his face.  *Id*. at ¶ 90.

On the following day, defendant Fisher Nesmith, a physician's assistant at Great Meadow, went to plaintiff's cell in response to Gillard's

complaint of injuries, examined him, and arranged for him to be moved to the medical area.  Nesmith Decl. (Dkt. No. 82-10) ¶ 4; Kinsey Aff. (Dkt. No. 82-13) Exh. K, p. 27 (hereinafter cited as "Medical Records p. ___"). At that time, plaintiff was treated for a possible minor contusion to the right orbital area, under his right eye.  Nesmith Decl. (Dkt. No. 82-10) ¶ 5. Thereafter, plaintiff was examined by Corrections Sergeant Hoy and Nurse Labrum, also on February 1, 2008.  Hoy Decl. (Dkt. No. 82-11) ¶ 8; Labrum Decl. (Dkt. No. 88) ¶ 7.  X-rays taken on that day were negative. Hoy Decl. (Dkt. No. 82-11) ¶ 9; Labrum Decl. (Dkt. No. 88) ¶ 8.

     C.   <u>Medical Treatment</u>

On September 20, 2007, three days after the first claimed assault, plaintiff was examined by Corrections Officer Michael Hoy and Nurse Roberta Labrum.  Medical Records pp. 7- 8.  Although plaintiff complained of back pain, neither Hoy nor Labrum observed any injuries.  *See id.*  The next day, plaintiff was prescribed a lumbar corset.  *Id.*; *see also* Silverberg Decl. (Dkt. No. 82-8) ¶ 9.

Defendant Howard Silverberg, a physician at Great Meadow, examined the plaintiff on September 25, 2007.  *Id.* at ¶ 10.  On that date Dr. Silverberg prescribed a back brace and the medication Flexeril for

pain.  *Id.*; *see also* Medical Records pp. 7-8.

On October 5, 2007, plaintiff requested x-rays and a neck brace, complaining of back pain.  Medical Records p. 5.  He also stated that he had just seen a doctor, started medication, and underwent magnetic resonance imaging ("MRI") testing, but nonetheless desired to see a doctor again.  *Id.*  Medical staff instructed plaintiff to take the medication "as ordered" and "give them a chance to work."  *Id.*

Approximately two months later, on December 18, 2007, Dr. Silverberg prescribed an ankle brace and lumbar corset for the plaintiff. Medical Records pp. 25-26.  Defendant Silverberg also recommended that plaintiff see an orthopedic surgeon.  *Id.* at 23.  That suggestion, however, was rejected by other prison medical personnel, who recommended that plaintiff first undergo physical therapy.  *Id.*

Plaintiff contends that after the purported January 31, 2008 assault, he advised defendant Lapan that he needed to see medical staff because he was vomiting blood.  Am. Compl. (Dkt. No. 33) ¶ 90; Gillard Decl. (Dkt. No. 87) ¶ 8.  Plaintiff was seen by Physician's Assistant Fisher Nesmith the next day.  Medical Records p. 27; Nesmith Decl. (Dkt. No. 82-10) ¶ 4. During that visit Gillard complained of "vague pain" because a "sgt hit him

9

last PM," and defendant Nesmith treated plaintiff for a possible minor bruise under his right eye.  Medical Records p. 27; Nesmith Decl. (Dkt. No. 82-10) ¶¶ 4-5.  Plaintiff also received an x-ray.  Medical Records pp. 22, 27.  Plaintiff was informed on February 15, 2008 of the x-ray results, which were "essentially normal."  Silverberg Decl. (Dkt. No. 82-8) ¶ 21; Medical Records pp. 22, 27.  Based upon those results, medical staff recommended that plaintiff use an air cast or undergo physical therapy for his ankle pain. Silverberg Decl. (Dkt. No. 82-8) ¶ 21; Medical Records p. 11.  An ankle cast was subsequently prescribed for the plaintiff on March 31, 2008 by Dr. Silverberg.  Silverberg Decl. (Dkt. No. 82-8) ¶ 22.

## II.   <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action on October 10, 2008.  Dkt. No. 1. Since its inception, the matter has had a extensive procedural history which need not be recounted in full for purposes of placing the pending motion in context.

The operative pleading of the plaintiff now before the court is a revised amended complaint filed on November 16, 2009.  *See* Dkt. No. 33.  In that document, which is essentially excerpted from a prolix amended complaint earlier filed with the court, plaintiff names seventeen

of the seventy-three defendants originally sued, both in their official and individual capacities, and asserts claims of excessive force, failure to intervene, deliberate medical indifference, and verbal harassment, all in violation of the Eighth Amendment.  Am. Compl. (Dkt. No. 33).

Following service, joinder of issue, and the completion of pretrial discovery, defendants moved on September 7, 2010 for summary judgment dismissing plaintiff's claims against them.  Dkt. No. 82.  In their motion defendants argue that 1) the record fails to support plaintiff's Eighth Amendment claims; 2) defendants Harris, Paige, Czerwinski, Redmond, Nesmith, Hoy, Labrum, Besson, Hendry, and Lapan were not personally involved in any alleged civil rights deprivation; 3) defendants are entitled to Eleventh Amendment immunity from suit in their official capacities; and 4) as individuals they are entitled to qualified immunity.  *Id.* Defendants' motion, which plaintiff has opposed, *see* Dkt. No. 87, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.    <u>DISCUSSION</u>

A.   <u>Summary Judgment Standard</u>

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is

warranted when "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of*

*Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir.

2004).  A fact is "material," for purposes of this inquiry, if it "might affect

the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at

248, 106 S. Ct. at 2510; *see also Jefferys v. City of New York*, 426 F.3d

549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in

dispute "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson*, 477 U.S. at 240, 106 S. Ct. at

2510.  Though *pro se* plaintiffs are entitled to special solicitude when

defending against summary judgment motions, they must establish more

than mere "metaphysical doubt as to the material facts."  *Matsushita Elec.*

12

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348,

1356 (1986); *But see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21

(2d Cir. 1999) (noting obligation of court to consider whether *pro se*

plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve

any ambiguities, and draw all inferences from the facts, in a light most

favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v.*

*Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary

judgment is warranted only in the event of a finding that no reasonable

trier of fact could rule in favor of the nonmoving party.  *See Building*

*Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d

Cir. 2002) (citation omitted); *see also Anderson*, 477 U.S. at 250, 106 S.

Ct. at 2511 (summary judgment is appropriate only when "there can be

but one reasonable conclusion as to the verdict").

> B.   Plaintiff's Failure to File a Proper Local Rule 7.1.(a)(3)
>      Statement

The court's rules provide that a party opposing a motion for

summary judgment

> shall file a response to the [moving party's]
> Statement of Material Facts.  The non-movant's
> response shall mirror the movant's Statement of

> Material Facts by admitting and/or denying each of
> the movant's assertions in matching numbered
> paragraphs.  Each denial shall set forth a specific
> citation to the record where the factual issue
> arises.  The non-movant's response may also set
> forth any additional material facts that the non-
> movant contends are in dispute in separately
> numbered paragraphs.

N.D.N.Y.L.R 7.1(a)(3).  This rule, which is typical of similar rules from

many courts, serves to assist the court in identifying material issues in a

case and determining whether they are genuinely disputed.  *See Monahan*

*v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000).

The consequences of a failure to adhere to this meaningful rule are

potentially significant.  By its terms, Local Rule 7.1(a)(3) provides that

"[t]he Court shall deem admitted any facts set forth in the Statement of

Material Facts that the opposing party does not specifically controvert."

N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original).  Courts in this district have

routinely enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by

deeming facts admitted upon an opposing party's failure to respond.  *See,*

*e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 U.S. Dist. LEXIS,

2000 WL 1264122, at *1 (Aug. 22, 200) (McCurn, S.J.) (listing cases)[7];

---

[7]    Copies of all unreported decisions cited in this document have been appended
for the convenience of the *pro se* plaintiff.

*see also Monahan*, 214 F.3d at 292 (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).  As a counterbalance to this often-fatal deficiency, a court has broad discretion to overlook a party's failure to comply with its local rules.  *Travelers Indemnity Co. of Ill. v. Hunter Fan Co.*, No. 99 CIV 4863, 2002 U.S. Dist. LEXIS 1238, 2002 WL 109567, at *7 (S.D.N.Y. Jan. 28, 2002) (citing *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001)).

While in opposing defendants' motion plaintiff has filed a document entitled "Plaintiff's Statement of Disputed Factual Issues," plaintiff's submission fails to satisfy the requirements of Local Rule 7.1(a)(3). Although plaintiff's statement includes seven separately numbered paragraphs, those paragraphs do not directly respond or correspond to the forty-four separately numbered paragraphs contained in Defendants' Local Rule 7.1(a)(3) Statement.  *See* Plaintiff's Opposition (Dkt. No. 87) pp. 5-6 (unnumbered).[8]  Additionally, plaintiff has neglected to include any citations to the record in his Local Rule 7.1(a)(3) Statement, as also required by the rule.

Despite these deficiencies, plaintiff has submitted a twelve-

---

[8]     The pages of plaintiff's opposition are not numbered.  The court will therefore refer to the page numbers as filed and reflected on the court's docket.

paragraph affidavit detailing the incidents of alleged unconstitutional conduct.  *See* Gillard Decl. (Dkt. No. 87) pp. 1-4.  The last line of that affidavit is a declaration, signed by plaintiff, that "under the penalty of perjury . . . the foregoing is true and correct."[9]  *Id.* at p. 4.  Further, plaintiff's response is accompanied by affidavits from three witnesses to the incident allegedly occurring on January 31, 2008.  *Id.* at pp. 12-14. Accordingly, in deference to his *pro se* status, and given that he has actively opposed defendants' motion and that it is fairly clear from his submissions which facts are disputed, though without minimizing the importance of Local Rule 7.1(a)(3), I recommend against deeming plaintiff

---

[9]   Plaintiff's submission substantially complies with 28 U.S.C. § 1746, which provides that

> [w]herever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form: . . . "I declare (or certify, verify, or state) under penalty of perjury the foregoing is true and correct.  Executed on (date). (Signature)".

28 U.S.C. § 1746(2).

to have admitted the facts set forth in Defendants' 7.1 Local Rule 7.1(a)(3) Statement.[10]

C.    Eleventh Amendment Immunity

Plaintiff's complaint, as amended, makes clear that he is asserting claims against the defendants both individually and in their official capacities.  In their motion, defendants seek dismissal of Gillard's claims against them in their official capacities, asserting their entitlement to Eleventh Amendment immunity.  Defendants' Memorandum (Dkt. No. 82-2) p. 18.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought.  *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 3057-58 (1978).  This absolute immunity which states enjoy under the Eleventh Amendment extends to both state agencies and state officials sued in their official capacities when the essence of the claim involved is one against a state as the real party in interest.  *Richards v. State of New York Appellate Division, Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984)

---

[10]    This recommended disposition is particularly appropriate in this case since it does not appear that defendants' motion was accompanied by the required notice to plaintiff of the consequences of his failure to properly respond in opposition to the motion.  *See* N.D.N.Y.L.R. 56.2.

(citing *Pugh* and *Cory v. White*, 457 U.S. 85, 89-91, 102 S. Ct. 2325, 2328-29 (1982)).  To the extent that a state official is sued for damages in his or her  official capacity, the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[11]  *Kentucky v. Graham*, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 3105 (1985); *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361 (1991).

Since plaintiff's damage claims against the named defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal.  *Daisernia v. State of New York*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted, and that plaintiff's damage claims against the defendants in their capacities as state officials be dismissed.[12]

---

[11]   By contrast, the Eleventh Amendment does not serve as an impediment to suits seeking to impose individual or personal liability on state officials under section 1983.  *See Hafer*, 502 U.S. at 30-31, 112 S. Ct. at 364-65.

[12]   Among the relief sought in plaintiff's complaint, as amended, is the issuance of an injunction.  Claims against the defendants in their official capacities for injunctive relief are not subject to dismissal under the Eleventh Amendment.  *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 58, 116 S. Ct. 1114, 1124 (1996).  Nonetheless, it is likely that any request for injunctive relief in this case is destined to be rejected as moot in light of the fact that Gillard is no longer incarcerated at Great Meadow, where the events giving rise to his claims occurred.  It is well settled in this circuit that transfer

D.   Personal Involvement

In their motion certain of the individuals sued by the plaintiff, including defendants Harris, Paige, Nesmith, Besson, Hendry, Lapan, Hoy, Labrum, Czerwinski, and Redmond, urge dismissal of plaintiff's claims against them based upon the lack of any showing of their involvement in the constitutional violations alleged in his complaint.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Gatson v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffit v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  As the Supreme Court has noted, a defendant may only be held accountable for his or her actions under section 1983.  *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1927, 1952 (2009).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible

---

from a prison facility moots an action for injunctive relief against the transferring facility. *Prins v. Coughlin*, 76 F.3d 504, 506 (2nd Cir. 1996) (citing *Young v. Coughlin*, 866 F.2d 567, 568 n. (2d Cir.), *cert. denied*, 492 U.S. 909, 109 S. Ct. 3224 (1989), and *Beyah v. Coughlin*, 789 F.2d 986, 988 (2d Cir.1986)); *Candelaria v. Greifinger*, No. 96-CV-0017, 1998 WL 312375, at *2 (N.D.N.Y. June 8, 1998) (Pooler, J. and Scanlon, M.J.).

connection between the constitutional violation alleged and that particular defendant.  *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

### 1.   Defendant Czerwinski

Defendant Michelle Czerwinksi, a nurse administrator at Great Meadow, argues that she was not personally involved in any alleged unconstitutional conduct and that she is named as a defendant solely due to her place in the prison medical staff chain of command.  Plaintiff counters that defendant Czerwinski is liable for having ignored letters regarding his alleged medical mistreatment.[13]  *See, e.g.,* Am. Compl. (Dkt. No. 33)  ¶¶ 106, 109.

As a supervisor, defendant Czerwinski cannot be held liable for damages under section 1983 solely by virtue of her position; there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.  In order to establish her liability, plaintiff must prove that she 1) has directly

---

[13]     Plaintiff's motion response fails to address defendants' lack of personal involvement arguments.  However, affording the plaintiff the special solicitude that he deserves as a *pro se* litigant, when assessing the issue of personal involvement I have examined the allegations contained in his amended complaint, which is a verified pleading, *see Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) ("[A] verified pleading . . . has the effect of an affidavit and may be relied upon to oppose summary judgment.") (citation omitted), for sufficiency.

participated in the challenged conduct; 2) after learning of the violation

through a report or appeal, has failed to remedy the wrong; 3) created or

allowed to continue a policy or custom under which unconstitutional

practices occurred; 4) was grossly negligent in managing the subordinates

who caused the unlawful event; or 5) failed to act on information indicating

that unconstitutional acts were occurring.  *Iqbal v. Hasty*, 490 F.3d 143,

152-53 (2d Cir. 2007), *rev'd on other grounds sub nom.*, *Ashcroft v. Iqbal*,

___ U.S. ___,129 S. Ct. 1937 (2009); *see also Richardson*, 347 F.3d at

435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d

at 501.

       The record is devoid of any evidence of defendant Czerwinski's

direct involvement in the events giving rise to plaintiff's claim.  Her role

appears to be limited to the receipt of two letters from the plaintiff which

she failed to answer.  It is well-established that without more, "mere

receipt of letters from an inmate by a [supervisory official] regarding a

medical claim is insufficient to constitute personal liability."  *Gonzales v.

Wright*, No. 9:06-CV-1424 (JMH), 2010 U.S. Dist. LEXIS 15953, at *28,

2010 WL 681323, at *10 (N.D.N.Y. Feb. 22, 2010) (Hood, J.) (citations

omitted); *see also Booker v. Doe*, No. 9:06-CV-73 (GLS), 2008 U.S. Dist.

LEXIS 76413, at *22, 2008 WL 4527601, at *7 (N.D.N.Y. Sept. 30, 2008) (Sharpe, J.) ("It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement.").

In light of the lack of evidence of defendant Czerwinski's personal involvement in the constitutional violations alleged, I recommend that this defendant's motion for summary judgment be granted and plaintiff's claims against her be dismissed.

## 2.   Defendant Redmond

Defendant William Redmond, another nurse administrator, also argues that he also was not personally involved in any alleged unconstitutional conduct and that he is named as a defendant due solely to his supervisory position. Like Czerwinski, plaintiff claims that defendant Redmond ignored letters regarding his alleged medical mistreatment. *See* Am. Compl. (Dkt. No. 33) ¶115.

For purposes of the personal involvement analysis defendant Redmond's circumstances are factually distinguishable from those of defendant Czwerinski. In addition to the letters sent by the plaintiff, the record contains two memoranda authored by defendant Redmond, dated

22

November 13, 2007 and March 10, 2008, in which he explained and defended plaintiff's treatment.  *See* Kinsey Decl.  (Dkt. No. 82-13) Exh. J. It has been held that personal liability may lie where a "supervisor's 'involvement went beyond merely the receipt of complaint letters,' to 'responding, explaining the treatment and defending the institution.'" *Woods v. Goord*, No. 01 Civ. 3255 (SAS), 2002 U.S. Dist LEXIS 7157, at *27-31, 2002 WL 731691, at *7-9 (S.D.N.Y. Apr. 23, 2002) (Schendlin, J.) (internal citations omitted); *see also Rashid v. Hussain*, No. 95- Civ. 676, 1997 U.S. Dist. LEXIS 16132, at *9-10, 1997 WL 642549, at *3 (N.D.N.Y. Oct. 15, 1997) (Pooler, J.).

Drawing all inferences and resolving ambiguities in plaintiff's favor, I am unable to conclude that no reasonable factfinder could hold defendant Redmond accountable for the constitutional deprivations allegedly suffered by the plaintiff.  Accordingly, I recommend that his motion seeking summary judgment based upon lack of personal involvement be denied.

### 3.    Defendants Hoy and Labrum

Although defendants Michael Hoy and Roberta Labrum argue that they were not personally involved in any unconstitutional conduct, they

admit to having conducted a medical examination of plaintiff on September 20, 2007, three days after the first purported assault, and another on February 1, 2008, one day after the second alleged assault. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 82-1) ¶¶ 12, 26. Based upon these circumstances a reasonable factfinder could conclude that they were personally involved in defendants' indifference to plaintiff's medical condition.  As such, I recommend that  their summary judgment on the ground of lack of personal involvement be denied.

### 4.   Defendant Nesmith

Defendant Fisher Nesmith, who, as was previously noted, serves as a physician's assistant at Great Meadow, admits to having examined the plaintiff on February 1, 2008, one day after the second claimed assault. Nesmith Decl. (Dkt. No. 82-10) ¶ 4.  On that occasion, defendant Nesmith treated plaintiff for a possible minor bruise under plaintiff's right eye.  *Id.* at ¶ 5.  Based upon his role, a jury could find that defendant Nesmith was personally involved in plaintiff's medical care and defendants' deliberate indifference toward his medical needs.  Accordingly, I recommend that defendant Nesmith's motion for summary judgment on the ground of lack of personal involvement be denied.

5.    <u>Defendants Harris and Paige</u>

Defendants Arthur Harris and Michael Paige, two DOCCS

corrections officers stationed at Great Meadow, argue that they were not

personally involved in any constitutional deprivation alleged because the

only accusation against them is that they were in charge of opening

plaintiff's cell door so that he could be taken to the meeting that led to the

alleged assault on January 31, 2008.  In support of his claim against those

defendants, Gillard argues that they purposefully opened his cell door so

that defendants Burch, Doyle, and Frazier could assault him.  Am. Compl.

(Dkt. No. 33) ¶ 91; Gillard Decl. (Dkt. No. 87) ¶ 8. Defendants Harris and

Paige flatly dispute this claim.  Harris Decl. (Dkt. No. 82-4) ¶ 11; Paige

Decl. (Dkt. No. 82-9) ¶ 8.  Neither of those defendants was present in or

near plaintiff's cell at the time of his alleged assault; instead, both were

present in a control bubble, responsible for controlling cell doors and

access to and from cell blocks, among other things. Harris Decl. (Dkt. No.

82-4) ¶¶ 5 and 6; Paige Decl. (Dkt. No. 82-9) ¶¶ 5 and 6.  Both deny that

the purpose of opening plaintiff's cell door was to facilitate an assault.

Harris Decl. (Dkt. No. 82-4) ¶ 11; Paige Decl. (Dkt. No. 82-9) ¶ 8.

Plaintiff's allegations that when defendants Harris and Paige

performed their duty to open plaintiff's cell door they knew an assault would follow is wholly speculative.  No evidence has been offered from which a reasonable jury could find their complicity in the alleged use of excessive force against the plaintiff.  Plaintiff's unsupported conclusion regarding those defendants' motives is insufficient to raise an issue of fact precluding the grant of summary judgment.  *Franconero v. Universal Music Corp.*, No. 02 Civ.1963(BSJ),  2011 WL 566794, at * 5 (S.D.N.Y. Feb. 11, 2011) (citation omitted).  I therefore recommend that plaintiff's claims against those defendants be dismissed for lack of personal involvement.

### 6.   Defendants Besson and Hendry

Defendants Besson and Hendry, a corrections lieutenant and a corrections sergeant, respectively, argue that they are named as defendants due solely to their positions in the prison chain of command. They contend that the record now before the court fails to establish a tangible connection between their actions and plaintiff's constitutional claims sufficient to establish their personal involvement, and therefore seek summary judgment with regard to plaintiff's claims against them.

Defendant Besson has submitted a declaration in which he admits to

having interviewed the plaintiff on September 17, 2007 and again on February 12, 2008.  Besson Decl. (Dkt. No. 82-6) ¶¶ 5, 18.  Plaintiff fails to dispute defendant Besson's claim that Gillard could not offer any information or witnesses regarding the January 31, 2008 incident.  *See id.* at ¶¶ 6-7.  Since the January 31, 2008 incident represented an alleged constitutional violation which was not ongoing, but instead of finite duration, and hence defendant Besson was not in a position on February 12, 2008 to prevent or end the deprivation, there is no basis for finding requisite personal involvement on his part in connection with the January 31, 2008 incident to support a finding of liability.

Defendant Besson also had involvement with regard to the earlier matter by attempting to interview Gillard on September 17, 2007 regarding a complaint previously filed.  Besson Decl. (Dkt. No. 82-6) ¶ 18.  After failing to cooperate, plaintiff reported that he had been beaten on the way to the interview room.  *Id.* at ¶¶ 20-21.  Defendant Besson, however, observed no injuries, nor was he given any other reason to believe plaintiff's accusations, and plaintiff refused the opportunity to be examined by medical personnel regarding the matter.  *Id*. at ¶¶ 22-25.  Based upon these limited circumstances, I recommend a finding that plaintiff's has

27

failed to establish a basis for defendant Besson's liability.

Defendant Hendry falls into a different category.  Although his affidavit is referenced in defendant's Local Rule 7.1(a)(3) Statement, it is not currently before the court.  Measured against this void is plaintiff's assertion that defendant Hendry refused to provide medical assistance and disregarded his complaint after he was informed of the September 17, 2007 incident.  *See* Am. Compl. (Dkt. No. 33) ¶ 100.  I therefore recommend denial of defendant Hendry's motion for summary judgment based upon the lack of personal involvement in light of his potential participation in the alleged deliberate indifference to plaintiff's serious medical needs.

### 7.    Defendant Lapan

Defendant Richard Lapan is a corrections officer at Great Meadow. Lapan Decl. (Dkt. No. 82-7) ¶ 1.  Plaintiff claims that defendant Lapan denied his request for medical assistance when defendant Lapan returned plaintiff to his cell following the January 31, 2008 incident. Gillard Decl. (Dkt. No. 87) ¶ 8.  Defendant Lapan admits working at Great Meadow on January 31, 2008 and in his declaration does not deny that plaintiff requested medical attention without success.  *See generally* Latham Decl.

(Dkt. No. 82-7).  At a bare minimum, the issue of whether, as contended by the plaintiff, Gillard requested but was denied medical attention for his injuries from defendant Latham constitutes an issue of fact concerning his involvement which cannot be resolved on motion for summary judgment. Accordingly, I recommend denial of defendant Latham's motion for summary judgment based upon lack of personal involvement.

     E.    <u>Excessive Force</u>

At the heart of plaintiff's amended complaint are claims of excessive force based upon the September 2007 and January 2008 incidents. These claims are brought under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Estelle v. Gamble*, 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290-91 (1976); *see also Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1076, 1085 (citing, *inter alia*, *Estelle*).  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994)

(citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley*, 475 U.S. at 319, 106 S. Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999).  The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7, 112 S. Ct. 995, 998-99 (1992) (applying *Whitley* to all excessive force claims); *Whitley*, 475 U.S. at 320-21, 106 S. Ct. at 1085 (quoting *Johnsvon v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom.*, *John v. Johnson*, 414 U.S. 1033, 94 S. Ct. 462 (1972)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct.  *Wright v. Goord*, 554 F. 3d 255, 268 (2d Cir. 2009) (citing *Hudson*, 503 U.S. at 7-8, 112 S. Ct. at 999 and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).  As was

recently emphasized by the United States Supreme Court in *Wilkins v. Graddy*, however, after *Hudson*, the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial.   ___ U.S. ___, 130 S. Ct. 1175, 1179 (2010) (per curiam).  Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . .  This is true whether or not significant injury is evident.  Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000 (citations omitted); *see also Romaine v. Rewson*, 140 F. Supp. 2d 204, 211 (N.D.N.Y. 2001) (Kahn, J.) *Velasquez v. O'Keefe*, 899 F. Supp. 972, 973 (N.D.N.Y. 1995) (McAvoy, C.J.).  Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10, 112 S. Ct. at 1000 (citations omitted).

   With its focus on the harm done, the objective prong of the inquiry is contextual and relies for a point of reference upon "contemporary

31

standards of decency." *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503

U.S. at 8, 112 S. Ct. at 1000) (internal quotations omitted)).  When

addressing this component of an excessive force claim under the Eighth

Amendment calculus, the court can consider the extent of the injury

suffered by the inmate plaintiff.  While the absence of significant injury is

certainly relevant, it is not dispositive.  *Hudson*, 503 U.S. at 7, 112 S. Ct.

at 999.  The extent of an inmate's injury is but one of the factors to be

considered in determining if a prison official's use of force was

"unnecessary and wanton"; courts should also consider the need for force,

whether the force was proportionate to the need, the threat reasonably

perceived by the officials, and what, if anything, the officials did to limit

their use of force.  *Whitley*, 475 U.S. at 321, 106 S. Ct. at 1085 (citing

*Johnson*, 481 F.2d at 1033).  "But when prison officials use force to cause

harm maliciously and sadistically, 'contemporary standards of decency are

always violated . . . .  This is true whether or not significant injury is

evident.'" *Wright*, 554 F. 3d at 268-69 (quoting *Hudson*, 503 U.S. at 9, 112

S. Ct. at 1000).

     That is not to say "every malevolent touch by a prison guard gives

rise to a federal cause of action."  *Griffin*, 193 F. 3d at 91 (citing *Romano*

*v. Howarth*, 998 F.3d 101, 105 (2d Cir. 1993)); *see also Johnson*, 481 F.2d at 1033 ("Not every push or shove, even if it later may seen unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").  Where a prisoner's allegations and evidentiary proffers, if credited, could reasonably allow a rational factfinder to find that corrections officers used force maliciously, however, summary judgment dismissing an excessive force claim is inappropriate.  *Wright*, 554 F.3d at 269 (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (reversing summary judgment dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the . . . incident with [that officer] indicated only a slight injury")) (other citations omitted).

The basis for defendants' assertion that they are entitled to judgment as a matter of law dismissing plaintiff's excessive force claims is unclear, particularly in view of the fact-laden nature of the inquiry ordinarily surrounding the objective and subjective prongs of the Eighth Amendment test and the conflicting accounts given regarding the relevant events.

Looking first at the September 17, 2007 incident, plaintiff contends the he was kicked, punched, and kneed by defendant Rosati. *See, e.g.* Gillard Decl. (Dkt. No. 87) ¶ 4; *see also* Am. Compl. (Dkt. No. 33) ¶¶ 97-98. By contrast, defendant Rosati denies assaulting the plaintiff, stating instead that his conduct on that date was limited to a pat and frisk of the plaintiff. Rosati Decl. (Dkt. No. 89) ¶ 6, 9. These conflicting accounts squarely raise an issue of credibility, presenting a question of fact for resolution by a jury and inappropriate for determination by the court on a motion for summary judgment. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citing, *inter alia, Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513).

Plaintiff's claims surrounding the January 31, 2008 incident implicate defendants Burch, Doyle, and Frazier. Gillard Decl. (Dkt. No. 87) ¶ 7 and Am. Compl. (Dkt. No. 33) ¶¶ 84-88. Those three defendants are accused of having applied excessive force on that date in an effort to coerce the plaintiff to recant an earlier complaint regarding defendant Paige. *See id.*

For his part defendant Frazier maintains that he was not working at Great Meadow on January 31, 2008 and therefore was not present on the day of the alleged assault. Frazier Decl. (Dkt. No. 82-12) ¶ 7; *see also* Kinsey Aff. (Dkt. No. 82-13) Exhs. C and F. The exhibits submitted,

however, are somewhat equivocal concerning whether defendant Frazier was actually working on the day in question.  The Security Supervisor Chart for January 31, 2008, offered in support Frazier's contention, lists an "a. Frazier" accompanied with the handwritten text "645" and an illegible handwritten notation.  Kinsey Aff. (Dkt. No. 82-13) Exh. C.  At the end of the day, a jury undoubtedly will be called upon to resolve the issue of whether defendant Frazier was working and involved in the alleged assault on January 31, 2008.  Resolution of that issue cannot be accomplished by the court at this procedural juncture; instead, the conflicting accounts raise an issue credibility precluding the grant of summary judgment.  *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (quoting Fed. R .Civ. P. 56(e) Advisory Committee Note (1963)).

Defendant Burch and Doyle take a different tact in defense of plaintiff's claims.  They do not appear to dispute his claim that an altercation occurred on the date in question, instead arguing that x-rays of the plaintiff taken one day after of the purported assault were negative for injuries and, accordingly, plaintiff's allegations " 'fail to shock the conscience. . .'."  Defendants' Memorandum (Dkt. No. 82-2) at pp. 9-10. Assuming this to be true, the inquiry nonetheless is not ended, since even

35

if plaintiff suffered only minimal injuries, a rational factfinder could

determine that defendants Burch and Doyle acted maliciously and

sadistically by assaulting plaintiff to coerce him to recant his complaint.[14]

*See Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir. 2003) (summary

judgment inappropriate in an excessive force claim even though "medical

records after the . . . incident . . . indicate[] only a slight injury.").

Having determined that genuine issues of material fact exist

surrounding plaintiff's excessive force claims, I recommend that the

portion of their motion seeking dismissal of those claims as a matter of

law be denied.

F.     Failure to Intervene

In addition to asserting that various defendants beat him, plaintiff

alleges that other defendants, while not direct participants, observed the

_____

[14]     Defendants cite to *Kerman v. City of New York*, 261 F.3d 229 (2d Cir. 2001), for that proposition that "plaintiff will not prevail in a claim for excessive force when 'contrasting accounts . . . present factual issues as to the degree of force actually employed and its reasonableness.'" Defendants' Memorandum (Dkt. No. 82-2) pp. 6-7, 10.  Contrasting accounts of an incident such as that at bar clearly present an issue of material fact making summary judgment inappropriate. *See Rule,* 85 F.3d at 1011. Moreover, *Kerman* does not support defendants' proposition. In *Kerman,* the Second Circuit held that under Rule 50 of the Federal Rules of Civil Procedure judgment as a matter of law in a jury trial was *inappropriate* in an excessive force claim where "contrasting accounts of both [plaintiff's] and [defendant's] conduct . . . present factual issues as to the degree of force actually employed and its reasonableness."  *Kerman,* 261 F.3d at 239.

assaults and failed to act.  A corrections worker who, though not participating, is present while an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).  It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers.  *See Mowry v. Noone*, No. 02-CV-6257Fe, 2004 U.S. Dist. LEXIS 28225, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30, 2004); *see also Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).

In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the

use of excessive force.  *See Curley*, 268 F.3d at 72; *see also Espada v. Schneider*, 522 F. Supp. 2d 544, 555 (S.D.N.Y. 2007).  Mere inattention or inadvertence, it should be noted, does not rise to the level of deliberate indifference sufficient to support liability for failure to intervene.  *See, e.g.*, *Schultz v. Amick*, 955 F. Supp. 1087, 1096 (N.D. Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia*, *Daniels v. Williams*, 474 U.S. 327, 335-36, 106 S. Ct. 662, 667 (1986)).

In their motion defendants do not directly address plaintiff's failure to intervene claims. The sufficiency of those claims, however, is indirectly implicated, including in the portion of the motion addressing the question of personal involvement.

### 1.   Defendant Beecher

Defendant Beecher contends that the only allegations against him are for verbal harassment, claims that are not cognizable under § 1983. Factually, defendant Beecher maintains that his role in the relevant events was limited to instructing the plaintiff to go to the interview room on September 17, 2007 to see defendant Besson.  Beecher Decl. (Dkt. No. 82-3) ¶ 5.  Defendant Beecher states that it was his "job to give the inmate

a pass and not escort[] him personally."[15]  *Id.* at ¶ 6.  Plaintiff, by contrast,

accuses defendant Beecher of becoming hostile and of giving defendant

Rosati the "signal" to begin the assault, and of encouraging defendant

Rosati during the assault.  Gillard Decl. (Dkt. No. 87) ¶ 4.  Plaintiff claims

that defendant Beecher stood by and did nothing as the purported assault

occurred.  *Id.* at ¶¶ 4, 10. In his declaration, defendant Beecher does not

respond to this accusation.

These conflicting accounts present an issue of fact as to whether

defendant Beecher failed to intervene during the purported assault by

defendant Rosati on September 17, 2007.  As such, I recommend denying

the portion of defendants' motion requesting dismissal of plaintiff's claims

against defendant Beecher.

### 2.   Defendant Frazier

Plaintiff accuses defendant Frazier of standing by on January 31,

2008 as he witnessed plaintiff being beaten by defendant Rosati, a lower

ranked officer.  Defendant Frazier states that he did not work at Great

Meadow on that date.  *See* Frazier Decl. (Dkt. No. 82-12) ¶ 4.  As was

---

[15]    This appears to conflict with defendants' Local Rule 7.1(a)(3) Statement which
states "Defendant Beecher escorted Plaintiff to the interview room."  *See* Defendants'
Local Rule 7.1(a)(3) Statement (Dkt. No. 82-1) ¶ 7.

stated earlier, these conflicting accounts present an issue of fact as to whether defendant Frazier was present at Great Meadow on January 31, 2008, and also whether he failed to intervene in the alleged assault. Accordingly, I recommend denial of defendant Frazier's motion for summary judgment on the issue of his failure to intervene.

G.   Medical Indifference

Plaintiff alleges that defendants Lapan, Hoy, Hendry, Besson, Nesmith, Verio, Labrum, Czerwinski, Silverberg, and Redmond were deliberately indifferent to his serious medical needs, in particular by denying his request for treatment of injuries sustained during the two alleged assaults.  In their motion, defendants claim plaintiff has failed to establish both the existence of a serious medical need as well as a refusal by those defendants to provide the required treatment.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment.  *Estelle*, 429 U.S. at 102, 104, 97 S. Ct. at 290-91.  To satisfy their obligations under the Eighth Amendment, prison officials must ensure that inmates receive adequate food, shelter, and medical care, and

must take reasonable measures to guarantee the safety of inmates."

*Farmer*, 511 U.S. 832, 114 S. Ct. at 1976 (quoting *Hudson v. Palmer*, 468

U.S. 517, 526-27, 104 S. Ct. 3194, 3200 (1984)) (internal quotations

omitted).

      Like plaintiff's excessive force claim, his claim of medical

indifference must satisfy both objective and subjective requirements.

*Wright*, 554 F.3d at 268; *Price v. Reilly*, 697 F. Supp. 2d 344, 355-58

(E.D.N.Y. 2010) (Bianco, J.).  Addressing the objective element, to prevail

a plaintiff must demonstrate a violation sufficiently serious by objective

terms, "in the sense that 'a condition of urgency, one that may produce

death, degeneration, or extreme pain' exists."  *Hathaway v. Coughlin*, 99

F.3d 550, 553 (2d Cir. 1996).  With respect to the subjective element, a

plaintiff must also demonstrate that the defendant had "the necessary

level of culpability, shown by actions of 'wantonness.'"  *Blyden*, 186 F.3d

at  262.  Claims of medical indifference are subject to analysis utilizing this

Eighth Amendment paradigm.  *See Salahuddin v. Goord*, 467 F.3d 263,

279-81 (2d Cir. 2006).

      1.    <u>Objective Requirement</u>

      Analysis of the objective, "sufficiently serious," requirement of an

Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care . . .", and centers upon whether prison officials acted reasonably in treating the plaintiff.  *Salahuddin*, 467 F.2d at 279.  A second prong of the objective test addresses whether the inadequacy of the medical treatment was sufficiently serious.  *Id.* at 280.  If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition.  *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003).  If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition.  *Salahuddin*, 467 F.3d at 280.  "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment . . . [the focus of] the inquiry is on the challenged delay or interruption, rather than the prisoner's underlying medical condition alone."  *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted).  In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was

42

sufficiently harmful to establish a constitutional violation.  *Smith*, 316 F.3d

at 186.  Of course, "when medical treatment is denied for a prolonged

period of time, or when a degenerative medical condition is neglected over

a sufficient time, the alleged deprivation of care can no longer be

characterized as 'delayed treatment,' but may properly be viewed as a

'refusal' to provide medical treatment."  *Id.* at 186 n.10 (quoting *Harrison*

*v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a

condition untreated may or may not raise constitutional concerns,

depending on the circumstances.  *Harrison*, 219 F.3d at 136-37 (quoting,

*inter alia*, *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

Relevant factors informing this determination include whether the plaintiff

suffers from an injury or condition that a "reasonable doctor or patient

would find important and worthy of comment or treatment", a condition

that "significantly affects" a prisoner's daily activities, or "the existence of

chronic and substantial pain.'"  *Chance*, 143 F.3d at 702 (internal

quotations and citation omitted).

The record before the court reflects that plaintiff received at least

some modicum of medical treatment following both the September 17,

43

2007 incident and the alleged assault on January 31, 2008.  On

September 20, 2007, plaintiff was examined at the Great Meadow

infirmary by defendant Hoy, a corrections sergeant, and defendant

Labrum, a nurse.  Hoy Decl. (Dkt. No. 82-11) ¶ 5; Labrum Decl. (Dkt. No.

88) ¶ 4; Medical Records p. 8.  Neither of those examining personnel

observed any visible bruising during that examine. Hoy Decl. (Dkt. No. 82-

11) ¶ 6; Labrum Decl. (Dkt. No. 88) ¶ 5.  Plaintiff complained during that

examination of back pain and a strained neck.  Medical Records p. 8.  On

September 25, 2007, plaintiff was provided medication and a back brace

for pain. Hoy Decl. (Dkt. No. 82-11) ¶ 7; Labrum Decl. (Dkt. No. 88) ¶ 6;

*see also* Silverberg Decl. (Dkt. No. 82-8) ¶¶ 8-10.  Standing alone, these

allegations fail to establish the existence of a serious medical need of

constitutional proportions.  The record now before the court lacks

evidence of extreme pain or severe degeneration; instead, the record

discloses only injuries of a transitory nature which are insufficient to

establish the existence of a serious medical need passing constitutional

muster.  *See Johnson v. Brown*, No. 9:09-cv-0002 (GTS/DEP), 2010 U.S.

Dist. LEXIS 142207, 2010 WL 6243352, at *14-15 (N.D.N.Y. Sept. 3,

2010) (Peebles, M.J.) (finding that a "busted lip, dime-sized bruise, and

44

general complaints of pain" were not a serious medical condition), *report and recommendation adopted*, 2011 WL 1097864 (Mar. 22, 2011) (Suddaby, J.); *see also Ford v. Phillips*, No. 05 Civ. 6646 (NRB), 2007 U.S. Dist. LEXIS 25226, 2007 WL 946703, at *12 (S.D.N.Y. Mar. 27, 2007) (concluding that minor bruising, slight bleeding, and abrasions are not injuries that may produce death, degeneration or extreme pain and that no reasonable juror could find otherwise).

In addition to these allegations of a modest nature, plaintiff contends that he complained to defendant Lapan of vomiting blood following the January 31, 2008 incident, but that Lapan nonetheless denied his request for medical assistance.  Gillard Decl. (Dkt. No. 87) ¶ 8; *see also* Am. Compl. (Dkt. No. 33) ¶ 90 ("Lapan . . . refused to get the Plaintiff emergency medical attention as the Plaintiff was throwing up blood as well as face bruised" [*sic*].).  To be sure, vomiting blood can be an indication of a serious medical need.  *See Hale v. Rao*, No. 9:08-cv-612, 2009 WL 3698420, at *5 (N.D.N.Y. Nov. 3, 2009) (Hurd, J.) (citing *Morgan v. Maass*, No. 94-35834, 1995 U.S. App. LEXIS 38206, 1995 WL 759203, at *2 (9th Cir. Dec. 26, 1995)).  Because the summary judgment standard requires the court to resolve all ambiguities and draw all reasonable

45

inferences against the moving party, I therefore find that there are factual issues concerning whether plaintiff's claims satisfy the objective prong of the deliberate indifference standard.

2.    Subjective Element

The second, subjective requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants.  *Salahuddin*, 467 F.3d at 280 (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S. Ct. 2321, 2325 (1991)). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference."  *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979; *see also Leach v. Dufrain*, 103 F.3d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*).  "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law."  *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40, 114 S. Ct. at 1979-80).

Mere negligence on the part of a physician or other prison medical official in treating or failing to treat a prisoner's medical condition, on the other hand, does not implicate the Eighth Amendment and is not properly the subject of a section 1983 action. *Estelle*, 429 U.S. at 105-06, 97 S. Ct. at 292; *Chance*, 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106, 97 S. Ct. at 292. Thus, for example, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison*, 219 F.3d at 139. If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct is actionable as deliberate indifference. *Harrison*, 219 F.3d at 138; *Kearsey v. Williams*, No. 99 Civ 8646, 2005 U.S. Dist. LEXIS 19017, 2005 WL 2125874, at *5 (S.D.N.Y. Sep. 1, 2005) (Batts, J.).

While plaintiff's deliberate indifference claims potentially meet the objective prong, they fail to satisfy the subjective element of the controlling test. The record before the court reflects that plaintiff received considerable attention from medical personnel at Great Meadow for

47

injuries allegedly suffered during the course of the September 17, 2007

attack. On September 21, 2007, plaintiff received a lumbar corset for his

back pain. Silverberg Decl. (Dkt. No. 82-8) ¶ 9; Medical Records pp. 7-9.

Four days later, on September 25, 2007, defendant Silverberg prescribed

a back brace and pain medication. Silverberg Decl. (Dkt. No. 82-8) ¶ 10;

Medical Records p. 7.  On October 5, 2007, plaintiff presented requesting

x-rays and a brace for back pain. Medical Records p. 5.  Plaintiff advised

during the course of that appointment that he had just been seen by a

doctor and underwent MRI testing, and that he  had just begun taking

medication for his pain.  Medical Records p. 4.  Plaintiff was instructed to

take the medication as ordered and allow it an opportunity to relieve the

pain.  *See id*.

On December 18, 2007, approximately two months later, Dr.

Silverberg prescribed an ankle brace and lumbar corset for the plaintiff.

Silverberg Decl. (Dkt. No. 82-8) ¶ 14; Medical Records pp. 25-26.  Dr.

Silverberg also recommended that plaintiff be referred to an orthopedic

surgeon for evaluation of his ankle, although that recommendation was

rejected in favor of attempting physical therapy first before being referred

to an outside specialist.[16]  Medical Records p. 11.

In sum, plaintiff received significant medical treatment following the September 17, 2007 incident.  Based upon the record before the court, no reasonable factfinder could conclude that any of the individual defendants were subjectively indifferent to plaintiff's serious medical needs stemming from that event.

The record also reveals that plaintiff received substantial medical treatment following the January 31, 2008 incident.  Although plaintiff complained to defendant Lapan that he was vomiting blood, plaintiff received medical attention one day later on February 1, 2008 from Physician's Assistant Fisher Nesmith, who treated him on that occasion for possible minor contusion under the right eye.  Nesmith Decl. (Dkt. No. ¶ 82-10) ¶¶  4-5; Medical Records p. 7.  X-rays taken on that day were negative.  Silverberg Decl. (Dkt. No. 82-8) ¶ 19; Medical Records p. 22-23.

---

[16]    Significantly, plaintiff's medical records reveal that he failed to appear for scheduled physical therapy appointments for six consecutive weeks between November 7, 2007 and December 12, 2007.  Medical Records pp. 13-18.  This refusal of recommended treatment further serves to negate plaintiff's allegations of deliberate indifference.  *See Gillard v. Rovelli*, No. 9:09-cv-0830 (NAM/GHL), 2010 U.S. Dist. LEXIS 124737, 2010 WL 4905240, at *10 (N.D.N.Y. Sept. 29, 2010) (Lowe, Mag. J.) (citing *Rivera v. Goord*, 253 F. Supp. 2d 735, 756 (S.D.N.Y. 2003)).

A review of the record shows that between September 20, 2007 and February 15, 2008, plaintiff was seen by medical staff on at least thirteen different occasions.  *See* Medical Records pp. 4-9, 27. Throughout that period, plaintiff received pain medication, x-rays, corsets, and braces. *See generally id.*  Further, plaintiff was prescribed physical therapy, which he refused to attend.  *Id.* at pp. 14-20.  Succinctly stated, the record is devoid of any evidence upon which a reasonable factfinder could conclude that defendants acted with deliberate indifference to plaintiff's serious medical needs. Accordingly, I recommend that the portion of defendants' summary judgment motion seeking dismissal of plaintiff's medical indifference claims be granted.

H.     Verbal Harassment

In their motion, defendants also contend that plaintiff's claims against defendant Beecher stemming from his alleged use of offensive language toward Gillard does not state a constitutional claim.

As a general matter, verbal harassment, including profanity, without any associated physical injury, does not give rise to a claim cognizable under section 1983.  *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Gill v. Hoadley*, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003)

(Peebles, M. J.); *Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998).

Nor do threats amount to a constitutional violation.  *Malsh v. Austin*, 901

F. Supp. 757, 763 (S.D.N.Y. 1995) (Koeltl, J.).  Accordingly, plaintiff's

claims of verbal abuse, alleging conduct which, if true, is both

unprofessional and reprehensible, do not rise to the level of a

constitutional violation, and are not cognizable under 42 U.S.C. § 1983.

*See Moncrieffe v. Witbeck*, No. 97-CV-253, 2000 U.S. Dist. LEXIS 9425,

2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations

that corrections officer laughed at inmate not actionable under section

1983) (citation omitted); *Carpio v. Walker*, No. Civ.A.95CV1502, 1997

U.S. Dist. LEXIS 1617, 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997)

(Pooler, J. & DiBianco, M.J.) ("verbal harassment alone, unaccompanied

by any injury, no matter how inappropriate, unprofessional, or

reprehensible it might seem, does not rise to the level of an Eighth

Amendment violation").  I therefore recommend granting summary

judgment and dismissal of plaintiff's claims against defendant Beecher to

the extent that they are predicated upon alleged verbal harassment.

I.     <u>Qualified Immunity</u>

In addition to challenging the merits of plaintiff's claims, defendants

assert that they are entitled to qualified immunity from suit based upon plaintiff's allegations.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, "the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S. Ct. 1962 (1999). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2000).

In *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government

official's qualified immunity claims." *Pearson*, 555 U.S. at 232, 129 S. Ct. at 816.  The first step requires the court to consider whether taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[17] *Kelsey*, 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Cornwall-On-Hudson Police Dep't.*, 577 F.3d 415, 430 n.9 (citing *Saucer*).[18]  Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the . . .

---

[17]     In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further  inquiries concerning qualified immunity."  *Saucier*, 533 U.S. at 201, 121 S. Ct. 2151.

[18]     In *Okin*, the Second Circuit clarified that the "'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was unlawful."  *Okin*, 577 F.3d at 433 n.11 (citation omitted).

prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[19]  555 U.S. at 236, 129 S. Ct. at 818, 821.   In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of the constitutional right in a qualified immunity context, but we are free to do so."  *Kelsey*, 567 F.3d at 61 (citing *Pearson*, 129 S. Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs . . . should be addressed in light of the circumstances in the particular case at hand.'" *Okin*, 577 F.3d 430 n.9 (quoting *Pearson*).   "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all."  *Kelsey*, 567 F.3d at 61 (quoting *Pearson*).

With regard to the excessive force and failure to intervene claims,

---

[19]     Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability . . .", *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806 (1985), the Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation."  *Pearson*, 55 U.S. at 231, 129 S. Ct. 815.

the constitutional rights implicated were clearly established at the relevant

times.  As discussed above, I have concluded a reasonable jury could find

that defendants violated plaintiff's constitutional rights to be free from cruel

and unusual punishment.  Accordingly, I recommend that defendants'

motion for summary judgment on qualified immunity grounds be denied as

to the excessive force claims and failure to intervene.[20]

## IV.   SUMMARY AND RECOMMENDATION

At the heart of plaintiff's claims in this action are allegations that he

was assaulted by corrections officials on two separate occasions and that

others stood by and failed to intervene.  In view of the conflicting accounts

given by the parties regarding those claims, the grant of summary

judgment at this juncture would be inappropriate, although certain of the

defendants are entitled to dismissal based upon the lack of any showing

of their personal involvement in the offending conduct.  Plaintiff's

additional claim that defendants were deliberately indifferent to his

medical needs by failing to treat his resulting injuries lacks support in the

record, and his claim based on verbal harassment fails as a matter of law;

---

[20]      In view of my recommendation on the merits as to plaintiff's medical
indifference and verbal harassment causes of action claims, I do not find it necessary
to address defendants' claim that, in the alternative, they are entitled to qualified
immunity with regard to those claims.

summary judgment should therefore be granted to defendants on those claims.

Accordingly, it is therefore hereby respectfully,

RECOMMENDED, that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 82) be

1.      GRANTED to the extent that damages are sought against the defendants in their official capacities;

2.      GRANTED as to defendants Harris, Paige, Czerwinski and Besson based upon their lack of personal involvement in the deprivations alleged;

3.      GRANTED as to plaintiff's claims of

   a)      Verbal harassment against defendant Beecher; and

   b)      Medical indifference as to all defendants; and

4.      DENIED in all other respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report.  FAILURE TO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R.

Civ. P. 6(a), 6(d), 72; *Roland v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is further hereby ORDERED that the clerk of the court serve a

copy of this report and recommendation upon the parties in accordance

with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      August 22, 2011
            Syracuse, NY



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

C Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 *etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See, e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.*, 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton*, 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.*, 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. FN2 The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

　　　　FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See,e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *Seeid.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *SeeReese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7]*SeeReese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

> FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

> FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

☞  Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
THE TRAVELERS INDEMNITY COMPANY OF
ILLINOIS a/s/o the following entity and individuals:
Milstein Properties, Inc., Helen Abunasser, Jane
Everett, Stella Friedman, Zehava Mirkin, Arthur
Nadaner, Lisa Pettigrew, and Ziva Ben-Reuvan,
Plaintiff,
v.
HUNTER FAN COMPANY, INC., Capitol Lighting of
Paramus, Inc., M. Fortunoff of Westbury Corp., and
John Does "1" through "5", Defendants.
HUNTER FAN COMPANY, INC., Third Party
Plaintiff,
v.
Lionel HAMPTON, Lincoln Plaza Associates, Milford
Management Corp., One Lincoln Plaza Condominium,
20 West 64th Street Associates, Third Party Defendants.
**No. 99 CIV 4863 JFK.**

Jan. 28, 2002.

Robinson & Cole LLP, New York, NY, Michael B.
Golden, for Plaintiff, of counsel.

D'Amato & Lynch, New York, NY, Lloyd Herman, for
Defendant/Third Party Plaintiff Hunter Fan Co., Inc., of
counsel.

Gulino & Ryan, P.C., New York, NY, Joseph J. Gulino,
for Defendant Capitol Lighting of Paramus, Inc., of
counsel.

Lambert & Weiss, New York, NY, Richard Lambert, for
Third Party Defendant Lionel Hampton, of counsel.

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Wilson, Elser, Moskowitz, Edelman & Dicker LLP, New
York, NY, Eugene T. Boule, for Third Party Defendant
Lincoln Plaza Associates, of counsel.

*OPINION and ORDER*

KEENAN, J.

**\*1** Before this Court are Cross Motions for summary
judgment of Defendant/Third Party Plaintiff Hunter Fan
and Defendant Capitol Lighting of Paramus. Hunter Fan
moves to dismiss the claims of plaintiff The Travelers
Indemnity Company of Illinois and all cross-claims and
counter claims. Capitol Lighting moves to dismiss the
claims of plaintiff Travelers Indemnity Company and
seeks indemnification, costs and attorneys' fees from
Hunter Fan. For the reasons outlined below, the Court
denies all motions.

*Background*

Plaintiff the Travelers Indemnity Company of Illinois
("Travelers") was and still is an Illinois corporation with
its principal place of business located in Hartford,
Connecticut. *See* Am. Compl. ¶ 4. Defendant/Third Party
Plaintiff Hunter Fan, Inc. ("Hunter") was and still is a
Delaware corporation with its principal place of business
located in Memphis, Tennessee. *Seeid.* ¶ 5. Defendant
Capitol Lighting of Paramus, Inc. ("Capitol") was and still
is a New Jersey corporation with its principal place of
business located at Route 17, Paramus, New Jersey. *Seeid.*
¶ 7. Third Party Defendant Lionel Hampton ("Hampton")
was, at all relevant times, the lessee and resident at 20
West 64th Street, Apt. 28K, New York, New York. *Seeid.*
¶ 12.

This Court has jurisdiction pursuant to 28 U.S.C. § 1332
because the action is between citizens of different states
and the matter in controversy exceeds the sum of $75,000,
exclusive of interest and costs.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

On January 7, 1997, a fire broke out in Hampton's apartment. The fire allegedly started in Hampton's bedroom when a halogen lamp fell over onto the bed setting fire to the bed linens. There is no evidence as to exactly how the lamp tipped over. The fire consumed Hampton's apartment and caused damage to the building, other apartments in the building, and three individuals. Travelers had issued property insurance policies to the owners and various tenants of the building, and pursuant to those policies paid out over one million dollars in claims arising from this fire. Travelers brought this subrogation action against Hunter and Capitol seeking reimbursement with interest of the amounts it had paid to settle these claims.

In its Amended Complaint, Travelers alleges that in or before February 1996, Hunter imported, distributed, and/or sold certain Halogen Adjustable Arm Torchiere Floor Lamps, model number 20727BL in black and model number 20727WH in white. Travelers alleges that Hunter distributed lamps to Defendant Capitol for resale to the public. Hampton's assistant Caprice Titone ("Titone") had purchased two lamps for Hampton, and purchased the fire-causing lamp (the "Lamp") at Capitol. Hampton's valet Rubin Cox ("Cox") assembled the Lamp. Hampton used both lamps in his bedroom in a position whereby the adjustable arm was horizontal to the floor allowing the shade and bulb to point toward the floor ("the downbridge position"). The first lamp fell over at least once burning a hole into the bedroom carpet. That lamp later broke and Hampton began to use the second lamp. Travelers alleges that the Lamp was defectively designed because, despite representations on the packaging, the Lamp did not meet applicable standards; the Lamp was inherently dangerous because the halogen bulb it required can reach temperatures of up to 970 degrees Fahrenheit; and the instructions furnished with the Lamp failed to warn of the Lamp's instability. Travelers asserts eight claims for relief including causes of action in strict liability, breach of warranty, and negligence. Hunter now moves for summary judgment to dismiss all claims brought by Travelers and all cross-claims and counter claims. Capitol moves to dismiss Travelers' claims and asserts claims for full indemnification and reimbursement of all costs, disbursements and legal fees from Hunter.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Discussion*

**\*2** A motion for summary judgment may be granted under Fed.R.Civ.P. 56 if the entire record demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). The moving parties bear the burden of proving that no material facts are in dispute. *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.3d 54, 57 (2d Cir.1987). When viewing the evidence, the Court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990); *McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir.1997). In determining whether a genuine issue of fact has been raised, a court "must resolve all ambiguities and draw all reasonable inferences against the moving party." *Donahue,* 834 F.3d at 57. Courts should "take care not to abort a genuine factual dispute prematurely and thus deprive a litigant of his day in court." *Id.* at 55. Once the movant shows that there are no genuine issues of material fact, the opposing party must produce sufficient evidence to permit a reasonable jury to return a verdict in its favor, identifying "specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248, 256. If the court finds that there are factual disputes regarding material issues, summary judgment is not appropriate. *See id.* at 249; *see also Repp & K & R Music, Inc. v. Webber,* 132 F.3d 882, 890 (2d Cir.1997) ( "Clearly, the duty of a court on a motion for summary judgment is ... not to decide factual issues. In this regard, the court's task is issue identification, not issue resolution.").

I. *Hunter's Motion for Summary Judgment*

A. *Product Identification*[FN1]

> FN1. Capitol has adopted Hunter's arguments in its cross-motion for summary judgment. Therefore all references to and decisions made based on arguments made by Hunter will apply to Capitol.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

Hunter argues that it cannot be held liable because Travelers cannot prove that Hunter manufactured the Lamp. In a products liability action, the plaintiff bears the burden of proving that the defendant manufactured the product at issue. *See* *210 E. 86 th St. Corp. v. Combustion Eng'g, Inc.,* 821 F.Supp. 125, 142 (S.D.N.Y.1993). A plaintiff must establish by competent proof that the defendant manufactured and placed the injury-causing defective product into the stream of commerce. *Healey v. Firestone Tire & Rubber Co.,* 87 N.Y.2d 596, 601 (N.Y.1996). The evidence of a manufacturer's identity must establish that it is "reasonably probable, not merely possible or evenly balanced" that defendant was the source of the offending product. *Id.* at 601-02; *Moffett v. Harrison & Burrowes Bridge Contractors, Inc.,* 266 A.D .2d 652, 654 (N.Y.App.Div.1999). A manufacturer's identity may be established by circumstantial evidence, even if the allegedly defective product no longer exists. *Healey,* 87 N.Y.2d at 601. However, speculative or conjectural evidence of a manufacturer's identity is not enough. *Id.* at 602; *see also* *Franklin v. Krueger Int'l, Inc.,* No. 96 Civ. 2408, 1997 WL 691424, at *4 (S.D.N.Y. Nov. 5, 1997) (finding plaintiff's attorney's mere assertions that the defective chair resembled a chair manufactured by defendant shown in a photograph insufficient evidence).

**\*3** Hunter argues that its Model 20727 lamp is virtually identical to torchiere lamps manufactured or sold by numerous other companies and that there are several differences between Model 20727 and the Lamp, including differences in hole pattern and weight. Hunter claims that the marking "SF Made in Taiwan 211" found on the base of the Lamp is not used on Model 20727 lamps. Hunter claims it provides an Allen wrench and halogen bulb with every lamp and the absence of these items in the Lamp's packaging proves the Lamp was not a Hunter product. Capitol claims not to have sold any lamps during the relevant time period to Titone. Travelers has offered no evidence such as invoices, photos, other documents or deposition testimony to prove the Lamp's purchase thereby connecting it to a store and subsequently to a manufacturer.

Travelers responds that, while there is no receipt for the Lamp's purchase, there is a reimbursement check from Hampton to Titone dated March 1, 1996, indicating that the lamp was purchased before that date. (Titone Trans. at 65) Titone testified that she purchased two lamps for Hampton at Capitol and Fortunoff stores in New Jersey. Travelers argues that because Fortunoff was granted summary judgment and only Capitol remains as a distributor, Capitol sold the Hunter lamp during the relevant time period. Herman Lebersfeld, President of Capitol, testified that Capitol only sold lamps manufactured by Kenroy International, a subsidiary of Hunter. In particular, Capitol sold Hunter Model 20727 lamps during the relevant time period. (Lebersfeld Trans. at 20-22) Capitol cannot account for the sale of every Hunter lamp making it possible that one Model 20727 lamp was purchased by Titone. Travelers submits that it has not been established whether an Allen wrench came with the Lamp. Hampton's valet Rubin Cox assembled the lamp and testified that he does not remember seeing the wrench nor does he remember looking specifically for one. (Cox Trans. at 121) In addition, the physical remains of the Lamp, including the measurements of almost all of Lamp components, match Hunter exemplar lamps. The diameter of the base of the Lamp and the base of both Hunter exemplar lamps is the same. (Crombie Aff. ¶ 8) The lower and upper support poles of Model 20727 have the same diameter, length and weight as those of the Lamp. (Crombie Aff. ¶ 10)

Travelers has presented sufficient circumstantial evidence to create an issue of fact regarding whether Hunter was the manufacturer of the Lamp and Capitol was the distributor. Hampton's reimbursement check to Titone establishes a time frame for the Lamp's purchase, during which time Capitol cannot account for all of its sales of Model 20727 lamps. The similarity between the Lamp and Model 20727 has been shown to a "reasonable probability." Travelers has met its burden. Summary judgment is denied.

B. *Design Defect*

A defectively designed product is one which, when it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use. *Voss v. Black & Decker Manuf. Co.,* 59 N.Y.2d 102, 107 (N.Y.1983). A product may be defective when it contains a manufacturing flaw, is defectively designed, or is not accompanied by adequate warnings. *Liriano v. Hobart*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

*Corp.*, 92 N.Y.2d 232, 237 (N.Y.1998).

1. Design Defect

**\*4** Travelers claims that the Lamp was defectively designed and inherently dangerous because the surface of the halogen bulb reaches temperatures of up to 970 degrees Farenheit, the Lamp does not include a heat shield or other protective device to prevent the bulb from making contact with flammable objects, and the Lamp's design caused it to be inherently unstable and susceptible to tipping over. *See* Am. Compl. ¶¶ 70, 76-77. Hunter argues that the Lamp's design was not faulty, but that Hampton's use of the lamp in the downbridge position was misuse which caused it to tip over and ignite the fire. The claims of design defect and product misuse are thus intertwined. Accordingly, because issues of fact remain on the claim of product misuse, *see infra* Part I.D., the design defect claim must also be submitted to a jury.

2. Duty to Warn

Travelers alleges that the instructions that accompanied the Lamp failed to adequately warn consumers of the dangers associated with its heat, lack of a protective shield or screen, and its instability. *See* Am. Compl. ¶¶ 84, 89-90. Analyzing a failure to warn claim is an intensely fact-specific process which includes assessing the feasibility and difficulty of issuing warnings under the circumstances, the obviousness of the risk from actual use of the product, the knowledge of the particular product user, and proximate cause. *See Anderson v. Hedstrom Corp.*, 76 F.Supp.2d 422, 440 (S.D.N.Y.1999). A manufacturer may not be liable if the risks were sufficiently obvious to the user without a warning. Because of the factual nature of the inquiry, whether a danger is obvious is most often a jury question. *Id.* at 441; *Liriano*, 92 N.Y.2d at 309. Hunter argues that the danger here was obvious to Hampton based on his prior experience with the lamp falling over and burning a hole in the rug. However, courts have cautioned that judges should be wary of taking the issue of liability away from juries, even in situations where the relevant dangers might seem obvious. *Anderson*, 76 F.Supp.2d at 447. Therefore, whether the danger of using the lamp in the downbridge

manner was an obvious danger should be determined by a jury.

A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known, as well as a duty to warn of the danger of unintended uses of a product which are reasonably foreseeable. *Liriano*, 92 N.Y.2d at 237. A manufacturer may also be liable for failure to warn of foreseeable misuse. *Id.* at 240. Hunter argues that use in the downbridge position was not foreseeable because the Lamp was not depicted for use as a reading lamp. Hunter's expert Warren testified that proper use of the lamp was indicated by the diagrams, description as "torchiere" and the nature of the assembly. However, no language regarding what Hunter considered the "proper" configuration of its Model 20727 lamp is stated anywhere on the box, or anywhere on Hunter's Assembly Instructions. (Crombie Aff. ¶ 20) Paragraph 6 of Model 20727's Assembly Instructions states: "[t]he set screw is used to limit the movement of the arms. Raise the arm to a vertical position. Use the Allen wrench provided to turn in the set screw. To adjust the position of the arm assembly, loosen the adjusting handle, position the arms to the desired angle, then tighten the adjusting handle." Hunter's instructions allowed for adjustment to any position. The instructions do not warn against using the lamp in the downbridge position. Because the adequacy of warnings furnished by a manufacturer to avoid any foreseeable misuse by a consumer presents questions of fact, *Johnson v. Johnson Chem. Co., Inc.*, 588 N.Y.S .2d 607, 610 (N.Y.App.Div.1992), summary judgment is denied on this ground.

**\*5** Additionally, there is an issue of fact as to proximate cause. Travelers must show that the presence of a warning would have caused Hampton and his staff to change their behavior. Where "a warning would not have given [a user] any better knowledge of the [product's's] danger than he already had from prior use or than was readily discernible from observation, the absence of a warning could not have proximately caused his injuries." *Barnes v. Pine Tree Mach.*, 261 A.D.2d 295, 295-96 (N.Y.App.Div.1999). It is unknown whether, if Hunter had issued a warning against doing so, Hampton and his staff would not have used the lamp in the downbridge position. Hunter argues that the warning would not have had an effect because

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

Hampton's prior experience with the first lamp falling over and burning the rug did not cause him to change his behavior. Hampton argues that because a serious fire did not result from these previous incidents, he was not aware of the possible damage. Further, because the first lamp ultimately broke, Hampton and his staff could have concluded that it fell over because it was always broken. Hunter contends that Cox's testimony regarding how similar he believed the two lamps to be shows that Hampton and his staff were aware of the dangers. (Cox. Trans. at 130) Therefore, there is an issue of fact as to what effect a warning would have had on the behavior of Hampton and his staff. Summary judgment is denied.

C. *Subsequent modification*

Hunter argues that it cannot be held liable because Cox improperly assembled the Lamp by not using the Allen wrench it claims it provides with every Model 20727 lamp. Hunter argues that using the lamp in the downbridge position would not have been possible had the setscrews been properly tightened with the Allen wrench. Hunter argues that this faulty assembly and use of the lamp in as unintended manner constituted a subsequent modification to the lamp.

When a consumer makes a subsequent modification which *substantially alters* the product and is the proximate cause of plaintiff's injuries, the manufacturer cannot be held liable. *Robinson v. Reed-Prentice,* 49 N.Y.2d 471, 485 (N.Y.1980) (emphasis added). A user's substantial modifications of a product that render a safe product defective are not the manufacturer's responsibility. *Id.* at 479. Material alterations that destroy the "functional utility of a key safety feature" are not a manufacturer's responsibility. *Id.* at 480. When a product's design incorporates a certain safety feature, a manufacturer may be held liable under a design defect theory even though the removal of that safety feature caused the accident, provided the product was purposefully manufactured to permit its use without the safety guard. *Lopez v. Precision Papers,* 67 N.Y.2d 871, 875 (N.Y.1986).

Hunter claims that the setscrews were a safety device; however, Hunter did not submit evidence that the setscrew

was intended or marked as a safety device. There were no warnings or instructions regarding using the lamp in a particular manner. Further, it is unclear whether the Allen wrench was in the box of the lamp Hampton purchased allowing for the recommended assembly. Therefore, issues of fact remain regarding substantial modification and summary judgment is denied.

D. *Product Misuse*

**\*6** Hunter claims that Hampton's use of the Lamp in the downbridge position constitutes misuse and absolves Hunter of liability. A manufacturer may be liable for failing to warn of foreseeable misuse of its product. *Liriano,* 700 N.E.2d at 304. Foreseeability requires knowledge of a certain misuse by the particular defendant or in the industry generally. *See Amatulli v. Delhi Constr. Corp.,* 77 N.Y.2d 525, 533 (N.Y.1991). Without evidence of knowledge, a defendant will not be held liable. *Id.* However, even when a consumer admits misuse, a question of fact remains regarding liability. The general rule is that there may be liability in such cases when it is proved that the abnormal use was reasonably foreseeable. *See Johnson Chem. Co.,* 588 N.Y.S.2d at 610, whether a particular misuse is reasonably foreseeable is ordinarily a jury question. *Id.* When a jury might conclude that plaintiff misused the product in a way which ought to have been foreseen by the defendants, an issue of fact has been demonstrated as to whether the warnings furnished by the defendant manufacturer were adequate. *Id.* Here, whether Hampton's use of the lamp was foreseeable and required a warning is a question of fact for the jury. Accordingly, summary judgment is denied.

E. *Breach of Warranty*

Travelers has conceded to Hunter's arguments regarding the warranty claims. Accordingly, those claims are dismissed.

F. *Capitol's Motion*

Capitol moved for summary judgment adopting Hunter's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

arguments on product identification and defectiveness, and making a separate argument on Travelers' negligence claim. Additionally, Capitol seeks indemnification and reimbursement from Hunter. In response, Hunter argues first that Capitol violated Local Civil Rule 56.1 by not submitting a sworn statement of material facts. Local Civil Rule 56.1 requires there "be annexed to the notice of motion [for summary judgment] a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion." Local Civ. R. 56.1(a). The rule further states that "[e]ach statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Local Civ. R. 56.1(d). Capitol submitted only the Declaration of its counsel Joseph J. Gulino in support of its motion which makes references to exhibits in two paragraphs when referring to its motion papers and to Lebersfeld's affidavit. (Gulino Decl. ¶¶ 5, 9)

Failure to comply with the requirements of Local Civil Rule 56.1 constitutes grounds for denial of a motion. *MTV Networks v. Lane,* 998 F.Supp. 390, 393 (S.D.N.Y.1998) (denying defendant's motion for summary judgment because his papers failed to establish the absence of a factual dispute); *see also Rossi v. New York City Police Dep't,* No. 94 Civ. 5113(JFK), 1998 WL 65999, at *4 (S.D.N.Y. Feb. 17, 1998) (denying plaintiff's motion for summary judgment for failure to comply with Local Civil Rule 56.1 by not annexing a short and concise statement of material facts). The moving party's failure to comply with the Rule is particularly troubling because the moving party bears the burden of demonstrating that there is no genuine issue of material fact. *Reiss, et al. v. County of Rockland,* No. 84 Civ.1906, 1985 WL 426, at *1 (S.D.N.Y. Mar. 19, 1985) (denying summary judgment where movant submitted no statement at all and granting leave to re-file in compliance with the rule). A court may decide not to consider any statements made by a party in their Rule 56.1 statement that are not supported by a citation to the record. *See Shepard v. Frontier Communication Servs.,* 92 F.Supp.2d 279, 284 (S.D.N.Y.2000) (granting defendants' motion for summary judgment where several statements of disputed facts were not supported by a citation to the record).

**\*7** A district court has broad discretion whether to overlook a party's failure to comply with local court rules. *Holtz v. Rockefelier & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001). While this Court could deny Capitol's motion on the basis of Capitol's failure to comply with Local Civil Rule 56.1, there is no need to do so on that basis as Capitol's motion is denied on other grounds.

A. *Negligence*

Capitol argues that it is not liable in negligence because the lamp was sold in a sealed container and no alterations were made to the lamp. Under New York law, a retailer can be held liable in negligence if it fails to detect a dangerous condition that it could have discovered during a normal inspection while the product was in its possession. *See McLaughlin v. Mine Safety Appliances Co.,* 11 N.Y.2d 62, 68 (1962); *Schwartz v. Macrose Lumber & Trim Co.,* 270 N.Y.S.2d 875, 886-87 (N.Y.Sup.Ct.1966). A seller has a duty to give reasonable warnings of known latent dangers. *McLaughlin,* 11 N.Y.2d at 68-69. However, a retailer cannot be held liable for injuries sustained from the contents of a sealed product even though a testimony have uncovered a potential danger; no such obligation is imposed on a retailer. *Brownstone v. Times Square Stage Lighting Co., Inc.,* 333 N.Y.S.2d 781, 782 (N.Y.App.Div.1972); *Alfieri v. Cabot Corp.,* 235 N.Y.S.2d 753, 757 (N.Y.App.Div.1962), *aff'd* 13 N.Y.2d 1027 (N.Y.1963).

Lebersfeld testified that Capitol assembled several of its lamps, including Model 20727, as floor models for display and sale to customers. (Lebersfeld Trans. at 149-50, 160) Titone also testified that the lamps she purchased were on display in the store showrooms (Titone Trans. at p. 21, 38, 92) and that the salesperson demonstrated using the lamp with the bulb tilted toward either the ceiling or floor. (*Id.* at 24) Capitol claims the packages were sealed and it had no duty to inspect them. No evidence has been submitted regarding whether Capitol inspected the display lamps. An inspection of those lamps may have revealed a danger. Therefore an issue of fact remains as to whether Capitol met its duty to inspect. Summary judgment is denied.

B. *Indemnification and Reimbursement*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

Capitol argues that it is entitled to indemnification and reimbursement for fees, costs and disbursements from Hunter. Capitol argued that it engaged in no wrongdoing and full responsibility lies with Hunter. Capitol's motion for indemnification is premature.

Indemnity obligations can be created by contract or implied in law. Here there was no contractual agreement; the issue then is whether Capitol is entitled to common law indemnification. The right to indemnification may be implied by law to prevent an unfair result or the unjust enrichment of one party at the expense of another. *Cochrane v. Warwick Assoc., Inc.,* 723 N.Y.S.2d 506, 508 (N.Y.App.Div.2001). The right of common law indemnification belongs to parties found vicariously liable without proof of any negligence or active fault on their own part. *Colrer v. K Mart Corp.,* 709 N.Y.S.2d 758, 759 (N.Y.App.Div.2000). A finding that Capitol was negligent would preclude an indemnity award. Because an issue of fact remains as to Capitol's negligence, this Court cannot at this time find Hunter liable in indemnification. Capitol's motion is denied.

**\*8** Capitol has moved to recover attorney's fees and costs incurred during this litigation. The universal rule is not to allow a litigant to recover damages for the amounts incurred in the successful prosecution or defense of its rights. *Mighty Midgets Inc. v. Centennial Ins. Co.,* 47 N.Y.2d 12, 21-22 (N.Y.1979). Under the American Rule, no attorneys' fees are recoverable absent express statutory authority for such an award. *SeePennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 616, 561-62 (1986); *Jane Doe v. Karadzic,* No. 93 Civ. 0878, 2001 WL 986545, at [*]2 (S.D.N.Y. Aug. 28, 2001). Here this is no statutory authority for an award. Therefore, Capitol's motion is denied.

*Conclusion*

For the reasons outlined above, Hunter's and Capitol's Motions for summary Judgment are hereby denied. Capitol's motion for indemnification, and reimbursement for costs and fees is denied.

The parties are hereby given a Ready for Trial date of May 13, 2002. A copy of this Court's Pre-trial Requirements is forwarded to counsel with this Opinion.

SO ORDERED.

S.D.N.Y.,2002.
Travelers Indem. Co. of Illinois v. Hunter Fan Co., Inc.
Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

(Cite as: 1998 WL 312375 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Juan CANDELARIA, Plaintiff,

v.

Robert B. GREIFINGER; Bethlynn Terry; Anthony J. Annucci; Susan J. Butler; Dr. Lester Wright; Thomas Lavalley; Daniel A. Senkowski; Philip Coombe, Jr.; Mark R. Chassin, M.D.,M.P.P., M.P.H.; Public Health Council of the State of New York; Salvatore Canonico, Joseph Ostrowsky; Richard L. Herzfeld; David Neier; Quentin Moore; Kings County District Attorney; New York City Police Department; Supreme Court of the State of New York-County of Kings Criminal Term; George Pataki; Brown and Williamson Tobacco Corporation; Republic Tobacco Company, Defendants.

No. 96-CV-0017 (RSP/DS).

June 8, 1998.

Juan Candelaria, plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Department of Law, the Capitol, Albany, New York, for State Defendants, Howard L. Zwickel, Asst. Attorney General, of counsel.

MEMORANDUM-DECISION AND ORDER

POOLER, J.

**\*1** This matter comes to me following a report-recommendation by Magistrate Judge Daniel Scanlon, duly filed on the 24th day of April, 1998. Ten days after service thereof, the Clerk of the Court has sent me the entire file, including any and all objections filed by the parties. No party filed objections.

In this action pursuant to the Rehabilitation Act, the Americans with Disabilities Act, and various civil rights statutes, Candelaria challenges the conditions of his confinement at Clinton Correctional Facility ("Clinton"). Candelaria moved for injunctive relief requiring Clinton to transport physically disabled inmates in a wheelchair-accessible vehicle. Dkt. No. 15. On April 9, 1997, I concluded that Candelaria's motion could not be addressed on the record before me and remanded the issue to the magistrate judge for further consideration. Dkt. No. 99. Candelaria also renewed his motion for appointment of counsel, dkt. nos. 115, 116, and 121, and requested an extension of time in which to provide the United States Marshall Service with information necessary to effect service of process on certain of the defendants, dkt. no. 121.

The magistrate judge recommended I deny as moot Candelaria's motion for injunctive relief, on the grounds that Candelaria had been transferred from Clinton to Elmira Correctional Facility. Dkt. No. 123. In addition, the magistrate judge denied Candelaria's motion for appointment of counsel, granted his motion for an extension of time in which to provide information relevant to service, and recommended that, in the event Candelaria fails to provide the Court with completed USM-285 forms for each of the unserved defendants within forty-five (45) days of the date of the magistrate judge's order, the action

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

(Cite as: 1998 WL 312375 (N.D.N.Y.))

be dismissed as to those defendants for whom Candelaria had not submitted the forms. *Id.*

After careful review of the record, including the report-recommendation, to which the parties submitted no objections, I conclude that the magistrate judge's findings were not clearly erroneous. It is therefore

ORDERED that the report-recommendation is approved, and it is further

ORDERED that Candelaria's motion for injunctive relief concerning the transportation of disabled inmates is DENIED as moot, and it is further

ORDERED that if Candelaria fails to provide, within forty-five (45) days of the date of this order, completed USM-285 forms for each of the unserved defendants, this action will be dismissed without further order of the Court as to those defendants for whom Candelaria has not submitted the forms, and it is further

ORDERED that the Clerk of the Court serve a copy of this order on the parties by regular mail.

IT IS SO ORDERED.

ORDER and REPORT-RECOMMENDATION

SCANLON, Magistrate J.

Plaintiff Juan Candelaria filed this civil rights action in January 1996 to challenge his conviction and the conditions of his confinement at the Clinton Correctional Facility ("Clinton"). Candelaria alleges causes of action pursuant to the Rehabilitation Act, the Americans with Disabilities Act, and various civil rights statutes. This matter is before the Court for further consideration of that portion of plaintiff's motion for injunctive relief which relates to the adequacy of Clinton's method of transporting physically disabled inmates, in light of the parties' submissions filed pursuant to this Court's Order filed July 9, 1997. *See* Dkt. No. 107. Also before the Court are renewed motions from Candelaria for the appointment of counsel (Dkt. Nos. 115, 116 and 121), and a request for a further extension of time in which to provide the U.S. Marshal Service with certain information necessary to effect service of process on the remaining defendants. *See* Dkt. No. 121.[FN1] These matters will be addressed separately below.

FN1. The Court notes that Candelaria submitted with one of his requests for appointment of counsel a document entitled "Consolidated Next of Kin-Powers of Attorney-and-Last Will and Testament." *See* Dkt. No. 116.

*I. Injunctive Relief*

**\*2** Candelaria is paralyzed from the waist down and is confined to a wheelchair. By his motion for injunctive relief, Candelaria sought an order of this Court requiring Clinton to transport physically disabled inmates such as himself in a wheelchair-accessible van. According to plaintiff, Clinton's use of a prison station wagon which was neither equipped nor designed to accommodate passengers with physical impairments was both unsafe and in violation of his civil and constitutional rights. *See* Dkt. No. 68 at ¶ 18.

District Judge Rosemary S. Pooler determined that Candelaria's claim regarding Clinton's method of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

(Cite as: 1998 WL 312375 (N.D.N.Y.))

transporting physically disabled inmates could not be addressed on the record then before the Court and remanded that issue to this Court for review upon further factual development. *See* Dkt. No. 99. By Order filed July 9, 1997, this Court directed the state defendants to submit affidavits, together with supporting documentary evidence, if any, on the adequacy of Clinton's method of transporting such inmates. *See* Dkt. No. 107. Plaintiff was afforded an opportunity to respond to such submission and the Court reserved decision on whether an evidentiary hearing would be required prior to the resolution of plaintiff's motion for injunctive relief. *Id.* at 4.

Pursuant to the Court's Order, the state defendants filed the affidavits of John Mitchell, the Nurse Administrator at Clinton, and Mark Vann, a Correctional Lieutenant at Clinton. *See* Dkt. No. 114. By these affidavits, the state defendants continue to assert that physically disabled inmates (including Candelaria) have been transported without incident while sitting on a seat in one of the vans used for this purpose. *See id.* Candelaria filed responding papers in which he asserts that inmates are sometimes required to sit on the floor of the van and that, moreover, disabled persons such as himself are not always able to sit safely on a van seat. *See* Dkt. No. 117.

Since the entry of the Court's Order, Candelaria has been transferred to the Elmira Correctional Facility ("Elmira"), where he has been housed since December 2, 1997. *See* Dkt. No. 121.[FN2]

> FN2. Candelaria was transferred to Green Haven Correctional Facility on July 27, 1997, and was thereafter hospitalized from August 25, 1997 until December 2, 1997, when he was discharged to Elmira. *See* Dkt. No. 121.

It is settled in this Circuit that a transfer from a prison

facility moots an action for injunctive relief against the transferring facility. *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (citations omitted) (finding request for injunctive relief moot where inmate transferred from subject facilities). Accordingly, the Court recommends that plaintiff's motion for injunctive relief be denied without prejudice to renew in the event that he is transported from Elmira to outside medical visits in a vehicle which is not equipped for the transport of wheelchair-bound inmates.[FN3]

> FN3. In recommending that plaintiff's motion for injunctive relief be denied as moot, the Court makes no findings with regard to the adequacy of the method of transport utilized at Clinton or the need for an evidentiary hearing to determine same.

## II. Appointment of Counsel

Turning to Candelaria's requests for the appointment of counsel, a review of the file in this matter, including plaintiff's most recent submissions requesting appointment of counsel (*see* Dkt. Nos. 115, 116 and 121), in conjunction with the factors a court is to consider when ruling on such motions, *see* Hodge v. Police Officers, 802 F.2d 58, 61 (2d Cir.1986); Hendricks v. Coughlin, 114 F.3d 390 (2d Cir.1997), indicates no change of circumstances that would warrant appointment of counsel *pro bono* for the plaintiff at the present time. In this regard, Candelaria's apparent poor health does not appear as a matter of record in this action to have prevented him from effectively litigating this action. To the contrary, plaintiff has actively pursued his lawsuit against the defendants and has filed numerous motions during the course of this litigation.

**\*3** Accordingly, plaintiff's requests for appointment of counsel are denied for the reasons stated in this Court's prior order concerning this issue. *See* Dkt. No. 107.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

(Cite as: 1998 WL 312375 (N.D.N.Y.))

*III. Service of Process*

By its July Order, this Court granted Candelaria's requests for an extension of time in which to effect service of process on four individuals and seven entities named as defendants in this action. *See* Dkt. No. 107 at 18-20. Upon the completion of a new USM-285 form for each unserved defendant containing whatever information Candelaria possessed or was able to obtain in a reasonable period of time, the U.S. Marshals Service (the "Service") was directed to attempt to effect service of process on these defendants in accordance with the Federal Rules of Civil Procedure. *See* Dkt. No. 107.[FN4]

> **FN4.** The following defendants have not yet been served with the summons and complaint in this action: Mark E. Chassin, M.D.; Salvatore Canonico; Joseph Ostrowsky; Quentin Moore; Brown & Williamson Tobacco Corporation; Republic Tobacco, Company; Public Health Council of the State of New York; New York City Police Department; Supreme Court of the State of New York; County of Kings, Criminal Division; and Kings County District Attorney. *See* Dkt. No. 107.

Candelaria now seeks a further extension of time to permit him to provide the Service with the completed USM-285 forms. *See* Dkt. No. 121. According to Candelaria, his three transfers, including a lengthy hospitalization, prevented him from timely completing that paperwork.[FN5]

> **FN5.** Candelaria also contends that he is now confined to the infirmary at Elmira Correctional Facility, where he is not permitted "to possess a large quantity of legal papers." *Id.* at 1.

Plaintiff is hereby granted a further extension of forty-five (45) days from the filing date of this Order in which to provide the Service with the completed USM-285 forms. Said forms shall contain any and all information presently known to plaintiff concerning (i) the whereabouts of the individual defendants, and (ii) the name(s) of the individual(s) upon whom service can be effected on behalf of the seven entities. Upon receipt of same, the Service shall attempt to effect service of process on the these defendants in accordance with the Federal Rules of Civil Procedure and the July Order.[FN6] Candelaria is advised that his failure to timely provide the Service with the completed USM-285 forms will result in the dismissal of his action as against those defendants for whom plaintiff has not completed them.

> **FN6.** The Service is obligated to effect service of process in accordance with the Federal Rules of Civil Procedure and, if necessary, the Service must make multiple attempts at service. *See Armstrong v. Sears,* 33 F.3d 182, 188 (2d Cir.1994) (where defendant refused to acknowledge Service's request for waiver under Rule 4(d), Service must effect personal service under Rule 4(e)). *Accord, Hurlburt v. Zaunbrecher,* 169 F.R.D. 258, 259 (N.D.N.Y.1996) (Smith, M.J.).

WHEREFORE, it is hereby

RECOMMENDED, that Candelaria's motion for a preliminary injunction (Dkt. No. 19) be denied as moot insofar as it challenges the method of transporting physically disabled inmates at the Clinton Correctional Facility, and it is further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

(Cite as: 1998 WL 312375 (N.D.N.Y.))

ORDERED, that Candelaria's requests for the appointment of counsel (Dkt. Nos. 115, 116 and 121) are denied, and it is further

ORDERED, that Candelaria's request for an extension of time in which to provide the Service with completed USM-285 forms for each of the unserved defendants in this action is granted. Candelaria shall provide such forms, containing all of the information presently known to him relative to effecting service of process on those defendants within forty-five (45) days of the filing date of this Order, and it is further

RECOMMENDED, that if plaintiff fails to timely provide completed USM-285 forms as discussed herein, this action be dismissed as against those defendants for whom plaintiff has not submitted them, and it is further

ORDERED, that the Service shall attempt to serve each of the remaining defendants in accordance with the Federal Rules of Civil Procedure and the terms of the July Order promptly upon receipt of the completed USM-285 forms from Candelaria, and it is further

**\*4** ORDERED, that the Clerk serve a copy of this Order on the parties hereto, and on the Service, by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW, *Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Secretary*

*of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e) and 72.

IT IS SO ORDERED.

N.D.N.Y.,1998.

Candelaria v. Greifinger

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

**c**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Raymond GONZALES, Plaintiff,
v.
Dr. Lester WRIGHT, et al.,, Defendants.
No. 9:06-CV-1424 (JMH).

Feb. 23, 2010.
West KeySummary**Civil Rights 78** 🗝 1358

78 Civil Rights

78III Federal Remedies in General
78k1353 Liability of Public Officials
78k1358 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
Prison officials' motion for summary judgment was properly granted in prisoner's § 1983 action where prisoner failed to demonstrate they were involved in any alleged constitutional violation. Prisoner failed to demonstrate prison superintendent and deputy were personally involved in any alleged constitutional violation for denial of medical care and his claims against them were properly dismissed. Additionally, prisoner failed to allege any conduct by medical director or facility health director regarding his treatment, but merely named them in their official capacity and for "responsibility of medical care of inmates," but the fact that they held positions of medical director and facility health administrator was insufficient to provide requisite personal involvement to state a constitutional claim. 42 U.S.C.A. § 1983.
Raymond Gonzales, Romulus, NY, pro se.

Roger W. Kinsey, Office of Attorney General, Albany, NY, for Defendants.

**DECISION and ORDER**

HOOD, District Judge.

*1 Raymond Gonzales complains in this action brought pursuant to 42 U.S.C. § 1983 that, while he was incarcerated at the Upstate Correctional Facility ("Upstate"), Defendants, various New York penal officers and employees, denied him the protections of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.FN1 The matter is before the Court on Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 81). Plaintiff having responded to the motion *sub judice* (Dkt. No. 88), it is ripe for review.

FN1. The Eleventh Amendment recognizes the fundamental principle of sovereign immunity. Thus, the Eleventh Amendment bars any suit in federal court against a state by citizens of another state. Further, the Supreme Court has held that the amendment also bars a citizen from bringing a suit against his or her own state in federal court. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Sovereign immunity under the Eleventh Amendment protects state agencies and department sas well as the state itself. As the Supreme Court has noted: "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the Defendant is proscribed by the Eleventh Amendment.... This jurisdictional bar applies regardless of the relief sought." *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Moreover, "[o]bviously, state officials literally are persons. But a suit against a state official in his official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

As Plaintiff is suing Defendants only in their official capacities, the action would be subject to dismissal on this ground alone. However, Plaintiff's failure to seek relief against

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

Defendants in their individual capacities could be remedied through amendment.

**Plaintiff's Allegations**

Plaintiff claims that beginning shortly after his arrival on July 3, 2006, in Building 10 SHU at Upstate Correctional Facility, some unidentified "infections harmful chemical substance" came out of the ventilation system. Although Defendants John Finazzo and Gerald Caron looked for the substance, they claimed not to see anything and mocked him. (Dkt. No. 1, ¶¶ 38, 39). In response to his ongoing complaints, Plaintiff claims that Defendants James Spinner, Sheen Pombrio, Brian Grant, Michael Riley, Scott Dumas, Jonathan Price, Jeffrey Hyde, William Brown, and Lynn Furnace looked for the substance, but claimed that they did not see nor find anything. (Dkt. No. 1, ¶¶ 41, 42).

Plaintiff also claims that all the above-named Defendants, along with Defendants Steven Salls, Jeffrey Bezio, Ricky Colton, N. Guerin, Dean Sauther, Brian Bogardus, Michael Welch, Michael Albert, and non-movant D. Ravelle [FN2], made comments and placed "infections harmful chemical substance" in the ventilation system in retaliation for filing lawsuits at other facilities and that Defendants Robert Woods and Norman Bezio directed this conspiracy. (Dkt. No. 1, ¶¶ 45-50). Defendant Bogardus is alleged to have gestured and looked with satisfaction and gladness towards the ventilation system while delivering mail. (Dkt. No. 1, ¶ 55). Plaintiff also states that the above-named Defendants tried to poison his food with an unknown "infectious chemical substance." (Dkt. No. 1, ¶¶ 108-110) [FN3].

> **FN2.** Although named as a Defendant, D. Ravelle has never been served with process or appeared in this action. By separate order, Plaintiff will be required to show cause why this action should not be dismissed as to this Defendant pursuant to Fed.R.Civ.P. 4(m).

> **FN3.** Additionally, though not in his complaint, Plaintiff also alleges that as a part of this conspiracy laser beams were shot at him through the lights in his cell. (Dkt. No. 81-3, Ex. A, 14.)

Plaintiff further alleges that the above Defendants denied him access to the courts by denying him a pen needed to complete his 45 page, 177 paragraph complaint as well as legal work related to his other pending lawsuits. (Dkt. No. 1, ¶¶ 162-67). Plaintiff claims that he requested a pen from the correctional officers as supplies were given out and was repeatedly denied one. (Dkt. No. 1, ¶¶ 127, 129, 132, 162-67, 170-71).

Additionally, Plaintiff alleges that after his food was supposedly tainted he refused to return his food tray (Dkt. No. 1, ¶¶ 130, 168-69) which prompted a search of Plaintiffs' cell. (Dkt. No. 1, ¶¶ 126, 134-41). Plaintiff further alleges that during the cell search, the officers damaged his legal documents in retaliation for his other lawsuits against DOCS employees at other correctional facilities. (Dkt. No. 1, ¶¶ 142-43). Plaintiff further alleges that the cell search was unlawful because he said he returned all the pieces of the broken food tray. Therefore, the officers had no right to conduct the search, and did it for the sole purpose of retaliation. (Dkt. No. 1, ¶¶ 142-43).

**\*2** Plaintiff alleges that due to the "infectious harmful chemicals," his face, chest, and other body parts became infected. (Dkt. No. 1, ¶ 43). Due to Plaintiff's alleged "infections, he made several sick call requests, requesting medical attention for his "infections." (Dkt. No. 1, ¶¶ 44, 74, 85). Plaintiff also wrote letters to Facility Health Service Director Wiessman requesting medical care. (Dkt. No. 1, ¶ 74). Plaintiff also wrote Lester Wright, the Associate Commissioner of Health Services/Chief Medical Officer of New York State Department of Correctional Services at Albany, asking Wright to order Defendant Louise Tichenor to provide Plaintiff with medical care. (Dkt. No. 1, ¶ 78). Plaintiff claims that, although seen by Defendant Tichenor on July 14, 2006, he did not receive proper medical care. (Dkt. No. 1, ¶ 77). Thus, Plaintiff alleges that Defendant Evelyn Wiessman, failed to properly supervise Plaintiff's medical providers. (Dkt. No. 1, ¶ 7A).

Plaintiff also alleges that Defendant Tichenor failed to adequately examine him during his medical call out on July 14, 2006, asking with intrigue what had happened to Plaintiff's skin, but failing to properly examine Plaintiff's chest, back, shoulders, testicles and penis. (Dkt. No. 1, ¶¶ 64, 66). Plaintiff also states that Defendant Tichenor

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

prescribed him Loratadine, which Plaintiff refused to take because Plaintiff knew that he was given the medicine only to conceal and hide the evidence of the damage caused to him by the "infectious substances." (Dkt. No. 1, ¶¶ 68-69, 72). Plaintiff then states that he was given a prescription cream for his skin problem, but not enough of it. (Dkt. No. 1, ¶¶ 73, 75).

Plaintiff also alleges that Defendant Tichenor wrongfully discontinued and denied Plaintiff the nutritional supplement, Ensure, although Plaintiff acknowledges that he failed to comply with facility procedure by refusing to drink the Ensure in front of the Nurses. (Dkt. No. 1, ¶¶ 145-60).

Finally, Plaintiff alleges that nurses J. Chesbrough, R. Holmes, and Walsh failed to provide Plaintiff with non-prescription medication even though Plaintiff completed all required sick call procedures. (Dkt. No. 1, ¶¶ 85, 89-106). Plaintiff contends that all these Defendants were deliberately indifferent to his medical needs.

### Defendants' Statement of Material Facts

Defendants have provided a different view of what happened while Plaintiff was confined at Upstate, as detailed in their statement of material facts. Although quite lengthy, they are recounted in detail below to provide a better understanding of Defendants' position in the matter:

1. Plaintiff Raymond Gonzalez was seen on a nearly daily basis from his arrival at Upstate on or about July 3, 2006. Weissman Declaration, Exhibit 1.

2. On July 5, 2006, Plaintiff demanded that he be given skin cream and became very agitated when he was told that he had to wait until he was examined by the PA in order to receive the cream. Weissman Declaration, Exhibit 2.

**\*3** 3. Plaintiff also received an orientation on sick call procedure on July 5, 2006. Weissman Declaration, Exhibit 3.

4. On July 6, 2006, Plaintiff refused to drink his Ensure in the presence of the nurse and became very vulgar and abusive. As a result, Plaintiff received a misbehavior report. Weissman Declaration, Exhibit 4.

5. On July 6, 2006, it was once again explained to Plaintiff that medical procedure required that Plaintiff consume the Ensure in view of the nurse to insure that it was properly consumed. *Id.*

6. Plaintiff was also informed that Ensure and skin cream would be withheld pending an examination by the PA. *Id.*

7. Plaintiff was again seen on July 8, 2006 and July 10, 2006 and requested skin cream and indigestion aids. Plaintiff did not exhibit any symptoms and continued to be very demanding. Weissman Declaration, Exhibit 5.

8. On July 12, 2006, Plaintiff demanded Ensure, ibuprofen and hemorrhoid cream and refused hepatitis B vaccination. Weissman Declaration, Exhibit 6.

9. On July 14, 2006, Plaintiff was examined by the PA. Weissman Declaration, Exhibit 8.

10. On July 15, 2006, Plaintiff demanded the medication ordered by the PA. Weissman Declaration, Exhibit 7.

11. On July 17, 2006, Plaintiff refused to be weighed and refused medication for allergies. *Id.*

12. On July 19, 20, and 21, 2006 Plaintiff refused treatment, demanded to see Dr. Weissman and was vulgar and loud indicating he did not want further treatment from the PA. Weissman Declaration, Exhibit 9.

13. On July 24, 2006, Plaintiff refused to be examined and became verbally abusive, using the vilest of language, threats and sexually explicit rants. Weissman Declaration, Exhibit 10.

14. On July 25, 2006, the refusals and tirades were repeated and Plaintiff refused treatment. *Id.*

15. On July 26, 2006, Plaintiff once again refused to cooperate in his examination and treatment could not be

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

provided. Once again, Plaintiff began to be verbally abusive, using the vilest of language, threats and sexually explicit rants. Weissman Declaration, Exhibit 11.

16. On July 27, 2006, Plaintiff rejected his medication by throwing it on the floor and indicating that he did not want to be examined or treated by the PA. *Id.*

17. On July 28, 2007, Plaintiff refused treatment yet again. Additionally, Plaintiff continued to express that he did not want what was being prescribed. Weissman Declaration, Exhibit 12.

18. On July 29, 2006, Plaintiff once again refused to be examined and insisted that he be given medication without examination. Plaintiff also persisted in his abusive and vulgar language until he was given a misbehavior report. Weissman Declaration, Exhibit 13.

19. On July 30, 2006, Plaintiff continued to refuse examination, making treatment impossible. Plaintiff also refused to consume Ensure as directed and treated the nurse to more vulgarity. *Id.*

20. On July 31, 2006, Plaintiff was again seen and reminded that he was required to consume the Ensure in the presence of the nurse or it would be discontinued. Examination revealed that Plaintiff's face was clear and had no redness, however, Plaintiff continued to insist that his face was real bad, dry and itching. Weissman Declaration, Exhibit 14.

**\*4** 21. On August 1, 2006, Plaintiff once again refused to consume Ensure in the presence of the nurse and was warned again that non-compliance would cause the Ensure to be stopped. Plaintiff continued to refuse to comply and the Ensure was ordered stopped. Weissman Declaration, Exhibits 15-16.

22. On August 2, 2006, Plaintiff again refused to be examined and became vulgar and abusive. An attempt to talk with Plaintiff about taking Ensure was met with more abuse and vulgarity. Plaintiff was finally given a misbehavior report when he began to threaten staff. Weissman Declaration, Exhibit 17.

23. On August 4, 2006, Plaintiff again refused to be examined and refused treatment. Once more the nurse was treated to a vulgar and threat filled tirade. *Id.*

24. On August 5, 2006, Plaintiff was non-compliant with sick call procedure. *Id.*

25. On August 6, 2006, Plaintiff again refused to be examined and refused treatment. Once more the nurse was treated to a vulgar and threat filled tirade. Weissman Declaration, Exhibit 18.

26. On August 7, 2006, Plaintiff's medicine was renewed and once again he was uncooperative and vulgar and received another misbehavior report. Weissman Declaration, Exhibit 19.

27. On August 9, 2006, the PA examined Plaintiff and Plaintiff was once more instructed that he must talk to and cooperate with the nurse in order to be treated. *Id.*

28. On August 8, 2006, Plaintiff refused to speak to the nurse and instead simply held up a piece of paper. Weissman Declaration, Exhibit 20.

29. On August 10, 2006, Plaintiff refused to speak to the nurse and instead simply held up a piece of paper. When told that he must cooperate, Plaintiff once more became enraged and vulgar and refused treatment. *Id.*

30. On August 12, 2006, Plaintiff failed to comply with sick call procedures. Weissman Declaration, Exhibit 21.

31. On August 13, 2006, Plaintiff failed to comply with sick call procedures and instead exposed himself and stood silently as the nurse tried to examine and find out symptoms. *Id.*

32. On August 14 and 16, 2006, once more Plaintiff refused to speak and held up a piece of paper when asked what he needed. The session was ended with a vulgar threat. Weissman Declaration, Exhibits 21 and 22.

33. On August 17, 2006, Plaintiff was treated for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

indigestion and allergies. Weissman Declaration, Exhibit 22.

34. On August 18 and 19, 2006, Plaintiff refused to speak to the nurse doing sick call[,] thus, refusing to be evaluated and instead held up a piece of paper. Weissman Declaration, Exhibits 22 and 23.

35. On August 21, 2006, Plaintiff allowed an evaluation and was found to be without nasal congestion and a minor rash for which he was given medication. It was noted that his face was clear of any rash. Weissman Declaration, Exhibit 24.

36. On August 22, 2006, Plaintiff was once again noncompliant and abusive rendering any attempt to examine and treat him as impossible. *Id.*

*5 37. On August 23, 2006, Plaintiff was once again noncompliant and abusive rendering any attempt to examine and treat him as impossible. Medications were reordered in spite of Plaintiff's lack of cooperation. Weissman Declaration, Exhibit 25.

38. On August 24, 2006, Plaintiff complained of gas and a headache and allowed an evaluation and was treated for a headache and given antacid. *Id.*

39. On August 25 and 27, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibits 26 and 27.

40. On August 28, 2006, Plaintiff complained of gas and a headache and allowed an evaluation and was treated for a headache and given antacid. Weissman Declaration, Exhibit 27.

41. On August 31, 2006 and September 1, 2006, Plaintiff was once again non-compliant, vulgar and abusive rendering any attempt to examine and treat him as impossible. Weissman Declaration, Exhibits 27-28.

42. On September 4, 2006, Plaintiff complained that he had a rash on his face, chest and back. Plaintiff was examined and no rash was seen. *Id.*

43. On September 5, 2006, Plaintiff requested ibuprofen and nasal pills. Plaintiff was examined and no tenderness or redness was noted in his throat. Weissman Declaration, Exhibit 29.

44. On September 8, 2006, Plaintiff complained of gas and a rash on his testicles. Plaintiff was examined and irritation was noted and Plaintiff advised to keep clean and dry. *Id.*

45. On September 12, 2006, Plaintiff requested ibuprofen and nasal pills. Plaintiff was examined and given fluids and dispensed medications. Weissman Declaration, Exhibit 30.

46. On September 13, 2006, Plaintiff requested sinus medication and antacid. Plaintiff was examined and given antacid and sinus medication. Weissman Declaration, Exhibit 31.

47. On September 15, 2006, Plaintiff complained of a sore on his penis. Plaintiff was examined and irritation was noted but there was no evidence of a fungal infection or broken skin. Plaintiff was given bacitracin ointment to apply. *Id.*

48. On September 17, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. *Id.*

49. On September 18, 2006, Plaintiff requested ibuprofen and hemorrhoid treatment. Plaintiff was examined and give ibuprofen and hemorrhoid medication. Weissman Declaration, Exhibit 32.

50. On September 20, 2006, Plaintiff requested ibuprofen and antacid. Plaintiff was examined and treated with ibuprofen, antacid and warm compresses to his back. Weissman Declaration, Exhibit 33.

51. On September 20, 2006, Plaintiff refused to go to the infirmary for examination of possible tuberculosis infection. Plaintiff became abusive and vulgar and received a misbehavior report. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

52. On September 21, 2006, Plaintiff again refused to be tested or evaluated. Weissman Declaration, Exhibit 34.

53. On September 28 and 30, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibit 35.

**\*6** 54. On October 3, 2006, Plaintiff complained of a headache, upset stomach and infected skin. Plaintiff was examined and given ibuprofen and antacid. Weissman Declaration, Exhibit 36.

55. On October 4, 2006, Plaintiff complained of a headache and gas. Plaintiff was examined and given ibuprofen and antacid. *Id.*

56. On October 6, 2006, Plaintiff's medications were renewed. *Id.*

57. On October 9, 2006, Plaintiff complained of a headache, cold sore and gas. Plaintiff was examined and given ibuprofen, cold sore medication and antacid. Weissman Declaration, Exhibit 37.

58. On October 10, 2006, Plaintiff complained of a headache and gas. Plaintiff was examined and given Tylenol and antacid. *Id.*

59. On October 11, 2006, Plaintiff complained of a headache, rash and gas. Plaintiff was examined and it was noted that his penis was irritated. Plaintiff was given ibuprofen, bacitracin ointment and antacid. *Id.*

60. On October 23, 2006, Plaintiff complained of infection on his back, chest and shoulders and demanded to see Dr. Weissman. Plaintiff was examined and no sores or rash was noted. The skin appeared dry and unremarkable. Plaintiff was given Tylenol and antacid. Weissman Declaration, Exhibit 38.

61. On October 24, 2006, Plaintiff complained of infection on his back, chest and shoulders and demanded to see Dr. Weissman. Plaintiff was examined and no sores or rash was noted, although a small patch of dryness was noted on Plaintiff's thigh. The skin

appeared dry and unremarkable. Plaintiff was given Tylenol and antacid. *Id.*

62. On October 25, 2006, Plaintiff complained of an infected penis. Plaintiff was examined and there was no evidence of sores or breaks in the skin. Weissman Declaration, Exhibit 39.

63. October 26, 2006, Plaintiff refused to cooperate with lab tests and with a consultation. Plaintiff also complained of an infected groin, face chest and head. Plaintiff was examined and no infection was seen. Weissman Declaration, Exhibit 40.

64. On October 30, 2006, Plaintiff once again refused laboratory tests. *Id.*

65. On November 3, 2006, Plaintiff complained of gas and a lip injury. Plaintiff was examined and give[n] antacid and antibiotic cream for his lip. *Id.*

66. On November 4, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibit 41.

67. On November 5, 2006, Plaintiff complained of gas and a split lip. Plaintiff was examined and given antacid and bacitracin for his lip. *Id.*

68. On November 6, 2006, Plaintiff complained of gas and infected skin. Plaintiff's wrist, face, head, chest and back were examined but no infection could be found. Plaintiff was given antacid for his gas. Plaintiff continued to request Ensure but it was not ordered. Weissman Declaration, Exhibit 42.

69. On November 8, 2006, Plaintiff complained of gas and a split lip. After examination Plaintiff was given triple antibiotic cream for his lip and antacid. *Id.*

**\*7** 70. On November 9, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. *Id.*

71. On November 10, 2006, Plaintiff received his quarterly review and examination. Three issues were

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

discussed. Plaintiff's lip was treated with bacitracin and antacids were given for his gas problem. It was determined that Ensure would not be restarted due to non-compliance with medical protocol. Weissman Declaration, Exhibit 43.

72. On November 11, 2006, Plaintiff reported stomach problems and requested lip cream. Following an examination it was determined that Plaintiff did not require additional lip cream and was give[n] Tylenol and antacid. *Id.*

73. On November 14, 2006, Plaintiff again requested antacid and lip cream. Following an examination, it was determined that Plaintiff did not require any treatment other than antacid. Weissman Declaration, Exhibit 44.

74. On November 15, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. *Id.*

75. On November 17, 2006, Plaintiff reported stomach upset and general body aches. Following examination, Plaintiff was given antacid and analgesics for body pain. *Id.*

76. On November 18, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibit 45.

77. On November 19 and 21, 2006, Plaintiff requested antacids and ibuprofen. Plaintiff was examined and given antacid and Tylenol. Weissman Declaration, Exhibits 45 and 46.

78. On November 22, 2006, Plaintiff requested antacids and Tylenol. Plaintiff was examined and given antacids and Tylenol. Weissman Declaration, Exhibit 46.

79. On November 24, 2006, Plaintiff requested Ensure, lip cream and antacids. Plaintiff was examined and found to have no problems that required lip cream. Plaintiff was also informed that Ensure was suspended due to non-compliance. Tylenol and antacid was prescribed. Weissman Declaration, Exhibit 47.

80. On November 27, 2006, Plaintiff requested Ensure, lip cream and antacids. Plaintiff was examined and found to have no problems that required lip cream. Plaintiff was also informed that Ensure was suspended due to non-compliance. Tylenol and antacid was prescribed. *Id.*

81. On November 30, 2006, Plaintiff requested Ensure, lip cream and antacids. Plaintiff was examined and found to have no problems that required lip cream. Plaintiff was also informed that Ensure was suspended due to non-compliance. Tylenol and antacid was prescribed. Weissman Declaration, Exhibit 48.

82. Defendants Tichenor, Wash, Holmes and Chesbrough saw the Plaintiff for his sick call and also prescribed him medication which the Plaintiff refused. Complaint ¶ 72.

83. Plaintiff admits that every time he submitted a sick call, at the very least, the nurses would examine him. Dep. Pg. 30, ¶¶ 8-10.

84. Any lack of examination or treatment was due to Plaintiff's actions, either not responding to the nurse or creating a situation where evaluation and treatment was not possible. Weissman Declaration.

*8 85. While Plaintiff claimed various needs, including a rash, examination failed to confirm any medical condition existed, thus rendering treatment unnecessary. Weissman Declaration.

86. Any deprivation that Plaintiff suffered was due to his own conduct. Weissman Declaration.

87. Plaintiff was not given Ensure due to his unwillingness to consume the Ensure as directed by staff. Weissman Declaration.

88. No reasonable health care professional, on the above record, would believe that any conduct by the staff involved, violated any right enjoyed by Plaintiff. Weissman Declaration.

89. On the contrary, all personnel involved exhibited

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

extraordinary restraint and professionalism in the face of vile, uncooperative and potentially dangerous conduct by Plaintiff. Weissman Declaration.

90. Plaintiff never saw Superintendent Woods throw the chemicals on him, rather he imagined Woods did. Deposition at pg. 22, ¶¶ 14-17.

91. Plaintiff admits he did not see Deputy Superintendent Bezio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 18-20.

92. Plaintiff admits that he did not see Sergeant J. Bezio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 21-23.

93. Plaintiff admits that he did not see Sergeant Pombrio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 24-25; pg.23, ¶ 2.

94. Plaintiff admits that he did not see Sergeant Salls ever throw any infectious chemical on him. Deposition at pg. 23, ¶¶ 3-5.

95. Plaintiff admits that he did not see Sergeant Spinner ever throw any infectious chemical on him. Deposition at pg. 23, ¶¶ 6-8.

96. Plaintiff never saw any of the corrections staff throw any substance in his cell, rather he believes they did it through an apparatus, which he has never seen and never saw any of the defendants use. Deposition at pg. 23,¶¶ 9-17.

97. [Plaintiff] does not know who was throwing the beige substance at him but imagines it was Defendants, because they worked at Upstate. Deposition at pg. 24, ¶¶ 12-15.

98. Plaintiff has no knowledge of who was burning him with laser beams, because he had not seen the lasers or anyone use them. Deposition at pg. 24, ¶¶ 16-19.

99. Plaintiff never saw anyone throw chemical agents at him, and that he doesn't know who (if anyone) was throwing them, but that he assumes it is Defendants

because they work at the facility. Deposition at pg. 24, ¶¶ 20-25.

100. Plaintiff does not allege any conduct by Defendants Wright or Weissman regarding his treatment, but rather names them in their capacity as Defendant Weissman as Facility Health Director and Defendant Wright as Medical Director and for "responsibility of medical care of inmates". Complaint ¶¶ 4, 7A, 62; ¶¶ 78, 79; ¶¶ 82, 83.

101. Plaintiff never saw any defendant place anything in his food. Dep. Pg 34, ¶¶ 18-20; Dep. Pg. 35, ¶¶ 7-8.

102. Cell searches of Plaintiff's cell were made necessary by Plaintiff's behavior. Specifically, Plaintiff refused to return his tray after meals on several occasions and broke them into pieces. Dumas Declaration.

*9 103. The broken pieces then had to be recovered and the tray reassembled to insure that all pieces were accounted for and out of the cell. Dumas Declaration.

104. The broken pieces present a safety and security issue. Dumas Declaration.

105. At no time did the staff involved enter the cell with the purpose of destroying Plaintiff's possessions but Plaintiff's own behavior required that the searches be made. Dumas Declaration.

106. Searches of his cell, delay in getting a pen and alleged destruction of his papers delayed Plaintiff's legal work, but it had no lasting impact, because any deadlines he missed, he got extended and Plaintiff was able to submit his legal papers to the court. Dep. Pg. 46, ¶¶ 3-15.

(Dkt. No. 88-1, ¶¶ 1-106).

Although Plaintiff has contested some of the facts asserted by Defendants in the motion now before the Court (Dkt. No. 88-2), his conclusory assertions do not preclude summary judgment.[FN4] The standard for granting summary judgment is well-known.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

FN4. Had this matter been before the Court on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the teachings of *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937,1949, 173 L.Ed.2d 868 (2009), would guide this Court. There, the Supreme Court wrote:

We turn to respondent's complaint. Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an u n a d o r n e d , the-defendant-unlawfully-harmed-me accusation. *Id.,* at 555, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.,* at 557, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.,* at 570, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely

consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.,* at 557, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (brackets omitted).

*Id.* at 1949.

The undersigned strongly believes that Plaintiff's complaint would not survive under this standard either.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, this Court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. Furthermore, the evidence and all facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## Personal Involvement

To allege a constitutional violation under 42 U.S.C. § 1983, a pleading must state facts sufficient to support a finding that the defendant was personally involved in the alleged violation. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006). For this reason, liability of a state official cannot be established under the doctrine of *respondeat superior. Iqbal,* 129 S.Ct. at 1948.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001). Moreover, a plaintiff must allege personal acts of wrong on behalf of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

each Defendant he names in the complaint. *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999).

In the present complaint, Plaintiff solely brings suit against Superintendents Woods, Deputy Superintendent for Security Bezio, Facility Medical Director Weissman and Lester Wright, the Medical Director of DOCS, alleging supervisory liability. Under 42 U.S.C. § 1983 liability cannot be imposed on a supervisory official on the theory of *respondeat superior. Id.* In order for a supervisory official to be involved in a constitutional violation, he or she must have (1) directly participated in the alleged constitutional violation; (2) learned of the violation through a report or appeal and failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom; (4) been grossly negligent in supervising subordinates who committed the wrongful act; or (5) exhibited deliberate indifference to inmates' rights by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

**\*10** In the instant case, Plaintiff has merely alleged *respondeat superior* liability against Superintendents Woods, Deputy Superintendent for Security Bezio, Facility Medical Director Weissman and Lester Wright, the Medical Director of DOCS. The Superintendent's and Deputy Superintendent's delegation of medical judgment to appropriate staff was proper as the Second Circuit has cautioned that non-medical Defendants should not intercede in the medical care and treatment of an inmate. *Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000) ("One can imagine the repercussions if non-medical prison officials were to attempt to dictate the specific medical treatment to be given particular prisoners...."). Concomitantly, the Second Circuit has also explicitly held the denial of a grievance on medical matter is insufficient to demonstrate personal involvement on behalf of a prison Superintendent. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Similarly, the mere receipt of letters from an inmate by a facility Superintendent regarding a medical claim is insufficient to constitute personal liability. *Swindell v. Supple,* 2005 WL 267725, at \*11 (S.D.N.Y.2005); *Burgess v. Morse,* 259 F.Supp.2d 240, 250 (W.D.N.Y.2003). Therefore, Plaintiff cannot

demonstrate that Superintendent Woods and Deputy Bezio were personally involved in any alleged constitutional violation for denial of medical care and his claims against them must be dismissed.

Plaintiff also names as Defendants Dr. Evelyn Weissman, Facility Health Director and Dr. Lester Wright, the Medical Director for the Department. Once again, Plaintiff does not allege any conduct by Defendants Wright or Weissman regarding his treatment, but rather names them in their capacity as Defendant Weissman, Facility Health Director, and Defendant Wright, Medical Director, and for "responsibility of medical care of inmates." The mere fact that Defendant Dr. Wright held the position of Medical Director and Defendant Dr. Weissman the title of Facility Health Administrator is insufficient to provide the requisite personal involvement to state an Eighth Amendment claim. *Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003); *Swindell,* 2005 WL 267725, at \*9-10. Based on the above, the motion for summary judgment should be granted as to Defendants Dr. Evelyn Weissman, Dr. Lester Wright, Robert Woods, and Norman Bezio.

**Medical Indifference**

In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Court recognized that the government has an obligation to provide medical care for those it incarcerates, because they are unable to obtain such care on their own, and held that a prisoner may have a claim for failure to do so under the Eighth Amendment. To prevail on an Eighth Amendment claim involving prison medical care, an inmate must establish that the Defendant acted with deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 294-95, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *West v. Atkins,* 487 U.S. 42, 46, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). This indifference may be manifested by prison doctors in their response to a prisoner's needs, or by officers in intentionally denying or delaying access to medical care or treatment. *Estelle,* 429 U.S. at 104. The inmate must prove both the subjective and objective elements of a claim: (1) deliberate indifference, and (2) a serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). In the instant case, Plaintiff fails to satisfy either of these elements.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

**\*11** A review of the record pertaining to Plaintiff's complaints to prison medical personnel reveals that he complained frequently of a rash or infection on various parts of his body including his face, around his testicles, and on his penis. There is nothing which would indicate that the rash was "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Throughout Plaintiff's complaint, he describes his rash, but never does he state that the rash caused him pain, much less extreme pain, that it was spreading anywhere else, besides the areas he already claimed, or that it was likely to produce death.

Even if the rash is a serious medical condition, the subjective element of the test is not met. To meet the subjective element, a prisoner must satisfy *Farmer v. Brennan's* test for deliberate indifference-the Defendant must know of and disregard an excessive risk to inmate health. A Defendant need not expressly intend to inflict pain-but Plaintiff must establish at least that a Defendant acted with the criminal recklessness discussed in *Farmer v. Brennan. See Hathaway v.Coughlin,* 99 F.3d 550, 553 (2d Cir.1996); *Morales v. Mackalm,* 278 F.3d 126, 132 (2d. Cir.2002).

Turning to the deliberate indifference element, the record is replete with evidence that Defendant medical personnel examined Plaintiff (when they were allowed to) and prescribed appropriate topical and/or allergy medicines. Although Plaintiff may have desired some other type of medicine, that desire would have, at the very best, demonstrated negligence, not deliberate indifference.

The above analysis would apply with equal force to each medical condition reported. The medical personnel treated or attempted to treat every condition despite abusive conduct on Plaintiff's part. No Eighth Amendment violation on the part of the prison medical personnel is perceived.

### Powders and Lasers

Defendants J. Finazzo and G. Caron were called and requested by the Plaintiff to look into his room for substances coming from the ventilator and the roof of his cell. Both J. Finazzo and G. Caron are accused of reacting "in the shape of mockery" and said or showed to Plaintiff that they did not see the substance. Also at Plaintiff's request, Defendants J. Spinner, S. Pombrio, B. Grant, M. Riley, S. Dumas, J. Price, J. Hyde, W. Brown, and L Furnace, looked into the cell at the ventilator and the roof and "almost made the same gesture (as J. Finazzo and G. Caron)" and told the Plaintiff they did not see any substance. Plaintiff alleges that Defendant B. Bogardus, would, while collecting or delivering the mail, looked towards the ventilator and roof of Plaintiff's cell and made a "gesturing of satisfaction and gladness." Even if true, the above allegations by Plaintiff fail to state a claim with regard to looks and smirks. Looks and smirks are not actionable.

Plaintiff alleges that Defendants S. Salls, J. Hyde, J. Bezio, S. Pombrio, J. Spinner, R. Colton, N. Guerin, D. Sauther, G. Caron, M. Riley, B. Grant, S. Dumas, B. Bogardus, M. Welch, J. Price, M. Albert, D. Ravelle, L. Furnace, J. Finazzo and W. Brown allegedly threw infectious harmful chemicals upon the Plaintiff via ventilator and the roof of his cell with a machine-like system that was allegedly placed in the room above his cell. Plaintiff alleges that all these actions were taken in retaliation for Plaintiff's other lawsuits against other DOC's employees, yet Plaintiff concedes in his deposition that he has no proof or evidence that any named Upstate employees had any knowledge of his other lawsuits. (Dkt. No. 81-3, Ex. A at 25, ¶¶ 2-10). Tellingly, all Defendants deny knowledge of any lawsuits brought by Plaintiff at other facilities.

**\*12** Equally demonstrative of the frivolous nature of the complaint, during his deposition, Plaintiff stated that he never saw Superintendent Woods throw the chemicals on him; rather he imagined Woods did. (Dkt. No. 81-3, Ex. A. at 22, ¶¶ 14-17). Additionally, Plaintiff admits he did not see Defendants Deputy Superintendent Bezio, Sergeant J. Bezio, Sergeant Pombrio, Sergeant Salls, Sergeant Spinner, ever throw any infectious chemical on him. (Dkt. No. 81-3, Ex. A at 22 ¶¶ 1-20,21-23, 24-25; 23, 2, 3-5, 6-8). In fact, Plaintiff admits that he never saw any of the corrections staff throw any substance in his cell, rather he believes they did it through an apparatus, which he has never seen and never saw any of the Defendants use. (Dkt. No. 81-3, Ex. A at 23, ¶¶ 9-17). Plaintiff further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

admits that he does not know who was throwing the beige substance at him but imagines it was them, because they work there. (Dkt. No. 81-3, Ex. A.24, ¶¶ 12-15). Plaintiff also admitted under oath that he has no knowledge of who was burning him with laser beams, because he had not seen the lasers or anyone use them. (Dkt. No. 81-3, Ex. A.24, ¶¶ 16-19). Plaintiff testified that he never saw anyone throw chemical agents at him, and that he doesn't know who was throwing them, but that he assumes it is Defendants because they work at the facility. (Dkt. No. 81-3, Ex. A.24, ¶¶ 20-25). Similarly, while Plaintiff alleges that Defendants, M. Riley and B. Grant, on August 14th, placed "a strange harmful substance" in his lunch, he stated in his deposition that he never saw either Defendant place anything in his food on the day in question or on any other day for that matter. (Dkt. No. 81-3, Ex. A. 34, ¶¶ 18-20; 35, ¶¶ 7-8).

As the Second Circuit and New York District Courts have steadily recognized, it is utterly unjust to haul people into federal court to defend against, and disprove, delusions. *See, e.g. Pillay v. INS,* 45 F.3d 14, 17 (2nd Cir.1995); *Lewis v. New York,* 547 F.2d 4, 6 (2nd Cir.1976); *Tyler v. Carter,* 151 F.R.D. 537, 540 (S.D.N.Y.1993) (*sua sponte* dismissing complaint alleging conspiracy to enslave and oppress), *affd* 41 F.3d 1500 (2nd Cir.1994). A victimization fantasy, with no existence beyond Plaintiff's insistence, cannot be allowed to pass review under Fed.R.Civ.P. 56(b). "Genuine issue of material fact" must mean substantially more. Plaintiff admitted under oath that he has no facts nor evidence which states the involvement of any Defendants in somehow infecting him with "infectious harmful chemicals," or laser beams. Plaintiff's complaints are mere surmise and consist of conclusory statements that contain no specific allegations of fact indicating a deprivation of rights. Accordingly, the motion for summary judgment should be granted on this issue.

**Retaliation**

Plaintiff has charged that Defendants' actions were in retaliation for him bring lawsuits against other prison employees elsewhere in the New York penal system. The use of "buzz words" such as retaliation do not cure a pleading defect such as the one herein. *See Barr v. Abrams,* 810 F.2d 358, 362 (2d Cir.1986) (the Second

Circuit has repeatedly held, "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning"); *see also, e.g., Boddiev. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("unsupported, speculative, and conclusory" allegations should be dismissed); *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("[c]laims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse. Virtually every prisoner can assert such a claim as to every decision which he or she dislikes); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (where allegations of retaliation and conspiracy are "wholly conclusory," the complaint "can be dismissed on the pleadings alone"); *Justice v. Coughlin,* 941 F.Supp. 1312, 1316 (N.D.N.Y.1996) ("In recognition of the reality that retaliation claims can be fabricated easily, [inmates] bear a somewhat heightened burden of proof, and dismissal can be granted if the claim appears insubstantial"). Therefore, Plaintiff's claims based on some retaliatory animus shall be dismissed. *See Iqbal,* 129 S.Ct. at 1948-49.

**Cell Search**

**\*13** Plaintiff further alleges that Defendants B. Grant, M. Riley, and M. Welch, under orders from N. Guerin, during a cell search to look for any remaining pieces of a tray broken by the Plaintiff, "did mess up, crush, spoil, destroy" legal documents and scattered shampoo on them as well. On September 8, 2006, Plaintiff alleges he asked Defendants D. Ravelle, Riley, Grant, S. Dumas and Albert for a pen throughout the day. Plaintiff alleges that no one gave Plaintiff a pen in retaliation for Plaintiff's refusal to hand in his empty food tray and, as a consequence, he broke it into pieces. Following Plaintiff's admitted refusal to give back the food tray, Defendant G. Caron and M. Albert asked Plaintiff to exit cell for a cell search. Plaintiff refused. Following his initial refusal, Defendants J. Hyde, G. Caron, S. Dumas, and M. Albert, requested that Plaintiff leave his cell for a cell search, but Plaintiff again admittedly refused. Following the second refusal to exit the cell, M. Tirone and J. Irvin came and asked Plaintiff to exit his cell for a cell search. Plaintiff agreed to do so.

During the ensuing cell search, Plaintiff alleges that Defendants G. Caron, S. Dumas, M. Albert, and an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

unknown officer, "did mess up, crush, spoil, destroy, and mix" Plaintiff's legal documents, with the consent of J. Hyde.

This aspect of the complaint has two aspects. The first, the legitimacy of the cell search, will not take long to address. Prison officials have every right to search a cell to retrieve broken pieces of a food tray, pieces which could easily be made into some form of a weapon. Plaintiff in this instance was simply removed from his cell while the search ensued.

"The Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)." No constitutional violation is perceived.

The second aspect of the cell search which must be addressed is Plaintiff's claim regarding the destruction of his legal papers. This claim will not delay the Court long either.

Although Plaintiff claims that the destruction of his papers delayed his legal work, he admits that it had no lasting impact as any deadlines he missed he was able to get extended and was able to submit his legal papers to the court. Hence, as he had no actual injury even if the events as he saw them occurred, he is not entitled to relief on this aspect either. *See Lewis v. Casey,* 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

### Conclusion

Accordingly,
**IT IS ORDERED** Defendants' motion for summary judgment be, and the same here by is, **GRANTED.**

This the 22nd day of February, 2010.

N.D.N.Y.,2010.

Gonzales v. Wright

Slip Copy, 2010 WL 681323 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Amin B. BOOKER, Plaintiff,
v.
John DOE (Medical Provider # 261); John Doe
(Medical Provider # 123); Dr. Pang L. Kooi; Virginia
Androsko; Bill Robertson; Lester Wright, Defendants.
No. 9:06-CV-73 (GLS).

Sept. 30, 2008.

Amin B. Booker, pro se.

Adrienne J. Kerwin, for Defendants.

**MEMORANDUM DECISION AND ORDER**

GARY L. SHARPE, District Judge.

*1 In this civil rights complaint, plaintiff, an inmate in the custody of the New York Department of Correctional Services ("DOCS"), alleges that employees of DOCS were deliberately indifferent to his serious medical need for treatment for his left shoulder. Complaint (Compl.) (Dkt. No. 1). Plaintiff seeks substantial monetary relief.

Presently before the court [FN1] is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 39). Plaintiff opposes defendants' motion. (Dkt. No. 43). For the following reasons, this court will grant defendants' motion, and will dismiss the action *sua sponte* as to the two John Doe defendants and defendant Robertson.

> FN1. The parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded for purposes of this motion, and as such, any appeal taken rom this order will be to the Court of Appeals for the Second Circuit.

**DISCUSSION**

**1.** *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

**2.** *Facts*

Plaintiff is currently incarcerated at Green Haven Correctional Facility. Plaintiff testified at his deposition [FN2] that his shoulder problems began in 1994 while he was incarcerated at Greene Correctional Facility. Def. Ex. A (Deposition Transcript (T.) at 7-8) (Dkt.No.39). Plaintiff stated that he fell out of a window, and tried to break his fall with his arm. (T. at 8). Plaintiff testified that he did not begin seeking medical treatment for his shoulder until 1998.[FN3] (T. at 10-11).

> FN2. Plaintiff was deposed on October 12, 2007. Def. Ex. A.

> FN3. Although not relevant to this decision

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

because plaintiff has not named any medical personnel that examined him prior to 2002, the court notes that plaintiff first testified at his deposition that between the time of his injury in 1994 and 1998, he did not ask anyone to look at his shoulder, but then stated that he requested treatment for the pain, but the medical personnel never gave him anything. (T. 10-12). Plaintiff also testified that he was incarcerated throughout this time. (T. 11). The court notes, however, that it appears that plaintiff was *not* incarcerated between February 23, 1996 when he was released on parole from his 1994 incarceration until October 28, 1998, when he was returned on a parole violation which included four new criminal charges. Plaintiff's current DIN number is 98-A-6245, which would indicate that he was received into DOCS in 1998. Thus, In order for him to have been incarcerated in 1994, there would have had to have been a prior incarceration. The DOCS website confirms this. http://www.docs.state.ny.us Plaintiff's prior DIN number was 94-R-8535. Unless there is another Amin Booker with the same birth date, these two records appear to be the same individual. Thus, it is unclear why plaintiff testified that he was incarcerated for the entire time between 1994 and 1998.

Plaintiff states that on January 25, 2002 and on February 4, 2002, while he was incarcerated at Attica Correctional Facility in Attica, New York, he was examined by two defendant "John Doe" medical providers.[FN4] Compl. ¶¶ 14-18. Plaintiff states that on each of these dates, he complained about his shoulder. Plaintiff claims that the first John Doe asked plaintiff to raise his arm, and when plaintiff complied, told him that the shoulder was not dislocated. Compl. ¶ 15. The second "John Doe" allegedly ordered an x-ray of plaintiff's shoulder, but told plaintiff there was nothing wrong. Compl. ¶ 17. Plaintiff claims that when he asked if there was any way to stop the problem that he was having with his shoulder, John Doe # 2 told plaintiff that he would get back to him if there was anything that could be done. Compl. ¶ 18. Plaintiff claims that John Doe # 2 also told plaintiff not to sign up for sick call about "this" or he

would be issued a misbehavior report. *Id.*

FN4. Plaintiff identifies these "John Doe" defendants by their Provider Numbers, # 261 and # 123. Compl. ¶¶ 14, 16. At his deposition on October 12, 2007, plaintiff testified that in the time since he prepared the complaint, he learned the names of Medical Providers 261 and 123. (T. at 16-17). Plaintiff states that Medical Provider 261 is Norman Dworzeck and Medical Provider 123 is Jose Deprivio. *Id.* Plaintiff has never sought leave to amend his complaint, and the two "John Does" remain as unnamed defendants. As will be discussed below, the complaint may be dismissed as against these individuals in any event, thus, plaintiff's failure to amend his complaint is irrelevant.

*2 Defendants have submitted excerpts from plaintiff's Ambulatory Health Record [FN5] ("AHR"). Def. Ex. B. The AHR entry for January 25, 2002 shows that plaintiff complained to a medical professional that plaintiff dislocated his shoulder the week before. (AHR at Jan. 25, 2002). The notation by the examiner states that plaintiff complained that he had been unable to "pick up [his] arm," but that he eventually "worked it back into place." *Id.* Plaintiff also told the examiner that this had been happening for a long time. *Id.*

FN5. Plaintiff's Ambulatory Health Record, submitted by defendants, is located at Docket Number 39, Exhibit B. Defendants have "traditionally" filed plaintiff's health records, including a number of documents and forms that are not Ambulatory Health Record forms that are interspersed within the actual Ambulatory Health Records. All of the documents are in reverse chronological order, with the most recent documents appearing first. Where the court can cite to a dated entry in the Ambulatory Health Record, the court will use the form "AHR at [date]". The court has additionally hand-numbered the 67 pages of Exhibit B so that it may cite to the numerous documents interspersed within the Ambulatory Health Records. In those instances, the court will use the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

form "Defs. Ex. B at [page]".

> In addition to the traditionally filed motion, defendants provided the court with a compact disc that stores electronic versions of all of the documents related to the summary judgment motion. The electronic version of the documents did not include page numbers for Exhibit B..

The examiner's note states that he observed that plaintiff could move his left arm freely, and could lift his arm over his head. *Id.* The January 25, 2002 note states that plaintiff's shoulders were "symmetrical," and that plaintiff was not in pain at the time of the visit. *Id.* The note states "DR callout." *Id.* The examiner's handwriting is unclear with respect to his [FN6] name and provider number. *Id.*

> [FN6.] Plaintiff has implied by calling these individuals "John" Doe, that they were both male.

On February 4, 2002, the AHR shows that plaintiff complained of pain in his shoulder, and stated that he had a history of dislocation. (AHR at Feb. 4, 2002). The examiner's handwriting is unclear for most of the entry. *Id.* It appears that plaintiff was still experiencing some tenderness at the time of the medical visit. *Id.* The examiner wrote "-xray left shoulder". *Id.*

On February 4, 2002, Wyoming Valley Radiologists, P.C. performed an x-ray on plaintiff's left shoulder. A "Report for Department of Correctional Services-Attica Facility" by C.J. Riggio, M.D. states "[f]ilms of the left shoulder with internal and external rotation show a one centimeter calcification in soft tissues just inferior to the region of the surgical neck of the humerus. The bony architecture otherwise appears normal." Def. Ex. B at p. 66.

The medical records do not contain any other complaints about, or treatments for plaintiff's left shoulder until August 2003. Between February 2002 and August 2003, plaintiff's medical records show that plaintiff was moved to two other DOCS facilities. Plaintiff testified at his deposition that he arrived at Auburn sometime in March or April of 2003. (T. at 20). An AHR entry dated March 6, 2003, shows "Upstate" in the box where the current facility is entered, but has a stamp with the word "incoming" circled and a handwritten notation "Auburn chart." (AHR at Mar. 6, 2003).

The AHR shows that plaintiff's first complaint after arriving at Auburn Correctional Facility regarding his left shoulder occurred on August 11, 2003. (AHR at Aug. 11, 2003). On August 11, 2003, Registered Nurse ("RN") A. Vega wrote that plaintiff requested a doctor's appointment because his ears were plugged and he had pain in his left rotator cuff. RN Vega wrote that she scheduled an appointment with Dr. Kooi. On August 22, 2003, the AHR shows that plaintiff again complained about pain in his left rotator cuff and "clicking." (AHR at Aug. 22, 2003). RN S. Lennox noted "appt already scheduled with Dr. Kooi." *Id.*

**\*3** The AHR shows that plaintiff's next complaint about his shoulder was on September 5, 2003 when he complained of "L shoulder-rotator cuff." (AHR at Sept. 5, 2003). RN Lennox wrote that plaintiff "[h]as appt [with] Dr. Kooi scheduled". *Id.* On September 6, 2003, the AHR shows that plaintiff was in a fight and had a "Head to toe assessment. (AHR at Sept. 6, 2003). RN D. Cayle noted that "No injury" was present. *Id.* Plaintiff was admitted to the Special Housing Unit ("SHU") on September 11, 2003, and the AHR shows that plaintiff did not have any health complaints at that time. (AHR at Sept. 11, 2003). Plaintiff was seen six times between September 11, 2003 and November 20, 2003, when he next complained about his left shoulder. (*See* AHR at Sept. 12, 15, 19, and Oct. 6, 19, 18, 2003).

Although plaintiff includes the above information in his complaint, he does not name as defendants any of the individuals who examined him at Auburn between August 11, 2003 and November 20, 2003, when he was examined by defendant Androsko. Compl. ¶¶ 19-22. The AHR shows that on November 20, 2003, plaintiff complained that his left shoulder "slips out of joint" and requested to see a doctor. (AHR at Nov. 20, 2003). Defendant RN Androsko stated that this was an "old problem per inmate." *Id.* It appears that this was plaintiff's first

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

interaction with RN Androsko. Plaintiff also complained about some acne. *Id.* RN Androsko noted "PA Laux list." *Id.*

In the complaint, plaintiff claims that on December 3, 2003, Dr. Kooi told plaintiff that his shoulder "looked alright, he just needed to exercise more." Compl. ¶ 27. Plaintiff also claims that Dr. Kooi looked at plaintiff's February 4, 2002 x-rays and told plaintiff that he just had a slight "tissue calcification." Compl. ¶ 28. Plaintiff claims that Dr. Kooi finally agreed to "take another x-ray" after plaintiff continued to complain. Compl. ¶ 29.

Plaintiff's AHR shows that defendant Dr. Kooi examined plaintiff's left shoulder on December 3, 2003. (AHR at Dec. 3, 2003). The entry states that plaintiff told Dr. Kooi that his left shoulder "comes out." *Id.* In the "objective" section of the AHR form, Dr. Kooi wrote "ROM N." *Id.* In his s declaration, Dr. Kooi states that this notation indicates that he found plaintiff's range of motion was normal. Kooi Decl. ¶ 10. Dr. Kooi states that "[e]ven though plaintiff's physical examination was negative for dislocation, I ordered an x-ray of the plaintiff's left shoulder and directed the plaintiff [to] perform exercises designed to strengthen his shoulder." *Id.*

Plaintiff alleges in the complaint that he was examined by defendant Androsko on December 23, 2003, and that when he complained that his shoulder had dislocated several times and that he was in "excruciating pain," she called him a "Big Baby," and told him that no one wanted to hear about his shoulder. Compl. ¶¶ 30-32. Plaintiff claims that defendant Androsko was rude to him and stated that if he wanted "luxury treatment, he shouldn't be in jail," and that she would personally see to it that it would be another month before he would get his x-ray. Compl. ¶¶ 30-34.

**\*4** RN Androsko's entry in the AHR for December 23, 2003 states that plaintiff asked when the x-rays would be performed. (AHR at Dec. 23, 2003). RN Androsko wrote "Inmate wants x-ray done immediately-also claims hasn't seen MD-saw MD 12/3." *Id.* RN Androsko also wrote that she told plaintiff that the x-ray order was written, and the "x-ray will be done when tech has it scheduled." *Id.*

In his complaint, plaintiff alleges that on January 2, 2004, he told defendant Androsko that he was in excruciating pain, but that she "taunted" plaintiff about his "whining." Compl. ¶ 37. However, plaintiff states that defendant Androsko put plaintiff on the list to see the doctor. Compl. ¶ 38. The AHR entry for January 2, 2004, states that plaintiff complained of shoulder pain, and stated that his shoulder kept "dislocating & re-locating by itself." (AHR at Jan. 2, 2004). Defendant Androsko's entry states that plaintiff requested to see a doctor, and defendant Androsko put plaintiff on the list for "Dr. K." *Id.*

Plaintiff states that his shoulder was x-rayed on January 20, 2004, however, no treatment was prescribed. Compl. ¶ 39. The plaintiff's medical records show that on January 20, 2004, St. Lawrence Radiology, P.C. performed an x-ray of plaintiff's left shoulder. Defs. Ex. B at p. 44. The radiologist's report stated

Benign appearing bone density seen projecting in the soft tissue consistent with a chronic origin. No other significant bony pathology is seen. The bone density projects just medial and posterior to the humeral neck.

*Id.*

Although plaintiff claims in the complaint not to have seen Dr. Kooi again until May 3, 2004, the records show that plaintiff saw Dr. Kooi on February 2, 2004. (AHR at Feb. 2, 2004). Plaintiff told Dr. Kooi that plaintiff's shoulder had dislocated on many occasions. *Id.* Dr. Kooi examined plaintiff and found a normal range of motion with no laxity. (AHR at Feb. 2, 2004; Dkt. No. 39, Kooi Decl. at ¶ 12). Dr. Kooi ordered shoulder exercises and a follow up appointment in three months "to evaluate the outcome of the exercise regime." Kooi Decl at ¶ 12; AHR at Feb. 2, 2004.

In the complaint, plaintiff alleges that on March 16, 2004, a nurse named "Greg" examined plaintiff and read his "February 4, 2002" x-ray results. Compl. ¶¶ 40-41. Plaintiff claims that "Greg" told plaintiff that he would need an MRI to identify why his shoulder was dislocating. Compl. ¶ 41. Plaintiff states that "Greg" put plaintiff on

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

the list to see Dr. Kooi on March 16 and later on March 30, 2004. Compl. ¶¶ 43, 45.

The AHR also shows, however, that plaintiff was examined on March 3, 2004, when he complained about his left shoulder. (AHR at Mar. 3, 2004). The nurse noted that plaintiff "Has appt on 5/3 but req to move up." *Id.* Plaintiff again complained to the same nurse about his shoulder on March 16 and March 30, 2004. (AHR at Mar. 16 & 30, 2004). Plaintiff complained about pain in his shoulder to RN Vega on April 12, 2004 and again on April 27, 2004. (AHR April 12 & 27, 2004). On April 12, 2004, plaintiff requested an appointment with an orthopedist. (AHR at Apr. 12, 2004). On April 27, 2004, RN Vega wrote that she explained the procedure about waiting lists for doctors. (AHR at Apr. 27, 2004).

**\*5** Plaintiff states that he saw Dr. Kooi May 4, 2004. Compl. ¶ 46. The AHR indicates that the appointment was actually on May 3, 2004. (AHR at May 4, 2004). In the complaint, plaintiff alleges that Dr. Kooi asked plaintiff to raise his left arm, and when he "complied," Dr. Kooi told plaintiff that there was nothing that he could do for him. Compl. ¶ 47. Plaintiff states that he told Dr. Kooi that "several" registered nurses had explained to plaintiff that it was "their professional judgment" that plaintiff should have an MRI and see a specialist. Compl. ¶¶ 48.

Plaintiff also claims that Dr. Kooi never looked at the x-rays, he merely stated that the nurses did not know what they were talking about and refused to order an MRI and a consultation by an orthopedic specialist. Compl. ¶¶ 49-51. Instead, plaintiff claims that Dr. Kooi told plaintiff that he would give plaintiff some pills that would "cure" him. Compl. ¶ 52. The AHR note for May 4, 2004 is short and difficult to read, however, Dr. Kooi states in his declaration that plaintiff "indicated that he had experienced pain in his left shoulder off and on for approximately eight years. On examination, plaintiff had normal range of motion in his left shoulder. I ordered the plaintiff a prescription for Motrin." Kooi Decl. at ¶ 13.

Plaintiff claims that on May 5, 2004, his shoulder dislocated again, and he filed a grievance. Compl. ¶ 53. Plaintiff states that in his grievance, he asked to be assigned a different doctor and that Dr. Kooi be

"investigated and penalized for his actions." Compl. ¶ 54. Plaintiff states that after a hearing on his grievance, he was told that nurses do not order or interpret x-rays, and that the committee could not instruct the medical department on specific courses of treatment. Compl. ¶ 56.

Plaintiff states that he was told that he needed to write to Dr. Kooi to request a different medical provider and that plaintiff could address his complaints to Dr. Lester Wright, Associate Commissioner of Health Services. Compl. ¶ 57. Plaintiff states that he wrote to Dr. Wright on May 18, 2004, detailing the problems with plaintiff's shoulder and asking Dr. Wright to "address the problem professionally." Compl. ¶ 58. Plaintiff claims that he also wrote to defendant Kooi again. Compl. ¶ 59. Plaintiff also alleges that he complained to Nurse Administrator defendant William Robertson, who promised to speak with Dr. Kooi, but never followed through. Compl. ¶ 60. Plaintiff claims that Dr. Wright never responded to plaintiff's letter. Compl. ¶ 62.

Even though plaintiff claims that his shoulder dislocated on May 5, 2004, the AHR shows that plaintiff next complained about his shoulder on July 12, 2004. (AHR at July 2, 2004). Plaintiff does not cite the July 12, 2004 visit, instead, he alleges that he went to the Auburn Medical Unit on August 16, 2004, and a nurse scheduled him for an appointment to see Dr. Kooi. Compl. ¶ 63. The AHR for July 12, 2004 indicates that a follow up appointment was scheduled with Dr. Kooi. *Id.* In his complaint, plaintiff states that "[a]t sometime before plaintiff was seen again by Dr. Kooi, plaintiff somehow arranged to see another doctor at Auburn ... named Graceffo, who put plaintiff on a list to see an orthopedic doctor ...." Compl. ¶ 64. A document titled "Request and Report of Consultation" shows that Dr. Anthony Graceffo referred plaintiff to an orthopedist on July 12, 2004. Defs. Ex. B at p. 39.

**\*6** Dr. Kooi examined plaintiff again on August 30, 2004. (AHR at Aug. 30, 2004). Plaintiff complained of "stiffness in his left shoulder from an old injury." Kooi Decl. at ¶ 14; (AHR at Aug. 30, 2004). Dr. Kooi noted that plaintiff had already been referred to see an orthopedic specialist. *Id.* In his Declaration, Dr. Kooi states

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

[b]ased on the negative findings of dislocation or separation on plaintiff's x-ray, together with his normal range of motion on each physical examination by me, and plaintiff's ability to raise his arm above his head, it was my reasoned judgment and opinion that the plaintiff was not suffering from a dislocation or separation injury and, instead, was experiencing pain due to weakness in his left shoulder. I therefore prescribed strengthening exercises for the plaintiff and followed the plaintiff's condition.

Kooi Decl. at ¶ 15.

Plaintiff claims that on August 30, 2004, Dr. Kooi simply told plaintiff to "do some exercise." Compl. ¶¶ 66-68. On September 1, 2004, plaintiff was examined by a doctor at "Walsh RMU ." Defs. Ex. B at p. 36. After an orthopedic examination, the doctor prescribed physical therapy three times a week for six weeks. *Id.* Plaintiff participated in physical therapy at Five Points Correctional Facility beginning September 24, 2004 until November 1, 2004. Defs. Ex. B at 26-35. Plaintiff states that the physical therapy did not work. Compl. ¶ 69.

It is unclear when plaintiff next complained about his left shoulder. The AHR shows a visit to the medical department on November 15, 2004. (AHR at Nov. 15, 2004). The entry does not indicate that plaintiff complained about his shoulder. *Id.* The first two lines of the entry are mostly illegible except for the word "Theraband." *Id.* In his deposition, plaintiff described Therabands as "strong elastic band[s]" that were used in his physical therapy sessions. (T. at 62). Dr. Dwight Webster examined plaintiff on December 7, 2004, and on that date, plaintiff consented to surgery for the purpose repairing his "dislocating L shoulder." Defs. Ex. B at 19-20. The medical records show that plaintiff had surgery on his left shoulder on February 2, 2005. Defs. Ex. B at 6-7.

Plaintiff's complaint contains four causes of action. All the causes of action allege violations of plaintiff's right to be free from cruel and unusual punishment, caused by the defendants' deliberate indifference to plaintiff's serious medical needs. Compl. at pp. 13-14. Plaintiff's third and fourth causes of action also allege equal protection and due process violations. [FN7]

FN7. Although plaintiff's causes of action raise "equal protection" and "due process" violations, it is unclear to what plaintiff is referring. In order to state an equal protection violation plaintiff would have to be claiming that he was treated differently than other similarly situated individuals. Plaintiff makes no such claim, thus, any equal protection claim may be dismissed. Plaintiff may be referring to "substantive due process" in the nature of his Eighth and Fourteenth Amendment claims for denial of constitutionally adequate medical care.

3. *Personal Involvement*

It is well-settled that in order to be held liable for damages in a section 1983 action a defendant must have been personally involved in the alleged violation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978). The doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973), *cert. denied,* 414 U.S. 1033 (1973).

*7 In *Williams v. Smith,* the Second Circuit detailed the various ways in which a defendant can be personally involved, and thus be subject to individual liability, in a constitutional deprivation. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

Defendants argue that defendant Dr. Lester Wright

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

was not personally involved in plaintiff's alleged violations. Defs, Mem. of Law at 8 (Dkt. No. 39). Dr. Wright was the Deputy Commissioner and Chief Medical Officer of DOCS. Wright Decl. ¶ 1. Plaintiff's only claim against Dr. Wright is that Dr. Wright failed to respond to plaintiff's letter and failed to rectify the allegedly inadequate care plaintiff received at Auburn Correctional Facility. Compl. at ¶ 62. Plaintiff cites no other involvement by this defendant.

In his declaration, Dr. Wright states that his office's normal business practice is to assign the investigation of alleged violations to a member of his staff. Wright Decl. at ¶ 6 (Dkt. No. 39). "A member of my staff learned that plaintiff had filed a grievance in connection with the issues discussed in his May 30, 2004 letter to me, and that the plaintiff had been examined by a physician at his facility ... The matter was then closed in my office" *Id.* at ¶ 7-8. Defendant Wright states that he did not see plaintiff's letter. Wright Decl. ¶ 6.

Defendants' Exhibit D is a form-note from Dr. Wright to "Hally" [FN8] in which Dr. Wright requested this individual to "[i]nvestigate and respond on my behalf." The note indicates that the matter was "[i]nvestigated and closed .... " Defs. Ex. D. The comments state that the "inmate has filed a grievance-he has been evaluated by Dr. Kooi." *Id.* It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 642-643 (S.D.N.Y.2006). The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation. *Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007).

FN8. The name on this note is difficult to read. The person's name to whom the investigation as referred could be "Hally" or "Holly."

Dr. Wright was not directly involved in plaintiff's care and did not examine plaintiff. It is clear that plaintiff's letter was referred to a subordinate for investigation. Clearly, plaintiff had also filed a grievance that was also being investigated. Thus, the investigation by defendant

Wright's subordinate was closed. This does not constitute personal involvement by defendant Wright, and the case may be dismissed as to this defendant.

**4. *Medical Care***

**\*8** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is *objective* and measures the severity of the deprivation, while the second element is *subjective* and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). A medical condition has been considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). The seriousness of a plaintiff's medical need may also be determined by reference to the effect of denying the particular treatment. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 310 (S.D.N.Y.2001) (citation omitted). Thus, if unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the inmate to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious." *Id.* (citing *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000)).

In this case, defendants argue that plaintiff's shoulder injury does not constitute a serious medical need. Defs. Mem. of Law at 3-6 (Dkt. No. 39). There is, however, no "metric guide" for the court to determine whether a plaintiff has a sufficiently serious medical condition. *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003). In *Chance v. Armstrong,* 143 F.3d 698, 702-703 (2d Cir.1998), the Second Circuit set forth some guidelines for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

this determination. *Id*. (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir.1992)). These considerations include (1) whether a reasonable doctor or patient would perceive the medical need in question as "important or worthy of comment or treatment," (2) whether the medical condition significantly affects daily activities, and (3) "the existence of chronic and substantial pain". *Id.*

This court is hesitant to hold as a matter of law that a shoulder injury is simply not a serious medical need, particularly based upon the third consideration listed above, the existence of chronic and substantial pain. It has been held that allegations of "severe pain ... [and] reduced mobility ..." in the shoulder are sufficient to raise a material issue of fact as to a serious medical need. *Sereika v. Patel,* 411 F.Supp.2d 397, 406 (S.D.N.Y.2006). In *Guarneri v. Bates, et al.,* this court adopted Magistrate Judge David Homer's recommendation, finding sufficient issues of material fact as to the actual pain and severity of the plaintiff's shoulder injury. *Guarneri v. Bates, et al.,* 9:05-CV-444 (GLS/DRH), 2008 U.S. Dist. LEXIS 18281, *3-4 (N.D.N.Y. March 10, 2008).

**\*9** In *Guarneri,* the plaintiff's shoulder was injured during an arrest, and the plaintiff complained for approximately one year about severe pain in his shoulder and an inability to move his arm before he was seen by an orthopedic specialist. *Guarneri v. Bates, et al.,* 9:05-CV-444 (Report-Recommendation) at 2-3 (Dkt. No. 86). Even though the plaintiff in *Guarneri* was able to continue the activities of daily living, including playing "rough basketball" and "punching lights and walls with his injured arm," Judge Homer found sufficient issues of material fact as to the actual pain and severity of the plaintiff's shoulder injury. *Id.* at 11.

In *Benjamin v. Galeno,* 415 F.Supp.2d 254, 259 (S.D.N.Y.2005),[FN9] the court held that although there was no proof in the record that the plaintiff's rotator cuff injury was a serious medical condition, plaintiff's claim that he was suffering extreme pain was sufficient to raise a question of fact, "albeit a tenuous one," as to the objective prong of the Eighth Amendment analysis. A careful reading of these cases shows that generally, the court will bypass the difficult determination of whether a plaintiff has a serious medical need, and will instead consider the second prong of the analysis to determine whether the defendants have shown "deliberate indifference." *See e.g.* *Sereika v. Patel,* 411 F.Supp.2d at 407-409 (dismissing the inadequate treatment claim after finding that plaintiff had demonstrated a serious medical need); *Guarneri v. Bates,* 9:05-CV-444 (Report-Rec. at 11) (finding no evidence of deliberate indifference to shoulder injury, even though there was a question of fact regarding the seriousness of the injury).

> FN9. This case, together with other related cases, was affirmed by the Second Circuit. *enjamin v. Koeningsman,* 204 Fed. Appx. 979 (2d Cir.2006).

In this case, plaintiff injured his shoulder long before the defendants were ever involved in his care, and years went by before he began requesting medical care for his injury. Plaintiff testified that his injury occurred in 1994. (T. at 7-8). According to plaintiff, between 1994 and 1998, his shoulder dislocated as often as once a year. (T. at 11-12). Plaintiff claims that from 1998 until plaintiff sought treatment in Attica Correctional Facility in 2002, plaintiff's shoulder dislocated another three or four times. (T. at 12-13). Plaintiff states that during the time that the shoulder was actually dislocated, the pain was "excruciating, like real throbbing. It hurt, real severe." (T. at 9). Plaintiff testified that the shoulder always relocated itself, and that it took a few minutes for the shoulder to move back to the proper position. (T. at 14).

Oddly enough, the medical records show that plaintiff complained about his shoulder to the two John Doe defendants in Attica in January and February of 2002. However, plaintiff **never** mentioned his shoulder again despite many medical examinations between 2002 and 2003. In fact, the records show that when plaintiff was transferred to Upstate Correctional Facility in June of 2002, plaintiff denied any "chronic medical problems" and had no "current medical complaints." Defs. Ex. B at pp. 57-59.

**\*10** Plaintiff does claim, however, that when the shoulder dislocated, the pain was "excruciating." Additionally, the records show that beginning in 2003, plaintiff did complain about his shoulder regularly. Thus,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

for purposes of this order, the court will find that there is a question of fact regarding the seriousness of plaintiff's medical condition, but will proceed to consider the second element of the standard.

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Id.* (citing *Estelle,* 429 U.S. at 105-106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F .3d at 702). The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

Disagreement with prescribed treatment does *not* rise to the level of a constitutional claim. *Sonds,* 151 F.Supp.2d at 311. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id* . (citations omitted). An inmate does *not* have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does *not* become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

In this case, plaintiff argues that his eventual surgery

on his left shoulder in February 2005 shows that he had a serious medical need, and that medical professionals were indifferent to that serious medical need up until the point that the surgery was ordered. (Dkt. No. 43, 3). None of the defendants in this case came into contact with plaintiff until 2002, and the named defendants at Auburn Correctional facility never met the plaintiff until late 2003.

The medical records show that after plaintiff began experiencing problems with his shoulder in 2003, and he was being examined in the Medical Department at Auburn, the providers never noticed any dislocation. *See, generally* Defs. Ex. B. By the time plaintiff was examined, there was no dislocation, and plaintiff was observed to have the full range of motion. (AHR at Dec. 3, 2003; Feb. 2, 2004; May 4, 2004; Nov. 30, 2004).

*11 In the months from plaintiff's transfer to Auburn Correctional Facility in March or April 2003 and the surgery in February 2005, plaintiff was given medication, assigned strengthening exercises, and prescribed physical therapy. Plaintiff visited the Medical Department on many occasions in 2003 and 2004 when he did not complain about his shoulder at all. Plaintiff names two defendants who actually participated in his medical care: Nurse Androsko and Dr. Kooi.

Plaintiff's complaint about Nurse Androsko basically is that she was rude and verbally abusive to him, and called him a "baby." (T. at 28). Plaintiff states that he first saw defendant Androsko on November 20, 2003. At plaintiff's deposition he stated that when he first saw Nurse Androsko, plaintiff already had an appointment to see Dr. Kooi. (T. at 36). Plaintiff told defendant Androsko about his shoulder, but was also complaining of acne. (AHR Nov. 20, 2003). It is unclear what plaintiff claims that Nurse Androsko should have done at this time. Plaintiff conceded at his deposition that his shoulder was *not* dislocated when he saw defendant Androsko. (T. at 29). Plaintiff saw the doctor on December 3, 2003. (AHR Dec. 3, 2003).

Plaintiff saw defendant Androsko again on December 23, 2003 and January 2, 2004. Compl. ¶¶ 30-38. The AHR confirms these dates. Although again, plaintiff states that this defendant was rude to him, he also stated that his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

shoulder was **not** dislocated when he saw her. (T. at 35-36). During the deposition, plaintiff stated that defendant Androsko told him that she was not going to rush to get him x-rays (T. at 35), however, the AHR indicates that plaintiff wanted the x-rays done "immediately," and that defendant Androsko told plaintiff that the x-rays were ordered, and that they would be done "when the tech has it scheduled." (AHR Dec. 23, 2003). On January 2, 4004, plaintiff saw defendant Androsko and asked to see the doctor. (AHR Jan. 2, 2004). Defendant put plaintiff on the doctor's list. *Id.* Plaintiff also claims that she refused to give him pain medication, telling him to ask Dr. Kooi. (T. at 37). These are the only allegations against this defendant. Plaintiff had his x-rays on January 20, 2004. Def. Ex. B at p. 44.

Plaintiff complains that Dr. Kooi did not treat plaintiff properly, and told plaintiff that he should exercise more. Plaintiff claims that the exercises that Dr. Kooi gave him did not work. In his complaint, plaintiff alleges that "several registered nurses" interpreted the x-rays and told plaintiff that in "their professional judgment," he needed an MRI. Compl. ¶ 48. At his deposition, plaintiff admitted that it may have been **one** nurse that mentioned an MRI, and that plaintiff had "embellished" in the complaint. (T. at 48). The fact that plaintiff disagrees with the defendants' manner, medical judgments, or choices about treatment does not rise to the level of a constitutional violation. As stated above, disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Dr. Kooi did suggest that plaintiff exercise more, however, Dr. Webster also told plaintiff that he had to strengthen his muscles. (T. at 61). In fact, after plaintiff was referred to specialists, they did not initially discuss surgery with plaintiff. (T. at 61). Plaintiff was initially prescribed physical therapy. (T. at 62). Plaintiff participated in physical therapy two to three times per week for two to three months. (T. at 62). It was only after the physical therapy did not work, that Dr. Webster told plaintiff that the decision to have surgery was "up to him." (T. 64-65).

**\*12** Even if Dr. Kooi's and Nurse Androsko's examinations and treatment of plaintiff's shoulder

amounted to negligence or malpractice, malpractice does **not** become a constitutional violation simply because the plaintiff is an inmate. *Sonds, supra. See also Daniels,* 474 U.S. at 332. The fact that surgery was ordered on plaintiff's shoulder at some later date simply does not show that the care that plaintiff received until then was constitutionally inadequate. Plaintiff also testified at his deposition that while he was at Auburn, he never had problems obtaining sick-call visits, and he was always able to see "somebody ." (T. at 72-73). As the alleged "quality" of the care that plaintiff did not like. Plaintiff's allegations, even if they amount to malpractice do not rise to the level of a constitutional violation. Even assuming that plaintiff had a serious medical need, plaintiff's multiple visits to and treatments given by the Medical Department at Auburn Correctional Facility do not constitute deliberate indifference to his serious medical needs.

The motion for summary judgment will be granted, and the complaint dismissed as to defendants Nurse Androsko and Dr. Kooi.

**5. *Service of Process***

Rule 4 of the Federal Rules of Civil Procedure requires that service of process be made within 120 days after the complaint is filed. FED. R. CIV. P. 4(m). If service is not effected, the court "must dismiss the action without prejudice against that defendant or order that service be made within a specified time." *Id.* When plaintiff is proceeding *pro se* and *in forma pauperis,* he is entitled to rely on the U.S. Marshal to serve process. *Romandette v. Wheetabix,* 807 F.2d 309 (2d Cir.1986). *See also* 28 U.S.C. § 1915(d); LOCAL RULES N.D.N.Y. 5.1(g).

Plaintiff filed this action in January 2006, and was notified by order of this court that he should "take reasonable steps to identify the John Doe defendants, including discovery requests served on the named defendants in accordance with the Federal Rules of Civil Procedure." (Dkt. No. 6). In his complaint, plaintiff described both John Does as medical personnel at Attica Correctional Facility. Compl. at ¶¶ 6-7. At plaintiff's deposition in October 2007, plaintiff testified that he had identified both John Does. (T. at 16-17). However,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

plaintiff has made no effort to request service on these individuals, and the 120 days has long since passed.

Generally, the court would dismiss the action without prejudice for failure to serve, however, a review of the claims against these individuals, together with the dates of their alleged actions shows that the complaint should be dismissed with prejudice against these defendants. In his complaint, plaintiff alleges that he saw John Doe # 1 at Attica [FN10] Correctional Facility on January 25, 2002, and he saw John Doe # 2 at Attica Correctional Facility on February 4, 2002. Compl. ¶¶ 14-18. The only allegations against these individuals are that John Doe # 1 told plaintiff that his shoulder was not dislocated after making plaintiff raise his arm, and John Doe # 2 told plaintiff that there was nothing wrong with his shoulder, but that John Doe would "get back to" plaintiff if there was anything he could do. *Id.*

> FN10. Attica is in the Western District of New York. This could raise some venue issues that re not necessary for this court to discuss.

**\*13** Plaintiff did not see these individuals again or complain about his shoulder until August of *2003.* The complaint does not state a claim as against these two individuals. To the extent that plaintiff alleges that they did not treat him properly, he does not state a claim for deliberate indifference. [FN11] This is particularly so because the court has found that plaintiff's Eighth Amendment claims must fail as against all of the defendants, based on plaintiff's medical records and his own testimony. Thus, the court will dismiss this action with prejudice as against the John Doe defendants. [FN12]

> FN11. The court would also point out that there is also a possible statute of limitations issue. The Attica John Does examined plaintiff in January and February of 2002. Plaintiff filed this action on January 18, 2006 (the date the complaint was postmarked) (Dkt. No. 1). The statute of limitations for section 1983 actions is *three* years in New York State. *Weir v. City of New York,* 05 Civ. 9268, 2008 U.S. Dist. LEXIS 61542, *27 (S.D.N.Y. Aug. 11, 2008) (citing *inter alia Owens v. Okure,* 488 U.S. 235, 249-50 (1989);

N.Y. CIV. PRAC. L. & R. § 214(5); *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002)). The accrual of a cause of action is governed by federal law, which provides that a claim accrues when the plaintiff knows or has reason to know of the harm upon which his action is based. *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994). Although this court will not engage in a lengthy analysis of the statute of limitations in this case, the court would simply point out that in addition to plaintiff's lack of a claim for deliberate indifference, there would also be a statute of limitations issue.

> FN12. When a plaintiff is proceeding *in forma pauperis,* the court may dismiss the claim or claims at any time that the court determines *inter alia* that plaintiff does not state a claim for relief. 28 U.S.C. § 1915(e)(2)(B)(2).

Nurse Administrator Robertson has also not been served in this action. On July 20, 2006, the U.S. Marshal filed a "Process Receipt and Return" form indicating that defendant Robertson had not been served because he was no longer employed by DOCS. (Dkt. No. 10). Plaintiff was apparently aware that defendant Robertson no longer worked for DOCS because on the same form, in a section titled "Special Instructions or Other Information that Will Assist in Expediting Service," plaintiff stated that he was "told" that defendant Robertson no longer worked at Auburn. *Id.* Plaintiff then stated that the defendant's "previous employer" at Auburn would have defendant Robertson's forwarding address. *Id.* The docket sheet in this action does not show any further attempts at serving defendant Robertson. Again, normally, the court would either dismiss the action without prejudice or give plaintiff some extra time to serve this defendant, however, as with the John Doe defendants, this court finds that plaintiff does not state a claim against defendant Robertson.

Defendant Robertson was the Nurse Administrator at Auburn Correctional Facility. The only claims that plaintiff makes against this defendant is that plaintiff complained to defendant Robertson "on numerous occasions" when he saw this defendant in the Medical Unit. Compl. ¶ 60. Plaintiff claims that defendant

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

Robertson told plaintiff that he would speak with Dr. Kooi, but Robertson never spoke to Dr. Kooi or assisted plaintiff in solving his problem. Compl. ¶ 61.

Nurse Administrator Robertson is a supervisory official, and like defendant Wright, would not be responsible for failing to investigate plaintiff's problems. *Smart v. Goord,* 441 F.Supp.2d at 642-43. Plaintiff does not claim that defendant Robertson was his medical provider or that he had any other involvement with plaintiff's medical care. The fact that plaintiff saw the Nurse Administrator a few times in the medical unit and mentioned his problems is not a sufficient statement of the personal involvement of this defendant. Thus, the court will dismiss the action with prejudice as against Nurse Administrator Robertson for failure to serve and under 28 U.S.C. § 1915(e)(2)(B)(ii).

**WHEREFORE,** based on the findings above, it is hereby

**ORDERED,** that defendants' motion for summary judgment (Dkt. No. 39) is **GRANTED,** and it is further

**\*14 ORDERED,** that the case against **JOHN DOE # 1, JOHN DOE # 2 and DEFENDANT N.A. ROBERTSON** is **DISMISSED WITH PREJUDICE** for failure to serve and pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), and the complaint is **DISMISSED IN ITS ENTIRETY.**

**It is so ordered.**

N.D.N.Y.,2008.

Booker v. Doe
Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Charles WOODS, Plaintiff,

v.

Glenn S. GOORD, Commissioner Docs; Dr. Lester N. Wright, M.D., Mph Associate Commissioner Chief Medical Officer; Charles G. Greiner, Superintendent of Green Haven Corr. Fac.; Dr. Norman Salwin, Acting Health Service Director Green Haven Corr. Fac.; Dr. Carl J. Koenigsmann, Green Haven Corr. Fac. Health Service Director; Lawrence Zwillinger, Regional Health Servens Administrator; Dr. Charles John Bendheim, Medical Doctor; Dr. Lester S. Silver, U.P.D. Medical Provider; Dr. Steven Weinstent, U.P.D. Physiatrist; Barbara Whitney, Medical Records Clerk; Dr. John Galeno; M. Jones, Correctional Officer; Correction Physician Services, Inc. (CPS),[FN1] Defendants.

> FN1. Plaintiff refers to Charles Greiner as "Grenier" at times, Greiner at other times, and occasionally just "Charles," but is sufficiently precise such that the Superintendent of Green Haven, Charles Greiner, can be identified. The correct spelling of "Salwin" appears to be Norman Selwin. *See* Defendants' (Goord et al.) Memorandum in Support of Motion to Dismiss ("Goord Def. Mem .") at 1. While defense counsel uses the name Weinstent, *see* Galeno Defendants' Memorandum in Support of Motion to Dismiss ("Galeno Def. Mem.") at 1, the correct spelling appears to be Weinstein.

No. 01 CIV. 3255(SAS).

|

April 23, 2002.

Charles Woods # 82-A-5434, Unit for the Physically Disabled, Green Haven Correctional Facility, Stormville, for Plaintiff (Pro Se).

Melinda Chester-Spitzer, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, for Defendants Goord, Wright, Greiner, Selwin, Koenigsmann, Zwillinger, Bendheim, Silver and Whitney.

Tracy M. Larocque, Esq., Pennock & Breedlove LLP, Clifton Park, for Defendants Weinstein, Galeno and CPS.

OPINION AND ORDER

SCHEINDLIN, D.J.

**\*1** Charles Woods, proceeding *pro se,* brings this action pursuant to 42 U.S.C. § 1983 against the New York Department of Corrections ("DOCS") and its officials, and various supervisors, health care providers and employees of Green Haven Correctional Facility ("Green Haven"), for failing to provide him with medical care in violation of the Eighth Amendment. Woods also brings claims under Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12132, and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, for discrimination on the basis of disability. He seeks monetary damages and injunctive relief.

Defendants Glenn Goord, Lester Wright, Charles Greiner, Norman Selwin, Carl Koenigsmann, Lawrence Zwillinger, Charles John Bendheim, Lester Silver, and Barbara Whitney (collectively, the "Goord defendants") now move to dismiss the Complaint and Amended Complaint pursuant to Rule 12(b)(6). Defendants Steven Weinstein, John Galeno and Correction Physician Services ("CPS") (the "Galeno defendants") move to dismiss all claims pursuant to Rule 12(c). For the reasons below, the motions are granted in part and denied in part. The claims against the remaining defendants are dismissed.[FN2]

> FN2. There are five additional defendants. "M. Jones" is named in the caption of the Amended Complaint, but apparently has not been served. Additional defendants are mentioned in the body of the Amended Complaint: "Selim Ace," "Mar[ ]y Kate Moddox Williams," "Randy Duprey," and DOCS. *See* 6/18/01 Amended Complaint ("Am.Compl.") ¶¶ (F); (O)-(P); (T). Although these individuals and this entity are not listed in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

the caption, I will treat them as if they were named defendants. In addition, I will construe the plaintiff's opposition papers to contain factual allegations to the extent that they are consistent with the allegations in the Amended Complaint. *See Burgess v. Goord,* No. 98 Civ.2077, 1999 WL 33458, at *1 n. 1 (S.D.N.Y. Jan. 26, 1999) ("In general, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.") (citing cases); *see also Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001) (stating that courts should include in their analysis of motions to dismiss "not only the assertions made within the four corners of the Complaint itself, but also those contained in the documents attached to the pleadings or in documents incorporated by reference.").

I. BACKGROUND

The following allegations are drawn from the Amended Complaint and Woods's opposition papers.
A. The Parties

Charles Woods is a 63-year-old prisoner currently incarcerated at Green Haven Correctional Facility ("Green Haven") in Stormville, New York. *See* Am. Compl. ¶ (D) at 2; 1/11/02 Plaintiff's Opposition to Defendants' Motion ("Pl.Opp.2d") at 10.[FN3] Defendant Glenn Goord is the Commissioner of DOCS. *See* Am. Compl. ¶ (G) at 2. Defendants Lester Wright, M.D., and Lawrence Zwillinger, are DOCS's Chief Medical Officer and Regional Health Administrator, respectively. *See id.* ¶¶ (I), (L) at 3. Defendant Charles Greiner is the Superintendent of Green Haven. *See id.* ¶ (H) at 2. Defendants Norman Selwin and Carl J. Koenigsmann are Green Haven's Medical Director and Health Services Director, respectively. *See id.* ¶¶ (J), (K) at 3. Dr. Lester S. Silver is the Medical Director for Green Haven's Unit for the Physically Disabled ("UPD"), where plaintiff resides. *See id.* ¶ (N) at 3.

FN3. Plaintiff submitted a first opposition brief on December 6, 2001. *See* 12/6/01 Objection to

Motion and Conference Hearing.

Plaintiff has also sued the following health care professionals. Doctors Charles J. Bendheim, Steven Weinstein and John Galeno each treated plaintiff directly. Dr. Bendheim was the primary care physician for plaintiff and other physically disabled inmates at the time of most of the alleged events. *See id.* ¶ (M) at 3. Defendant Selim Ace is a physical therapist employed by DOCS, and defendant Mary Kate Moddox Williams is his assistant. *See id.* ¶¶ (O)-(P) at 4.

B. Summary of Woods's Medical History at Green Haven

Woods was first incarcerated at Green Haven in December 1995. *See id.* ¶ 1. In early 1996, Woods asked to see a doctor after he began experiencing pain in his hands, knees, elbows, hips and back. *See id.* ¶ 3. He was seen by Dr. Bendheim, who referred him to Dr. Helen Feng, a rheumatologist at Albany Medical Center ("AMC"). *See id.* Dr. Feng examined Woods on May 31, 1996, the first of many such visits. *See id.* Feng and other specialists have since determined that Woods suffers from Rheumatoid Arthritis, Degenerative Joint Disease and leukemia. *See id.* ¶¶ 2, 20. From 1996 to the present, plaintiff has thus required extensive care, including chemotherapy.

**\*2** Woods alleges that from 1996 to 1999, Dr. Bendheim delayed or did not schedule many specialist-ordered appointments. He alleges that, following surgery on Woods's elbow in 1999, Dr. Weinstein denied him physical therapy in 2000 and 2001. Plaintiff also alleges that from 1996 to the present he has requested, but has been denied, surgery to replace his knees, hips, and elbows with prostheses. In addition, since 1996, Woods has consistently requested a lightweight wheelchair due to the extreme pain he experiences in trying to operate his current, heavy wheelchair. These allegations are fully discussed in Part IV, *infra*.

On April 19, 2001, after years spent exhausting prison grievance procedures, *see infra* note 16, plaintiff filed his original Complaint. *See* 4/19/01 Complaint ("Compl."). On June 21, 2001, plaintiff filed an Amended Complaint. Plaintiff seeks $250,000 in compensatory damages from each defendant for a total of $5,000,000. *See id.* ¶¶ 34,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

(A)-(C).[FN4]

> FN4. Plaintiff does not address the fact that $250,000 multiplied by the number of defendants (17) does not equal $5,000,000.

## II. LEGAL STANDARD

A motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Tarshis v. Riese Org.,* 211 F.3d 30, 35 (2d Cir.2000) (quotation marks and citation omitted).[FN5] "At the Rule 12(b)(6) stage, [t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000) (citation, quotation omitted).[FN6] The task of the court in ruling on a Rule 12(b)(6) motion is " 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." ' *Id.* (quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984)). When deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "take as true all of the allegations contained in plaintiff's complaint and draw all inferences in favor of plaintiff." *Weinstein v. Albright,* 261 F.3d 127, 131 (2d Cir.2001).

> FN5. Plaintiff opposes *summary judgment* in his 40-page brief, to which nearly one hundred pages of exhibits are attached. *See* Pl. Opp.2d. But because defendants moved to dismiss for failure to state a claim, they need not comply with Local Rules 3(g) or 56.1, or any other rule pertaining to summary judgment, as plaintiff argues.

> FN6. The same standard applies to Rule 12(c) motions to dismiss. *Fed.R.Civ.P. 12(c); see Simpri v. New York City Agency for Children's Servs.,* No. 99 Civ. 6712, 2001 WL 1661910, at *2 (S.D.N .Y. Dec. 28, 2001) (citing *Irish Lesbian and Gay Org. v. Giuliani,* 143 F.3d 638, 644 (2d Cir.1998)).

Because "most pro se plaintiffs lack familiarity with the formalities of pleading requirements, [courts] must construe pro se complaints liberally, applying a more flexible standard to evaluate their sufficiency." *Lerman v. Board of Elections in the City of New York,* 232 F.3d 135, 140 (2d Cir.2000) (citing *Hughes v. Rowe,* 449 U.S. 5, 9-10 (1980), and *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972)). Courts must remain particularly "mindful of the care exercised in this Circuit to avoid hastily dismissing complaints of civil rights violations." *Gregory,* 243 F.3d at 691. "Complaints based on civil rights statutes must include specific allegations of facts showing a violation of rights instead of a litany of general conclusions that shock but have no meaning." *Burgess,* 1999 WL 33458, at *2 (citing, *inter alia, Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987)). "However, assertions must truly be bare for dismissal to be appropriate." *Id.* (citing *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 672 (2d Cir.1995)).

## III. ELEVENTH AMENDMENT IMMUNITY

**\*3** Plaintiff brings both federal and state claims against all defendants, including state agencies DOCS and CPS, in their official as well as individual capacities. *See* Am. Compl. ¶¶ (D)-(V) ("The Parties"), 32-33.
A. Federal Claims

The Eleventh Amendment bars suit in federal court by a citizen of a state against a state or its agencies, unless the state has waived immunity to suit, *see Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100-01 (1984), or Congress has abrogated the state's immunity, *see Quern v. Jordan,* 440 U.S. 332, 343-44 (1979). *See also Farricelli v. Holbrook,* 215 F.3d 241, 244-45 (2d Cir.2000); *Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993). Because New York has not waived its immunity, *see Oyague v. State,* No. 98 Civ. 6721, 2000 WL 1231406, at *5 (S.D.N.Y. Aug. 31, 2000), and 42 U.S.C. § 1983 was not intended to abrogate states' immunity, *see Quern,* 440 U.S. at 343-44, the Eleventh Amendment bars plaintiff's claims against both DOCS and CPS because they are state agencies.[FN7]

> FN7. Woods's claims against DOCS and CPS in their individual capacities are dismissed for failure to state a claim.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

A state official is also entitled to invoke Eleventh Amendment immunity to the extent that she is sued in her official capacity, because such suit is deemed to be one against the state itself. *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985); *Spencer v. Doe,* 139 F.3d 107, 111 (2d Cir.1998). In addition, suits for monetary damages from the state treasury are barred. *See Edelman v.. Jordan,* 415 U.S. 651, 677 (1974). Thus, plaintiff's claims for money damages against the defendants in their official capacities are dismissed for failure to state a claim on which relief may be granted. *See Spencer,* 139 F.3d at 111; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993).

B. State Law Claims

Plaintiff alleges negligence and violations of New York State Corrections Law against all defendants. *See* Am. Compl. ¶¶ 32-33. Absent a waiver by the state, however, the Eleventh Amendment also bars *state law* claims against state officials in their official capacity. *See Pennhurst,* 465 U.S. at 99-101. New York has made no such waiver. To the contrary, New York explicitly bars state law claims brought by state prisoners against state law correction personnel in federal court, *see* N.Y. Corr. Law § 24, and the federal courts are bound by this provision, *see Ierardi v. Sisco,* 119 F.3d 183, 186 (2d Cir.1997). Plaintiff's state claims are dismissed in their entirety.

IV. EIGHTH AMENDMENT CLAIMS (PURSUANT TO 42 U.S.C. § 1983)

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that defendants, while acting under color of state law, denied plaintiff a constitutional or federal statutory right. *See West v. Atkins,* 487 U.S. 42, 48 (1988); *Ruggiero v. Krzeminski,* 928 F.2d 558, 562-63 (2d Cir.1991). The Eighth Amendment's prohibition against cruel and unusual punishment of prison inmates has been construed to include the denial of adequate medical care. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994); *Estelle v. Gamble,* 439 U.S. 97, 104 (1976) (holding that such behavior amounts to an "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment); *Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at *7 (S.D.N.Y. Mar. 7, 2002) ("A person who is

incarcerated is entitled to receive adequate medical care."). Prison officials violate this right when they are deliberately indifferent to an inmate's serious medical needs. *See Estelle,* 429 U.S. at 104; *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001).

**\*4** The Second Circuit has interpreted *Estelle* to consist of objective and subjective elements: *First,* a court must determine whether, objectively speaking, plaintiff's condition is such that the alleged deprivation of medical assistance is " 'sufficiently serious." ' *Hathaway v. Coughlin,* 37 F.3d 63, 66-67 (2d Cir.1994) (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). This "standard contemplates a 'condition of urgency, one that may produce death, degeneration, or extreme pain." ' *Id.* (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)). A serious medical need arises where " 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." ' *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997)). *See, e.g., Rivera v. Goord,* 119 F.Supp.2d 327, 332, 337 (S.D.N .Y.2000) (pain and facial swelling, migraines and burning in eyes gave rise to serious medical need); *Arce v. Banks,* 913 F.Supp. 307, 309 (S.D.N.Y.1996) (failure to treat small cyst on forehead not sufficiently serious).

*Second,* a court must consider whether the official " 'kn[ew] that an inmate face[d] a substantial risk of serious harm, and disregarded that risk by failing to take proper measures to abate it ." ' *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (quoting *Farmer,* 511 U.S. at 837). The failure to render proper care must result from a "sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66 (citing *Wilson v. Seiter,* 501 U.S. at 298). "[T]he subjective element of deliberate indifference entails something more than mere negligence but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin II,* 99 F .3d 550, 553 (2d Cir.1996) (citing *Farmer,* 511 U.S. at 835). While mere medical malpractice is not tantamount to deliberate indifference, certain instances of medical malpractice may rise to that level. *See id.* (citing *Farmer,* 511 U.S. at 847).

Here, it is largely undisputed that plaintiff's medical

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

needs were serious. *See* Galeno Def. Mem. at 5. The key questions in this case turn on whether plaintiff has pleaded facts which show that each defendant was deliberately indifferent to those needs. As stated earlier, Woods's allegations must be assumed true for purposes of this discussion.

A. Dr. Bendheim

Beginning in early 1996, Dr. Bendheim established a pattern of sending plaintiff to specialists, and then ignoring their orders for monthly follow-up visits and blood work. Courts have held that a prison official's delay in scheduling appointments and failure to follow orders of a doctor constitutes denial of adequate medical care. *See, e.g., Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) ("Prison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors."); *Brown v. Coughlin,* 758 F.Supp. 876, 882-83 (S.D.N.Y.1991). Moreover, a pattern "might be taken to show that the described incidents were not accidents, inadvertent failures, or random occurrences of medical malpractice." *Abdush-Shahid v. Coughlin,* 933 F.Supp. 168, 182 (N.D.N.Y.1996) (quotation omitted).

**\*5** At plaintiff's first appointment with Dr. Feng at AMC on May 31, 1996, he was ordered to return one month later. Yet Dr. Bendheim waited until January 31, 1997, *seven* months later, to send plaintiff for a follow-up visit.[FN8] *See* Am. Compl. ¶¶ 3-4. He then failed to have plaintiff's blood work done in advance of the visit, as ordered. *See id.* ¶ 4. Subsequently, rather than schedule plaintiff for an appointment one month from January 31, Dr. Bendheim did not do so until June 10, 1997, *six* months later. *See id.* ¶ 6. Again, Bendheim failed to take the necessary steps to have plaintiff's blood work done. *See id.*

> FN8. This claim is not time-barred because the last such act occurred less than three years before plaintiff filed his Complaint. "When a plaintiff challenges a policy that gives rise over time to a series of allegedly unlawful acts, it will often be the case that plaintiff might bring his claim after the first such act, and yet the law may render timely a claim brought prior to the expiration of the statute of limitations on the last such act."

*Connolly v. McCall,* 254 F.3d 36, 40 (2d Cir.2001). *See also id.* (New York statute of limitations of three years for personal injury actions applies to Eighth Amendment claims brought pursuant to section 1983 in New York).

After this appointment, plaintiff saw Dr. Feng in July 1997 and September 1997. *See id.* Yet the pattern of delayed visits continued. In January of 1998, Bendheim failed to schedule a follow-up visit with a hematologist as ordered by a "Dr. Scroggion" in late 1997. *Id.* ¶ 17. In August 1999, Dr. Bendheim ignored orders issued by St. Agnes Hospital-where plaintiff had undergone elbow surgery in the Fall of 1999-to schedule appointments with a hematologist and a rheumatologist. *See* Pl. Opp.2d at 39.[FN9] As a result of Dr. Bendheim's actions, plaintiff's weight dropped dramatically and his white blood cell count became unstable. *See* Am. Compl. ¶ 4.

> FN9. Plaintiff does not mention any defendant in connection with this last omission, but liberally construing his pleadings which elsewhere tie Bendheim to a failure to schedule such appointments, I conclude that plaintiff intended to name Bendheim here.

Bendheim thus repeatedly flouted the orders of trained specialists over several years.[FN10] Further, he never rescheduled plaintiff's knee surgery that was put off in June 1996 due to a shortage of beds.[FN11] *See id.* ¶ 17. Although the proof may show otherwise, these allegations state a claim of deliberate indifference to plaintiff's serious medical needs. Defendants' motion is denied with respect to plaintiff's Eighth Amendment claims against Dr. Bendheim.

> FN10. Bendheim does not contend that his opinion differed from that of Dr. Feng or any other specialist with respect to plaintiff's allegations regarding the need for follow up visits. *See Amaker v. Goord,* No. 98 Civ. 3634, 2002 WL 523371, at *6 (S.D.N.Y. Mar. 29, 2002) (citing *Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622 (S.D.N.Y. Oct. 15, 1999) ("[A] prisoner's disagreement with the diagnostic techniques or forms of treatment

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

employed by medical personnel does not itself give rise to an Eighth Amendment claim."), and *Muhammad v. Francis,* No. 94 Civ. 2244, 1996 WL 657922, at *6 (S.D.N.Y. Nov. 13, 1996) ("It is well established that mere differences in opinion regarding medical treatment do not give rise to an Eighth Amendment violation.")).

FN11. Bendheim's argument, that plaintiff does not state a claim because he received plenty of care, is unavailing. *See Hathaway,* 37 F.3d at 68 (defendant doctor's frequent examinations of plaintiff did not preclude finding of deliberate indifference because "course of treatment was largely ineffective, and [he] declined to do anything more to improve [plaintiff's] situation."); *Ruffin v. Deperio,* 97 F.Supp.2d 346, 353 (W.D.N.Y.2000) (stating that deliberate indifference could be pleaded despite frequent treatment by prisoner's doctors where treatment was "cursory" or evidenced "apathy").

B. Dr. Weinstein

Following plaintiff's elbow surgery in Fall 1999, Dr. Weinstein refused to carry out plaintiff's surgeon's orders-on seven different occasions in late 2000 and early 2001-by denying plaintiff's requests for physical therapy. *See* Pl. Opp.2d at 38. Instead, Dr. Weinstein prescribed "home treatment" or "self-exercise," despite the fact that plaintiff could not use his arms to do anything including such basic functions as washing or dressing himself. Pl. Opp.2d at 38. I must draw the reasonable inference that, at times, no one was available to assist plaintiff in doing those things.

While plaintiff may not be able to prove his case against Dr. Weinstein, that is not the test here. By alleging that Dr. Weinstein intentionally refused to provide the treatment ordered by a specialist, such that plaintiff was virtually incapacitated, plaintiff has successfully pleaded that Dr. Weinstein was deliberately indifferent to his serious medical needs.

C. Dr. Silver

On September 16, 2000, Dr. Silver examined

plaintiff's elbow, which was dripping fluid and causing him "excruciating pain." Pl. Opp.2d at 22-3. Plaintiff requested surgery and a bone scan; Silver's response was "soap it." *Id.* at 22. While a medical doctor's determination is presumed correct, in certain instances a physician may be deliberately indifferent if he consciously chooses "an easier and less efficacious" treatment plan. *Chance,* 143 F .3d at 703. *See also Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974); *Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir.1989). Because plaintiff may be able to prove that such was the case here, this claim cannot be dismissed against Dr. Silver. In addition, on February 8, 2001, plaintiff was taken to St. Agnes Hospital for surgery on his elbow, but was turned away because "the facility failed to properly arrange this trip." Pl. Opp.2d at 23. When he arrived back at Green Haven, he asked Dr. Silver to reschedule the surgery but Dr. Silver refused. *See id.* Once again, allegations that a prison doctor failed to follow the orders of specialists or schedule surgery where the plaintiff's condition is admittedly grave, states a claim of deliberate indifference. Defendants' motion with respect to Dr. Silver is denied.

D. Dr. Galeno

*\*6* On August 17, 1999, Dr. Galeno performed surgery on plaintiff's elbow, then "failed to order antibiotics" despite "s[eeing] plaintiff's... infection." Am. Compl. ¶ 12. Instead, Dr. Galeno prescribed "Noprxen" for plaintiff's pain. Pl. Opp.2d at 39. As a result, plaintiff's elbow was infected for three days. *See* Am. Compl. ¶ 12.

While plaintiff alleges that Galeno was aware of some risk to plaintiff, his case against Galeno fails on both prongs. *First,* the alleged deprivation of care caused a localized infection that lasted for three days, which is not a condition approaching urgency, degeneration or great pain. *See Hathaway,* 37 F.3d at 66. *Second,* there was "no delay" in prescribing *some* treatment, and "the fact that plaintiff felt something more should have been done ... [is] not a sufficient basis for a deliberate indifference claim." *Brown v. McElroy,* 160 F.Supp.2d 699, 704 (S.D.N.Y.2001). The allegations against Dr. Galeno state, at most, a claim for one instance of medical malpractice, and therefore must be dismissed. *See Estelle,* 439 U.S. at 104; *Pritchett v. Artuz,* No. 99 Civ. 3957, 2000 WL 4157, at *3 (S.D.N.Y. Jan. 3, 2000).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

E. Supervisory Defendants: Goord, Greiner, Wright, Selwin, Koenigsmann, and Zwillinger

Plaintiff claims that Goord, Greiner and Wright "failed to remedy a constitutional deprivation and are personally involved." Pl. Opp.2d at 12. He asserts that all of the supervisors named in this lawsuit, Goord, Greiner, Wright, Selwin, Koenigsmann and Zwillinger, had "authority and ability" to address his problems but did not. *Id.* at 34.

It is well established that personal liability cannot be imposed on a state official under a theory of *respondeat superior. See Black v. Coughlin II,* 76 F.3d 72, 74 (2d Cir.1996); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).* "The plaintiff must plead ... that the defendant had some direct [or personal] involvement in or responsibility for the misconduct." *Thompson v. State of New York,* No. 99 Civ. 9875, 2001 WL 636432, at *6 (S.D.N.Y. Mar. 15, 2001) (citing *Hendricks v. Coughlin,* 114 F.3d 390, 394 (2d Cir.1997)). A supervisory official may be personally involved in a section 1983 violation where the official: (1) directly participated in the infraction or ordered that the action be taken; (2) failed to remedy a wrong after learning of the violation; (3) created or allowed the policy or custom under which the incident occurred; (4) was grossly negligent in managing subordinates who caused the incident; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *See Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). To succeed on a claim under section 1983 a plaintiff must allege personal involvement by each defendant in the alleged constitutional deprivation. *See Keyes v. Strack,* No. 95 Civ. 2367, 1997 WL 187368, at *3 (S.D.N.Y. Apr. 16, 1997).

*7 The *alleged constitutional deprivations,* upon which supervisory liability may be predicated, are: (1) Bendheim's pattern, from 1996 to 1999, of delaying the scheduling of appointments with specialists and not carrying out their orders. and his failure to reschedule knee surgery; (2) Weinstein's failure to follow a specialist's orders regarding physical therapy; and (3) Silver's opting for the easiest course of treatment for

plaintiff's elbow, and failure to reschedule elbow surgery in February 2001.[FN12] Plaintiff argues that the grievances he filed and the letters he wrote to these supervisors, *see* Am. Compl. ¶¶ 4, 5, 8, 13, establish their personal involvement in these alleged constitutional deprivations, *see* Pl. Opp.2d at 12-15, 19-22.

FN12. *See Poe v. Leonard,* 282 F.3d 123, 126 (2d Cir.2002) (holding that in order for a supervisor to be held liable under section 1983, a subordinate must have violated the law). Plaintiff argues that the supervisory defendants were personally involved in two additional claims. First, plaintiff argues that he was unconstitutionally denied a lightweight wheelchair. *See* Pl. Opp.2d at 18-19, 25, 32-33. Plaintiff does not allege, however, that any individual defendant or defendants are responsible for this deprivation. Therefore, this claim must be dismissed. In July 1999, plaintiff's elbow required immediate attention, but surgery was delayed for three months. *See* Am. Compl. ¶ 21. Here, too, plaintiff fails to implicate any defendant and thus the claim must be dismissed.

The test for personal involvement of supervisory officials implies some alleged violation of a federal right. *See Poe,* 282 F.3d at 126. Where, as here, plaintiff does not successfully allege any violation, *supervisory* liability is not adequately pleaded, either. Personal involvement in an alleged violation cannot exist where there is no alleged violation.

1. Commissioner Goord and Superintendent Greiner

Plaintiff alleges that Goord and Greiner "ignored *all* [of his] grievances and appeals, [and] also failed to act on direct information indicating that [the *Milburn* decree is not being enforced]." Pl. Opp.2d at 13 (emphasis added).[FN13] Even construed liberally, however, "direct information" does not refer to anything other than the letters plaintiff wrote to Goord and Greiner, because no other specific facts are alleged with respect to these defendants. *See id.* at 13-14, 19-20, 22. Receipt of letters

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

or grievances, however, is insufficient to impute personal involvement. *See Thompson,* 2001 WL 636432, at *7; *Rivera,* 119 F.Supp.2d at 344; *Pritchett,* 2000 WL 4157, at *6; *Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, at *6 (S.D.N.Y. July 13, 1998).[FN14] "Were it otherwise, virtually every prison inmate who sues for constitutional torts by [prison officials] could name the [supervisor] as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the [supervisor]." *Thompson,* 2001 WL 636432, at *7. Greiner "passed upon" several of plaintiffs letters by referring them to Lester Wright. *See, e.g.,* 12/10/99 Letter from Wright to Goord, Ex. 6 to Am. Compl. (stating that Commissioner Goord had forwarded plaintiff's September 13, 1999 letter to him). Referring medical complaint letters to lower-ranked prison supervisors, however, does not constitute personal involvement. *See Ramos v. Artuz,* No. 00 Civ. 149, 2001 WL 840131, at *8 (S.D.N.Y. July 25, 2001). Because there are no further allegations regarding Goord or Greiner, plaintiff's case is dismissed as against them.

FN13. In 1980, Judge Robert Ward of this Court certified a class of present and future Green Haven inmates challenging the constitutionality of Green Haven's provision of health care services. *See Shariff v. Artuz,* No. 99 Civ. 321, 2000 WL 1219381, at *4 n .5 (S.D.N.Y. Aug. 28, 2000) (referring to "*Milburn v. Coughlin,* No. 79 Civ. 5077 (S.D.N.Y.)"). The parties entered into a series of agreements culminating in the 1991 modified consent decree, requiring Green Haven to create and maintain an ADA and Rehabilitation Act-compliant unit for the physically disabled-the UPD-and establishing certain guidelines for adequate medical care. *See id.; see also McKenna v. Wright,* No. 01 Civ. 6571, 2002 WL 338375, at *7 n. 9 (S.D.N.Y. Mar. 4, 2002) (recognizing Milburn consent decree); *Green v. Bauvi,* 792 F.Supp. 928, 936 n. 12 (S.D .N.Y.1992) (same). To the extent that plaintiff is alleging a violation of the *Milburn* decree, his action is not properly before this Court and thus cannot be considered. *See McKenna,* 2002 WL 338375, at *7 n. 9 (holding that plaintiff must refile with Judge Ward who

retains supervision over enforcement of the Milburn decree); *Kaminsky v. Rosenblum,* 737 F.Supp. 1309, 1317 n. 6 (S.D.N.Y.1990) ("[Issue of whether Milburn decree was violated] is not, and cannot be, before this Court. Violations of the *Milburn* decree can be remedied only by bringing the alleged violations to the attention of the able District Judge [Ward] who retains supervision over that decree."). Thus, plaintiff's claims to enforce the *Milburn* decree are denied.

FN14. In *Burgess,* I stated that "courts have found personal involvement of a supervisory official where a plaintiff has sent letters or orally informed the official of an ongoing constitutional violation." 1999 WL 33458, at *5 (quoting *Heron v. Dalsheim,* No. 95 Civ. 2625, 1999 WL 2871, at *5 (S.D.N.Y. Jan. 4, 1999)). I note, however, that this statement of law is now against the weight of authority. In any event, plaintiff in *Burgess* alleged that a supervisor said to him "something to the effect that he saw no reason why plaintiff could not take the stairs one day out of the week." *Id.* at *1, *5. This allegation evinced a level of personal involvement outside of the official's receipt of plaintiff's complaints. *See id.* at *5.

2. Associate Commissioner Wright and Health Services Director Koenigsmann

Wright and Koenigsmann, on the other hand, did not merely receive plaintiff's letters, but also responded to them. *See* Pl. Opp.2d at 22. On December 10, 1999, Wright wrote to plaintiff, explaining that plaintiff's letter to Goord had been forwarded to him. *See* 12/10/99 Letter from Wright to Woods ("12/10/99 Wright Ltr."), Ex. 6 to Am. Compl. Wright allegedly gave the following explanation in response to plaintiff's complaint that he was not seeing the rheumatologist often enough:

**\*8** You have been examined by a rheumatologist on May 6 and July 22 of this year; received a prosthetic elbow brace on July 28, 1999, been evaluated by the orthopedic surgeon on August 18, September 10, September 27 and November 8 of this year, and had surgery on your right elbow on November 12, 1999. On

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

August 24, 1999 your white blood cell count was 116,000 and this test was repeated at St. Agnes Hospital the same day with a result of 95.5. On September 3 it was 80.8; on September 24 it was 76.4 and on November 4, is was 74.7. You were scheduled to see the hematologist in follow-up at Westchester Medical Center on October 4, but you refused. You had a decompressive laminectomy of your neck on April 27[,] 1999. Your left shoulder triplearthrodesis was postponed to accommodate your neck surgery; as have your bunion surgery and left foot triplearthrodesis....

12/10/99 Wright Ltr. Plaintiff alleges that Wright responded on two other occasions with similarly informative, thorough letters. *See* 10/18/00 Letter from Wright to Goord, Ex. 22 to Am. Compl.; 1/24/01 Letter from Wright to Goord, Ex. 6 to Am. Compl. In response to his complaint regarding the alleged denial of physical therapy, plaintiff alleges that Koenigsmann wrote on May 4, 2000:

I have investigated the allegations made in your letter and discussed your case at length with the Physical Therapy department as well as reviewed the documentation involved in the event. On 5/1/00 you began therapy for your right elbow. The recommendation for Physical Therapy was made both by Physiatry and the Orthopedic Surgeon as well as the types of therapy I.e. [sic] active range of motion and strengthening exercises. When you arrived in Physical Therapy you were instructed to begin active range of motion exercises, you declined to participate in this program and insisted on Passive range of motion. This was not indicated or recommended for your treatment. With that you stated that you would do that in your cell on your own and refused therapy. To be clear, the Physical Therapy personnel were fully prepared to have you participate in the program but the type of therapy must be per the recommendations of the Physicians and Physical Therapists. To refuse care because they will not comply with the program that you want but do not need is potentially hindering maximum recovery from the surgery. I urge you to agree to return to Physical Therapy and follow the program that was arranged for you.

5/4/00 Letter from Koenigsmann to Woods, Ex. 20 to

Am. Compl. Plaintiff argues that Wright and Koenigsmann thus had actual knowledge of these wrongs committed by their subordinates but did not attempt to remedy them except to respond to his complaints.

One court has held that where a supervisor's "involvement went beyond merely the receipt of complaint letters," to "responding, explaining the treatment and defending the institution," personal involvement was established. *Ramos,* 2001 WL 840131, at *8 (Pitman, J.). *See also Rashid v. Hussain,* No. 95 Civ. 676, 1997 WL 642549, at *2-*3 (N.D.N.Y. Oct. 15, 1997) (Pooler, J.) (detailed responses to prisoner's letter establish personal involvement). This is by no means the majority rule, however. *See, e.g., Joyner v. Greiner,* No. 01 Civ. 7399, 2002 WL 550092, at *5 (S.D.N.Y. Mar. 28, 2002) (McMahon, J.) (holding that prison doctor's response to plaintiff's letter did not plead personal involvement); *Ramsey v. Coughlin,* 1 F.Supp.2d 198, 204 (W.D.N.Y.1998) (holding that plaintiff's claim that supervisor responded to his letters is not sufficient to establish personal involvement).

**\*9** Wright and Koenigsmann's provision of information and advice based on diagnoses from their staff does not appear to constitute "fail[ure] to remedy a wrong." *Colon,* 58 F.3d at 873. Supervisors are entitled to rely on and adopt the recommendations of prison doctors without incurring a charge of personal involvement. *See Thompson,* 2001 WL 636432, at *7; *Keyes,* 1997 WL 187368, at *3. Moreover, it may be said here: "Far from establishing deliberate indifference, [the medical supervisor's] response demonstrates appropriate attention to plaintiff's circumstances." *Joyner,* 2002 WL 550092, at *5. On the other hand, plaintiff alleges that Wright and Koenigsmann responded to his complaints in a detailed, specific manner, a factor not present in *Joyner. See also Rashid,* 1997 WL 642549, at *3 (stating that where defendant merely responded to plaintiff's letter, no personal involvement would be established, but opposite is true where defendant responded in such a way as to suggest notice of the "duration and extent of [plaintiff]'s condition"). Because the depth of their responses indicates full awareness of plaintiff's situation, Wright and Koenigsmann may actually have failed to remedy a wrong by, for instance, not intervening to schedule a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

rheumatology appointment or ensuring that physical therapy treatment was provided. The motions to dismiss are denied with respect to Wright and Koenigsmann.

3. Acting Health Service Director Selwin

Woods alleges that Norman Selwin "constantly ... denied [plaintiff] medical treatment for his neck, shoulder, wrist, elbows, knees, rheumatoid arthritis monthly appointments, MRI and x-ray consults." Pl. Opp.2d at 20. Beyond this conclusory allegation which provides no dates or time frame, there is no other allegation of Selwin's personal involvement, as defined in *Colon v. Coughlin,* with respect to any of the established allegations of deprivation. The Complaint and Amended Complaint are thus dismissed with respect to Selwin for failure to state a claim.

4. Regional Health Administrator Zwillinger

Plaintiff does allege sufficient facts to state a claim against Zwillinger. FN15 In 1998, Zwillinger was "constantly contacted by Dr. Robert Cohen M.D. (Medical Auditor assigned by Judge Ward U.S.D.J.) and Margaret K. Loftus from Prisoner's Rights Project regarding plaintiff's constitutional deprivation of adequate medical care and the violation of the burn v. Coughlin stipulation." Pl. Opp.2d at 15. Both Cohen and Loftus specifically requested that Zwillinger remedy the lack of regularly scheduled rheumatology appointments. *See* 9/25/98 Letter from Loftus to Zwillinger, Ex. 11 to Am. Compl. ("Mr. Woods ... has not been to see his Rheumatoid Arthritis specialist in over four months."); 8/21/98 Letter from Cohen to Zwillinger, Ex. 10 to Am. Compl. ("Could you please review the care of Mr. Woods with [respect to] ..: 1. Lack of access to specialty care, specifically rheumatology consultation. Mr. Woods needs to be seen regularly by a rheumatologist and is being denied access to necessary consultation.").

FN15. Several allegations against Zwillinger are dismissed for failure to state a claim. Plaintiff alleges that in January 1996 and as late as March 19, 1996, Zwillinger, Koenigsmann, and Selwin "[led] [the medical team] to believe plaintiff had a reconstruct[ive] should[er] operation at St. Agnes, where in fact plaintiff never had reconstructive surgery, plaintiff had arthroscopic

surgery." Am. Compl. ¶ 16. Plaintiff claims that the effort to mislead the medical team as to the type of surgery he had in 1996 at St. Agnes continues to this day, as does his suffering because of it. *See id.* These allegations are wholly inexplicable and as such, fail to state a claim for which relief can be granted.

**\*10** Thus, Zwillinger had knowledge, beyond receipt of letters or grievances from plaintiff, of alleged unconstitutional deprivation. *See Poe v. Pearl,* No. 94 Civ.2058, 1997 WL 76576, at \*6 (D.Conn. Jan. 29, 1997) ("A supervisor acts with deliberate indifference if he has actual or constructive knowledge of unconstitutional practices and fails to act on the basis of information available to him."). Outside health and legal professionals appealed directly to Zwillinger on behalf of Woods, and he did nothing. *See Ramos,* 2001 WL 840131, at \*9-\*10 (holding that prison official's receipt of direct and detailed pleas from the Legal Aid Society regarding plaintiff's deprivation of treatment, and failure to respond appropriately, constituted deliberate indifference). Zwillinger thus exhibited deliberate indifference to Woods's serious medical needs by failing to act on Cohen's or Loftus's pleas. *See Colon,* 58 F.3d at 873. Defendants' motion is denied as to Zwillinger.

F. Defendants Ace, Williams and Duprey

Plaintiff does not allege any facts, in either complaint or in his opposition papers, with respect to Selim Ace, Mary Kate Moddox Williams or Randy Duprey. "The courts have consistently held that, where the complaint names a defendant in the caption but no allegations indicating exactly how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to th[ose] defendant[s] should be granted." *Marable v. Kurtz,* No. 99 Civ. 1387, 2000 WL 1279763, at \*4 (S.D.N.Y. Sept. 11, 2000) (citation omitted). The Complaint and Amended Complaint are dismissed as to Ace, Williams and Duprey.

V. QUALIFIED IMMUNITY

Defendants argue that, in the event that the Court rules that plaintiff has stated a claim against any defendant, such defendant's actions were objectively

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

reasonable and therefore entitled to qualified immunity.

The defense of qualified immunity "shields public officials from liability for their discretionary acts that do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Hathaway,* 37 F.3d at 67 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). The court in *Hathaway,* referring to the unconstitutional deprivation of a prisoner's right under the Eighth Amendment to adequate medical care, stated that "[e]ven where, as here, a plaintiff's federal rights are well-established, qualified immunity is still available to an official if it was 'objectively reasonable for the public official to believe that his acts did not violate those rights.' " *Id.* (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)).

"Although qualified immunity is typically addressed at the summary judgment stage of the case, the defense may be raised and considered on a motion to dismiss. The motion will be granted if the complaint fails to allege the violation of a clearly established constitutional right." *Hardy v. Jefferson Community Coll.,* 260 F.3d 671, 677 (6th Cir.2001) (citation omitted). An immunity defense usually depends on the facts of the case, however, making dismissal at the pleading stage inappropriate. *See Alvarado v. Litscher,* 267 F.3d 648, 651 (7th Cir.2001); *King v. Simpson,* 189 F.3d 284, 289 (2d Cir.1999) (reversing district court's dismissal on ground of absolute immunity because factual showing was necessary where plaintiff alleged constitutional violation). Thus, a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds. *See Alvarado,* 267 F.3d at 651 (citing *Jacobs v. City of Chicago,* 215 F.3d 758, 765 n. 3 (7th Cir.2000)). Here, plaintiff *has* successfully alleged a constitutional violation against Bendheim, Weinstein, and Silver, and personal involvement in at least one of those violations by Zwillinger. A determination as to whether these defendants' actions were "objectively reasonable" is necessarily fact-based. Thus, defendants' qualified immunity defense must be rejected at this stage.

VI. CLAIM AGAINST BARBARA WHITNEY

**\*11** Woods claims that defendant Barbara Whitney copied plaintiff's medical records and released them to the Attorney General's office "without getting an Authorized

medical release form, which is a violation of ... plaintiff's confidentiality." Pl. Opp.2d at 27-28. Woods does not specify when this was done.

It is settled law that release of an inmate's medical records in defense of litigation does not violate any right of the inmate when he has filed suit against prison officials. *See, e.g., Gill v. Gilder,* No. 95 Civ. 7933, 1997 WL 419983, at \*2 (S.D.N.Y. July 28, 1997) (citing *Crawford v. Manion,* No. 96 Civ. 1236, 1997 WL 148066, at \*1 (S.D.N.Y. Mar. 31, 1997) (Mukasey, J.)). Plaintiff thus waived all rights to privacy in his medical records when he put his medical condition in issue in a lawsuit. In the absence of any allegation that Barbara Whitney's action occurred before suit was instituted or was for some purpose other than the defense of litigation, this claim is dismissed.

VII. DISCRIMINATION CLAIMS AND ADMINISTRATIVE EXHAUSTION

Plaintiff also claims that defendants have violated his rights under Title II of the ADA and section 504 of the Rehabilitation Act (1) by denying him a lightweight wheelchair; and (2) because in 1998, defendant Jones, a corrections officer, forced plaintiff to stand up so that he could be frisked, causing him to fall. *See* Pl. Opp.2d at 18-19, 25, 32-33; Am. Compl. ¶ 18. To state a claim under Title II of the ADA, a prisoner must show "(1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity that provides the service, program or activity is a public entity." *Shariff,* 2000 WL 1219381, at \*4 (quoting *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995)). *See also* 42 U.S.C. § 12132. To state a claim under section 504 of the Rehabilitation Act, a prisoner must allege facts showing that "(1) he is a 'qualified individual with a disability'; (2) he is 'otherwise qualified' to participate in the offered activity or program or to enjoy the services or benefits being offered; (3) he is being excluded from participation or enjoyment solely by reason of his disability; and (4) the entity denying the inmate participation or enjoyment receives federal financial assistance." *Shariff,* 2000 WL 1219381, at \*4 (quoting *Clarkson,* 898 F.Supp. at 1036). *See also* 29 U.S.C. § 794(a).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

Before reaching the merits of these claims, it is necessary to examine whether plaintiff has exhausted prison remedies for these complaints. The Prison Litigation Reform Act of 1980 requires that prisoners pursue available administrative remedies before bringing any federal claim in federal court. *See* 42 U.S.C. § 1997e.[FN16] Recently, the Supreme Court clarified the parameters of this requirement. *See Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 988 (2002). "All available remedies must now be exhausted; those remedies need not meet federal standards, nor must they be plain, speedy [or] effective." *Id.* Dismissal on the basis of failure to exhaust is now mandatory, whereas it was once within the discretion of the district court. *See id.* (citing *Booth v. Churner,* 532 U.S. 731, 739 (2001)).

> **FN16.** Woods has exhausted administrative remedies for his Eighth Amendment claims. *See* Am. Compl. ¶ 13. Woods's voluminous attachment to his opposition papers shows, *inter alia,* that he has filed grievances regarding (1) Dr. Bendheim's delay in scheduling follow-up visits with Dr. Feng; (2) denial of physical therapy; and (3) lack of treatment of elbow and denial of knee surgery. Further, defendants do not argue that Woods has failed to exhaust available remedies for these claims.

**\*12** Woods does not allege nor offer any evidence that he followed prison grievance procedures for his disability discrimination claims. Thus, they must be dismissed without prejudice.

VIII. INJUNCTIVE RELIEF

The Eleventh Amendment is not a bar to suits in equity against state officials. *See Keyes,* 1997 WL 187368, at \*4 (citing *Dube v. State Univ. of New York,* 900 F.2d 587, 595 (2d Cir.1990)). "A state official acting in his official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar." *Dube,* 900 F.2d at 595. Plaintiff seeks an order from the Court requiring "the defendants [to] provide for the plaintiff appropriate [ ] medical treatment in the future." Am. Compl. ¶ (D). Plaintiff does not further specify the nature

of the injunctive relief he requests.

The *Milburn* decree "governs the provision of health care services at Green Haven." *McKenna,* 2002 WL 338375, at \*7 n. 9. *See also supra* note 13. In light of Judge Ward's exclusive supervision of the *Milburn* decree, *see Kaminsky,* 737 F.Supp. at 1317 n. 6, it is not within this Court's jurisdiction to order the broad injunctive relief that Woods requests. Woods's request that appropriate medical care be provided to him in the future is tantamount to a suit to enforce the *Milburn* decree and, as such, must be refiled with Judge Ward. *See McKenna,* 2002 WL 338375, at \*7 n. 9; *Kaminsky,* 737 F.Supp. at 1317 n. 6; *supra* note 13. This portion of the Complaint and Amended Complaint is dismissed.

IX. CONCLUSION

For the foregoing reasons, the Complaint and Amended Complaint are dismissed to the extent that they assert (1) monetary claims against defendants in their official capacities; and (2) state law claims against defendants in any capacity. Plaintiff's claims brought under the ADA and Rehabilitation Act are dismissed for failure to exhaust administrative remedies. Plaintiff's claim for injunctive relief is denied.

Defendants' motions to dismiss are granted with respect to defendants DOCS, CPS, Goord, Greiner, Selwin, Duprey, Jones, and Whitney, and additional defendants Ace, Moddox Williams and Duprey. The motions are denied in part, and granted in part, as to defendants Wright, Koenigsmann, Zwillinger, Bendheim, Weinstein, and Silver. The claims that have been dismissed against these individuals are listed at notes 12 and 15, *supra.* A conference is scheduled for May 10, 2002 at 4:30 p.m.

SO ORDERED:

S.D.N.Y.,2002.

Woods v. Goord
Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Zayd Abdur RASHID, f/k/a Aundre Singh, Plaintiff,
v.
Syed HUSSAIN, Dr., D.D.S., Eastern Correctional
Facility; Dr. Korfman, Regional Director; Robert
Mitchell; Superintendent Eastern Correctional Facility;
Frank Tracy, Deputy Superintendent Eastern
Correctional Facility; Robert McArdle, D.D.S., Director
of Correctional Dental Services, Defendants.
No. 95-CV-676 (RSP/DS).

Oct. 15, 1997.
Zayd Abdur Rashid, Sullivan Correctional Facility,
Fallsburg, New York, plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General for the State of
New York, The Capitol, Albany, New York, for
defendants, Lisa Renee Harris, Asst. Attorney General, of
Counsel.

**MEMORANDUM DECISION AND ORDER**

POOLER, J.
  *1 This matter comes to me following a
report-recommendation by Magistrate Judge Daniel
Scanlon, duly filed on the 9th day of September, 1997.
Following ten days from service thereof, the Clerk has sent
me the entire file, including any and all objections filed by
the parties herein.
  Plaintiff, Zayd Abdur Rashid, has been incarcerated
by the New York State Department of Corrections since
1983 and was incarcerated at Eastern Correctional Facility
from November 11, 1988, until December 2, 1993.
Compl., Dkt. No. 1, ¶ 11; McArdle Aff., Dkt. No. 19, ¶
93. Rashid brings this action pursuant to 42 U.S.C. §
1983, alleging that defendants violated his Eighth
Amendment rights through their deliberate indifference to
his serious dental needs. Compl., ¶¶ 16-25. Specifically,
Rashid claims that on May 26, 1989, he saw a

periodontist, who recommended that Rashid have
periodontal surgery as soon as possible. Id., Exh. B.
Rashid claims that despite his repeated complaints
regarding the condition of his mouth during his
incarceration at Eastern, defendants failed to provide a
periodontal consultation or the recommended surgery.
Rashid eventually saw a periodontist on January 5, 1993,
McArdle Aff., Dkt. No. 19, ¶ 79, but did not have the
recommended surgery. On April 15, 1993, after his
transfer to Clinton Correctional Facility (CCF), plaintiff
had a consultation with Dr. Kenneth Palm, a general
dentist at CCF. Id., ¶¶ 82-83. Dr. Palm noted that plaintiff
had generalized bone loss and chronic periodontitis,
moderate to advanced, and recommended a course of
treatment which included extraction of all of Rashid's
upper teeth. Id., ¶¶ 84-86. Rashid's upper teeth were
extracted by May 11, 1994. Id., ¶¶ 96. Rashid claims
defendants' failure to attend to his dental needs resulted in
the deterioration of his condition and the ultimate loss of
his upper teeth. Compl., ¶¶ 23, 24.

  Defendants moved for summary judgment, Dkt. No.
19, arguing that they have been attentive to plaintiff's
dental needs and that, in any event, he has failed to allege
conduct sufficient to state a constitutional claim, Dkt. No.
20. Defendants also argued that plaintiff had failed to
allege personal involvement on the part of defendants
Tracy, McArdle, and Mitchell as required under Section
1983. In a report-recommendation filed on September 9,
1997, Magistrate Judge Scanlon concluded that plaintiff's
claims against defendants in their official capacities were
barred by the Eleventh Amendment. Dkt. No. 37 at 6. The
magistrate judge also recommended that I(1) grant the
motions for summary judgment as to defendants Tracy and
McArdle, on the ground that plaintiff had not alleged their
personal involvement in his dental care, id. at 15-17; and
(2) deny the motion for summary judgment as to
defendants Hussain and Korfman, on the ground that
questions of fact exist as to whether plaintiff had
established a serious dental need and whether defendants
had exhibited deliberate indifference to same, id. at 8-13.
Finally, the magistrate judge concluded that because there
is no evidence that service of the complaint was ever

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

perfected on defendant Mitchell, the court lacked jurisdiction over him and would not consider the claims against him. *Id.* at 15. At plaintiff's request, the time for filing his objections was extended to October 10, 1997. Dkt. No. 39. Plaintiff filed objections to the report-recommendation on October 14, 1997. Dkt. No. 42.

**\*2** I consider *de novo* those portions of the report-recommendation to which Rashid objects. 28 U.S.C. § 636(b)(1). Initially, Rashid objects to the magistrate judge's conclusion that the court lacks jurisdiction over defendant Mitchell because Mitchell was never served with the summons and complaint. Dkt. No. 42, at 2-4. Specifically, Rashid argues that although the United States Marshall attempted to serve the summons and complaint on Mitchell on July 9, 1995, Rashid was not advised that service was not completed until April 11, 1997. He claims that immediately thereafter he sought an order of the magistrate judge directing the United States Marshall to serve the complaint on Mitchell. In response to his request, Rashid received a letter dated May 13, 1997, from the Deputy Clerk of the Court which stated that the Assistant Attorney General had advised the court that she represented all of the defendants, including Mitchell, and that the Attorney General's office filed an answer to plaintiff's complaint and a motion for summary judgment on behalf of all of the defendants. The Clerk advised Rashid that his request for service on Mitchell was therefore moot.

Defendants' answer, filed on August 8, 1995, raised no affirmative defenses concerning service or personal jurisdiction. Dkt. No. 13. Moreover, in their motion for summary judgment, defendants made no jurisdictional arguments with regard to defendant Mitchell, arguing instead that the complaint against him should be dismissed for his lack of personal involvement in the conduct alleged. Dkt. No. 20 at 2-4. In any event, the statements of Assistant Attorney General Harris confirm that defendants raised no jurisdictional defenses regarding Mitchell. Accordingly, I disagree with the magistrate judge's conclusion that the court lacks jurisdiction over Mitchell. The question remaining is whether Mitchell is entitled to summary judgment on the ground that he was not personally involved in the alleged violations of plaintiff's constitutional rights.

It is well settled that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). In a suit for monetary damages under Section 1983, the doctrine of *respondeat superior* does not suffice, and a showing of some personal responsibility of the defendant is required. *Id.* (citing *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). A defendant who occupies a supervisory position may be found personally involved in the deprivation of a plaintiff's constitutional rights in several ways: (1) the defendant may have directly participated in the infraction; (2) a supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong; (3) a supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; or (4) a supervisory official may bear personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

**\*3** In opposition to defendants' motion for summary judgment, Rashid produced numerous pieces of correspondence in support of his position that Mitchell had notice of Rashid's need for surgery and his continuing pain. Specifically, Rashid produced, among other things, (1) a memorandum dated November 25, 1991, which he sent to defendant Hussain and copied to Mitchell, in which Rashid detailed his ongoing condition and the periodontist's May 26, 1989, recommendation that he have oral surgery; (2) a memorandum to Hussain dated June 2, 1992, copied to Mitchell, in which Rashid again advised Hussain of the recommendation for surgery, his continually deteriorating condition and fear that he would lose his teeth, and his belief that defendants' handling of the situation "constitute[d] a deliberate, depraved indifference to [his] dental needs"; and (3) a letter dated June 9, 1992, from Attorney Penny Shane to Mitchell, in which Shane advised Mitchell that Rashid was "suffering from severe dental problems that cause him to live in pain," and reminding Mitchell of the earlier recommendation that Rashid have surgery. Dkt. No. 31,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

Exh. 6. The record contains evidence that Rashid complained to Mitchell five times concerning the condition of his teeth during the period from November 25, 1991, to July 3, 1993. *Id.* Through these documents, Rashid has presented sufficient evidence to demonstrate the existence of genuine issues of material fact concerning Mitchell's personal involvement in the alleged deprivation of Rashid's rights. Accordingly, I conclude that summary judgment is inappropriate as to Mitchell.

Rashid also objects to the magistrate judge's finding that Rashid failed to allege personal involvement by Tracy and McArdle in the alleged constitutional violations and the recommendation that I grant summary judgment on that basis. Dkt. No. 42 at 3-12. Rashid argues that there is sufficient evidence in the record to establish these defendants' personal involvement or, at that very least, that there are disputed issues of fact in this regard which preclude summary judgment. *Id.* at 5, 11. I conclude that Rashid presented sufficient evidence to raise genuine issues of material facts concerning personal involvement by Tracy and McArdle in the alleged deprivations, such that summary judgment is inappropriate.

Specifically, Rashid produced evidence that Tracy read and responded to at least one of the letters Rashid wrote to Mitchell and received a response from Rashid dated July 3, 1992, detailing Rashid's condition, the history of his treatment, and his complaints regarding his care at Eastern. Dkt. No 31, Exh. 7. I agree with the magistrate judge that the mere fact that Tracy responded to a letter complaining about Rashid's dental treatment would not, by itself, subject Tracy to liability. *Abdush-Shahid v. Coughlin,* 933 F.Supp. 168, 183 (N.D.N.Y.,1996). However, Rashid has presented evidence which suggests Tracy had notice of the extent and duration of Rashid's condition. Without passing judgment on the merits of Rashid's case, I conclude that "it is not beyond doubt that plaintiff could prove no set of facts under one of the *Williams* tests to support his claim of [Tracy's] personal involvement" in the alleged deprivation." *Horne v. Coughlin,* 795 F.Supp. 72, 76 (N.D.N.Y.1991).

**\*4** As to McArdle, I note initially that defendants have made no argument that McArdle was not personally

involved in the alleged deprivations. Dkt. No. 20 at 2-3. Moreover, in response to Rashid's grievance concerning his medical treatment, Mitchell notified Rashid that the "Dental Department advises they have been in contact with the Chief Dentist, who is attempting to make arrangements for grievant to see a periodontal specialist." Dkt. No. 31, Exh. 8. Drawing all inferences in Rashid's favor, as I must on this motion for summary judgment, *id.* at 73, I conclude that Rashid has presented evidence sufficient to raise a question of fact concerning McArdle's personal involvement, either because he knew of a problem and failed to remedy it or because, as dental director, he was grossly negligent in managing subordinates who caused a deprivation to occur, *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

In conclusion, after careful review of all of the papers herein, including the magistrate judge's report-recommendation and Rashid's objections thereto, I approve that part of the report-recommendation which denied defendants' summary judgment motions as to defendants Hussain and Korfman. However, for the reasons stated above, I decline to adopt that part of the report-recommendation which granted defendants' motion and dismissed the complaint as to Tracy and McArdle, and I deny the motion as to those defendants. In addition, I decline to adopt the magistrate judge's conclusions as to defendant Mitchell and deny the summary judgment as to Mitchell as well.

IT IS SO ORDERED.

DANIEL SCANLON, Jr., Magistrate J.

**ORDER and REPORT-RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Plaintiff, an inmate, alleges in this 42 U.S.C. § 1983 action that defendants violated his Eighth Amendment rights through their deliberate indifferent to his serious dental need. Defendants counter that they have been attentive to plaintiff's dental needs, and that plaintiff's suit sounds of dental malpractice-which would not be actionable under § 1983. Defendants have motioned for summary judgment (dkt.19), and plaintiff opposes the motion (dkt.29) For the following reasons, the Court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

records that defendants Dr. McArdle and Tracy be granted summary judgment; that defendants Dr. Korfman and Dr. Hussain be denied summary judgment; and that because the Court lacks jurisdiction over defendant Mitchell, it cannot examine the claims against him. The Court also orders parties to produce affidavits addressing the discrepancies appearing in the records submitted to it.

## BACKGROUND

Plaintiff has been incarcerated by the New York Department of Corrections ("DOCS")since 1983. His DOCS dental records, though not always legible, reflect that from the onset of his incarceration he has required a good deal of dental care. The misconduct that plaintiff alleges stems from his periodontal condition and its treatment. In December 1987, while he was an inmate at the Green Haven Correctional Facility, he was referred to a periodontist for an examination.[FN1] In May 1988, plaintiff was examined by Dr. Andrew Benjamin, a periodontist, who found that plaintiff's level of periodontoclasia was "moderate" (as opposed to "incipient" or "severe"), are recommended that plaintiff receive "ul curettage followed by minimal flap surgery to eliminate ul pocketing." [FN2] Dr. Benjamin estimated that plaintiff would require two to three appointments to complete the recommended treatment. He also noted that plaintiff evidenced "good" oral hygiene. Compl. at ¶¶ 9, 10; Ex. A; McCardle Aff. at ¶¶ 34-38. As of December 5, 1988, plaintiff had not received the recommended surgery. Now incarcerated at the Eastern Correctional Facility ("Eastern"), plaintiff was examined on that date by Dr. Harold Yellin, D.D.S., who likewise recommended that he see a periodontist. There was some delay in obtaining a periodontist, as Dr. Yellin notes in an April 24, 1989 memorandum to plaintiff, "not for a lack of trying" but because "[t]he consultant was simply unavailable." Walter Aff. at Ex. 1 (dkt.32). Dr. Benjamin examined plaintiff on May 26, 1989. He reported that plaintiff:

> FN1. Periodontics is the branch of dentistry concerned with the study and treatment of diseases of periodontal tissue and structures, such as gum disease.

> FN2. According to *The Mount Sinai Medical Center Family Guide to Dental Care,* to which the Court will refer to in this matter to explain dental terms, periodontal disease progresses in

four stages. The first stage is gingivitis, which essentially is an inflammation of the gums and is readily treatable. The second stage is early periodontitis, which in addition to including a swelling of the gums is marked by the formation of pockets (*e.g.,* spaces) forming between the gum and root. Treatment typically requires that plaque and calculus be removed from the diseased area and inflamed, severely damaged tissue is removed via curettage.

Stage three of periodontal disease is moderate periodontitis, which is characterized by swollen, inflamed gums and deep pockets. Treatment of this stage includes a scraping of the each affected tooth surface and curettage of the affected gum. Tooth decay may be planed, in addition to be scraped, to provide a smooth surface to which the regenerating gum may attach. More severe cases of moderate periodontitis may require surgery, such as flap surgery. The last stage of periodontal disease is tooth mobility and loss, which requires periodontal surgery as treatment. At this point, even surgery may not be enough to save the affected tooth or teeth. *See generally,* Jack Klatell, D.D.S., et al., *The Mount Sinai Medical Center Family Guide to Dental Care* 71-81 (1991).

**\*5** needs flap surg. for ul after 2-3 visits of scaling-no surg. was done after last year's scaling. Rec. oper. tx be done asap, then perio surg. to follow.... No hopeless t., but molars very quest. Rec. rubber tip e $NaHCO3 + 3$ pt. needs prophies + scaling q. 3 months e hygienist, if possible.

Compl. at ¶¶ 11-13, Ex. B.

In December 1989, plaintiff began treating under defendant Dr. Syed Hussain, D.D.S. Plaintiff's dental records reflect that Dr. Hussain saw plaintiff twenty-five times from December 11, 1989 to October 13, 1992. During that interim, plaintiff also was treated twice by Defendant Dr. Martin Korfman, D.D.S. Walter Aff. at Ex. 4. Plaintiff alleges that he visited Dr. Hussain so many times due to "repeated infections, inflammations, and a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

steady deterioration of his gums." He claims that despite the "signs that he was living in pain as a result of his periodontal condition, no effort was made by [defendants] to ensure that [he] receive the recommended surgery for his serious medical need"-despite the fact that he complained in writing to defendants regarding his condition on several occasions. Compl. at ¶¶ 16, 17. *See* Walter Aff. at Ex. 1.

On July 10, 1990, Dr. Hussain did recommended that plaintiff see a periodontist for "re-evaluation." Compl. at ¶ 15; McArdle Aff. at ¶ 59, Ex. J. No action was taken on this recommendation until January 4, 1993, when Dr. Hussain requested that plaintiff's "perio condition" be evaluated. The following day periodontist Dr. Monroe Weinstein examined plaintiff. He found that plaintiff suffered from "severe pockets on maxilla"; had "severe bone loss" at teeth "# 3 & 7", and that teeth "# 8, 9 12, & 14 are questionable." [FN3] Dr. Weinstein recommended a full mouth curettage and extraction of "# 3 & 7." McCardle Aff. at ¶ 79.

> **FN3.** The "maxilla" is the upper jaw. In dental nomenclature, teeth are given individual numbers. The teeth on the maxilla are numbered from right to left as one through sixteen, starting with number one as the right wisdom tooth and finishing with number sixteen as the left wisdom tooth. All of the teeth discussed in Dr. Weinstein's report, therefore, belong to plaintiff's upper jaw.
>
> The lower jaw, or "mandible," features the teeth numbered seventeen through thirty-two.

Dr. Hussain performed the curettage but did not perform the recommended extractions that day. McCardle Aff. at ¶ 80. Plaintiff was transferred from Eastern to Clinton Correctional Facility in April 1993, where Dr. Kenneth Palm, D.D.S. examined him. Dr. Palm diagnosed plaintiff as suffering generalized bone loss and chronic periodontitis, and he recommended that all of plaintiff's upper teeth be extracted. McCardle Aff. at ¶¶ 84, 86. All of plaintiff's upper teeth eventually were extracted and he was fitted with a full upper denture. Compl. at ¶ 24; McCardle Aff. at ¶¶ 92, 96.

Plaintiff contends that defendants violated his constitutional rights, wherefore he seeks compensatory, punitive and declaratory relief.

## DISCUSSION

I. Standard for Summary Judgment.

Rule 56 allows for summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A motion for summary judgment may be granted when the moving party carries its burden of showing that no triable issues of fact exist. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). In light of this burden, any inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. *Id.; United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (*per curiam*). If the moving party meets its burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party" *Anderson,* 477 U.S., at 248, 106 S.Ct., at 2510. When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *Id.,* at 250-251, 106 S.Ct., at 2511.

II. Official Capacity Claims.

**\*6** Plaintiff brings this suit against defendants in both their official and individual capacity. To the extent plaintiff asserts claims for monetary damages against defendants in their official capacities, these claims must be dismissed. Claims against employees of the New York State Department of Corrections for actions taken in their official capacity are suits against the State. Absent the State's waiver or consent, neither of which have been given here, the Eleventh Amendments bars all 42 U.S.C. § 1983 suits for legal or equitable relief brought by citizens against the State and its agencies. *See, e.g., Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam), *Eng v. Coughlin,* 858

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

F.2d 889, 896-97 (2d Cir.1988). Plaintiff's claim for monetary damages from defendants in their official capacities is barred under the Eleventh Amendment.

The Court, therefore, turns to plaintiff's claims asserted against defendants in their individual capacities. *See generally* Hafer v. Melo, 502 U.S. 21, 30-31, 112 S.Ct. 358, 364, 116 L.Ed.2d 301 (1991) ("[T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal' liability on state officials under § 1983").

III. 42 U.S.C. § 1983 and Eighth Amendment Claim.

Plaintiff has brought his complaint pursuant to 42 U.S.C. § 1983, which permits suit against those individuals, acting under color of state law, who caused him to be "depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Defendants acted in this matter pursuant to their authority as prison officials under color of New York state law. The only unresolved question is whether they acted in a manner that deprived plaintiff of any "rights, privileges or immunities secured by the United States Constitution." 42 U.S.C. § 1983.

In arguing that defendants have violated his "constitutional rights," the Court infers that plaintiff refers to his Eighth Amendment rights. Plaintiff is *pro se* and we read his complaint liberally. *See* Bass v. Jackson, 790 F.2d 260, 262 (2d Cir.1986) ("*Pro se* complaints ... are held 'to less stringent standards than formal pleadings drafted by lawyers.' "); Soto v. Walker, 44 F.3d 169, 173 (2d Cir.1995). The Eight Amendment, made applicable to the States by the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishment upon prison inmates. Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994); Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir .1994), *cert. denied sub nom.* Foote v. Hathaway, 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). In Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court held that deliberate indifference to an inmate's serious medical needs fell within the scope of the Eighth Amendment's prohibition. Id., at 104, 97 S.Ct., at 291. Under *Estelle,* prison officials violate the Eighth Amendment if they are deliberately indifferent to an inmate's serious medical needs by denying or delaying his

access to medical care or by intentionally interfering with his treatment. Id. at 104-05, 97 S.Ct. at 291-92; *see also* Wilson v. Seiter, 501 U.S. 294, 298, 302-03, 111 S.Ct. 2321, 2324, 2326-27, 115 L.Ed.2d 271 (1991). A state's medical care obligations applies to dental care as well. Chapman v. Rhodes, 434 F.Supp. 1007, 1020 (S.D.Ohio 1977), *aff'd,* 624 F.2d 1099 (6th Cir.1980), *rev. in other part,* 452 U.S. 337, 344, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981); Shaffer v. McWilliams, 570 F.Supp. 1422 (W.D.N.Y.1983).

*7 The determination of whether a defendant acts with deliberate indifference to a plaintiff's serious medical needs involves both objective and subjective components. Hathaway, 37 F.3d at 66. The objective component requires a determination of whether there has been a sufficiently serious deprivation of a plaintiff's constitutional rights, whereas the subjective component requires an examination of a defendant's state of mind. Id. at 66. The Second Circuit noted:

[d]eliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.... More specifically, a prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety, the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'

*Id.* at 66-67 (*quoting* Farmer, 511 U.S., at 837, 114 S.Ct., at 1979).

To establish an unconstitutional denial of medical care, therefore, plaintiff must meet both prongs of a two part test: first, he must demonstrate that the deprivation alleged is "sufficiently serious"; and second, he must show that defendants acted with "deliberate indifference" to his health or safety. Farmer, 511 U.S., at 834, 114 S.Ct., at 1977; Hathaway, 37 F.3d at 66.

A. Serious Medical Need.

A serious medical need entails a deprivation that is " 'sufficiently serious' in the sense that 'a condition of

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

urgency, one that may produce death, degeneration, or extreme pain" exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted); *see also Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Hathaway,* 37 F.3d at 66. This standard prescribes not only the denials of medical treatment that result in "torture or lingering death," but also those denials of medical care that "may result in pain and suffering which no one suggests would serve any penological purpose." *Abdush-Shahid v. Coughlin,* 933 F.Supp. 168, 181 (citing *Estelle,* 429 U.S., at 103, 97 S.Ct., at 290); *see also Koehl,* 85 F.3d at 88 (suggesting it is not necessary for medical deprivation to cause pain as long as deprivation prolongs suffering).

There exist genuine and disputed issues of material fact regarding whether plaintiff's medical condition was "sufficiently serious" that cannot be resolved as a matter of law on a motion for summary judgment. It has been held that "increased tooth sensitivity and attendant pain experienced over an extended period of time identif[ies] a medical need which a reasonable person would consider to be serious." *Reynolds v. Ternullo,* No. 82 Civ. 4018(CSH), 1985 WL 2153, *2 (S.D.N.Y. July 26, 1985); *but see Tyler v. Rapone,* 603 F.Supp. 268 (E.D.Pa.1984) (holding toothache not a serious medical need). Plaintiff alleges his deteriorating periodontal condition caused him considerable pain and suffering, and that defendants prolonged this pain and suffering by delaying and ignoring the treatment recommended by Dr. benjamin. Plaintiff cites the numerous visits he made to Dr. Hussain between December 1989 and October 1992 as evidence of his pain and suffering, and defendants have not presented evidence to undermine this claim. Pain associated with the need for corrective surgery may support a finding of a "serious medical need." *See generally Hathaway,* 37 F.3d 63; *see also Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977) (medical conditions that cause or perpetuate pain constitute serious medical needs).

B. Deliberate Indifference.

**\*8** Defendants contend that regardless of whether plaintiff has demonstrated that he had a serious medical need, he has not presented any evidence that defendants were deliberately indifferent to this need because at most plaintiff has alleged that defendants were negligent. To state a claim of deliberate indifference, plaintiff must show that prison officials intentionally denied, delayed access to or interfered with prescribed treatment. *Estelle,* 429 U.S., at 104-05, 97 S.Ct., at 291. Defendants are absolutely correct in stating that a claim for medical (or dental) malpractice is not actionable under § 1983. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id.,* 429 U.S., at 106, 97 S.Ct., at 292. Summary judgment is appropriate if plaintiff's allegations constitute at most malpractice. *Bryant v. Maffucci,* 923 F.2d 979, 984 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (citing *Estelle* ). Nor would plaintiff's claim survive under § 1983 if it amounted to mere disagreement with defendants' medical judgment. *Williams v. Coughlin,* 650 F.Supp. 955, 957 (S.D.N.Y.1987). Summary judgment is not available however, if plaintiff presents evidence that would permit a trier of fact to conclude that the disputed medical treatment-or lack thereof-constituted deliberate indifference. *See Abdush-Shahid,* 933 F.Supp. at 181 (citing *Bryant,* 923 F.2d at 984; *Liscio v. Warren,* 901 F.2d 274, 276 (2d Cir.1990); *Kaminsky v. Rosenblum,* 737 F.Supp. 1309, 1317 (S.D.N.Y.1990), *appeal dismissed,* 929 F.2d 922 (2d Cir.1991)). Plaintiff's allegations clearly transcend a claim for dental malpractice or a disagreement in medical judgment.

Prisoners are not entitled to a "perfect plan for dental care," *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986), but a significant, unexplained delay in dental care may amount to deliberate indifference. *See, e.g., Boyd v. Knox,* 47 F.3d 966, 969 (8th Cir.1995) ("A three week delay in dental care, coupled with knowledge of the inmate patient's suffering, can support a finding of an Eighth Amendment violation under section 1983") (citation omitted); *Fields v. Gander,* 734 F.2d 1313 (8th Cir.1984) (claim stated where plaintiff alleged defendants knew of pain resulting from infected tooth but delayed in providing dental care for three weeks); *Hunt v. Dental Dep't,* 865 F.2d 198, 201 (9th Cir.1989) (claim stated where plaintiff alleged that loss of dentures caused severe pain, bleeding gums, and breaking teeth, yet defendants took no action to provide pain relief or prescribe a soft-food diet and delayed three months in obtaining replacement dentures); *cf. Dean v. Coughlin,* 623 F.Supp.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

392, 401 (S.D.N.Y.1985) (deliberate indifference may be manifested by a physician's refusal of treatment); *Hathaway,* 37 F.3d at 66 (allegations that prison physician knew prisoner had two broken pins in hip and yet delayed surgery for over two years sufficient to meet both components of deliberate indifference claim and withstand motion to dismiss).

**\*9** Deliberate indifference requires a showing that defendants may have acted with a sufficiently culpable state of mind. *Hathaway,* 37 F.3d at 66. As the Second Circuit explained:

[t]he subjective element requires a state of mind that is the equivalent of criminal recklessness; namely, when the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Hathaway,* 99 F.3d at 553 (citations omitted). Plaintiff has plead facts sufficient to survive summary judgment with respect to the deliberate indifference of Dr. Hussain: namely that based upon the evidence, a trier of fact might conclude that Dr. Hussain knew of and disregarded the risk to plaintiff's health.

Dr. Benjamin's May 1988 recommendation suggested that plaintiff receive flap surgery; and when Dr. Benjamin examined plaintiff in May 1989, he recommended that the surgery "be done asap, then perio surg. to follow." Dr. Hussain saw plaintiff twenty-five times from December 11, 1989 to October 13, 1992. Plaintiff alleges that "repeated infections, inflammations, and a steady deterioration of his gums" were the reasons for his numerous visits, and claims that despite the "signs that he was living in pain," Dr. Hussain made no effort to ensure he received the dental surgery Dr. Benjamin had recommended. In July 1990, Dr. Hussain did recommend that plaintiff see a periodontist, but the recommendation was never acted upon. McArdle Aff. at ¶ 56.[FN4] Plaintiff's dental records, which include five grievances and letters written to Dr. Hussain, demonstrate that the question of that defendant's deliberate indifference to his serious medical need is a genuine question of material fact.[FN5] A

reasonable trier of fact might conclude that Dr. Hussain intentionally denied, delayed access to or interfered with plaintiff's prescribed treatment.

[FN4.] The timing of Dr. Hussain's periodontal recommendation is peculiar. On June 21, 1990, roughly three weeks prior to the recommendation, "Dr. Hussain [had] re-evaluated plaintiff's periodontal condition and noted that it was 'o.k.' " McArdle Aff. at ¶ 58. Even more peculiar is Dr. Hussain's noting that plaintiff's periodontal condition was "o.k." in light of his deposition testimony in plaintiff's collateral state proceeding, in which he admitted that he was not capable of treating plaintiff's periodontal condition. *See* Plf's Aff. at Ex. 4, pgs. 63 and 89 (dkt.30).

[FN5.] These letters, dated November 25, 1991 through March 15, 1993 complain of pain and suffering, and remind Dr. Hussain of Dr. Benjamin's May 1988 and May 1989 recommendations for flap surgery. *See* Plf's Memo. at Exs. 6, 10 (dkt.31).

Summary judgment should not be available for Dr. Korfman, either. Plaintiff has demonstrated sufficient evidence exists to allow a reasonable trier of fact to conclude that Dr. Korfman was deliberately indifferent to plaintiff's serious medical need. Plaintiff's dental records indicate that Dr. Korfman saw plaintiff three times-once in 1989 and twice in 1991-subsequent to Dr. Benjamin's recommendations that plaintiff should receive flap surgery. During the latter two visits, made on November 15 and December 4, 1991, Dr. Korfman advised plaintiff that he had suffered from bone loss.[FN6] In deposition testimony given for plaintiff's collateral state proceeding, Dr. Korfman agrees that "bone loss suggest[s] ... that [plaintiff] continues to suffer from a periodontal condition." Korfman Depo. at 46:4-6 (dkt.30, Ex. 3). When asked next why he did not have plaintiff treated by a periodontist, Dr. Korfman answers that "[i]n order for him to have any success ... he would have to have had an oral condition that was amenable to healing." Korfman Depo. at 46:7-13. The implication is that plaintiff's oral condition was not curable. Yet, when asked later whether

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

he ever reached a decision that plaintiff's "perio condition was not curable," Dr. Korfman responded that he "never made that conclusion"-with the exception of plaintiff's tooth number ten. Korfman Depo. at 63:22-24; 64:22-65:3. Dr. Korfman further testifies that even though it was "not advisable" that plaintiff should "wait more than a year for periodontal evaluation," he had "no choice" because he "couldn't get a guy to see the patient." [FN7] Korfman Depo. at 67:8-17. In fact by Dr. Korfman's own admission, plaintiff did not see a periodontist until January 5, 1993. Korfman Depo. at 40:9-15. This date was almost two and a half years after Dr. Hussain had recommended that a periodontist "re-evaluate" plaintiff and four and a half years after Dr. Benjamin's initial recommendation that plaintiff receive flap surgery. On March 27, 1989, plaintiff requested that Dr. Yellin, who was then treating him, inform him of the status of his overdue November 1988 periodontist appointment. Dr. Yellin, apologizing that the matter had taken "such a long time," was able to obtain the appointment for plaintiff in May 1989. He explained to plaintiff that the "delay was not for lack of trying on our part"; rather, "[t]he consultant was simply unavailable." Walter Aff. at Ex. 1. Any inferences to be drawn from the facts must be viewed in the light most favorable to plaintiff as the non-moving party. *Thompson, 896 F.2d at 720.* Whether Dr. Korfman could not obtain a periodontist for more than two and a half years is a question of fact.

> **FN6.** Dr. Korfman's November 15, 1991 notes in plaintiff's dental records read, in pertinent part, "[e]xplained to patient about bone loss & possibility of losing # 10." His notes for plaintiff's December 12, 1991 visit read in part "[a]dvised again of removal of 6-8 mm bone loss." McArdle Aff. at Ex. M.

> **FN7.** Dr. Korfman states that Dr. Hussain "probably [could] not" schedule plaintiff to see a periodontist without his approval, thus the inference is that Dr. Korfman is largely responsible for securing a periodontist.

**\*10** Defendants' argument that as a matter of law plaintiff's dental records demonstrate a concerted and continual effort to treat plaintiff's various dental maladies, and that plaintiff ultimately lost the teeth in his upper jaw

for reasons beyond their control, is unavailing. They note that from November 1983 to March 1996-the date of their summary judgment motion-plaintiff had been treated by thirteen DOCS dentists, three DOCS hygienists and two outside periodontists, and that he had received two full thickness flap surgeries and fifteen dental prophylaxes. McCardle Aff. at ¶¶ 98, 103. Yet, as plaintiff counters, the fact that he was seen a number of times by different dental personnel does not invalidate his claim of deliberate indifference. The gravamen of his complaint is that defendants' deliberate indifference stems from their alleged denial and interference with his course of recommended treatment-*e .g.,* the 1988 and 1989 recommendations for surgery-and not that he was denied dental care in general. Though defendants' claims that plaintiff's loss of his upper teeth was attributable to his own actions may ultimately prove correct, plaintiff clearly has furnished evidence that makes their conclusion a genuine question of material fact.

C. Personal Involvement.

The Second Circuit requires that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under *§ 1983.*" *Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991); see also Johnson v. Glick, 481 F.2d 1028, 1034 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)* ("The rule in this circuit is that when monetary damages are sought under *§ 1983,* the general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the defendant is required .")

Plaintiff names defendants McArdle, Mitchell and Tracy as supervisors who violated his Eighth Amendment rights. There is no indication whatsoever that service was perfected on defendant Mitchell, therefore, as the Court has no jurisdiction over the claims against him, it cannot consider the claims against him. [FN8] As to the remaining supervisory defendants, although it is undisputed that they had direct or indirect supervisory authority over the dental staff, in and of itself this fact is not sufficient to hold them personally liable for damages for constitutional violations alleged under *§ 1983. Abdush-Shahid, 933 F.Supp. at 182 (citing Black v. Coughlin, 76 F.3d 72, 74 (2d Cir.1996)).* Prison supervisors may be held liable only if they

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

personally are involved in actions that deprive an inmate of his constitutional rights. *Id.* This circuit defines "personal involvement" as: (1) direct participation; (2) failure to remedy an alleged wrong after learning of it; (3) creation of a policy or custom under which unconstitutional practices occurred; or (4) gross negligence in managing subordinates. *Black,* 76 F.3d at 74; *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).

> FN8. The summons sent to Mitchell was returned unexecuted. *See* dkt. 36.

**\*11** Plaintiff has not furnished evidence that supports his claim that the McArdle and Tracy were "personally involved" in the alleged violation of his Eighth Amendment rights. Tracy, plaintiff argues, was on notice of the "two recommendations for surgery and that [plaintiff] was suffering as a result of not receiving the surgery." Plf's Memo. at 2. The record indicates that Tracy, the Deputy Superintendent of Administration at Eastern, exchanged several correspondences with plaintiff from January 31 to July 13, 1992. In his January 31, 1992 memorandum to plaintiff, Tracy states that he discussed plaintiff's treatment with Dr. Hussain and was told that it was "appropriate." Plf's Memo. at Ex. 7. In a June 9, 1992 letter to Penny Shane, Esq., of Prisoners' Legal Service, Tracy, responding on behalf of Superintendent Mitchell, writes that it "is the opinion of both Dr. Korfman and Dr. Hussein (sic) that [plaintiff] can cerive only limited benefit from a consultation with an outside periodontist, [but] Dr. Hussein (sic) nevertheless agreed to arrange for this consultation." He cautions, however, that "consultations with private periodontists generally take some time to be scheduled and that emergency cases naturally take precedence." *Id.* In his July 13, 1992 memorandum to plaintiff, Tracy explains that "Medical Unit staff are making every effort to obtain a periodontal consultation for you." *Id.*

Prison supervisors are not deemed "personally involved" on the sole allegation that they responded to a plaintiff's letter complaining about his medical treatment. *Abdush-Shahid,* 933 F.Supp. at 182 (*citing Garrido v. Coughlin,* 716 F.Supp. 98 (S.D.N.Y.1989); *Eng v. Coughlin,* 684 F.Supp. 56, 66 (S.D.N.Y.1988)). It is also true that supervisory officials generally are entitled to

delegate medical responsibility to facility medical staffs and are entitled to rely on the opinion of medical staff concerning the proper course of treatment. *Id.* (*citing Smiley v. Westby,* No. 87 Civ. 6047, 1994 WI. 519973, at *8 (S.D.N.Y. Sept. 22, 1994) ("[A] warden who receives assurances from his medical staff that an inmate is receiving appropriate care will ordinarily be insulated from § 1983 liability")). In this instance, it appears Tracy acted appropriately when the plaintiff complained to him about his dental treatment. Tracy spoke with the dentist who had been treating plaintiff and was assured that plaintiff's treatment was correct. There is no indication that Tracy was "personally involved" in the alleged deprivation of plaintiff's Eighth Amendment rights; and indeed, it arguably appears that Tracy may have facilitated plaintiff's January 5, 1993 periodontist consultation. Tracy should be granted summary judgment in this matter.

Summary judgment should be granted for Dr. McArdle as well. By plaintiff's own admission, Dr. McArdle, the Director of Correctional Dental Services, never saw or treated him. Plf's Memo. at 13. Nor is there anything in the record that supports a claim of personal involvement as defined in *Black, supra,* by this defendant. *Black,* 76 F.3d at 74.

Discrepancies in the Record.

**\*12** Plaintiff informs the Court that there is a significant discrepancy in the dental records before it. According to plaintiff, during his collateral state action, which he commenced in 1995, he was given copies of his dental records ("collateral records") to prosecute that case. He supplies these records as an exhibit attached to the affidavit of Lanny E. Walter, Esq., who represented him in his state court claim. *See* Walter Aff. at Ex. 1 (dkt.32). These records are the same records that are being used by parties as evidence in this case. Plaintiff points out, however, that several notations appear in exhibits attached to Dr. McArdle's affidavit that do not appear in the collateral records, though clearly there should be no such discrepancy between these exhibits and the collateral records.

Defendants' exhibits differ from plaintiff's collateral records in a significant manner: they feature notes, all appearing to be of the same handwriting, dating back to

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

November 23, 1983 that read "oral hygiene instr."-or some very similar variation thereof. These notes appear in the margins of the following dates of plaintiff's treatment records: November 23, 1983 (*See* McArdle Aff., Ex. A (dkt.19)); January 9, 1985 (*Id.,* Ex. C); January 9, 1990 (*Id.,* Ex. I); February 21 and October 1, 1991 (*Id.,* Ex. K); and February 11, April 27, June 8 and October 13, 1992 (*Id.,* Ex. N). The inference, which obviously is beneficial to defendants, is that plaintiff was consistently given oral hygiene instructions because he was deficient in his personal dental care.

There appears to be a significant fabrication of the records before the Court, which the Court cannot and will not tolerate. Defendants have provided no explanation for this discrepancy. By Order of the Court, they will. Parties are ordered to provide affidavits explaining the discrepancy in plaintiff's dental records by October 1, 1997. Upon review of the affidavits, the Court will decide whether any actions, including sanctions, are appropriate in this instance. Parties are forewarned that failure to provide affidavits by October 1, 1997 may result in sanctions.

## CONCLUSION

WHEREFORE, based upon the foregoing, it is hereby ORDERED, that parties provide affidavits by October 1, 1997 that explain why there is a discrepancy in plaintiff's dental records that defendants have used as an exhibit in this matter (dkt.19) and the dental records that plaintiff used in his collateral state proceeding (dkt.32). Upon review of the affidavits, the Court will decide whether any actions, including sanctions, are appropriate in this instance. Parties are forewarned that failure to provide affidavits by October 1, 1997 may result in sanctions; and it is further

RECOMMENDED, that defendants' motion for summary judgment (dkt.19) be DENIED as to defendants Dr. Hussain and Dr. Korfman; and it is further

RECOMMENDED, that defendants' motion for summary judgment (dkt.19) be GRANTED as to defendants Tracy and Dr. McArdle; and it is further

**\*13** RECOMMENDED, that because the Court has no jurisdiction over defendant Mitchell, it cannot examine the claims against him.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (*citing Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e) and 72.

**SO ORDERED.**

N.D.N.Y.,1997.

Rashid v. Hussain
Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 566794 (S.D.N.Y.)

(Cite as: 2011 WL 566794 (S.D.N.Y.))

**c**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Connie FRANCONERO personally known as Connie
Francis, Plaintiff,
v.
UNIVERSAL MUSIC CORP., Defendant.
No. 02 Civ.1963(BSJ).

Feb. 11, 2011.
*Memorandum and Order*

BARBARA S. JONES, District Judge.

*1 Defendant UMG Recordings, Inc.[FN1] moves for summary judgment on Plaintiff Connie Francis' claims for breach of contract and underpayment of royalties.[FN2] For the reasons provided below, Defendant's motion is GRANTED in part and DENIED in part.

> FN1. Universal Music Corp. is improperly named. The proper defendant is UMG Recordings, Inc.

> FN2. Plaintiff's amended complaint contains nine claims. The first is for breach of contract. (Am.Compl.¶¶ 73-75.) The third and seventh are for underpayment of royalties. (*Id.* ¶¶ 78-79, 91-92.) Plaintiff stipulated to the dismissal of her second claim. The remaining claims were dismissed by Court order. *See Franconero v. Univ. Music Corp.*, No. 02 Civ.1963(RO), 2003 WL 22990060 (S.D.N.Y. Dec. 19, 2003).

**BACKGROUND**

Plaintiff achieved fame as a singer in the 1950s and 1960s. During that time and in the decades that followed, Plaintiff entered into a series of recording contracts with Defendant and its predecessors.

The parties entered into their first agreement in January 1958. (Creelan Decl. Ex. B.) Shortly after that, in

January 1959, the parties signed a second agreement, which amended the first. (*Id.,* Ex. C.) Plaintiff signed a third agreement in January 1962. (*Id.,* Ex. D.) This agreement amended the 1959 agreement. (*Id* .) Unlike the prior two agreements, the 1962 agreement included an anti-coupling clause. (*Id.,* Ex. D, at § 2.) It provided, "On all recordings to be made by you for us hereunder, you shall be the sole recording artist, except for background accompaniment, vocal and/or instrumental. We shall not couple your recordings with those of any other artist without your consent." (*Id.*) In practical terms, this meant none of the recordings Plaintiff made under this agreement could be included on compilation albums with songs from other artists without Plaintiff's consent.

Four years later, in October 1966, Plaintiff signed another recording agreement. (*Id.,* Ex. E.) Despite altering the structure of the artist-label relationship, the agreement made clear that "[a]ll of the terms and conditions of the" prior agreements, including superseding amendments, "shall be applicable hereto as if fully set forth" in the agreement. (*Id.* at § 4.) In January 1980, the parties signed a new recording contract. (*Id.,* Ex. F.) Unlike any of the prior agreements, the 1980 agreement gave Defendant "the sole and exclusive right to reproduce the Masters and the performances embodied thereon and to manufacture therefrom all forms of derivatives and derivative works including Phonograph Records in any speed, size, or format whatsoever, coupling the Masters at Company's option with other Masters not the subject hereof." (*Id.* at § 5(b).) The plain text of this provision makes clear Defendant did not need Plaintiff's consent to couple recordings made under this agreement.

The final pertinent agreement-and, the crux of what is at issue here-was signed in November 1982. (*Id.,* Ex. G.) It called for Plaintiff to deliver a new German-language recording. (*Id.*) All of its provisions, except one, pertained to the German recording. The outlier provision, Section 17, provided,

In consideration of this Agreement Artist hereby absolutely and forever releases and discharges

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 566794 (S.D.N.Y.)

(Cite as: 2011 WL 566794 (S.D.N.Y.))

Company, its officers, directors, employees, licensees and assigns (the "Releasees") from any and all claims, demands, debts, damages, liabilities, actions, causes of action, suits, sums of money, accounts, covenants, agreements, contracts and promises in law or in equity which Artist may now have or has had at any time against the Releasees, whether or not the same have been subject to dispute or whether or not known or unknown, by reason of any undertaking, promise, contract (express, implied in fact or implied in law), liens, liability, matter, cause, fact, thing, act or omission whatsoever from the beginning of the world to the day of the date of this agreement. Notwithstanding the foregoing, nothing herein contained shall absolve Company from its obligation to render accountings and pay royalties otherwise payable to Artist in accordance with Artist's prior agreements with Company and any extensions or renewals thereof but Company shall have no other obligations with respect to Sides delivered to Company pursuant to such prior Agreements.

**\*2** (*Id.* at § 17.)

Plaintiff's first claim is that Defendant committed breach of contract, after the 1982 agreement, by including her recordings on compilation albums with songs from other artists without obtaining her consent. (Am.Compl.¶¶ 73-75.) Defendant moves for summary judgment on this claim primarily on the basis that Section 17 of the 1982 agreement extinguished Defendant's duty to secure Plaintiff's consent.

With respect to Plaintiff's third and seventh claims for underpayment of royalties, Defendant moves for summary judgment on the basis that these claims are time-barred. Defendant's argument is rooted in the recording agreements' requirement that Plaintiff object, in writing, to any royalty statements provided by Defendant within six months of receipt or be deemed to have accepted those statements. Because Plaintiff failed to object in writing at any point prior to filing her lawsuit, Plaintiff's royalties claims should be dismissed, according to Defendant, except to the extent Plaintiff seeks damages limited to the six-month period immediately prior to the filing of her lawsuit.

**LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a mater of law." FED. R. CIV. P. 56(a). The moving party bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Although all reasonable inferences and ambiguities must be drawn or resolved in favor of the nonmoving party, " '[u]nless the nonmoving party offers some hard evidence showing that its version of the events is not wholly fanciful, summary judgment is granted to the moving party.' " *See, e.g., Miner v. Clinton County, New York,* 541 F.3d 464, 471 (2d Cir.2008) (alteration in original) (citation omitted).

**ANALYSIS**

**I. Plaintiff's Coupling Claim**
**A. The 1982 Agreement**

Under New York law, "the initial question for the court on a motion for summary judgment with respect to a" claim for breach of contract "is 'whether the contract is unambiguous with respect to the question disputed by the parties.' " *See Law Debenture Trust Co. of New York v. Maverick Tube Corp.,* 595 F.3d 458, 465 (2d Cir.2010) (citations omitted). Whether a contract is ambiguous "is a question of law for the court." *See id.* at 465-66 (citations omitted). " '[A] written agreement that is complete, clear and unambiguous on its face must be [interpreted] according to the plain meaning of its terms, without the aid of extrinsic evidence.' " *Id.* at 467-68 (citations omitted).

Section 17 of the 1982 agreement has two clauses. The first "release[d] and discharge[d]" Defendant "from any and all ... covenants, agreements, contracts and promises in law or in equity which Artist may now have or has had at any time against" Defendant. (Creelan Decl. Ex. G, at § 17.) The second clause carved out two exceptions to the first clause's broad release: "nothing herein contained shall absolve Company from its obligation to *render accountings* and *pay royalties* otherwise payable to Artist in accordance with Artist's prior agreements with Company and any extensions or renewals thereof but Company shall have *no other obligations* with respect to Sides delivered to Company pursuant to such prior

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 566794 (S.D.N.Y.)

(Cite as: 2011 WL 566794 (S.D.N.Y.))

Agreements." (*Id.* (emphasis added). The import of these clauses is clear and unambiguous: Going forward, with the exception of (1) rendering accountings and (2) paying royalties, Defendant would have "no other obligations" to Plaintiff, including those imposed by "covenants, agreements, contracts and promises in law or equity[,]" that she previously had or continued to have when the 1982 agreement was signed.

**\*3** In arguing that the duty to obtain her consent survived Section 17's broad release, Plaintiff attempts to conflate the duty to render accountings and to pay royalties with the separate duty to obtain her consent for coupling in certain circumstances. No doubt the accounts rendered and royalties paid under the agreements that included the anti-coupling clause reflected monies paid to her for those coupled recordings. But that does not mean that the duty to render accountings or to pay royalties encompassed the duty to obtain Plaintiff's consent prior to coupling her recordings.

Plaintiff also argues that Section 17 is ambiguous. She relies primarily, however, on extrinsic evidence.[FN3] She points, for example, to Defendant's attempts, prior to the 1982 agreement, to convince her to explicitly revoke the anti-coupling provision. (*See* Francis Aff., Ex. E, F.) She also points to letters allegedly showing Defendant sought Plaintiff's consent after the 1982 agreement. (*See id.*, Ex. J.) All of this evidence is irrelevant. In cases such as this, "[w]here [the] contract is unambiguous and complete, no extrinsic evidence ... will be considered." *See In re Application of MobiTv, Inc.,* 712 F.Supp.2d 206, 252 (S.D.N.Y.2010) (citations omitted); *see also Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir.1998) ("If the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence.").

FN3. To the extent Plaintiff attempts to argue that the anti-coupling clause is a "restriction" as opposed to an "obligation," the term "restriction" does not appear in the 1982 agreement. As a result, the agreement itself does not identify any "restrictions" that survived Section 17's broad

release. In addition, virtually every requirement to obtain consent can be framed as an "obligation" or a "restriction"-a "restriction" not to act without permission can be phrased, alternatively, as an "obligation" to secure permission before acting. As this example demonstrates, Plaintiff's argument regarding the distinction between a "restriction" and an "obligation" is nothing more than "[c]ontorted semanticism[,]" which may not "create an issue [of fact] where none exists." *See, e.g., Wards Co., Inc. v. Stamford Ridgeway Assocs.,* 761 F.2d 117, 120 (2d Cir.1985).

Plaintiff also claims Magistrate Judge Eaton already found that Section 17 is ambiguous. Plaintiff is wrong. In an order addressing, among other things, whether Plaintiff was entitled to discovery of extrinsic evidence regarding the 1982 agreement, Magistrate Judge Eaton expressed doubt as to the scope of Section 17. He specifically reserved construing Section 17, however, noting "that the district judge will be in a better position to answer (and to decide whether to consider extrinsic evidence)" when he or she construes the 1982 agreement. (Dkt. 20, at 3-4.) Thus, Magistrate Judge Eaton did not find it was ambiguous, as Plaintiff suggests.

Plaintiff contends, lastly, that a 1992 agreement between the parties demonstrates that the 1982 agreement did not release Defendant from its duty to secure Plaintiff's consent prior to coupling. (*See* Francis Aff. Ex. K.) Plaintiff points to the final provision of the 1992 agreement, which provides that the terms of the 1959 agreement and 1966 agreement "are hereby ratified and confirmed without limitation or exception." (*Id.* ¶ 4.) Because the 1992 agreement does not explicitly state that the 1982 agreement modified or amended the prior agreements, the 1992 agreement demonstrates, according to Plaintiff, that the 1982 agreement did not modify or amend the prior agreements. Plaintiff is wrong. The first paragraph of the 1992 agreement specifically refers to the 1959 and 1966 agreements "as amended" by later agreements. (*Id.* (opening paragraph).) In view of Section 17's "release[ ] and discharge[ ] ... from any and all ... covenants, agreements, contracts and promises in law or in equity which" Plaintiff had when the 1982 agreement

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 566794 (S.D.N.Y.)

(Cite as: 2011 WL 566794 (S.D.N.Y.))

was signed, it is beyond dispute that the 1982 agreement amended all prior agreements.

**B. Damages**

*4 Even assuming, as Plaintiff argues, the 1982 agreement is ambiguous, which it is not, Defendant would still be entitled to summary judgment as there is no evidence Plaintiff suffered any damages as a result of the alleged breach. Under New York law, in order to make a prima facie case for breach of contract, " 'a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach .' " See *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank,* 392 F.3d 520, 525 (2d Cir.2004) (citations omitted).

To prove damages here, Plaintiff must offer a basis for calculating "the position [she] would have occupied but for the breach." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.,* 380 F.Supp.2d 250, 269 (S.D.N.Y.2005) (citations omitted); *see also Nat'l Mkt. Share, Inc.,* 392 F.3d at 525 (explaining that " '[o]ne who violates his contract ... is liable for all the direct and proximate damages which result from the violation' " (citations omitted)). Instead, in his report, Plaintiff's damages expert, Arthur L. Erk,[FN4] argues the proper measurement of damages should be all of the revenue Defendant received from coupled uses.[FN5] (See Creelan Decl., Ex. I, J.) This constitutes disgorgement. It is well-settled that "[d]isgorgement ... is not an appropriate remedy for a breach of contract" because "[d]isgorgement looks to the defendant's ill-gotten gains, rather than to the plaintiff's losses." See *Topps Co., Inc.,* 380 F.Supp.2d at 269 (citation omitted).

FN4. Erk is a certified public accountant. (Erk.Aff.¶ 1.)

FN5. Erk alleges $2,054,101 in damages for Plaintiff's coupling claim (see Creelan Decl., Ex. J. at Summary Chart of Claimed Amounts Due), which constitutes all of the revenue Defendant received from coupled uses (see id., Ex. I, J).

In an effort to salvage her damages claim, in her opposition to Defendant's motion for summary judgment, Plaintiff and her damages expert submit affidavits,

alleging that sales of Plaintiff's full-length albums declined because Defendant released compilation albums. (Francis Aff. ¶¶ 44-45; Erk Aff. ¶¶ 7-20.) In view of the fact that she earns more from the release of a full-length album than a compilation album (id.), Plaintiff asserts damages are certain. In cases where damages are certain, "the burden of uncertainty as to the amount of damage is" on the wrongdoer. See *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 926 (2d Cir.1977) (citation omitted). Accordingly, Plaintiff argues, her damages claim must be presented to a jury.

Erk's affidavit also provides an alternative basis for calculating Plaintiff's alleged damages. (See Erk Aff. ¶¶ 7-20.) Erk's new estimate-$1,185,701-is based on domestic sales of compilation albums between 1995 and 2005. (Id. ¶ 16.) Erk calculated this figure by estimating the net earnings attributable to Plaintiff for one recording on a compilation album (30.5 cents), subtracting, from this amount, approximately how much Erk believes Plaintiff has already been paid for each compilation sold (1.78 cents), and then multiplying this amount (28.72 cents) against the total number of compilation albums sold domestically between 1995 and 2005 (4,128,616).[FN6] (Id. ¶¶ 12-16.) Based on these calculations, Erk concludes Plaintiff suffered $1,185,701 in damages for her coupling claim. (Id. ¶ 17.) This amount, Erk adds, constitutes less than the damage claim Plaintiff would be entitled to if she were claiming one-for-one loss in sales for full-length albums for each compilation album sold. (Id. ¶¶ 18-19.)

FN6. Erk estimates Defendant made a net earning of $4.27 for each compilation album sold. (Erk Aff. ¶ 12.)

*5 Plaintiff's arguments fail for three reasons. As an initial matter, Erk's affidavit is improper. In his deposition, Erk confirmed that in his report, he made no effort to determine whether the release of coupled albums had any effect on the sale of Plaintiff's full-length albums. (See Creelan Decl., Ex, H (Erk.Dep.118:6-17).) Pursuant to Federal Rule of Civil Procedure 26(a) (2)(B)(i), all expert reports must contain "a complete statement of all opinions the witness will express." Because Erk's report contained no opinion regarding the effects of coupled albums on Plaintiff's full-length albums, Erk's affidavit is improper

Slip Copy, 2011 WL 566794 (S.D.N.Y.)

(Cite as: 2011 WL 566794 (S.D.N.Y.))

under Federal Rule of Civil Procedure 37(c)(1).[FN7] *See* FED. R. CIV. P. 37(c)(1) ("If a party fails to provide information ... as required by Rule 26(a) ... the party is not allowed to use that information ... on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless ."); *see also Revlon Consumer Prods. Corp. v. Estee Lauder Companies, Inc.,* No. 00 Civ. 5960 RMB AJP, 2003 WL 21751833, at *4 (S.D.N.Y. July 30, 2003) (excluding "new" portions of summary judgment affidavit).

> FN7. Erk's new damages calculation also constitutes a new opinion that is improper under Federal Rule of Civil Procedure 37(c)(1).

Second, even assuming Erk's affidavit were not improper, both his affidavit and Plaintiff's are loaded with conclusory assertions. In order for Plaintiff to establish there is an issue of fact regarding damages, she must present some evidence showing that the release of compilation albums caused her full-length album sales to decline. *See Nat'l Mkt. Share, Inc.,* 392 F.3d at 525 (noting that "[c]ausation is an essential element of damages in a breach of contract action" and that "a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages" (emphasis in original) (citations omitted)). Although Plaintiff may be correct that sales of her full-length albums decreased at the same time sales of compilation albums increased, that does not prove, as Plaintiff and Erk urge, that sales of her full-length albums declined because Defendant released compilation albums. Plaintiff assumes causation from evidence that merely shows correlation. Erk and Plaintiff both assume that had Defendant not released compilation albums, consumers who purchased compilation albums would otherwise have purchased Plaintiff's full-length albums. Neither Erk nor Plaintiff offer evidence to this effect, however. Without more than conclusory statements, Plaintiff has not shown there is an issue of fact regarding damages. *See Kinsey v. Cendant Corp.,* 521 F.Supp.2d 292, 303 (S.D.N.Y.2007) (observing that "unsupported conclusions are insufficient to defeat summary judgment" (citations omitted)).

Lastly, with respect to Plaintiff's argument that damages are certain and that the burden of uncertainty rests with Defendant, even if the Court credited Plaintiff's argument that damages are certain, Erk's new damages calculation still fails to provide " 'a stable foundation for a reasonable estimate' of damages." *See ESPN, Inc. v. Office of the Comm'r of Baseball,* 76 F.Supp.2d 416, 418 (S.D.N.Y.1999) (citations omitted). In *ESPN,* a court in this district explained that "[a]lthough it is true that '[w]hen the existence of damage is certain, and the only uncertainty is as to its amount, the plaintiff will not be denied recovery[,]' ... even then the plaintiff must show 'a stable foundation for a reasonable estimate' of damages." *Id.* (citations omitted). While Plaintiff "does not need to prove damages with 'mathematical precision [,]' " she must provide "at least a 'reasonable evidentiary foundation' for an estimate of" her damages. *See, e.g ., Netherby Ltd. v. Jones Apparel Gp., Inc.,* No. 04 Civ. 7028(GEL), 2007 WL 1041648, at *18 (S.D.N.Y. Apr. 5, 2007) (citations omitted).

*\*6* Here, Erk's new calculation, like the one in his expert report, provides no reasonable foundation for estimating her damages-*i.e.,* "the position [Plaintiff] would have occupied but for the breach." *See also Topps Co., Inc.,* 380 F.Supp.2d at 269 (citations omitted). Instead, Erk creates a new formula for calculating how much revenue Defendant received from coupled albums-this time focusing solely on the revenue received from Plaintiff's contribution to coupled albums as opposed to all revenue earned from coupled uses-and then claims this is an adequate way to ascertain Plaintiff's damages. (Erk Aff. ¶¶ 12-17.) By again focusing on revenue earned, however, Erk is just offering a modified form for obtaining disgorgement damages. As explained earlier, "[d]isgorgement ... is not an appropriate remedy for a breach of contract." *See Topps Co., Inc.,* 380 F.Supp.2d at 269 (citation omitted). In view of Erk's failure to "show 'a stable foundation for a reasonable estimate' of damages[,]" even assuming damages are certain, Defendant is entitled to summary judgment on Plaintiff's coupling claim.

## C. Request for Leave to Amend the Amended Complaint

Well after briefing on Defendant's motion for summary judgment was complete, Plaintiff substituted counsel. At a status conference, Plaintiff's new counsel

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 566794 (S.D.N.Y.)

(Cite as: 2011 WL 566794 (S.D.N.Y.))

sought leave to amend the amended complaint. The Court allowed the parties to submit letters on Plaintiff's request. In her letters, in addition to rehashing her arguments for disgorgement, Plaintiff indicates that she seeks to add a claim for money had and received or unjust enrichment. Plaintiff's application is DENIED for undue delay and futility. *See, e.g., McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir.2007)* ("A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." (citation omitted)).

First, with respect to undue delay, Plaintiff filed her initial complaint in 2002. (Dkt.1.) Plaintiff filed an amended complaint shortly thereafter. (Dkt.4.) Nearly nine years later, and on the eve of a decision on Defendant's potentially dispositive motion for summary judgment, Plaintiff seeks leave to amend her complaint again. Plaintiff offers no reason for her inordinate delay. *See MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc., 157 F.3d 956, 962 (2d Cir.1998)* ("The burden to explain a delay is on the party that seeks leave to amend." (citation omitted)). And, as Defendant argues, Plaintiff's substitution of counsel does not excuse her delay in seeking leave to amend. *See Ansam Assocs., Inc. v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir.1985); see also Therion, Inc. v. Media By Design, Inc., No. CV 08-5256(TCP)(ETB), 2010 WL 5341925, at *4 (E.D.N.Y. Nov. 10, 2010); Zubulake v. UBS Warburg LLC, 231 F.R.D. 159, 162 (S.D.N.Y.2005).* Moreover, granting Plaintiff leave to amend her complaint at this point, on the eve of an adverse ruling on Defendant's motion for summary judgment, would be "especially prejudicial" to Defendant. *See Ansam Assocs., Inc., 760 F.2d at 446; see also PI, Inc. v. Quality Prods., Inc., 907 F.Supp. 752, 764 (S.D.N.Y.1995)* ("When it appears that leave to amend is sought in anticipation of an adverse ruling on the original claims, however, the court is free to deny leave to amend." (citations omitted)).

**\*7** Second, with respect to futility, to the extent Plaintiff seeks to rehash her arguments for disgorgement, these arguments fail for the reasons provided above. *See supra.* In regard to Plaintiff's argument for money had and received or unjust enrichment, in cases such as this, when an issue falls within the four corners of a contract, a party may not proceed on a quasi-contract claim. *See Telstar*

*Res. Gp., Inc. v. MCI, Inc., 476 F.Supp.2d 261, 274-75 (S.D.N.Y.2007)* ("Under New York law, the existence of a contract governing a particular dispute normally forecloses recovery by an unjust enrichment theory." (citations omitted)); *see also AdiPar Ltd. v. PLD Int'l Corp., No. 01 Civ. 0765(MBM), 2002 WL 31740622, at *12 (S.D.N.Y. Dec. 6, 2002)* (noting that "[a] written contract covering the subject matter of a dispute precludes recovery in quasi-contract" (citations omitted)). Here, as explained earlier in the Court's principal finding, the 1982 agreement unambiguously extinguished Defendant's duty to secure Plaintiff's consent prior to coupling her songs. *See supra.* As a result, there is no basis for finding that Defendant unlawfully obtained a benefit without compensating Plaintiff.

**II. Plaintiff's Royalties Claims**

In its opening papers, Defendant argues that Plaintiff's third and seventh claims for underpayment of royalties are time-barred, except to the extent Plaintiff seeks damages limited to the six-month period immediately preceding the filing of her lawsuit. Putting aside that Defendant drops this argument in its reply, Judge Owen-taking into account a tolling agreement between the parties (Francis Aff., Ex. N)-already dismissed "all of Plaintiff's claims for royalties ... to the extent they relate to accounting periods prior to July 1, 1995." (Dkt. 37; *see also* Dkt. 36). With no " 'compelling reason[ ]' " to deviate from Judge Owen's Order, July 1, 1995 is the earliest date for which Plaintiff can maintain her royalties claims. *See, e.g., Johnson v. Holder, 564 F.3d 95, 99 (2d Cir.2009)* (explaining that "[t]he law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise' " (citations omitted)).

**CONCLUSION**

For the reasons provided above, Defendant's motion for summary judgment (Dkt.83) is GRANTED as to Plaintiff's first claim for breach of contract and DENIED as to Plaintiff's third and seventh claims for underpayment of royalties.

The trial in this case will commence on March 21, 2011 at 9:30 a.m. in Courtroom 17C of the United States District Court, 500 Pearl Street, New York, N.Y. 10007.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 566794 (S.D.N.Y.)

(Cite as: 2011 WL 566794 (S.D.N.Y.))

The parties are directed to submit all in limine motions on or before March 7, 2011. Any opposition to a motion in limine must be submitted by no later than March 14, 2011. A final pre-trial conference will be held on March 17, 2011 at 4:30 p.m. The parties must submit their proposed voir dire and proposed jury charges by no later than March 17, 2011, as well.

**\*8** SO ORDERED:

S.D.N.Y.,2011.

Franconero v. Universal Music Corp.
Slip Copy, 2011 WL 566794 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Frank G. MOWRY, Plaintiff(s),
v.
Robert F. NOONE, In his Individual and Official
Capacity and Douglas Dickenson, Individually and in
his Official Capacity as an employee/agent of the
County of Seneca, Defendant(s).
**No. 02-CV-6257FE.**

Sept. 30, 2004.

Frank G. Mowry, Gowanda, NY, pro se.

Thomas J. Lynch, Esq., Law Offices of Thomas J. Lynch,
Syracuse, NY, Thomas Desimon, Esq., Harris Beach LLP,
Pittsford, NY, for Defendants.

DECISION AND ORDER

*Preliminary Statement*

FELDMAN, Magistrate J.

**\*1** Plaintiff Frank G. Mowry ("Mowry" or "plaintiff"),
proceeding *pro se,* brings this action pursuant to 42 U.S.C.
§ 1983. Plaintiff alleges that (1) defendant Robert F.
Noone, Jr. ("Noone") used excessive force to effectuate
his arrest, in violation of his rights under the Fourth
Amendment of the Constitution, (2) defendant Douglas
Dickenson ("Dickenson") failed to intervene to stop
Noone from using excessive force, and (3) both Noone
and Dickenson deliberately denied him medical care in
violation of his rights under the Fourteenth Amendment of
the Constitution. Defendants now move for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure (Docket # 70). In accordance with the
provisions of 28 U.S.C. § 636(c), the parties have
consented to the jurisdiction of this Court for all
dispositive matters, including trial. (Docket # 11). For the
reasons set forth herein, defendants' motion for summary
judgment is granted.

*Factual Background*

Mowry alleges that on July 22, 1999 he was stopped at a
traffic light in the left turn only lane at the Ovid Street
bridge in Seneca Falls, New York. Mowry continued
straight ahead onto Cayuga Street when the light turned
green. Defendant Officer Robert F. Noone, Jr. of the
Seneca Falls Police Department, observed Mowry disobey
the traffic sign, activated the emergency lights on his
vehicle and began following Mowry. (Mowry Dep. Trans.
p. 17, 17-18 FN1). Mowry knew that he was driving
illegally but did not pull over. (Mowry Dep. Trans. p. 18,
12). Noone continued to follow Mowry for several miles.
(Mowry Dep. Trans. p. 20, 8). When Mowry turned onto
Route 318, Deputy Douglas Dickenson of the Seneca
County Sheriff's Department, joined the pursuit and
activated his emergency lights. (Mowry Dep. Trans. p. 22,
5-6, p. 24, 3). Mowry continued driving even though he
knew he was the subject of pursuit. (Mowry Dep. Trans.
p. 25, 7). Mowry lead defendants on a highspeed chase
that reached speeds of over 75 mph and narrowly avoided
several head-on collisions as he attempted to pass vehicles
on the two-lane road. (Mowry Dep. Trans. p. 21, 12-13,
22). Mowry turned onto Birdsey Road and continued
driving until a construction road closure forced him to stop
his car. (Mowry Dep. Trans. p. 28, 9-22).

FN1. Deposition references are to the page and
line number of transcript of the May 27, 2003
deposition of plaintiff Frank. G. Mowry.

Mowry exited his car and when he saw Dickenson,
followed by Noone, turn onto Birdsey Road he began to
flee. (Dep. Trans. p. 38, 9-13; p. 39, 3). Dickenson ran
after Mowry yelling at him to stop. (Mowry Dep. Trans. p.
39, 8). Once Mowry saw that he was about to be overtaken

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

by Dickenson, he stopped and Dickenson brought him to the ground. (Mowry Dep. Trans. p. 34, 20). Mowry landed with his hands and knees on the gravel. (Mowry Dep. Trans. p. 37, 2; p 40, 20-21). Dickenson asked Mowry if he was alright, and Mowry responded yes. (Mowry Dep. Trans. p. 42, 15-20).

Dickenson gave Mowry 30 seconds to catch his breath on his hands and knees, then pulled Mowry's right arm behind his back to handcuff him. (Mowry Dep. Trans. p. 42, 12-13, p. 39, 21-22). At the same time, Mowry heard a car door slam and saw Noone running towards them. (Mowry Dep. Trans. p. 72, 19-21). Mowry testified that when he saw Noone running towards them he only had time to turn his head away. (Mowry Dep. Trans. p. 46, 6-8). Mowry testified that Noone was running too fast and overran Mowry and Dickenson. (Mowry Dep. Trans. p. 46, 18-19). As Noone jumped over the top of Mowry's head, the toe of Noone's boot hit the side of Mowry's head. (Mowry Dep. Trans. p. 49, 4-5). Noone landed on one foot before regaining his balance. (Mowry Dep. Trans. p. 48, 21-23). Noone and Dickenson pulled Mowry off the ground and placed him in Noone's car. (Mowry Dep. Trans. p. 49, 13-14). Mowry claims to have lost consciousness until he was placed in the back of the patrol car. (Mowry Dep. Trans. 50, 9-14). Mowry denies telling anyone that he was injured until after he got to the police station and was formally "booked in" at the county jail. (Mowry Dep. Trans. 55, 7-13). Mowry concedes that he did not ask for any medical attention at that time. (Mowry Dep. Trans. 55, 17-22, 68, 10-15).

**\*2** Mowry was taken to the Seneca Falls Police Station where he was charged with Driving While Intoxicated, Aggravated Unlicensed Operation of a Motor Vehicle in the First Degree, and Reckless Endangerment.[FN2] Within 24 hours of his arrest, Mowry was examined by medical personnel at the county jail and was treated for neck pain. (Mowry Dep. Trans. p. 68, 19; p. 58, 3-4).

> FN2. Mowry later admitted guilt to all three charges. (Mowry Dep. Trans. p. 63, 8-20).

Mowry alleges that he was later diagnosed with a fractured left cheekbone. (Mowry Dep. Trans. p. 65, 5-9). He also asserts that as a result of this injury he experiences blurred vision and migraine headaches. (Mowry Dep. Trans. p. 65, 6-9). According to Mowry, the results of an MRI taken while he was in prison were "normal." (Mowry Dep. Trans. p. 82, 18-19).

*Discussion*

*Summary Judgment Standard:* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if it has some affect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Catanazaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998).

The burden of showing the absence of any genuine issue of material fact rests on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a court is confronted with facts that permit different conclusions, all ambiguities and inferences that may reasonably be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). Rule 56(e), however, also provides that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial. Such an issue is not created by a mere allegation in the pleadings [citations omitted], nor by surmise or conjecture on the part of the litigants." *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (per curium). "Affidavits submitted in opposition to a motion for summary judgment must set forth such facts as would be admissible in evidence." *Franklin v. Krueger Int'l,* 1997 WL 691424 at *3 (S.D.N.Y. November 5, 1997) (citing *Raskin v. The Wyatt Co.,* 125 F.3d 55 (2d Cir.1997) ("only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

In addition, *pro se* submissions, particularly those alleging civil rights violations, are construed liberally and are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

treated as raising the strongest arguments that they might suggest. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). *See also Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (because plaintiff's "complaint alleges civil rights violations and he proceeded *pro se* in the District Court, we must construe his complaint with particular generosity") (citations omitted).

**\*3** *I. Excessive Force Claim:* The Supreme Court has held that claims against police officers for excessive force must be examined under the Fourth Amendment's reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Determining whether the force used was reasonable requires a balancing of the intrusion on the individual's Fourth Amendment rights against the interests of the government. *Id.* at 396. The reasonableness of a particular use of force must be judged objectively from the perspective of a reasonable officer at the scene of the arrest. *Graham,* 490 U.S. at 397. In evaluating the officer's actions, courts should consider the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. It is well established that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion. *Id. See Mickle v. Morin,* 297 F.3d 114, 120 (2nd Cir.2002)(in the context of excessive force used during an arrest, "not every push or shove" is excessive.)(internal citations omitted).

In this case, the record is clear that the officers were faced with an extremely dangerous situation as Mowry drove erratically down narrow roads to avoid capture. Indeed, Mowry's actions repeatedly put the lives of other motorists in imminent danger. Applying the *Graham* balancing test to these circumstances, there is no question that the officers acted appropriately in stopping and arresting Mowry. *See Washington v. City of Riverside Illinois,* 2003 WL 1193347, \*5 (N.D.Ill. March 13, 2003) (summary judgment granted when driver's decision to flee justified officer's subsequent use of force to arrest.). Simply put, Mowry has produced no evidence upon which a reasonable jury could find that the defendants used excessive force during his take down and arrest.

As for Mowry's allegation that Noone applied excessive

force by "kicking him in the head," this Court will not credit Mowry's attempt to change his deposition testimony with the affidavit he submits in opposition to defendants' motions. Rather, this Court relies on Mowry's deposition testimony which clearly establishes the accidental nature of any injury caused by Noone. *See Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987)("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."); *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").

The undisputed facts here are that after Mowry was taken down by Dickenson, Noone exited his vehicle, ran toward Mowry with such speed that he overran Mowry and Dickenson, and tripped over Mowry. In light of the prolonged chase, the officers had a reasonable basis for believing that Mowry posed a serious threat, especially since he continued to run and evade arrest after he exited his vehicle. Under these circumstances, this Court finds that it was objectively reasonable for Noone to approach Mowry at a high rate of speed in his effort to assist Dickenson in subduing Mowry, and that his actions can not constitute excessive force.

**\*4** *II. Failure to Intervene Claim:* Mowry also makes a claim for failure to intervene. It is well established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by others. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994); *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988). Failure to intercede results in liability where an officer observes the use of excessive force or has reason to know that it will be used. *Anderson,* 17 F.3d at 557. In order to be held liable, the law enforcement official must have had a realistic opportunity to intervene in order to prevent the harm from occurring. *Id.* at 557.

Here, based on the facts as presented by Mowry, Dickenson did not have the opportunity to intercede before Noone tripped over Mowry, and therefore cannot be held liable. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

(2d Cir.1988) (defendant entitled to judgment where record clear that blows were struck in such a rapid succession that officer "had no realistic opportunity to attempt to prevent them."). At the time the alleged excessive force was used, Dickenson had one hand on Mowry's left arm and was attempting to pull Mowry's right arm behind Mowry's back. Even Mowry stated that when he heard Noone running toward them he only had time to turn his head away before Noone overran them. Moreover, Noone's alleged use of excessive force was a single kick to the head, an event which Mowry concedes happened quickly and without warning. This was not a situation where the alleged excessive force continued for such a period of time that Dickenson, upon realizing what was happening, could have stopped it. *Id.* at 11-12.

Because a reasonable jury could not conclude otherwise, summary judgment should be granted in favor of Dickenson on the failure to intervene claim.

*III. Denial of Medical Treatment:* Mowry's third claim is for denial of medical treatment. The denial of medical treatment for a pre-trial detainee is evaluated under the Due Process Clause of the Fourteenth Amendment. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). Although not specifically defined by the Supreme Court, the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner. *City of Revere,* 463 U.S. at 244; *Weyant v. Okst,* 101 F.3d. at 856.

In *Weyant,* the Second Circuit established a two-part test to determine liability for denial of medical treatment. First, the denial of medical treatment must concern an objectively serious injury. *Weyant,* 101 F.3d at 856. A serious injury has been defined as "one that may produce death, degeneration or extreme pain." *Mills v. Fenger,* 2003 WL 251953, *4 (W.D.N.Y.2003)* (citations omitted). Second, the plaintiff is required to show that based on what the defendant knew or should have known, the defendant acted with deliberate indifference to plaintiff's serious medical needs. *Weyant,* 101 F.3d at 856. Deliberate indifference is established if the defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical condition. *Weyant,* 101 F.3d at 856.

*5 Here, the undisputed facts establish that the defendants did not deny plaintiff medical treatment. Even assuming arguendo that Mowry's injury rose to the level of an objectively serious medical injury, there is no credible evidence in the record to base a finding that either Noone or Dickenson should have been aware of his need for medical treatment, but were indifferent to his needs. Indeed, the record demonstrates that Mowry never told the defendants that he needed medical attention and the injuries he now alleges were not apparent to them. Contrary to plaintiff's claims, Dickenson demonstrated his concern for plaintiff's well-being when he asked Mowry if he was alright and gave him time to catch his breath. Mowry did not ask for medical assistance or complain about his alleged injuries immediately following the arrest. At the county jail, Mowry stated that he did not need medical attention. It was not until the following day that Mowry first requested medical attention. Mowry admits that in response to this request, he was then treated by the medical personnel at the county jail and given a prescription for neck pain.

The record is devoid of credible evidence that either defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical needs. *See Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 338 (E.D.N.Y.2003) (to establish a constitutional violation the facts must give rise to a reasonable inference that defendants *knew* of serious medical needs and intentionally disregarded them.). Based on the record here, summary judgment should be granted in favor of defendants Dickenson and Noone on plaintiff's denial of medical treatment claim.

*Conclusion*

For all the foregoing reasons, defendants' Motions for Summary Judgment (Docket # 67, 70) are granted. Having granted defendants' motion for summary judgment by determining that plaintiff has failed to adduce evidence of a constitutional violation, plaintiff's motions for "dismissal of defendant's (sic) motion" and "cross motion" for summary judgement (Docket # 75) are denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))


SO ORDERED.


W.D.N.Y.,2004.
Mowry v. Noone
Not Reported in F.Supp.2d, 2004 WL 2202645
(W.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Ronald JOHNSON, Plaintiff,
v.
C.O. BROWN; Boulter; Kiernan; Guerin; and Eastern,
Defendants.
Civ. Action No. 9:09-CV-0002 (GTS/DEP).

Sept. 3, 2010.
Ronald Johnson, Woodbourne, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General, Krista A. Rock, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Ronald Johnson, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. In his complaint plaintiff asserts that he was assaulted by six corrections officers, including the named defendants, that following the assault defendants failed to provide medical treatment for his resulting injuries, and that in retaliation for filing grievances regarding the incident he was threatened and harassed.

Currently pending before the court is defendants' motion for summary judgment. In their motion, defendants assert that as to several of plaintiff's claims he has failed to state constitutionally cognizable causes of action, and as to others, based upon the record now before the court, no reasonable factfinder could find in plaintiff's favor. Additionally, defendants assert that they are immune from liability for damages in their official capacities, and are also protected from suit by the doctrine of qualified immunity.

Having carefully reviewed the record considered in light of the arguments of the parties, for the reasons that follow I recommend that defendants' motion be granted and that plaintiff's complaint be dismissed.

I. *BACKGROUND*[FN1]

> **FN1.** In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). It should be noted, however, that most of plaintiff's allegations are sharply contested by the defendants.

The facts forming the basis for Johnson's claims are uncomplicated, although the parties vigorously dispute the relevant events, particularly the allegation that the plaintiff was beaten by corrections officers. Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"); at the times relevant to his complaint, Johnson was housed at the Watertown Correctional Facility ("Watertown"), located in Watertown, New York. *See generally* Complaint (Dkt. No. 1); *see also* Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 34-12) ¶ 1. On September 29, 2009, plaintiff was returning to Watertown on a DOCS transport bus driven by Sergeant Guerin, after having been resentenced to post release supervision in Queens County Court. Defendants' Rule 7.1(a)(3) Statement ¶¶ 2-3; *see also* Transcript of Plaintiff's Deposition ("Tr.") (Dkt. No. 34-10) pp. 20-21. The Watertown bus arrived at the Oneida Correctional Facility at 12:00 p.m. to meet the incoming bus from the Ulster Correctional Facility and to exchange staff. Guerin Aff. (Dkt. No. 34-4) ¶ 4. At the staff exchange the Ulster bus, in which plaintiff was riding, became the bus bound for Watertown. *Id.* During the transport to Watertown, plaintiff claims to have asked a question regarding seating arrangements, precipitating the alleged beatings and harassment that followed. Complaint (Dkt. No. 1) § 6. This is where the parties' versions of the relevant events begin to diverge.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

According to Sergeant Guerin plaintiff did not merely ask a question, but rather demanded that the inmates in his group be permitted to "spread out" on the bus instead of being seated together; when Sergeant Guerin advised that this was not possible because more inmates would be boarding, Johnson verbally protested in a loud and angry manner. Guerin Aff. (Dkt. No. 34-4) ¶ 5. Consequently, Sergeant Guerin calmly instructed Johnson to quiet down. *Id.* at ¶ 6. Upon arrival at Watertown at 3:15 p.m., Sergeant Guerin exited the bus and went to his office to complete paperwork in connection with the transfers. Defendants' Rule 7.1(a) (3) Statement ¶¶ 14-15.

**\*2** Plaintiff's version of the verbal exchange on the bus significantly differs from that of Sergeant Guerin. Plaintiff alleges in his complaint that when he asked the sergeant about security arrangements on the bus, it was Sergeant Guerin who became agitated, loudly instructing Johnson not to tell him how to run his bus. Complaint (Dkt. No. 1) § 6. Though he admits that he did not hear what was said, plaintiff speculates that when the bus arrived at Watertown, Sergeant Guerin told the corrections officer meeting them that Johnson had been an "asshole" while on the bus.[FN2] Tr. (Dkt. No. 34-10) p. 30. As a result of Sergeant Guerin's comment, plaintiff believes, Corrections Officer Eastern immediately approached Johnson and said, "welcome home" and remarked to Johnson that he had been an "asshole" on the bus. Tr. (Dkt. No. 34-10) p. 26.

> FN2. Although never served, in the caption of his complaint plaintiff names "C.O. Easton" as a defendant and later identifies "CO Eastern", an officer who worked in the draft room, as a defendant. Plaintiff testified at his deposition that the corrections officer who met the bus and approached him was the defendant whom he believes is named "Easton" or "Eastern". Tr. (Dkt. No. 34-10) pp. 26-27. For the purposes of consistency and clarity in this report and recommendation, that defendant will be referred to throughout as "Eastern", the name listed on the court's records

In his complaint, plaintiff alleges further that after

seeing the nurse in the draft room he was placed in a cell isolated from other prisoners, and six corrections officers, including certain of the named defendants, entered his cell and proceeded to beat him with their fists, as well as to kick and choke him, and that defendant Brown told him that now he knows that he is "nothing but a stupid nigger."[FN3] Complaint (Dkt. No. 1) § 6 and Attached Statement of Facts. Plaintiff's complaint also alleges that after the beating was over, Sergeant Kiernan entered the cell and asked Johnson if he was okay, to which plaintiff replied that he was afraid for his life; plaintiff was then escorted from draft processing to the housing unit at the facility without being offered any medical assistance. *Id.*

> FN3. In papers submitted in opposition to defendants' motion plaintiff clarifies his position regarding the participants in the beating, noting that defendant Kiernan witnessed the beating but did not intervene to protect him. Plaintiff's Memorandum (Dkt. No. 48) at pp. 11-12.

Plaintiff maintains that when he reported to emergency sick call the following day, despite notifying the nurse of the beating the day before and complaining of pain in the head, neck and ribs, he was only given pain medication and was not X-rayed until three weeks later. Complaint (Dkt. No. 1) § 6 and Attached Facts. The nurse at sick call on September 30, 2009, completed an injury report based upon plaintiff's statement that he had been jumped by corrections officers the day before and also examined plaintiff, finding no objective evidence of injury with the exception of a small bruise over his left eye, and gave plaintiff ibuprofen for his pain. *See* Plaintiff's Opposition (Dkt. No. 48) Attachments. When plaintiff returned to emergency sick call two days later voicing the same complaints, the nurse again examined plaintiff and found no objective evidence of injury, but again provided him with ibuprofen and ordered x-rays. *See id.*

Plaintiff claims to have filed grievances regarding the beating. Complaint (Dkt. No. 1) § 4 and Attached Facts. According to Johnson, in retaliation for filing those grievances he was threatened and bribed by the defendants, and his request for a transfer to another facility, which was motivated by his fear for his own safety, was denied.[FN4] *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

FN4. Plaintiff was later transferred out of Watertown in January of 2009. Tr. (Dkt. No. 34-10) p. 62.

**\*3** Defendants Guerin, Brown, and Kiernan dispute plaintiff's version of the events of September 29, 2008, and deny that any threats, assault, or retaliation occurred. *See generally* Guerin Aff. (Dkt. No. 34-4); Brown Aff. (Dkt. No. 34-3); and Kiernan Aff. (Dkt. No. 34-6). Plaintiff has not identified any other officers allegedly involved. According to Sergeant Guerin, who drove the transport bus, he proceeded directly to his office after arriving at Watertown, and did not ask or instruct staff to assault or in any way retaliate against Johnson. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 43-12) ¶¶ 15-16; *see also* Guerin Aff. (Dkt. No. 34-4) ¶¶ 7-8. Corrections Officer Boulter claims to have been on vacation on the day in question, and did not at any time enter the facility on that date. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 34-12) ¶¶ 27-30; *see also* Boulter Aff. (Dkt. No. 34-1). Defendant Brown worked the "night shift", from 3:00 to 11:00 p.m., on the day of the alleged assault, and was assigned to Unit 16 as Roundsman; as such, he did not see or speak with Johnson at any time on September 29, 2008. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 34-12) ¶¶ 32-33; *see also* Brown Aff. (Dkt. No. 34-3) ¶¶ 3-4. Similarly, Kiernan did not see or speak with Johnson at any time on that date, and never threatened the plaintiff in any manner. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 34-12) ¶¶ 22, 25; *see also* Kiernan Aff. (Dkt. No. 34-6) ¶¶ 5-8.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on January 1, 2009. Dkt. No. 1. As defendants, plaintiff's complaint names Corrections Officers Brown, Boulter, and Eastern; John Doe, the corrections sergeant who drove the Watertown bus; [FN5] and Sergeant Kiernan. Plaintiff's complaint references only the Eighth Amendment, and alleges that defendants subjected him to use of excessive force, indifference to his medical needs arising from the incident, and retaliation and harassment. *See generally* Complaint (Dkt. No. 1). Plaintiff seeks $1 million in damages to compensate for the physical and emotional pain that he has suffered.

FN5. The "John Doe" defendant has since been identified as Sergeant Guerin, who also has been served with the summons and complaint and has appeared in the action. *See* Dkt. Nos. 23, 24, and 27.

Following pretrial discovery, defendants filed a motion seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety. Dkt. No. 34. In their motion, defendants argue that 1) the damage claims against them in their official capacities are barred by the Eleventh Amendment; 2) plaintiff's claims involving retaliation, verbal harassment and threats, and the failure to transfer him to another facility are not actionable; 3) the claims against defendants Boulter, Brown, and Kiernan are subject to dismissal based upon their lack of personal involvement in the alleged constitutional deprivations; 4) the evidence in the record fails to raise a triable issue of fact with respect to plaintiff's claim for excessive use of force; and, 5) in any event, defendants are entitled to qualified immunity from suit. Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 48, and defendants have submitted a reply to plaintiff's submission. Dkt. No. 50.

**\*4** Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

*Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. *Fed.R.Civ.P. 56(e);* *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").[FN6]

FN6. Although plaintiff has opposed defendants' motion, he has failed to submit a responding statement of material facts in dispute as required by the court's local rules. The consequences of this failure are potentially significant. By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). Courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV611, 2000 WL 1264122, at *1 (Aug. 22, 2000)* (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). Based upon plaintiff's failure to submit a proper response to Defendants' Rule 7.1(a)(3) Statement, I recommend that the court accept as true defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement.

B. *Eleventh Amendment Immunity*

**\*5** At the outset, defendants' summary judgment motion seeks dismissal of plaintiff's claims against them in their official capacities, asserting their entitlement to Eleventh Amendment immunity.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58 (1978). This absolute immunity that states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[FN7] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91, 102 S.Ct. 2325, 2328-29 (1982)). To the extent that a state official is sued for damages in his or her official capacity the official is

Page 5

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

entitled to invoke the Eleventh Amendment immunity belonging to the state.[FN8] *Kentucky v. Graham,* 473 U .S. 159, 166-67, 105 S.Ct. 3099, 3105 (1985); *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361 (1991).

> FN7. In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693 (2006).

> FN8. By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer,* 502 U.S. at 30-31, 112 S.Ct. at 364-65.

Although it appears from plaintiff's motion response that his claims against the defendants are brought against them solely in their individual capacities, to the extent his complaint can be interpreted otherwise, defendants are correct that since plaintiff's damage claims against the named defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798-99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted, and that plaintiff's damages claim against the defendants in their official capacities be dismissed.

C. *Verbal Harassment*

Included within plaintiff's complaint are allegations of threats and harassment on the part of prison officials which seem to form the basis, at least in part, for plaintiff's Eighth Amendment claim. Plaintiff alleges that defendants Guerin and Eastern, called him an "asshole", and Eastern is alleged to have said to plaintiff "welcome home", a

statement that plaintiff interpreted as a threat. Brown is alleged to have called plaintiff a "stupid nigger", and plaintiff alleges that Kiernan threatened to set plaintiff up by planting drugs or weapons in his cell if he did not withdraw the grievance he filed regarding the alleged assault. Defendants assert that those allegations fail to give rise to a plausible Eighth Amendment claim.

As the defendants correctly note, 42 U.S.C. § 1983 is not designed to remedy harassment or verbal abuse. *Alnutt v. Cleary,* 913 F.Supp. 160, 165-66 (W.D.N.Y.1996) (citations omitted). As a general matter, verbal harassment, including profanity, without any associated physical injury, does not give rise to a claim cognizable under section 1983. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Nor do threats amount to a constitutional violation. *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). Accordingly plaintiff's claims of verbal abuse, alleging conduct which, if true, is both unprofessional and reprehensible, do not rise to the level of a constitutional violation, and are not cognizable under 42 U.S.C. § 1983. *See Moncrieffe v. Witbeck,* No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N .Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983) (citation omitted); *Carpio v. Walker,* No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997) (Pooler, J. & DiBianco, M.J.) ("verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation").[FN9]

> FN9. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*6** While implicitly acknowledging these well-established principles, plaintiff appears to claim that as a result of defendants' harassment he was emotionally and psychologically injured, making the defendants' conduct actionable under section 1983.[FN10] While under extreme circumstances the Eighth Amendment's prohibition against cruel and unusual punishment may encompass intentionally inflicted psychological injury,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

necessarily excluded from this protection is conduct causing only *de minimis* psychological harm. *St. Germain v. Goord,* No. 96-CV-1560, 1997 WL 627552, at *4 (N.D.N.Y. Oct. 8, 2007) (Pooler J. and Homer, M.J.); *Jermosen v. Coughlin,* No. 87 Civ. 6267,1993 WL 267357, at * 6 (S.D.N.Y. Jul. 9, 1993). Plaintiff's allegations in this case, even if true, would not rise to the level of malevolent conduct falling within the Eighth Amendment's protection. *Shabazz,* 994 F.Supp. at 475.

> FN10. To the extent the plaintiff contends that the name calling accompanied the alleged assault, plaintiff may have plausibly alleged an Eighth Amendment violation; as will be seen, however, plaintiff's excessive force claim fails on the merits. *See* pp. 20-33, *post.*

The comments allegedly made to the plaintiff amount to nothing more than name calling and an unrealized threat of retaliation, and plaintiff has failed to come forward with evidence to substantiate that he suffered anything more than minimal psychological consequences as a result of that conduct. Indeed, plaintiff admits that even though defendant Kiernan threatened to issue him a false misbehavior report, he never did. As to his alleged injuries, plaintiff contends that as a result of defendants' conduct he has had difficulty sleeping, but admits that it is a problem that he has always had when around corrections officers. Additionally, plaintiff claims that he saw a psychologist for treatment, but when questioned regarding the details of that alleged treatment, he was unable to identify the psychologist by name, and conceded that he consulted with her "maybe three times", and that he is not currently undergoing any psychological treatment or taking any medication. Tr. (Dkt. No. 34-10) pp. 14-16, 67.

Under these circumstances, I have concluded that no reasonable factfinder could find that plaintiff's allegations of verbal harassment and threats establish that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment, and therefore recommend that the portion of defendants' motion challenging that component of plaintiff's Eighth Amendment claim be granted.

D. *Retaliation*

Plaintiff's claim of retaliation fares no better than his allegations of verbal harassment. In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. *Headley v. Fisher,* No. 06 Civ. 6331, 2010 WL 2595091, at *3 (S.D.N.Y. June 28, 2010). In the prison context, "adverse action" is objectively defined as retaliatory conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.), *superseded by* 320 F.3d 346 (2d Cir.2003)).

*7 Based on the record now before the court, plaintiff cannot satisfy the second prong of the retaliation test. Plaintiff's complaint alleges retaliation in only a conclusory manner, merely stating that after he filed a grievance complaining of the alleged assault defendants threatened to set him up with weapons or drugs in his cell and to subject him to further beatings. In response to defendants' motion, plaintiff claims that it was Sergeant Kiernan who threatened to set him up, and with future assaults.

Plaintiff's filing of a grievance clearly represented protected activity, as it was an exercise of his right to petition the government for redress of grievances under the First Amendment. *Scott v. Coughlin,* 344 F.3d 282, 288 (2d Cir.2003) (citation omitted). Kiernan's alleged verbal threats, however, which plaintiff admits never came to fruition, are patently insufficient to establish adverse action and support a plausible retaliation claim. *Bartley v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

Collins, No. 95 Civ. 10161(RJH), 2006 WL 1289256, at *6 (S.D.N.Y.2006) ( "verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action") (citing Dawes v. Walker, 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, Swierkiewicz v. Sorema N.A ., 534 U.S. 506, 122 S.Ct. 992 (2002)). Plaintiff's failure to allege any specific adverse action taken by the other defendants is similarly fatal to this cause of action. Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983).

Because plaintiff has failed to adduce any evidence of adverse action taken against him as a result of the grievances he claims to have filed, I have concluded that he has failed to come forward with sufficient facts to support a plausible claim for retaliation, and I therefore recommend that defendants' motion for summary judgment dismissing that cause of action be granted.

E. Excessive Force/ Failure To Intervene

At the heart of plaintiff's complaint is his claim that on September 29, 2008 he was subjected to an unprovoked attack by the defendants. Once again, in this regard plaintiff's complaint is conclusory, alleging only that six corrections officers, including those named in the complaint, beat him, and he has since alleged minimal additional facts to support this claim. Defendants argue for dismissal of this cause of action, relying on the Second Circuit's decision in Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir.2005), and asserting that based upon the record now before the court, no reasonable factfinder could credit plaintiff's version of the relevant events.

1. Excessive Force

Plaintiff's excessive force claim is alleged under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); see also Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, inter alia, Estelle ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of

an inmate's confinement are subject to Eighth Amendment scrutiny. Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

*8 A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." Whitley, 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); Griffen v. Crippen, 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Hudson v.. McMillian, 503 U.S. 1, 6-7, 112 S.Ct. 995, 998-999 (1992) (applying Whitley to all excessive force claims); Whitley, 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), cert. denied sub nom., John v. Johnson, 414 U.S. 1033, 94 S.Ct. 462 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. Wright v. Goord, 554 F.3d 255, 268 (2d Cir.2009) (citing Hudson, 503 U.S. at 7-8, 112 S.Ct. at 999 and Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in Wilkins v. Gaddy, however, after Hudson the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. --- U.S. ----, 130 S.Ct. 1175, 1178 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) ( McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated.... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268-69 (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000). That is not to say, however, that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

**\*9** With regard to the objective prong of the Eighth Amendment analysis, Johnson has stated that he sustained a "busted lip", a black and blue eye, and blue and red spots all over his body. Tr. (Dkt. No. 34-10) p. 56. Plaintiff believes the bruise was over his left eye, and that

it was about dime-sized. *Id.* at p. 57. Though admittedly minor, these injuries could potentially provide sufficient objective evidence to satisfy the first prong of the test.

Subjectively, if true, plaintiff's version of the events that transpired on the day in question would seem to establish that the actions of the corrections officers allegedly involved contravene contemporary standards of decency. Plaintiff alleges that the attack was prompted by the verbal exchange that took place between him and Sergeant Guerin during transport to Watertown and Guerin's purported statement to Eastern that plaintiff was an "asshole" and/or a problem on the bus. Thus, as a result of what appears to have been a relatively trivial outburst on the Watertown bus, plaintiff claims that he was brutally beaten by six corrections officers. In sum, the facts alleged by the plaintiff would appear to also satisfy the subjective prong of the governing Eighth Amendment test.

2. *Application of Jeffreys v. City of New York*

What sets this case apart from many other excessive force cases is that the dispute is not limited to specific facts surrounding the alleged incident, but instead defendants deny that any incident involving the use of force upon the plaintiff even occurred on the day in question. In light of plaintiff's claims and the defendants' denial of the use of any force against Johnson on September 29, 2008, it would appear that the court is squarely presented with an issue of credibility. It is well-established that credibility issues, which are questions of fact for resolution by a jury, are inappropriately decided by a court on motion for summary judgment. *Rule v. Brine, Inc.* 85 F.3d 1002, 1011 (2d Cir.1996) (citing, *inter alia, Anderson,* 477 U.S. at 255, 106 S.Ct. 2513).

However, in *Jeffreys,* 426 F.3d 549, a case now relied upon by defendants, the Second Circuit created a very narrow exception to this rule. *Slacks v. Gray,* No. 9:07-CV-510, 2009 WL 3164782, at \* 13 (N.D.N.Y. Sept. 29, 2009) (Mordue, C.J.). In that case, the Second Circuit held that summary judgment may be awarded in the rare circumstance where there is nothing in the record to support the plaintiff's allegations, other than his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

plaintiff, the court determines that "no reasonable person" could credit the plaintiff's testimony. *Jeffrey* s, 426 F.3d at 54-55. The *Jeffreys* court cited with approval the district court's opinion in *Shabazz,* 994 F.Supp. at 468-71, which granted summary judgment in an excessive force case based upon the absence of any evidence in the record to corroborate the plaintiff's version of the events, highlighting the "many inconsistencies and contradictions within the plaintiff's deposition testimony and affidavits." *Slacks,* 2009 WL 3164782, at *13 (citing *Jeffreys,* 426 F.3d at 555 and quoting *Shabazz,* 994 F.Supp. at 470).[FN11]

> [FN11.] The court in *Shabazz* found that when the facts alleged by the plaintiff are "so contradictory that doubt is cast upon their plausibility," the court may "pierce the veil of the complaint's factual allegations ... and dismiss the claim." *Shabazz,* 994 F.Supp. at 470. While approving of the lower court's reasoning in *Shabazz,* the *Jeffreys* court was careful to distinguish *Fischl v. Armitage,* 128 F.3d 50, 56 (2d Cir.1997), another case it had previously decided, wherein it reversed the grant of summary judgment in an excessive force case. *Jeffreys,* 426 F.3d at 554-55. In doing so, the court emphasized that in *Fischl* the plaintiff's testimony that he was beaten was supported by photographs showing severe bruises, hospital records showing that he had fractures of the head; by a physician's opinion that plaintiff's injuries were consistent with having been kicked in the head; and that the plaintiff's eye socket fracture could not have been self-inflicted. *Id.*

**\*10** In this district, it appears that in order to qualify for application of the *Jeffreys* exception a defendant must meet the following three requirements: 1) the plaintiff must rely "almost exclusively on his own testimony"; 2) the plaintiff's testimony must be "contradictory or incomplete"; and 3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Benitez v. Ham,* No. 9:04-CV-1159, 2009 WL 3486379, at *20-21 (N .D.N.Y. Oct. 21, 2009) (Mordue, C.J. and Lowe, M.J.) (citing and quoting *Jeffreys* ). Based upon a careful review of the entire record before the court, I have concluded that this case presents one of those rare exceptions to the rule

that credibility determinations are inappropriately made when ruling on a summary judgment motion, given that the plaintiff's allegations are conclusory and inconsistent; there is an utter absence of medical evidence to corroborate the plaintiff's version of the events; and a review of the record as a whole shows that no reasonable person could believe plaintiff's version.

The only evidence supporting plaintiff's claim that the defendants used excessive force is his own deposition testimony, during which he was decidedly vague, and at times inconsistent. When questioned at his deposition about the details of the assault, plaintiff could provide few. Plaintiff merely surmised that the motivation for the attack was the verbal exchange between him and Sergeant Guerin. Johnson admitted that he was not aware of what, if anything, Sergeant Guerin communicated to Corrections Officer Eastern when his bus arrived at Watertown, but instead just assumed that Guerin told Eastern what occurred on the bus. Tr. (Dkt. No. 34-10) pp. 26, 30. During his deposition, plaintiff asserted that even before he "got jumped", another inmate, named Earl, told him that the officers said they were going to do something to him. Tr. (Dkt. No. 34-10) p. 33. When asked to identify exactly what "Earl"-whose last name Johnson did not know-reported, the plaintiff testified, "[h]e just told me that the officers said that they were going to try to get me sent to the box and they're going to try to jump me, something like that." *Id.* According to plaintiff, Earl could not identify which officers made those statements. *Id.* Ultimately, plaintiff never received a misbehavior report relating to what ever occurred on September 29, 2009. *Id.* at pp. 60, 68.

Plaintiff further testified that after Eastern escorted him to the holding cell, "all of the officers came in"; he then identified the other corrections officers present as defendants Brown and Boulter, but was unable to name any others. *Id.* at p. 35. He apparently guessed at the number of corrections officers who participated in the alleged attack, stating that he was just "rounding it off to six. It could have been more." *Id.* Johnson could not state what role Eastern-who he claims escorted him into the cell-played, but testified that Eastern had to have been hitting him, and that Eastern later taunted him and withheld his personal property for over a week. *Id.* at pp.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

46-47.

**\*11** Plaintiff stated that the attack began with Brown inviting Johnson to hit him, stating, "you want to be a problem on the bus ... hit me." Tr. (Dkt. No. 34-10) p. 36. At the time, Johnson was sitting on a bench in the back of a cell; after he let Brown hit him a couple of times he got up, and the officers then took Johnson down to the floor, kicking him and calling him "stupid nigger." *Id.* at p. 37. When asked, plaintiff first said that he could not identify the corrections officers that took him down to the floor, but then said that they all helped. *Id.* at p. 48. Plaintiff testified that Brown kicked him in the ribs and hit him "probably in [the] head," swinging over the top of another corrections officer to reach Johnson; Boulter had his nose pushed up, and another corrections officer was choking him. Tr. (Dkt. No. 34-10) pp. 38-46. Although he alleges to have been kicked, punched, and slapped about the head and body by six corrections officers for five minutes, *see id.* at p. 37, plaintiff does not claim that immediately afterwards he was bleeding, exhibited signs of swelling, sustained any broken bones, or had any other obvious signs of injury, and he admits that he did not request medical attention at the time.

Johnson did go to emergency sick call on the day after the alleged incident; the record of the nurse's examination of plaintiff on that date, however, reveals that despite plaintiff's complaints of pain in the left rib and flank areas, nose, Adam's apple, and right lower lip, she only observed a dime-sized bruise over his left eye, *see* Plaintiff's Opposition (Dkt. No. 48) Attachments (Inmate Injury Report), and provided plaintiff with only ibuprofen for pain, a fact which plaintiff admits. Plaintiff returned to sick call on October 2, 2008 with the same complaints, and on that date the nurse similarly noted that a physical examination revealed no redness, swelling, or broken skin; nonetheless, the nurse ordered x-rays and provided plaintiff with more ibuprofen. *See id.* Johnson went to sick call again four days later, and while reiterating that he had been "jumped by officers" the week before, he stated that the pain in his ribs was improving, though they were still tender to touch; no other complaints were noted. Chest and rib X-rays performed sixteen days after the alleged beating were negative for any abnormality.[FN12] *See id.*

FN12. The photocopied incident photos attached to the injury report, which plaintiff has submitted as an attachment to his papers in opposition to defendants' motion, are of extremely poor quality such that it is impossible to determine what they purport to show. *See* Dkt. No. 48.

In their defense, each of the named defendants has submitted a sworn affidavit denying plaintiff's claim of excessive use of force. Indeed, defendant Boulter has testified, and submitted unrefuted documentary evidence confirming, that he took a vacation day and was not even at the facility on September 29, 2008, the day in question. Similarly, defendant Brown has sworn that he was not working the draft area that day, but was assigned to work as a roundsman in a housing unit. Defendant Kiernan states that he does not recall seeing or speaking with Johnson at any time on September 29, 2008, and that if he had the slightest suspicion that an altercation had occurred as alleged by Johnson, he would have followed standard operating procedure and would have immediately taken Johnson to Watertown's medical unit for medical attention and reported the incident for investigation. Notably, all of these statements are included within Defendants' Rule 7.1(a)(3) Statement, which plaintiff has failed to oppose, and are therefore deemed admitted.

**\*12** It should be noted that plaintiff made a complaint regarding the alleged incident to the DOCS Inspector General's office. After conducting an investigation, that agency concluded in a written report that Johnson's allegations were without merit, expressly noting that there were no witnesses to the alleged assault and that Johnson's lack of any significant injury is inconsistent with his statement that he was beaten by six corrections workers. *See* Plaintiff's Opposition (Dkt. No. 48) Attachment.

In sum, when considering the record as whole against plaintiff's vague and inconsistent assertions, it seems clear that no reasonable juror could credit plaintiff's testimony that he was brutally beaten for five minutes by six corrections officers in a draft holding cell at Watertown as a result of a seemingly insignificant exchange of words that he had on a transport bus with Sergeant Guerin. Accordingly, I recommend invoking the *Jeffreys* standard and granting defendants summary judgment dismissing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

plaintiff's excessive use of force claim.

3. *Failure to Intervene*

Although not alleged in plaintiff's complaint or addressed by the defendants in their motion, at various points in plaintiff's opposition papers he alleges that Sergeant Kiernan is liable for failure to intervene and protect him from the assault by other corrections personnel. A corrections worker who, while not participating in an assault upon an inmate, is present while it occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).

In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual, and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335-36, 106 S.Ct. 662, 667 (1986)).

**\*13** In this instance, plaintiff testified at his deposition that Kiernan did not enter the draft holding cell

until after the beating was over and the corrections officers involved had left, Tr. (Dkt. No. 34-10) p. 51, and has come forward no evidence that the Kiernan was either aware that the assault would take place, or that while it was occurring, he had the opportunity to stop it. Moreover, since I have already concluded that plaintiff's excessive force claim is not supported by any credible evidence in the record and should be dismissed, it follows that Kiernan cannot be held responsible on this theory.

F. *Medical Indifference*

Defendants also seek dismissal of plaintiff's claims that following the beating defendants were deliberately indifferent to his medical needs by failing to provide treatment for his injuries. As will become evident, for essentially the same reasons, plaintiff's medical indifference claim is not viable.

Like the plaintiff's excessive use of force claim, his assertion that prison officials intentionally disregarded his medical needs must be analyzed within the framework of the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291 (1976). To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200 (1984)) (internal quotations omitted).

Claims of medical indifference are subject to analysis utilizing the Eighth Amendment paradigm. *See Salahuddin v. Goord,* 467 F.3d 263, 279-81 (2d Cir.2006). Thus, plaintiff's medical indifference claim, like his excessive use of force claim, must satisfy both objective and subjective requirements. *Wright,* 554 F.3d at 268; *Price v. Reilly,* No. 07-CV-2634 (JFB/ARL), 2010 WL 889787, at *7-8 (E.D.N.Y. Mar. 8, 2010).

1. *Objective Requirement*

Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

...", and centers upon whether prison officials acted reasonably in treating the plaintiff. *Salahuddin,* 467 F.3d at 279. A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id.* at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter,* 316 F.3d 178, 185-86 (2d Cir.2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment ... [the focus of] the inquiry is on the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith,* 316 F.3d at 185) (internal quotations omitted). In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation. *Smith,* 316 F.3d at 186. Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186, n. 10 (quoting *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000)).

**\*14** Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136-37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'Dsignificantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at \*3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

*2. Subjective Element*

The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants. *Salahuddin,* 467 F.3d at 280 (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 2325 (1991)). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer* ); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M . J.) (same). Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law. *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S.Ct.1970).

Mere negligence on the part of a physician or other prison medical official in treating or failing to treat a prisoner's medical condition, on the other hand, does not implicate the Eighth Amendment and is not properly the subject of a section1983 action. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 292; *Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Thus, for example, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct is actionable as deliberate indifference. *Harrison,* 219 F.3d at 138; *Kearsey v. Williams,* No. 99 Civ 8646, 2005 WL 2125874, at \*5 (S.D.N.Y. Sep. 1, 2005).

**\*15** The basis for plaintiff's medical indifference claim against the named defendants is unclear. Plaintiff seems to fault Sergeant Kiernan for failing to take action

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

after the alleged assault when plaintiff purportedly told Kiernan that he feared for his life. In any event, the record in this case fails to establish that plaintiff experienced a serious medical need of constitutional proportions as a result of the incident complained of. Plaintiff alleges that during the incident he suffered from a busted lip, a dime-sized bruise, and general complaints of pain. The record, including plaintiff's deposition testimony and his submission in opposition to defendants' motion, fails to provide further elaboration and contains no evidence of any extreme pain or degeneration. Instead, the record discloses only injuries of a transitory nature which are insufficient to establish existence of a serious medical need of constitutional proportions. *Ford v. Phillips,* No. 05 Civ. 6646(NRB), 2007 WL 946703, at * 12 (S.D.N.Y. Mar. 27, 2007) (finding that minor bruising, slight bleeding, and abrasions are no injuries that may produce death, degeneration or extreme pain and that no reasonable juror could find otherwise).

Moreover, plaintiff first indicated a need for medical attention when he attended sick call on the day after the alleged assault. At that time, the nurse conducted an examination, completed an injury report based upon plaintiff's account of the events of the previous day, and provided plaintiff with ibuprofen for the pain. Two days later when plaintiff went to sick call again, he was again examined and given ibuprofen, and x-rays were ordered, even though no objective sign of injury was observed. Contrary to plaintiff's assertions, he was not denied medical attention for his claimed injuries.

Finally, turning to the subjective element as it relates to plaintiff's claim against Sergeant Kiernan, plaintiff admits that he did not inform the sergeant that he had been beaten, was injured, or that he needed medical assistance, nor is there any evidence in the record suggesting that there were obvious signs of serious injury to plaintiff. There is no claim that at the time that Kiernan entered the holding cell the plaintiff was bleeding from any part of his body, suffered from obvious swelling on any part of his body, or was otherwise in such a dire physical condition that Kiernan should have known that plaintiff's health was seriously at risk. Succinctly stated, the record is devoid of any evidence upon which a reasonable factfinder could conclude that Kiernan acted with deliberate indifference

to Johnson's serious medical needs.

### G. *Personal Involvement*

As an additional basis for dismissal of plaintiff's claims, including his allegation of medical indifference, defendants assert that they cannot be held responsible for alleged unconstitutional acts in which they did not participate.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*16** As defendants correctly contend, they cannot be held responsible for any alleged misconduct in which they were not personally involved. The only allegations against Brown and Boulter relate to the alleged assault. Accordingly, the only claim for which those defendants may be held responsible are those relating to the alleged use of force in violation of the Eighth Amendment, which I have already determined fails on the merits.

For the reasons stated above, there is no evidentiary support for the medical indifference claim against Kiernan. Plaintiff apparently seeks to additionally hold Sergeant Kiernan responsible for the alleged beating based upon his supervisory role. Notwithstanding that I have recommended a finding in favor of defendants on plaintiff's excessive force cause of action, defendant Kiernan could not be liable for damages under section 1983 solely by virtue of his position; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. In order for liability to attach in the case of Sergeant Kiernan, plaintiff must establish that he 1) directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* --- U.S. ----,129 S.Ct. 1937 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501.

Plaintiff has adduced no evidence supporting any of these showings. As a result, his attempt to hold Kiernan responsible for the alleged assault should be rejected.

H. *Request for Transfer*

The final allegation in plaintiff's complaint is that he was denied a transfer to another facility in retaliation for his grievances, a claim defendants correctly contend has no constitutional significance. It is well recognized that an inmate has no constitutional right to be incarcerated at a particular correctional facility, "and transfers among facilities do not need to be proceeded by any particular due process procedure." *Halloway v. Goord,* No. 9:03-CV-01524, 2007 WL 2789499, at * 5 (N .D.N.Y. Sept. 24, 2007) (Kahn, J. and Treece, J.) (citing *Wilkinson v. Austin,* 545 U.S. 209, 221-22 (2005)) (other citation omitted); *see also, Johnson v. Rowley,* 569 F.3d 40, 43 (2d Cir.2009) (per curiam); *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998). While the denial of a transfer could ostensibly be actionable under section 1983 if based upon retaliatory animus, *see Van Gorder v. Workman,* No. 03-CV-6409, 2006 WL 3149360, at *2 (W.D.N.Y. Nov. 01, 2006), plaintiff has offered no evidence to establish the required nexus between his grievances and the denial, nor has he shown that as corrections sergeants and officers, the defendants held the power to make such a decision.[FN13]

    FN13. It should be noted that plaintiff conceded at his deposition he was ultimately transferred out of Watertown in January of 2009. Tr. (Dkt. No. 34-10) p. 62.

**\*17** In view of the foregoing, to the extent plaintiff asserts a violation of his constitutional rights based upon any delay in his transfer, I recommend that defendants' motion in this regard be granted and the claim dismissed.

I. *Defendant Eastern*

Although defendants' motion does not explicitly request this relief, I have of my own initiative chosen to raise the question of whether plaintiff's claims should proceed as against the defendant Eastern, who was never served with the summons and complaint and who, if this report and recommendation is adopted, would be the sole remaining defendant in the case.

Rule 4(m) of the Federal Rules of Civil Procedure requires that service of a summons and complaint be made within 120 days of issuance of the summons.[FN14] "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.,* 94 F.3d 338, 340 (7th Cir.1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Id.* (citing Fed.R.Civ.P. 4(m)); *Zapata v.. City of New York,* 502 F.3d 192, 196 (2d Cir.2007) ("[D]istrict courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.,* 807 F.2d 309, 311 (2d Cir.1986). When examining whether to extend the specified 120 day period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *See Zapata,* 502 F.3d at 197.

    FN14. That rule provides that

        [i]f a defendant is not served within 120 days after the complaint is filed, the court-on motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

Fed.R.Civ.P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days. *See* N.D.N.Y.L.R. 4.1(b).

A plaintiff's *pro se* status entitles him or her to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of such a case on its merits, rather than on the basis of a procedural technicality. *Poulakis v. Amtrak,* 139 F.R.D. 107, 109 (N.D.Ill.1991). When a plaintiff proceeds *in forma pauperis,* such as is the case here, the court is obligated to issue the plaintiff's process to the United States Marshal, who must in turn effect service upon the defendants, "thereby relieving [the] plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint." *Byrd v. Stone,* 94 F.3d 217, 219 (6th Cir.1996).

I am mindful of the Second Circuit's recent decision in *Murray v. Pataki,* in which the court cautioned that

[a] *pro se* prisoner proceeding *in forma pauperis* is only required to provide the information necessary to identify the defendant, *see, e.g. Sellers,* 902 F.2d at 602, and it is "unreasonable to expect incarcerated and unrepresented prisoner-litigants to provide the current business addresses of prison-guard defendants who no longer work at the prison," *Richardson v. Johnson,* 598 F.3d 734, 739-40 (11th Cir.2010).

**\*18** *Murray v. Pataki,* No. 09-1657, 2010 WL 2025613, at \*2 (2d Cir. May 24, 2010) (summary order) (cited in accordance with Fed. R.App. Proc. 32.1).

In this instance, however, plaintiff has failed to demonstrate the requisite vigilance in insuring service upon defendant Eastern and, to the extent necessary, eliciting the court's assistance. Plaintiff's original complaint in this action was filed on January 5, 2009. A summons was issued for defendant Eastern on January 13, 2009 and was returned as unexecuted on January 28, 2009. *See* Dkt. Nos. 5, 8. Thereafter, on February 13, 2009, plaintiff sought the court's assistance in identifying Eastern and was advised that this information could be obtained through discovery after one or more of the

defendants had answered the complaint. Dkt. No. 15. Despite the passage of nearly a year, completion of discovery, and the expiration of the discovery deadlines, plaintiff has failed to request any further assist assistance from the court in locating and this defendant, nor has he provided the clerk with the additional information regarding Eastern's identity so that additional attempts at service could be made. Because plaintiff has not diligently attempt to discern the identity and pursue service upon the defendant identified as "Eastern", I recommend dismissal of plaintiff's claims against him, without prejudice. [FN15]

> FN15. Plaintiff's claim against this defendant seems to be that he participated in the use of excessive force. Since I have already determined, as to the other defendants, that plaintiff has failed to establish a violation of his constitutional rights, for the same reasons I could recommend dismissal of plaintiff's claim against Eastern on the merits as well.

IV. *SUMMARY AND RECOMMENDATION*

The record in this case discloses no basis on which a reasonable factfinder could conclude that plaintiff's constitutional right to be free from cruel and unusual punishment was violated by defendants on September 29, 2008 by an unprovoked attack, or that defendant Kiernan failed to intervene to prevent such a violation. The record similarly discloses no basis on which a reasonable factfinder could conclude that plaintiff suffered injuries of constitutional significance as a result of the alleged incident or that any defendant was subjectively indifferent to his serious medical needs. Additionally, plaintiff's damage claims against the defendants in their official capacities should be dismissed as barred by the Eleventh Amendment, and those claims against defendants for which they had no personal involvement are subject to dismissal on this independent basis. [FN16]

> FN16. In light of my determinations on the merits of plaintiff's claims, I have found it unnecessary to address the issue of qualified immunity.

Accordingly, it is hereby respectfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 34) be GRANTED and that plaintiff's complaint be DISMISSED in its entirety, with prejudice as to defendants Brown, Boulter, Kiernan and Guerin, and without prejudice as against defendant Eastern.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).*

**\*19** It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.

Johnson v. Brown
Slip Copy, 2010 WL 6243352 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Corey FORD, Plaintiff,
v.
William E. PHILLIPS, Superintendent of Green Haven
Correctional Facility; Guiney, Deputy Superintendent;
Matthew Miller, Corrections Officer; Franklin W.
Middleton, Corrections Officer; S. Phillip, Corrections
Officer; D. McClenning, Corrections Officer, J. Erns,
Corrections Officer; D. Huttel, Corrections Officer; C.
Austin, Corrections Officer; L. Czyzewski, Corrections
Officer; R. Myers, Sergeant; D. Carey, Sergeant; John
Doe # 1, Corrections Officer; John Doe # 2, Corrections
Officer; Joseph T. Smith, Superintendent of
Shawangunk Correctional Facility; John Maly, Deputy
Superintendent; Bipin Bhavsar, Medical Doctor;
Kimbler, Sergeant; Jewett, Sergeant; Alfred Vacca,
Inspector General, individually and in their official
capacities, Defendants.[FN1]

> [FN1]. This caption reflects the caption in
> plaintiff's Complaint. Defendants did not provide
> the Court with a full, corrected caption.

No. 05 Civ. 6646(NRB).

March 27, 2007.

Corey Ford, Walkill, NY, Plaintiff, pro se.

Efthimios Parasidis, Assistant Attorney General, Office of
the Attorney General, State of New York, New York, NY,
for Defendants.

MEMORANDUM AND ORDER

BUCHWALD, J.

**\*1** *Pro se* plaintiff Corey Ford ("Ford"), who is currently
incarcerated, brings this action against employees of the
Department of Correctional Services ("DOCS"), pursuant
to 42 U.S.C. § 1983, alleging: (1) excessive force; (2)
denial of recreation, showers, special meals and property;
(3) deliberate indifference to a serious medical need; and
(4) mail interference, all in violation of his constitutional
rights. Ford moved for summary judgment on July 24,
2006 and defendants cross-moved for summary judgment
on December 22, 2006.[FN2] For the reasons stated below,
we deny Ford's motion for summary judgment and grant
defendants' motion for summary judgment in part.

> [FN2]. Although the title of Ford's motion is
> "Motion for Partial Summary Judgment", his
> papers clearly argue for judgment on all of the
> claims raised in his Complaint. Defendants'
> motion for summary judgment expressly applies
> to Ford's entire Complaint.

*BACKGROUND* [FN3]

> [FN3]. Unless otherwise noted, the following facts
> are not in controversy.

A. Ford's Attack on Officer Miller

Plaintiff's Complaint arises from events at the Green
Haven and Shawangunk correctional facilities in April and
May of 2004.[FN4] In the early afternoon of April 14, 2004,
at approximately 12:30 p.m., Ford exited his cell without
permission when a corrections officer unlocked the door
for Ford's cellmate.[FN5] After leaving his cell, Ford headed
directly for Officer Miller, who was writing passes for
inmates.[FN6] As Ford later admitted,[FN7] Ford then threw hot
oil on Officer Miller, burning his face, head, eye, neck,
shoulders and chest, and repeatedly stabbed Officer Miller
with a homemade shank measuring approximately nine
inches in length. As he was attacked by Ford, Officer
Miller repeatedly screamed, "Get him off me!" [FN8]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN4. Plaintiff is currently incarcerated and serving a sentence of twelve and one-half to twenty-five years, having plead guilty to attempted murder, kidnapping and a weapons violation. *See* Declaration of Efthimios Parasidis ("Parasidis Decl."), dated December 22, 2006.

FN5. *See* Parasidis Decl., Ex. B, FORD 42. Earlier that day, Officer McClenning observed Ford yelling from his cell gate and generally being disrespectful. *Id.* at FORD 39.

FN6. *See id.* at FORD 1, 15, 17-18, 27, 34, 40, 42, 44, 66.

FN7. *Id.*, Ex. E., FORD IG 26-29, 290-295.

FN8. *Id.*, Ex B., April 14, 2004 Statement of Officer J. Erns ("I heard officer Miller begin to scream.... I saw Officer Miller being attacked by an inmate and Officer Miller screaming 'Get him off me Get him off me' ").

Officers Phillips, Middleton and Todriff responded to Officer Miller's call, attempting to restrain Ford.[FN9] After slipping in the oil and falling with Ford to the ground, the officers pried the shank out of Ford's hand, placed him in mechanical restraints, stood him up, and faced him against a wall.[FN10] Once the officers had Ford under control, an ambulance rushed Officer Miller to St. Francis Hospital in Poughkeepsie, New York, where he remained over night.[FN11] Officers Todriff and Middleton were also treated at the St. Francis emergency room for injuries sustained while restraining Ford.[FN12] Ford was later convicted by a jury for his assault on Officer Miller and is currently awaiting sentencing.[FN13]

FN9. *Id.*

FN10. *Id.* at FORD 1, 10-12, 16, 27, 29, 42, 77, 80.

FN11. *Id.* at FORD 45-46.

FN12. *Id.* at FORD 1-2, 21-22, 43.

FN13. *See id.*, Ex. F, FORD 130-131. *See also* Supreme & County Courts of the State of New York, Dutchess County, Certificate of Disposition Indictment (certifying that Ford was convicted of one count of first degree attempted assault, two counts of second degree assault, two counts of third degree criminal possession of a weapon, and one count of promoting prison contraband in the first degree).

In his Complaint, Ford provides a somewhat different version of the events of April 14, 2004. Specifically, Ford asserts that Officer Miller denied him recreation, an alternative meal, and showers on April 5, 12, 13 and 14 of 2004 [FN14] and that, on the morning of April 14, 2004, prior to his attack on Officer Miller, Officers Miller, Erns, and McClenning kicked and punched Ford in the face, head, chest and back without provocation.[FN15] Ford further asserts that later, at 12:30 p.m., approximately the time of Ford's assault on Officer Miller, Officers Miller, Erns, Middleton and Phillips used excessive force against him.[FN16]

FN14. Ford Complaint, received June 20, 2005 at the S.D.N.Y. Pro Se Office, at 6. Ford contends that he is entitled to non-meat meals.

FN15. *Id.* (alleging cruel and unusual punishment, harassment, excessive force, deprivation of outside exercise, threats of bodily harm, and other grievances). As discussed *infra,* these claims are contradicted by statements made and signed by Ford shortly after the putative attack.

FN16. *Id.* at 7.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

Thus, Ford does not directly challenge the facts provided above, but adds that Officer Miller deprived him of certain entitlements over four days, that Officers Miller, Erns and McClenning used excessive force against him on the morning of April 14, 2004, and that Officers Miller, Erns, Middleton and Phillips used excessive force against him again when he attacked Officer Miller.

**B. Ford's Escort to Special Housing**

**\*2** After Ford attacked Officer Miller, Officers Huttel, Czyzewski, Myers and Austin escorted Ford to Special Housing (also known as "SHU"). During the escort, defendants contend that plaintiff was combative and uncooperative, kicking Officer Huttel and attempting to kick the other officers.[FN17] As is evident from a videotape showing parts of Ford's transfer to Special Housing, Ford fell twice during his escort and was picked up by the officers each time.[FN18] Ford claims that he was again the victim of excessive force during this transfer, calling the officers' conduct "unwarrantly malicious sadistic and unprovoked" and alleging that his head was repeatedly rammed into a wall and steel bars, and that he was punched and kicked in the face and back.[FN19]

> FN17. Parasidis Decl., Ex. B, FORD 2, 42, 48, 52, 60-63; Ex. H (videotape of officers escorting Ford to Special Housing).

> FN18. *Id.*

> FN19. Compl. at 6-10. Apparently quoting the report from his medical examination, Ford asserts that he sustained "extreme and numerous abriasions (sic), with bleeding Lt temple (sic), redenes abriasion (sic) on both right and left sides of plaintiff face. 2 redden abriasions areas (sic) RT upper chest, superficial scratches on RT upper back" from the April 14 attacks.

**C. Ford's Post-Incident Medical Treatment**

Upon his arrival at Special Housing, Ford was examined

by medical staff, which found him to have a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back.[FN20] The staff found no other injuries and the medical records indicate that Ford did not suggest that he had any other injuries at that time.[FN21]

> FN20. Parasidis Decl., Ex. B, FORD 2, 8-9 (April 14, 2004 Physical Examination of Corey Ford), 51-53.

> FN21. *See id.,* Ex. C, FORD GRIEVANCE 43-46 (SHU Entrance Exam, stating "Use of force exam done.").

During the next few weeks, Ford received additional medical attention. On the morning of April 16, for instance, Ford was examined by a triage nurse and complained the he was urinating and spitting up blood.[FN22] The nurse scheduled an appointment for Ford to meet with a doctor and he was examined by Dr. Bipin Bhavsar that afternoon.[FN23] After examining Ford, Dr. Bhavsar ordered a urine analysis [FN24] and prescribed Tylenol.[FN25] Dr. Bhavsar also treated Ford on April 21, 2004, as Ford again complained of blood in his urine, and ordered a second urine analysis.[FN26] Both urine analyses found evidence of blood.[FN27]

> FN22. *Id.,* Ex. B, 47; Ex. D, FORD MEDICAL 26.

> FN23. *Id.*

> FN24. *Id.;* Ex. G (Bhavsar Decl.) at 1.

> FN25. *Id.*

> FN26. *Id.* at FORD MEDICAL 25; Ex. G at 2.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN27. *Id.*

On April 29, 2004, medical staff examined Ford because Ford complained of pain in his wrists.[FN28] The staff determined that Ford had "no obvious loss of dexterity."[FN29] The next day, on April 30, 2004, Dr. Bhavsar reexamined Ford, observing that Ford's ribs and abdomen had no tenderness, that his glands were not enlarged, that his abrasions were healed, and that his wrist was not swollen or restricted in movement.[FN30] As Ford still complained of blood in his urine, Dr. Bhavsar ordered a third urine analysis and ordered that x-rays be taken of Ford's hands as a precaution.[FN31] The x-rays were taken on May 3, 2004 and revealed no "fracture, dislocation or arthritic change."[FN32]

FN28. *Id.*

FN29. *Id.*

FN30. *Id.* at FORD MEDICAL 24; Ex. G at 9.

FN31. *Id.* at FORD MEDICAL 37.

FN32. *Id.* at FORD MEDICAL 41.

Finally, since Ford continued to complain of pain and other problems, and since the urine tests persisted in revealing blood at level "3+", Dr. Bhavsar ordered that Ford undergo a CAT-scan of his abdomen and kidneys on May 7, 2004.[FN33] The CAT-scan results were negative.[FN34] In addition to this and the other treatments he received, Ford had daily opportunities for medical assistance from the Special Housing nurse who, in accordance with DOCS policy, made regular rounds of the entire Special Housing unit.[FN35]

FN33. *Id.* at FORD MEDICAL 22-3, 69; Ex. G at 2.

FN34. *Id.* (Ford's "renal parenchyma and

collecting system [were] normal on all series" and there was "no evidence of renal stone, filling defect, or mass lesion". Ford's liver, adrenals, pancreas, spleen and bowels were also found to be "unremarkable". No free fluid or air was detected and, more generally, there was no evidence of any medical abnormality).

FN35. *Id.*, Ex. C, FORD GRIEVANCE 34.

**\*3** Notwithstanding the medical attention he received, Ford contends that he was denied necessary medical treatment during April and May of 2004.[FN36] Specifically, he asserts that he "was denied medical treatment on arrival to [Special Housing]" and, despite numerous complaints made to Sgt. Jewett, Sgt. Kimbler and others that he was in excruciating pain, "never received medical attention".[FN37] Ford claims that, to this day, he suffers from a weak bladder and leaks blood from his penis on occasion.[FN38]

FN36. *See e.g.* Ford' Motion for Partial Summary Judgment, dated July 24, 2006, at 18.

FN37. *Id.*

FN38. *Id.*

D. Post-Incident Restrictions on Ford

Ford was placed under certain restrictions upon his admission to Special Housing. According to defendants, Ford was under a restraint order as a result of his assault on the staff at Green Haven and, accordingly, was not permitted out-of-cell activities.[FN39] As well, Ford was initially denied certain property because of the danger he posed to himself and to others.[FN40] The order restraining Ford remained in effect until May 3, 2004, and the order regarding Special Housing property remained in effect until April 25, 2004.[FN41] Ford was permitted to leave his cell on April 20, 2004 to retrieve his personal property and, according to defendants' affidavits, was permitted out of his cell to shower on a regular basis starting on April

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

23, 2004. [FN42]

> FN39. Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57.

> FN40. *Id.*

> FN41. *Id.*

> FN42. *Id.*

Ford offers a slightly different, if only more specific, version of these restrictions. Ford repeatedly claims that, in violation of his rights, his cell was covered with plexi-glass and he was denied bed sheets, a pillow case, a towel, a wash cloth, soap, toothpaste, a toothbrush, pens and writing paper. [FN43] He also claims that he was not permitted to shower or to have outside recreation for fourteen days. [FN44] Ford states that he complained of these deprivations to Sgts. Kimbler and Jewett on April 15, 2004, the day after his attack on Officer Miller and before some of the deprivations allegedly occurred, but that the Sergeants ignored his complaints. [FN45]

> FN43. *See e.g.* Complaint at 10.

> FN44. *Id.*

> FN45. *Id.* at 10-11.

E. Ford's Mail Watch

Following his attack on Officer Miller, Shawangunk officials also implemented a mail watch for Ford pursuant to DOCS policy. [FN46] During the mail watch, DOCS employees discovered a letter from Ford in which he boasts about his attack on Officer Miller: "I had to let one of those crazy ass pink boys have a balance kit of steel & an hot oil treatment." [FN47] The mail watch also revealed a letter in which Ford apparently tried to convince his girlfriend and others to improperly influence a witness in his trial for that attack: "I'm trying to establish a way to try & beat this case, some way so (sic) how we have to make Mr. Hill do what we want him to do not what he wants to do." [FN48]

> FN46. Parasidis Decl., Ex. B, 126, 128-129, 131-137; Ex. J, FORD MAIL 1-12.

> FN47. *Id.,* Ex. E, FORD IG 316-324.

> FN48. *Id.,* at FORD IG 316, 325-333.

In his Complaint, Ford contends that Superintendent Joseph T. Smith authorized a mail watch on his personal and legal mail, which prevented Ford's girlfriend from receiving Ford's mail and prevented Ford from receiving mail from his girlfriend. [FN49] Ford further claims that DOCS employees and others conspired to deprive him of his privacy and to hamper his access to the courts by confiscating his incoming and outgoing legal mail, stating that incoming legal documents were taken and never returned to him. [FN50]

> FN49. Compl. at 13-14.

> FN50. *Id.* at 15.

*DISCUSSION*

A. Legal Standard

**\*4** Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 55(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Gallo v. Prudential Residential Srvcs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). The moving party bears the initial burden of "informing the district court of the basis for its motion"

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

and of identifying the matter that "it believes demonstrates the absence of a genuine issue of material fact." *Celotex, 477 U.S. at 323.* In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).* If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P. 56(e).*

When, as here, both parties seek summary judgment, the Court must consider each party's motion on its own merits, "taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Board of Educ., 667 F.2d 305, 314 (2d Cir.1981); accord Abrams v. United States, 797 F.2d 100, 103 (2d Cir.1986).* However, the submissions of a *pro se* plaintiff are held to a less stringent standard than those drafted by an attorney and must be liberally construed for the benefit of the plaintiff. *Estelle v. Gamble, 429 U.S. 97 (1976); Patrick v. LeFevre, 745 F.2d 153, 160 (2d Cir.1984).*

B. Analysis

1. Eleventh Amendment

As a preliminary matter, defendants note that they are sued for damages in their official as well as individual capacities and argue that Ford may only sue defendants for damages in their individual capacities. Defendants are correct. *See Al-Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir.1989)* ("[S]ection 1983 claim for damages against a state official can only be asserted against that official in his or her individual capacity"); *accord Davis v. New York, 316 F.3d 93 (2d Cir.2002); see also Kentucky v. Graham, 473 U.S. 159 (1985)* (a claim for damages against state officials in their official capacity is considered to be a claim against the state and is therefore barred by the Eleventh Amendment); *Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984)* (agencies and departments of the state are entitled to assert the state's Eleventh Amendment immunity); *Santiago v. New York State Dep't of Corr. Servs., 945 F.2d 25, 28 n. 1 (2d Cir.1991)* (department that is an agency of the state

is entitled to assert Eleventh Amendment immunity); *cf. Hafer v. Melo, 502 U.S. 21, 27-31 (1991)* (Eleventh Amendment does not bar actions for damages against state officials sued in their personal or individual capacities). Accordingly, Ford's claims for damages against defendants in their official capacities are dismissed.

2. Excessive Force

**\*5** Regarding his claims for excessive force, Ford describes three instances of abuse in his Complaint, which he alleges occurred: (1) on the morning of April 14, 2004; (2) after his assault on Officer Miller; and (3) during his transfer to Special Housing. Defendants argue that Ford was not the victim of excessive force and that any force used against him was appropriate given his attack on Officer Miller and his combative behavior following that attack.

To prevail on a claim for excessive force constituting cruel and unusual punishment under the Eighth Amendment, a plaintiff must show the unnecessary and wonton infliction of pain. *Hudson v. McMillian et al., 503 U.S. 1 (1992)* (citing *Whitley v. Albers, 475 U.S. 312 (1986)).* Whether an infliction of pain is unnecessary and wanton depends on the context in which force is used. *Whitley, 475 U.S. at 320.* Where prison officials use force to quell a prison disturbance, the question is whether force was applied in a good faith effort to maintain or restore discipline or, instead, if it was applied maliciously and sadistically for the purpose of causing harm. *Id. at 320-21; Hudson, 503 U.S. at 7* (prison officials must act quickly when responding to a prison disturbance, balancing the need to "maintain and restore discipline" against "the risk of injury to inmates."). When an individual attacks with a deadly weapon, for instance, corrections officers may respond with commensurate force. *Diggs v. New York Police Dep't et al., 2005 U.S. Dist. LEXIS 38244, \*1 (E.D.N.Y.2005)* (citing *Tennessee v. Garner, 471 U.S. 1, 11-12 (1985)* and *Estate of Kenneth Jackson v. Rochester, 705 F.Supp. 779, 783 (W.D.N.Y.1989)).*

a. The Morning of April 14, 2004

Ford alleges that Officers Miller, Erns and McClenning,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

without provocation, kicked and punched him in the face, head, chest and back, while using racial epithets, on the morning of April 14, 2004. Defendants respond that Ford was abusive and disruptive on the morning of April 14, 2004 and that corrections officers "verbally counseled" Ford without using any force.[FN51]

> FN51. *See e.g.* Parasidis Decl., Ex. E., FORD IG 303.

Having reviewed the parties' submissions and the evidence presented to the Court, we hold that no reasonable jury could find in favor of Ford on this claim. First, Ford's evidence is very weak and primarily suggests only a *de minimus* use of force. Ford offers no direct medical evidence supporting his claim [FN52] and his documentary evidence is limited to affidavits from other inmates, which contradict one another and are otherwise problematic. [FN53] The only affidavit submitted by Ford that offers any specific allegations of potentially excessive force is signed by inmate Eric Tolliver. That affidavit states, somewhat ambiguously, that Tolliver saw Officers Miller and McClenning attack Ford with "solid fist and kicks" after 9:40 a.m. on April 14, 2004.[FN54] However, in addition to being ambiguous in its description of the morning's events, Tolliver's affidavit suffers from the following problems: (1) it contradicts statements in the other affidavits submitted by Ford, including inmate Shaun Harris's sworn recollection of what Ford told Harris about that morning; (2) it makes no mention of Officer Erns, in contrast to the version of the events offered in Ford's Complaint; and (3) it was signed and dated by Tolliver on September 12, 2006, more than two years after the incident allegedly took place.

> FN52. Ford could have sustained any and all of the medical injuries evidenced in the record during his attack on Officer Miller or during his transfer to Special Housing.

> FN53. Specifically: the May 19, 2004 affidavit of Shaun Harris offers no personal knowledge of the alleged attack, stating only that Ford told Harris that Officer Miller had pushed Ford into his cell after yelling at Ford; the July 22, 2004 affidavit of Jermaine Page offers personal

knowledge of Ford being "up on the wall" on April 14, 2004, but says nothing about a push or any other violence; the September 14, 2004 affidavit of Jesse Guess states that Mr. Guess saw Officer Miller push Ford into his cell, consistent with what Harris claims Ford told Harris, but inconsistent with Jermaine Page's statement; the April 28, 2004 affidavit of Ralph Nieves only alleges general harassment of Ford by Officer Miller; and the August 24, 2004 affidavit of Allen Griffin generally alleges that he saw Officer Miller "verbally, mentally, emotionally, and physically" assault Ford on April 14, 2004, but does not specify whether the assault occurred in the morning or in the afternoon on April 14 and does not specify what kind of physical assault took place. The Court found these affidavits amidst a stack of disorganized papers in the case file kept by the clerk's office.

> FN54. Paragraph 8 of the Tolliver affidavit states exactly as follows: "On April 14, 2004 I was out of my cell as usual to clean up after keeplock recreation went out approx. 9:30 AM, I was talking to the dubble (sic) bunk cell above 143, 4 company, for about 10 minutes, The cell on 4-company 143 opened up around 9:40 AM I locked in and called the guy whom I heard his name was "C" which I found out was actually Corey Ford, I told him to watch himself I seen C.O. Miller use the exact tactics that I warned [him] about yesterday, the Guy Corey Ford was called over to the [B] post first and the gate to 4-company was then locked, I seen solid fist and kicks being thrown by officer M. Miller and c.o. McClenning connecting against the inmate Corey ford FACE and body, The inmate was yelling for help, I witness the whole excessive force incident."

**\*6** Second, defendants offer evidence that Ford faced no excessive force on the morning of April 14, 2004, having submitted a number of sworn affidavits to this effect,[FN55] and Ford's own statements, made shortly after the alleged abuse, confirm this position. In a statement signed on April 14, 2004, and in another statement signed on April 15, 2004 ("Ford's Post-Incident Statements"), Ford does

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

not accuse Officers Miller, McClenning and Erns of punching and kicking him during the morning of April 14, 2004. On the contrary, Ford makes no mention of any force used by Officers McClenning and Erns and only alleges that Officer Miller used a *de minimus* amount of force against him: "At this point, Miller slapped me on each side of my face ..."[FN56] *Candelaria v. Coughlin,* 787 F .Supp. 368, 374 (S.D.N.Y.1992) (use of force *de minimus* when officer "pushed his fist against [plaintiff's] neck so that [he] couldn't move and was losing [his] breath"), *aff'd* 979 F.2d 845 (2d Cir.1992).

FN55. *See supra* note 51.

FN56. Parasidis Decl., Ex. E, FORD IG 26-28 (quoting Ford's April 14, 2004 statement); *see also id.* at FORD IG 290-93 ("This is where he yells at me and slap me (sic) across my face"), dated April 15, 2004 at 9:00 a.m.

Third, given the different versions of the April 14 events offered by Ford and the inconsistencies between the affidavits submitted by Ford to support his Complaint, no reasonable jury could credit Ford's latest allegations. *See e.g. Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991) (plaintiff may not "create a material issue of fact by submitting ... affidavit[s] disputing his own prior sworn testimony" in order to defeat defendants' summary judgment motion) (quoting *Mack v. United States,* 814 F.2d 120, 124 (1987)); *Jeffreys v. City of New York,* 426 F.3d 549, 553 (affirming district court's grant of summary judgment for defendants in section 1983 case brought by *pro se* prisoner-where plaintiff relied almost exclusively on his own testimony, district court could make assessments about whether a reasonable jury could credit plaintiff's testimony); *Shabazz v. Pico,* 994 F.Supp. 460, 470 (S .D.N.Y.1998) (Sotomayor, J.) (granting summary judgment for defendants where "plaintiffs allegations of the events at issue [were] replete with inconsistent and contradictory statements" and "plaintiff's version of the events ... [had] undergone at least one significant revision"). Ford has offered no fewer than four versions of what happened on the morning of April 14, 2004 through his submissions to the Court, at least three of which allege only a *de minimus* use of force and many of which, as discussed, are inconsistent with one another.[FN57] Moreover, Ford's signed

and personal version of the events, without any explanation from Ford, has undergone at least one significant and self-serving revision, changing from a story about a *de minimus* use of force to one about a brutal, unprovoked beating.

FN57. *See supra* note 53. Versions of the events offered in Ford's submissions include: (1) Ford was pushed into his cell; (2) Ford was held up on a wall; (3) Ford was slapped in the face by Officer Miller; (4) Ford was punched and kicked by Officers Miller, McClenning and Erns; and (5) Ford was punched and kicked by Officers Miller and McClenning.

In sum, given the sheer lack of evidence to support Ford's new version of the April 14 morning events, the substantial evidence against that version, and the fact that Ford's initial, signed statements contradict the allegations in his Complaint and confirm defendants' position, no reasonable jury could find in favor of Ford on this claim. Accordingly, we deny Ford's motion for summary judgment and grant summary judgment in favor of defendants.

b. Attack on Officer Miller

**\*7** Regarding the afternoon of April 14, 2004, Ford alleges that Officers Miller, Erns, Middleton and Phillips kicked and punched him, and that Sgt. Carey watched this happen without taking action. Having reviewed the parties' submissions, we hold that, even accepting Ford's allegations as true, no reasonable jury could find that defendants responded with excessive force when attempting to save Officer Miller.

The genesis of Ford's claim is his own brutal attack on Officer Miller. As Ford admits, he rushed Officer Miller, threw hot oil on his face and then stabbed him repeatedly with a nine inch shank. Given this use of potentially lethal force, and given that defendants had to react quickly to save Officer Miller, defendants were legally authorized to respond to Ford with significant force of their own, perhaps including deadly force. *See e.g. Tennessee,* 471 U.S. at 11-12; *see also Diggs v. New York Police Dep't et*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

*al.,* 2005 U.S. Dist. LEXIS 38244, *1 (E.D.N.Y.2005). Most significantly, Ford does not allege that defendants used force even commensurate with the force that he used against Officer Miller. Instead, he only alleges that the officers punched and kicked him as they got him under control.[FN58] No reasonable jury could deem this force to have been wanton, unnecessary or otherwise excessive under the circumstances. Accordingly, we deny summary judgment for Ford and grant it for defendants.[FN59]

> FN58. *See e.g.* Parasidis Decl., Ex. B, FORD 1-2, 22, 43.

> FN59. Additionally, the officers are protected by the doctrine of qualified immunity for this allegation of excessive force as it would be objectively reasonable to respond to Ford's apparent attempt to seriously injure or kill Officer Miller with force much greater than that alleged by Ford. *See e.g. Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001) (officers entitled to qualified immunity as it was objectively reasonable for them to believe that their actions were lawful at the time of the challenged act).

c. Transfer to Special Housing

Regarding his transfer to Special Housing, immediately following his attack on Officer Miller, Ford alleges that he was kicked and punched by the officers escorting him, that Sgt. Myers punched him in the right side of his face, that the officers tried to break his wrist while he was on the elevator to Special Housing, that the officers repeatedly rammed his head into the steel bars at the entrance to Special Housing, and that the officers rammed his head into the wall of the strip/frisk room.[FN60] Defendants respond that they did not use excessive force against Ford and that Ford was uncooperative and violent throughout the transfer to Special Housing.

> FN60. Compl. at 9.

We deny Ford's motion for summary judgment on this claim. Ford offers no meaningful evidence, other than his own version of the events, to support the putative attacks during his transfer to Special Housing, and the medical evidence submitted by defendants tends to contradict Ford's claims. For instance, Ford asserts that his face and head were repeatedly rammed into steel bars, that the officers tried to break his wrist, and that Ford was otherwise beaten severely throughout the transfer-beatings that ostensibly followed Ford's alleged beating that morning at the hands of Officers Miller, Erns and McClenning as well as Ford's alleged beating during his attack on Officer Miller. Yet, the medical record of Ford's injuries upon his entrance to Special Housing reveals only the minor abrasions and scratches discussed *supra,* and the subsequent CAT-scan and x-rays revealed no injuries to Ford's abdomen or wrist. Moreover, Ford's transfer to Special Housing came immediately after, and because of, his assault on Officer Miller, making it objectively reasonable for the officers to use some amount of force to keep him under control.

*8 Despite the apparent weakness of Ford's evidence regarding this claim, we also deny defendants' motion for summary judgment. Defendants offer the medical evidence, which tends to contradict Ford's story, their sworn affidavits that Ford was not beaten during the transfer, their claims that Ford was combative throughout the transfer, and a video tape of the transfer that shows no violence being committed against Ford (but also does not show Ford being noticeably combative). Nevertheless, this evidence is not sufficient to preclude a reasonable jury from finding in Ford's favor. First, Ford offers his own sworn statement of the events in his Complaint, which describes a malicious, unprovoked beating accomplished while using racial epithets and, unlike his version of the morning attack, this version is consistent with Ford's Post-Incident Statements.[FN61]

> FN61. Ford makes no mention of abuse during his transfer to Special Housing in his April 14, 2004 statement. However, in his April 15, 2004 statement, Ford notes, "I also want to tell you about how I was assaulted in the elevator on my way to SHU. I was slammed in to the wall and taken to the floor a number of times. I did not resist. They had my hands cuffed behind my back and my pants were falling down. I had a hard time standing up-so I fell to the floor. When this happened they punched me in the balls. I think I

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

got the bump on my head when they threw me into the wall....".

Second, although the Court might find the low level of injuries in Ford's medical reports to strongly contradict Ford's claims, we cannot rely on that evidence alone to enter summary judgment against him. *See e.g. Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (genuine issues of material fact existed concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him; district court mistakenly concluded that because appellant's injuries were not severe, appellant's claim failed as a matter of law); *Estelle,* 429 U.S. at 102-105 ("inmates have the right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials").[FN62]

      FN62. As well, the evidence that Ford had blood in his urine tends to support his allegation that he was punched and kicked in the back. If defendants needlessly punched Ford in the back causing him to have internal bleeding, they violated his Eighth Amendment rights.

Finally, although the video tape shows Ford being escorted to and from the elevator to Special Housing and shows him entering the strip/frisk room and being stripped and frisked without apparent incident, the video has periodic breaks and interruptions. Whereas a complete video might dispel all issues of fact regarding Ford's transfer, an incomplete video cannot.[FN63] Accordingly, summary judgment is denied for defendants as well as for Ford on this claim.[FN64]

      FN63. Ford insists that defendants intentionally beat him when the cameras were off and during transitions between cameras. *See* Ford's Motion for Partial Summary Judgment at 8.

      FN64. Defendants claim that they are entitled to qualified immunity on all claims raised by Ford. However, the doctrine of qualified immunity, which protects officers in the reasonable exercise of their duties, clearly would not cover a malicious beating as alleged by Ford during his

transfer to Special Housing. *See supra* note 59.

**d. Due Process**

Liberally construed, Ford's Complaint also alleges that the aforementioned uses of excessive force violated his due process rights under the Fourteenth Amendment. For prisoners, however, the Eighth Amendment "serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified." *Whitley v. Albers,* 475 U.S. 312, 327 (1986). "Any protection that 'substantive due process' affords convicted prisoners against excessive force is, [the Supreme Court] has held, at best redundant of that provided by the Eighth Amendment." *Graham v. Connor,* 490 U.S. 386, 395 (1989). Accordingly, Ford is only entitled to pursue his claims for excessive force under the Eighth Amendment. *Cf. Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995) (in the non-prisoner, non-seizure context, the due process right to be free from excessive force is alive and well). Thus, we grant summary judgment for defendants on this claim.

**3. Deprivations**

*\*9* Ford also alleges that he suffered a number of deprivations upon being transferred to Special Housing and that these deprivations amounted to cruel and unusual punishment under the Eighth Amendment and to a violation of his due process rights under the Fourteenth Amendment. Defendants argue that Ford has failed to offer sufficient support for these claims.

**a. Cruel and Unusual Punishment**

"The constitutional prohibition against cruel and unusual punishments is intended to protect inmates from serious deprivations of basic human needs such as adequate food, clothing, shelter and medical care." *Malsh v. Garcia,* 971 F.Supp. 131, 138 (S.D.N.Y.1997). An Eighth Amendment claim challenging prison deprivations requires proof of subjective and objective components. Subjectively, the prison officials must have acted with deliberate indifference toward an inmate's health or safety and,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

objectively, the inmate's deprivation must have been sufficiently serious to have denied that inmate "the minimal civilized measure of life's necessities." *Branham v. Meachum,* 77 F.3d 626 (2d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 297-98 (1997) and *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied* 513 U.S. 1154 (1995)). The "minimal civilized measures of life's necessities" is not a low standard. Indeed, "conditions that are restrictive and even harsh are part of the penalty that criminal offenders pay for their offenses against society." *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985) (internal quotations omitted).

To support his Eighth Amendment claim, Ford alleges a number of deprivations. He complains that, on April 5, 12, 13, and 14, he was denied special meals, outside exercise and showers by Officer Miller and that, upon his arrival at Special Housing and until April 28, he was forced to have a plexi-glass shield on his cell, was denied recreation, was denied showers, did not trust the food given to him on one or two occasions, and was denied various personal items.

Defendants respond that Special Housing prisoners are limited in the number of belongings they may possess, that they are further limited in their recreation and shower privileges, and that these limitations may be extended if members of DOCS staff determine that the inmate poses a threat to himself or to others. [FN65] Defendants further state that Ford's vicious attack on Officer Miller precipitated his placement in Special Housing, that DOCS staff placed the restrictions on Ford expressly in response to that attack, and in response to the danger that Ford posed to himself and to others, and that the restrictions, which were temporary in nature and made in accordance with DOCS policy, did not amount to a constitutional violation.

> FN65. See Defendants' Mem. of Law at 10-13.

We agree with defendants that Ford's deprivation claims do not begin to demonstrate deliberate indifference toward Ford's need for the minimal necessities of life. Ford does not allege or explain why the temporary placement of a plexi-glass shield threatens his minimum needs and, as a matter of law, minor and temporary deprivations of property, showers and recreation do not violate the Eighth

Amendment. *See e.g. Chapple v. Coughlin,* 1996 U.S. Dist. LEXIS 12960, *1 (S.D.N.Y 1996) (temporary deprivations of shower, recreation and legal papers "in no way involved the severity of treatment which must be shown to make out a case of cruel and unusual punishment") (citing *Majid v. Scully,* No. 83 Civ. 7409, 1985 WL 1408 *6 (S.D.N.Y. May 21, 1985) (unpublished)); *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (prisoners must receive nutritiously adequate food that does not endanger their health and safety); *Cruz v. Jackson,* 1997 U.S. Dist. LEXIS 1093 (S.D.N.Y. Feb. 5, 1997) (two weeks without showers, cold food for four weeks and unspecified incidents of receiving rusty drinking water did not violate Eighth Amendment rights) (citing *Williams v. Greifinger,* 918 F.Supp. 91, 95 n. 3 (S.D.N.Y.1996)).

**\*10** Moreover, defendants have provided evidence that the deprivations were not a result of malice or of deliberate indifference to Ford's health or safety but, instead, served legitimate security and safety needs following Ford's attack on Officer Miller and were imposed during a period of time when Ford received food and medical care. [FN66] Accordingly, Ford's motion for summary judgment on his Eighth Amendment claim is denied and summary judgment is granted for defendants.

> FN66. *See e.g.* Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57; Ex. I, FORD ORDERS 1-8.

b. Due Process

Ford also suggests that his confinement to Special Housing, given the deprivations discussed above, violated his right to due process under the Fourteenth Amendment. We construe Ford's Complaint as asserting his liberty interest to be free from confinement involving atypical and significant hardships without due process of law.

A prisoner's confinement to Special Housing in a New York prison may implicate that prisoner's legally recognized interest in being free from restraints imposing atypical and significant hardships relative to the ordinary incidents of prison life. *Sandin v. Connor,* 515 U.S. 472

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

(1995) (thirty days in Special Housing does not, by itself, violate prisoner's due process rights); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (prisoner failed to demonstrate a significant deprivation of a liberty interest where he spent approximately twelve days in Special Housing and was denied "certain privileges that prisoners in the general population enjoy"); *Lee v. Coughlin,* 26 F.Supp.2d 615 (S.D.N.Y.1996) (Sotomayor, J.) (376 days in Special Housing implicated liberty interest recognized by the State of New York). However, to prevail under section 1983, a plaintiff must allege not only that his confinement to Special Housing implicated a recognized liberty interest, but also that the liberty interest was infringed without due process of law. *See e.g. Cespedes v. Coughlin,* 956 F .Supp. 454, 469 (S.D.N.Y.1997).

Regarding Ford's claim that he was denied recreation, showers, and a special meal on four occasions before and on April 14, 2004, we deny summary judgment for Ford and grant it in favor of defendants. These minor and temporary denials clearly do not constitute significant hardships implicating a constitutionally protected liberty interest. *See e.g. Frazier,* 81 F.3d at 317. We also deny summary judgment for Ford and grant it for defendants on Ford's claim arising from his confinement in Special Housing.

There are three significant problems with Ford's due process claim based on his confinement in Special Housing. First, it is far from clear that the alleged confinement, even if accurately depicted by Ford, implicates a protected liberty interest given the temporary nature of the deprivations. *See e.g. Frazier,* 81 F.3d at 317. Second, Ford has failed to allege that he was denied due process of law in connection with this ostensible liberty interest. Ford does not allege that he was denied a hearing or that his hearing officer was not objective, and he does not allege that defendants did not explain to him why he faced the deprivations he did. *Cf. Sandin,* 515 U.S. at 487-88 (summary judgment granted for defendants where plaintiff claimed violation of due process because defendants "refus[ed] to allow him to present witnesses at his hearing, and [sentenced] him to disciplinary segregation for thirty days.").

**\*11** Third, although Ford does allege that defendants deprived him of privileges and Special Housing property

in violation of DOCS directive 4933, this allegation fails to state a violation of due process. For one, the text of Directive 4933 shows that Ford was not necessarily entitled to the claimed property and privileges under the circumstances of his confinement: "An order depriving an inmate of a specific item, privilege or service may be issued when it is determined that a threat to the safety or security of staff, inmates, or State property exists". Moreover, defendants offer a mass of evidence demonstrating that they followed Directive 4933 with respect to Ford and that Ford received full consideration and a hearing in connection with Directive 4933. A "Deprivation Order", dated April 14, 2004 and authorized by Sgt. Maly, for example, states:

> In accordance with 7 NYCRR Section 305.2, you are being deprived of the following specific item(s), privilege(s), or service(s): All out of cell activities (including showers) because it is determined that a threat to the safety or security of staff, inmates or State property exists and for the following specific reason(s): You seriously assaulted a corrections officer. [FN67]

> > FN67. Parasidis Decl., Ex E., FORD GRIEVANCE 50. *See also id.* at FORD GRIEVANCE 50-58, 109, 118-20, 126, 128, 129, 131, 132, 133, 134, 135-37, 143; Ex. I, FORD ORDERS 1-8.

A lengthy statement reviewing Ford's April 19, 2004 grievance regarding his Special Housing confinement further provides: "Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby denied with clarification to the extent that the matter was investigated and the issue of the complaint has been found to be without merit." [FN68]

> > FN68. *Id.* at FORD GRIEVANCE 30.

Since Ford has failed to allege any cognizable violation of due process of law relating to his Special Housing confinement, and since defendants have provided the Court with ample, uncontroverted evidence that Ford received such process, summary judgment is denied for Ford and granted for defendants on this claim. [FN69]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN69. We note further that the reasons and bases for Ford's confinement and deprivations in Special Housing should have been obvious to Ford immediately upon his transfer to Special Housing given that they arose immediately after his vicious attack on Officer Miller. Not only would such an attack make guards fearful for themselves and other prisoners should Ford be taken out of his Special Housing cell, but guards would also be fearful that Ford would use any property he obtained to hurt himself or others. In fact, this is the explanation provided in the deprivation orders and related documents submitted by defendants. *See supra* note 67.

4. Deliberate Indifference to a Serious Medical Need

Ford argues that defendants Joseph Smith, John Maly, Sgt. Kimbler and Dr. Bhavsar violated his constitutional rights by failing to provide adequate medical care for the injuries to his face, head, back, kidneys, groin area and penis during April of 2004. Defendants respond that Ford's pleadings are not sufficient to support a claim for constitutionally deficient medical care.

To maintain a claim for deliberate medical indifference, Ford must prove "deliberate indifference to [his] serious medical needs". *Hathaway,* 37 F.3d at 63 (quoting *Estelle,* 429 U.S. at 102 (medical indifference claim brought by prisoner pursuant to section 1983 alleging violation of Eighth Amendment as applied to the states via Fourteenth Amendment)). This standard requires proof of objective and subjective prongs. *Id.*

The objective prong of the deliberate indifference standard requires proof of a medical deprivation "sufficiently serious" to create a condition of urgency that might produce death, degeneration or extreme pain. *Id.; see e.g. Williams v. Vincent,* 508 F.2d 541 (2d Cir.1974) (easier and less efficacious treatment of throwing away prisoner's ear and stitching the stump may be deliberate indifference); *cf. Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (cut finger with "skin ripped off" is insufficiently serious);

*Bonner v. N.Y. City Police Dep't,* No. 99 Civ. 3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (inability to close hand due to swelling insufficiently serious to constitute Eighth Amendment violation); *Gomez v. Zwillinger,* 1998 U.S. Dist. LEXIS 17713 at *16 (S.D.N.Y. November 6, 1998) (back pain and discomfort not sufficiently serious); *Jones v. New York City Health & Hosp. Corp.,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (S.D.N.Y. November 28, 1984) (deliberate indifference claim dismissed where plaintiff challenged treatment for bruises on head and body).

**\*12** The subjective prong of the deliberate indifference standard requires proof that the accused defendant knew of and disregarded "an excessive risk to inmate health or safety". *Hathaway,* 37 F .3d at 66 ("The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference."). Specifically, the plaintiff must prove that the accused defendant acted, or declined to act, with a state of mind equivalent to criminal recklessness. *See Boomer v. Lanigan,* 2002 WL 31413804, *1 (S.D.N.Y.2002) (Cote, J.) (unreported) (citing *Hathaway,* 99 F.3d at 553); *Cunningham v. City of New York,* 2006 U.S. Dist. LEXIS 35607 at *6 (S.D.N.Y. June 1, 2006) (mere disagreement between treating physician and patient about course of treatment does not give rise to a constitutional claim).

Having reviewed the pleadings and evidence submitted with the motions for summary judgment, we agree with defendants that Ford cannot prevail on his claim for deliberate medical indifference stemming from his treatment during April and May of 2004. First, most of the injuries asserted by Ford were not sufficiently serious to satisfy the objective prong of the deliberate indifference standard. Ford claims, and the prison's medical reports confirm, that Ford suffered from a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back when he was admitted to Special Housing. Abrasions, a minor bruise, slight bleeding and scratches are not injuries that may produce death, degeneration or extreme pain, and no reasonable jury could find to the contrary. *See e.g. Jones,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (allegations of bruises about head and body do not shock the conscience

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

and are inadequate to state claim for deliberate medical indifference in section 1983 suit). [FN70]

> FN70. The remaining injuries claimed by Ford, which might have appeared to be serious upon his initial complaints, also proved not to be serious. Ford complained that he found blood in his urine, that he vomited blood, that he suffered from persistent abdominal and groin pain, that his wrists hurt and that he had headaches and dizzy spells. Within a few weeks, however, Ford ceased to have blood in his urine; his bruises and abrasions were healed or healing normally; x-rays showed no damage to his wrist; and a CAT-scan revealed no injuries to the organs inside his abdomen or to his abdomen generally, confirming Dr. Bhavsar's finding that Ford had no tenderness in his ribs or abdomen. As well, Ford has not alleged that his vomiting, dizzy spells or headaches, for which there is no objective evidence to begin with, persisted or led to more serious problems, and though Ford claims that he now has a weak bladder, he has not alleged that it is degenerative or causes him extreme pain. *See generally* Parasidis Decl., Ex. G, Bhavsar Decl.

Second, in light of the evidence submitted by defendants, Ford also cannot satisfy the subjective prong of the deliberate indifference standard. Various medical forms submitted by defendants reveal that Ford was evaluated on no fewer than eight occasions between April 14, 2004 and early May of 2004, including examinations by a triage nurse and visits with Dr. Bhavsar, and not including the regular opportunities Ford had to speak with a Special Housing nurse. As Ford admits, Dr. Bhavsar, in addition to examining Ford personally, ordered three different urine analyses, a set of x-rays, and a CAT-scan, calling for the latter two procedures even though Ford's wrist and abdomen showed no apparent signs of problems. Dr. Bhavsar's records further reveal that he explained to Ford the proper course of treatment for his various injuries, that he prescribed Tylenol for his minor injuries, and that he continued to monitor Ford's possible internal injuries, such as the blood in his urine, until those symptoms subsided. [FN71]

> FN71. *Id.*

**\*13** As such, no reasonable jury could find that the medical staff demonstrated deliberate indifference to Ford's medical condition and certainly Ford has not offered any evidence to suggest that the medical care he received amounted to criminal recklessness. On the contrary, a reasonable jury would readily find that Ford, in receiving x-rays for a non-swollen wrist with full movement, a CAT-scan for an abdomen showing no tenderness, and three urine tests for a problem that shortly resolved itself, obtained more thorough medical attention while incarcerated than he would have outside of prison. For these reasons, we deny Ford's motion for summary judgment and grant defendants' motion for summary judgment on Ford's medical indifference claim. [FN72]

> FN72. Even if one or more officers ignored Ford's complaints on one or more specific occasions, which Ford alleges without offering additional support, the fact that Ford actually received extensive and repeated medical attention demonstrates that those instances of indifference did not deny Ford adequate medical attention. Moreover, to prevail on the subjective element against those officers, Ford would have to demonstrate that the officers knew that Ford actually had a serious injury-as opposed to simply hearing Ford complain of such an injury-and nevertheless ignored it. Ford has not offered any evidence to this effect, beyond that he complained more than once that he suffered from severe pain. He does not, for instance, allege that the officers saw him bleeding or otherwise suffering some clearly serious injury.

5. Mail Interference

Ford further complains that the DOCS staff instituted a mail-watch on his personal mail and confiscated some of his mail in violation of his constitutional rights, denying him access to the courts and preventing him from communicating with his girlfriend. Defendants admit that they instituted a mail watch on Ford following his attack on Officer Miller and argue that Ford has not sufficiently alleged any constitutional violation based on mail

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

interference.

a. Denial of Access to the Courts

In order to state a constitutional claim for denial of access to the courts, a plaintiff must show deliberate and malicious action resulting in an actual injury, such as the dismissal of an otherwise meritorious claim. *Cancel v. Goord,* 2001 U.S. Dist. LEXIS 3440, *16 (S.D.N.Y. Mar. 29, 2001) (plaintiff must show frustration of non-frivolous claim as a result of official action) (citing *Washington v. Jones,* 782 F.2d 1134, 1138 (2d Cir.1986)); *see also Lewis v. Casey,* 518 U.S. 343, 351 (1996); *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997). Actions causing mere delay in a prisoner's ability to work on a legal action or to communicate with the courts do not rise to the level of a constitutional violation. *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)).

We agree with defendants that Ford cannot prevail on his denial of access claim. Ford's only allegations that defendants' interference with his mail caused him an actual legal injury are his vague statements that the interference made him lose papers that were "very important" to his motion to set aside the verdict in his criminal trial and that the interference hurt his preparation for sentencing.[FN73] Ford has not alleged that he missed any deadlines or faced any other, specific legal injuries as a result of the alleged interference, and the mere suggestion, without any supporting argument or evidence, that Ford would have succeeded on his motion to set aside the verdict or that he would have received a lighter sentence but-for defendants' mail-watch clearly does not state that Ford lost an otherwise meritorious claim.[FN74] This is especially true in light of Ford's conviction for the offense charged, the substantial evidence supporting that conviction discussed *supra,* the fact that Ford has not yet been sentenced for his attack on Officer Miller, and the fact that Ford, far from proceeding *pro se,* has been represented by counsel throughout his criminal trial and post-trial proceedings.[FN75] Thus, we deny Ford's motion for summary judgment on this claim and grant summary judgment in favor of defendants.

FN73. *See* Ford Brief at 22-23; *see also*

Complaint at 25.

FN74. Ford also generally alleges that he was denied the right to appear before a grand jury. However, Ford does not explain how interference with his mail caused this denial and he has also submitted documents to the Court suggesting that he did not intend to appear before the grand jury in his criminal case. *See infra* note 75 at 3-4.

FN75. *See* March 16, 2006 Order of Judge Hayes at 2-3 (Ford was initially represented by Assistant Public Defender James Hill and was later represented by Assistant Public Defenders George Hazel and David Martin. Kenneth J. Roden, Esq. represented Ford in connection with his CPL §§ 330.30 and 440.10 motions).

b. First Amendment

**\*14** Ford's Complaint does not expressly assert a First Amendment claim based on interference with his non-legal mail, but a liberal reading of that document suggests that Ford intended to do so since he complains that DOCS staff took mail going to and coming from his girlfriend.[FN76] In order to state a First Amendment claim based on mail interference, a prisoner must show that the interference either did not further one or more substantial government interests, such as security, order and rehabilitation, or that the interference was greater than necessary to the protection of that interest. *Davis,* 2003 U.S.App. LEXIS 13030 at *8-10 (citing *Washington v. James,* 782 F.2d 1134 (2d Cir.1986)); *U.S. v. Felipe et al.,* 148 F.3d 101 (2d Cir.1998) (interception of prison correspondence does not violate First Amendment if prison officials had "good or reasonable cause" for inspection) (citing *U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996) ("We think it clear that-at least where prison officials have reasonable cause for suspicion-surveillance of inmate mail is unobjectionable; investigation and prevention of illegal activity among inmates is "a legitimate penological interest, which has a logical connection to the decision to impose a mail watch on a prisoner")).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN76. At times in Ford's submissions, he also complains of losing mail to his spouse. It is not entirely clear whether the spouse and girlfriend to whom Ford refers are the same person, but the pleadings, taken together, strongly suggest that this is the case.

We agree with defendants that no reasonable jury could find for Ford on his First Amendment claim. To the extent that Ford complains about a mail watch, it is evident from defense submissions and from the facts discussed *supra* that defendants had legitimate reasons for monitoring Ford's mail, namely: (1) to investigate Ford's assault on Officer Miller; (2) to prevent Ford from instigating further violence following that assault; and (3) to monitor efforts by Ford to improperly influence his trial for that assault.FN77 In fact, the mail watch revealed one letter in which Ford admits to stabbing and throwing hot oil on Officer Miller, which proved to be useful to the prison's investigation of that attack, and at least one letter wherein Ford discusses and recommends efforts to improperly influence a witness in his trial. FN78

FN77. *See* Parasidis Decl., Ex. C, FORD GRIEVANCE 126, 128-29, 131-37; Ex. J, FORD MAIL 1-12; Ex. E, FORD IG 316-24.

FN78. *Id.*

Moreover, although destroying Ford's incoming and outgoing mail would likely go beyond the measures necessary to protect the prison's interests in security and in investigating Ford's assault, Ford has failed to plead any instance of mail interference wherein defendants improperly confiscated his mail. Ford generally alleges that defendants took mail going to and from his girlfriend, but he does not allege any specific occurrence of confiscation and does not specify whether DOCS staff confiscated just the two letters discussed above or whether they took other letters as well. Clearly, if defendants only confiscated the letters admitting to the assault on Officer Miller and attempting to improperly influence Ford's trial for that assault, the confiscation did not go beyond what was necessary to protect the prison's legitimate penological interests. Without any specific allegation regarding some other confiscation by DOCS staff, without

any evidence offered to support such an allegation, and given defendants' affidavits and documents stating that defendants merely implemented an appropriate mail watch in accordance with DOCS policies and procedures,FN79 no reasonable jury could find that defendants violated Ford's constitutional rights by improperly interfering with his non-legal mail.

FN79. *See e.g.* Parasidis Decl., Ex C., FORD GRIEVANCE 128-29, 131-37; Ex. J, FORD MAIL 1-12.

**\*15** Accordingly, Ford has not sufficiently alleged any violation of his rights regarding the mail to state a constitutional claim. Ford's summary judgment motion for his mail claims is denied and summary judgment is granted in favor of defendants.

6. Responsibility of Individual Defendants

Defendants' Memorandum of Law concludes by arguing that Ford fails to allege that certain defendants were personally involved in or responsible for the constitutional violations he alleges, entitling those defendants to judgment as a matter of law. Specifically, defendants argue that Ford fails to allege: (1) that Sgt. Carey, Superintendent Phillips and Sgt. Guiney used any force against him; (2) that Inspector Vacca violated his constitutional rights by ordering a mail watch; and (3) that Sgt. Kimbler and Sgt. Jewett are responsible to him for any deliberate indifference to his medical needs. Defendants are correct that Ford must allege and support personal involvement in the constitutional violations to prevail against these defendants. *See e.g. Woods v. Goord,* 2002 U.S. Dist. LEXIS 7157, *23 (S.D.N.Y.2002) (Section 1983 plaintiff must allege personal involvement of each defendant); *see also Montero v. Travis,* 171 F.3d 757, 761-62 (2d Cir.1999) (requiring allegation of direct personal involvement against supervisory official to state section 1983 claim) (citing *Sealey v.. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)).

Having reviewed Ford's submissions, we agree that Sgt. Carey, Superintendent Phillips and Superintendent Guiney are entitled to summary judgment. Ford does not accuse

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

these defendants of using excessive force against him. We also agree that Inspector Vacca is entitled to summary judgment given that we grant defendants' motion for summary judgment on Ford's mail interference claims, and that Sgts. Kimbler and Jewett are entitled to summary judgment on Ford's claims for medical indifference and for lack of due process.

*CONCLUSION*

For the reasons stated above, we deny all aspects of Ford's motion for summary judgment and grant summary judgment for defendants on all of Ford's claims except for his excessive force claim arising from his transfer to Special Housing on April 14, 2004 .[FN80] Thus, Ford may pursue his claim for excessive force against defendants C.O. Huttel, C.O. Austin, C.O. Czyzewski and Sgt. Myers,[FN81] but his Complaint is dismissed as to the following defendants: Superintendent Phillips, Deputy Superintendent Guiney, C .O. Miller, C.O. Middleton, C.O. McClenning, C.O. Erns, Sgt. Carey, Superintendent Smith, Deputy Superintendent Maly, Dr. Bhavsar, Sgt. Kimbler, Sgt. Jewett and Inspector General Vacca.

FN80. Ford raises what purports to be an equal protection argument, for the first time, in his Motion for Partial Summary Judgment, dated July 24, 2006, at 26-27. The argument offers only minimal facts and conclusions of law, without providing any reason or argument as to why those facts support a violation of Ford's right to equal protection. To the extent that Ford seeks summary judgment on an equal protection claim, summary judgment is denied.

FN81. Although we do not grant summary judgment for defendants on Ford's one remaining claim, we note that our reluctance to do so should *not* be taken to reflect any view that Ford will prevail on that claim. On the contrary, Ford has only limited evidence to support the claim and defendants have considerable evidence against it. Moreover, for the plaintiff's edification, even if a jury were to find in his favor on that claim, it would be entitled to award Ford only nominal damages-as low as $1-if it

found that Ford deserved nothing more.

IT IS SO ORDERED.

S.D.N.Y.,2007.
Ford v. Phillips
Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

C
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
John HALE, Plaintiff,
v.
Jadow RAO; J. Ireland; Mack/s/Revell; R. Furnia; J.
Silver; John Doe # 1; John Doe # 2; Jane Doe # 1; Jane
Doe # 2; Jane Doe # 3; and Jane Doe # 4, Defendants.
**No. 9:08-CV-612.**

Nov. 3, 2009.

John Hale, Alden, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Richard Lombardo, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

DAVID N. HURD, District Judge.

**\*1** Plaintiff, John Hale, brought this civil rights action in
March 2008, pursuant to 42 U.S.C. § 1983. By
Report-Recommendation dated September 29, 2009, the
Honorable George H. Lowe, United States Magistrate
Judge, recommended that defendants' motions to dismiss
(Docket No. 27) be granted in part and denied in part as
follows: (1) the motion to dismiss should be granted to the
extent that plaintiff asserts claims for money damages
against defendants in their official capacities; and (2) the
motion should be denied to the extent that defendants
moved to dismiss plaintiff's Eighth Amendment claim
against defendant Rao, and moved to dismiss the
complaint against defendant Rao on the ground of
qualified immunity. The Magistrate Judge further
recommended that the motion to dismiss for failure to

prosecute, or in the alternative for an order compelling
plaintiff's responses (Docket No. 36), be denied. No
objections to the Report-Recommendation have been filed.

Based upon a careful review of the entire file and the
recommendations of Magistrate Judge Lowe, the
Report-Recommendation is accepted and adopted in all
respects. *See* 28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss (Docket No. 27) is
GRANTED IN PART and DENIED IN PART;

a. The motion to dismiss is GRANTED to the extent
that plaintiff asserts claims for money damages against
defendants in their official capacities; and

b. The motion is DENIED to the extent that
defendants moved to against defendant Rao on the
ground of qualified immunity;

2. Defendants' motion to dismiss for failure to prosecute,
or in the alternative, for an order compelling plaintiff's
responses (Docket No. 36) is DENIED;

3. This matter is referred back to the Magistrate Judge for
any further proceedings.

IT IS SO ORDERED.

### REPORT-RECOMMENDATION AND ORDER

GEORGE H. LOWE, United States Magistrate Judge.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

This *pro se* prisoner civil rights action, filed pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court.

Currently pending is a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c), seeking dismissal of the complaint in its entirety against Defendant Dr. Jadow Rao and against Defendants J. Ireland, R. Furnia, Mack Reyell, J. Silver, and Rao in their official capacities. Dkt. No. 27. Plaintiff opposes the motion. Dkt. Nos. 39, 41.

Also pending is a Motion to Dismiss for Lack of Prosecution pursuant to Fed.R.Civ.P. 41(b) or, in the alternative, for an Order compelling Plaintiff to respond to paragraphs I(A)(1)(b) and (c) of the Court's Mandatory Pretrial Discovery and Scheduling Order. Dkt. No. 36. Plaintiff opposes the motion. Dkt. Nos. 39, 41.

For the reasons discussed below, I recommend that the Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 12(c) be granted, in part, and denied, in part. I also recommend that the Motion to Dismiss for Lack of Prosecution pursuant to Fed.R.Civ.P. 41(b) or, in the alternative, for an Order compelling Plaintiff's responses be denied.

## I. MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) AND 12(c)

### A. BACKGROUND

*2 Plaintiff John Hale alleges that eleven employees ("Defendants") of the New York State Department of Correctional Services ("DOCS") violated his rights under the Eighth Amendment when (1) in or around May of 2006, Defendants Ireland, Revell, Furnia, and Silver physically assaulted and injured him without provocation at Clinton Correctional Facility ("C.F."), and (2) between May of 2006 and February of 2008, the remaining seven Defendants (Dr. Rao, John Does 1-2, and Jane Does 1-4)

were deliberately indifferent to his resulting serious medical needs at Clinton, Southport, Elmira and Attica C.F.s. Complaint at ¶¶ 16-27.

Plaintiff states that he has exhausted his administrative remedies. Complaint at ¶ 29. Plaintiff has submitted copies of decisions from the Central Office Review Committee of the Inmate Grievance Program. Dkt. No. 5, Exhibits. Plaintiff also included a copy of a decision from the Superintendent of Attica C.F. *Id.*

### B. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [FN1] or (2) a challenge to the legal cognizability of the claim.[FN2]

> FN1. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr .S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

> FN2. *See Swierkiewicz v. Sorema N.A.,* 534 U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12(b)(6)'s requirement of stating a cognizable claim and Rule 8(a)'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN3] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN4] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN5]

FN3. *Dura Pharm., Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v.*

*Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) (citation omitted).

FN4. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo,* 861 F .2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

FN5. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 (2d Cir.1996)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-57, 570 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

alleged-but has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

**\*3** It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." FN6 "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* "FN7 In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

> FN6. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

> FN7. *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.FN8 Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." FN9 Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." FN10 Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.FN11 In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." FN12

> FN8. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering plaintiff's response affidavit on motion to dismiss)). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

> FN9. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

> FN10. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

> FN11. *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN12. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[FN13] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[FN14] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN15] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [FN16]

FN13. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug. 12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") (internal quotation marks and citation omitted); *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

FN14. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8 ]); *accord,*

*Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit); *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN15. *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN16. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

Defendants also move pursuant to Fed.R.Civ.P. 12(c). Rule 12(c) of the Federal Rules of Civil Procedure provides, in pertinent part: "After the pleadings are closed ... any party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). "In deciding a Rule 12(c) motion, [courts] apply the same standard as that applicable to a motion under Rule 12(b)(6)." [FN17]

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

FN17. *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.), *cert. denied,* 513 U.S. 816 (1994) (citations omitted); *accord, Patel v. Contemporary Classics of Beverly Hills,* 259 F.3d 123, 126 (2d Cir.2001) (citations omitted) ("The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim.").

**C. ANALYSIS**

**1. Eighth Amendment**

Reading the complaint generously, Plaintiff alleges that he complained to Defendant Rao, Health Services Director at Attica C.F., about his "medical problems," which included (1) the injuries he sustained during the alleged May 2006 incident, such as persistent vomiting of blood and urinating of blood, (2) surgical staples in his stomach, and (3) swollen ribs.[FN18] Complaint at ¶ ¶ 16-27. Plaintiff alleges that in response, Dr. Rao stated that he did not believe Plaintiff's complaints, consistently "denied" Plaintiff's complaints, and called Plaintiff " 'crazy.' " *Id.* at ¶¶ 26, 27. Plaintiff claims that as a result, he has endured pain, suffering, and injuries. *Id.*

FN18. Specifically, Plaintiff states, "It should be noted that *Plaintiff has been complaining about all of the above medical problems* [which include the injuries sustained during the alleged assault, the surgical staples, and swollen ribs] to medical staff here at Attica C.F. *including Defendant Dr. Rao* ... and ever since he was beaten by the Defendant Officers Ireland, Reyell, Furnia, and Silver *he has been throwing up blood and urinating blood yet the Defendants consisting* [sic] *denied his complaints;* resulting in Plaintiff's pain and suffering, and further injuries." Complaint at ¶ 27 (emphasis added).

**\*4** Defendants argue that Plaintiff has made an insufficient showing of an Eighth Amendment claim against Defendant Rao. Dkt. No. 27-2 at pp. 3-6.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102-03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Farmer,* 511 U.S. at 834 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corrections,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

medical condition is sufficiently serious." *Id.* A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

**\*5** If the claim is that treatment was provided but was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

To satisfy the subjective component of an Eighth Amendment claim, the defendant's behavior must be "wanton." Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,*

143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105-06. Moreover, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703.

Regarding the objective component, the complaint alleges that Defendant Rao provided Plaintiff with inadequate or no medical care after learning of Plaintiff's physical complaints, including persistent vomiting of blood and urinating of blood. Vomiting of blood and urinating of blood are indications of serious medical needs. *See Morgan v. Maass,* No. 94-35834, 1995 WL 759203, at *2 (9th Cir. Dec. 26, 1995) (finding that vomiting blood constituted a serious medical need); *Kimbrough v. City of Cocoa,* No. 6:05-cv-471, 2006 WL 2860926, at *3 (M.D.Fla. Oct. 4, 2006) (finding that "[e]ven to a lay person, it is obvious that blood in the urine is an indication of a serious medical need."). Thus, the allegations in the complaint satisfy the objective component.

**\*6** Regarding the subjective component, the complaint alleges that Defendant Rao was aware that Plaintiff had serious medical needs, but consciously and intentionally disregarded or ignored those needs. Dkt. No. 1. Thus, the allegations in the complaint satisfy the subjective component.

Defendants argue that Plaintiff's complaint is conclusory and fails to contain specific allegations of fact indicating

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

a deprivation of rights as against Defendant Rao. Dkt. No. 27-2, at p. 5. The Court disagrees. Plaintiff specifically stated that he informed Defendant Rao about his "medical problems," which included vomiting of blood and urinating of blood, but that Dr. Rao expressed disbelief, consistently "denied" Plaintiff's complaints, and stated that Plaintiff was "crazy." Complaint at ¶ 27. Plaintiff has set forth more than a simple conclusory allegation.

In light of the foregoing, the Court declines to conclude at this stage that Plaintiff has failed to state a claim for deliberate medical indifference against Defendant Rao.[FN19] Accordingly, the motion to dismiss the Eighth Amendment claim against Defendant Rao should be denied.

> FN19. *See Beeks v. Reilly,* No. 07-CV-3865, 2008 WL 3930657, at *7 (E.D.N.Y. Aug. 21, 2008) (citing *Chance,* 143 F.3d at 703-04 (reversing district court's dismissal of medical indifference claim at 12(b)(6) stage because "[w]hether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.... It may be that Chance has no proof whatsoever of this improper motive, and that lack of proof may become apparent at summary judgment. But even if we think it highly unlikely that Chance will be able to prove his allegations, that fact does not justify dismissal for failure to state a claim, for Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations ....") (citations and quotation marks omitted) (other citations omitted); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 559 (S.D.N.Y.2008) (finding that amended complaint plausibly alleged that doctors knew that plaintiff was experiencing extreme pain and loss of mobility, knew that the course of prescribed course of treatment was ineffective, and declined to do anything to attempt to improve plaintiff's situation besides re-submitting MRI request forms) (citing *Harris v. Westchester County Dep't of Corrections,* No. 06 Civ.2011, 2008 WL 953616, at *23 (S.D.N.Y. Apr. 3, 2008) (despite plaintiff's sparse allegations as to defendant's conduct, at the 12(b)(6) stage plaintiff sufficiently alleged facts supporting a plausible claim that defendant

was deliberately indifferent to plaintiff's medical needs)).

## 2. Qualified Immunity

Defendant Rao asserts that he is entitled to dismissal on the ground of qualified immunity. Dkt. No. 27-2 at pp. 6-8.

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a prisoner civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68-69 (2d Cir.2004) (citations omitted), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007) (citations omitted).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962 (1992).[FN20] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v.. Templeton,* 505 F.3d 161, 169-70 (2d Cir.2007) (citations omitted). [FN21] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). [FN22] As the Supreme Court has explained,

> FN20. *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v.. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

> FN21. *See also Anderson v. Creighton,* 483 U.S. 635, 639 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (citation omitted); *Davis v. Scherer,* 468 U.S. 183, 190 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

> FN22. *See also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

*7 [T]he qualified immunity defense ... provides ample

protection to all but the plainly incompetent or those who knowingly violate the law.

... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. [FN23]

> FN23. *See also Hunter v. Bryant,* 502 U.S. 224, 299 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks and citation omitted].

Here, after liberally reviewing the complaint, accepting all of its allegations as true, and construing them in Plaintiff's favor, the Court declines to conclude that Defendant Rao is entitled to qualified immunity at this stage. As noted, Plaintiff alleges that he informed Dr. Rao of his "medical problems," including persistent vomiting of blood and urinating of blood, but Dr. Rao stated that he did not believe Plaintiff's complaints, consistently denied Plaintiff's complaints, and called Plaintiff " 'crazy,' " which resulted in pain, suffering, and injuries. Complaint at ¶¶ 26-27. Therefore, the motion to dismiss the complaint on the ground of qualified immunity should be denied. [FN24]

> FN24. *See Beeks,* 2008 WL 3930657, at *9 (citing *See McKenna,* 386 F.3d at 437-38 (affirming district court's denial of qualified immunity at motion to dismiss stage on deliberate indifference claim, "[h]owever the matter may stand at the summary judgment stage, or perhaps at trial....") (other citations omitted)).

**3. Eleventh Amendment**

Defendants Ireland, Furnia, Reyell, Silver, and Rao argue

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

that to the extent the complaint seeks damages against them in their official capacities, the claim is barred by the Eleventh Amendment. Dkt. No. 27-2 at pp. 8-9.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See* *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U .S. 139, 142-47, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101-06, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

The Eleventh Amendment bars suits against state officials acting in their official capacities.[FN25] Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) (citation omitted); *see also* Fed.R.Civ.P. 12(h)(3).

> FN25. *See* *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. . Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages

against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also* *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity.").

**\*8** Here, each of the represented Defendants has an official position with DOCS. Therefore, any claims for money damages against these Defendants in their officials capacities are barred by the Eleventh Amendment and should be dismissed.

## II. MOTION TO DISMISS FOR LACK OF PROSECUTION, OR IN THE ALTERNATIVE, FOR AN ORDER COMPELLING RESPONSES

Defendants argue that the complaint should be dismissed on the ground that Plaintiff has failed to prosecute this action. Dkt. No. 36. Defendants argue that in the alternative, Plaintiff should be compelled to respond to paragraphs I(A)(1)(b) and (c) of the Court's Mandatory Pretrial Discovery and Scheduling Order. *Id.*

### A. ANALYSIS

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

Rule 41 of the Federal Rules of Civil Procedure provides, "If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." Fed.R.Civ.P. 41(b). As a result, Fed.R.Civ.P. 41(b) may be fairly characterized as providing for two independent grounds for dismissal on motion or on the Court's own initiative: (1) a failure to prosecute the action, and (2) a failure to comply with the procedural rules, or any Order, of the Court. *Id.*

With regard to the first ground for dismissal (a failure to prosecute the action), it is within the trial judge's sound discretion to dismiss for want of prosecution.[FN26] The Second Circuit has identified five factors that it considers when reviewing a district court's order to dismiss an action for failure to prosecute under Rule 41(b):

FN26. *See Merker v. Rice,* 649 F.2d 171, 173 (2d Cir.1981).

[1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has taken care to strike the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard and [5] whether the judge has adequately assessed the efficacy of lesser sanctions.[FN27]

FN27. *See Shannon v. GE Co.,* 186 F.3d 186, 193 (2d Cir.1999) (affirming Rule 41(b) dismissal of plaintiff's claims by U.S. District Court for Northern District of New York based on plaintiff's failure to prosecute the action) (citation and internal quotation marks omitted).

As a general rule, no single one of these five factors is dispositive.[FN28] However, I note that, with regard to the first factor, Rule 41.2 of the Local Rules of Practice for this Court provides that a "plaintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution." N.D.N.Y. L.R. 41.2(a). In addition, I note that a party's failure to keep the Clerk's Office apprised of his or her current address may also constitute grounds for

dismissal under Rule 41(b) of the Federal Rules of Civil Procedure.[FN29]

FN28. *See Nita v. Conn. Dep't of Env. Protection,* 16 F.3d 482 (2d Cir.1994).

FN29. *See, e.g., Robinson v. Middaugh,* 95-CV-0836, 1997 WL 567961, at *1 (N.D.N.Y. Sept. 11, 1997) (Pooler, J.) (dismissing action under Fed.R.Civ.P. 41[b] where plaintiff failed to inform the Clerk of his change of address despite having been previously ordered by Court to keep the Clerk advised of such a change); *see also* N.D.N.Y. L.R. 41.2(b) ( "Failure to notify the Court of a change of address in accordance with [Local Rule] 10.1(b) may result in the dismissal of any pending action.").

**1. Address Changes**

As to the first factor (the duration of Plaintiff's "failures") Defendants argue that Plaintiff was transferred to several different facilities, but failed to update the Court and defense counsel of his changes of address. Dkt. No. 36-2, Lombardo Decl., at ¶¶ 4-5, 7-12 & Dkt. Nos. 49, 50. Defendants argue that the action should be dismissed for this reason alone. Dkt. No. 36-8.

*9 Plaintiff has failed at times to update the Court and defense counsel as to his address changes. His most recent failure occurred on July 6, 2009 when he was transferred from Green Haven C.F. to Auburn C.F., and subsequently to Wende C.F., where he now remains. Dkt. No. 50-2, Stachowski Decl., at ¶¶ 3-5. Plaintiff failed to update the Court and defense counsel as to these changes. Thus, Plaintiff's failure to provide an updated address has persisted since July 6, 2009 (less than three months). Generally, it appears that durations of this length (i.e., less than four months) are not long enough to warrant dismissal.[FN30]

FN30. N.D.N.Y. L.R. 41.2(a) ("[P]laintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution.");

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

*Georgiadis v. First Boston Corp.,* 167 F.R.D. 24, 25 (S.D.N.Y.1996) (plaintiff had failed to comply with order directing him to answer interrogatories for more than four months).

The Court notes that Plaintiff has been subject to frequent transfers. Since August 7, 2008, Plaintiff was transferred on seven occasions. Dkt. No. 36-3, Loiodice Decl., at ¶¶ 4-11; Dkt. No. 50-2, Stachowski Decl. at ¶¶ 4-5. Three of the transfers occurred within a span of six days. Dkt. No. 36-3, Loiodice Decl., at ¶¶ 7-11.

Moreover, whether Plaintiff was mentally and physically capable of providing written updates of all of his address changes is unclear. Plaintiff noted in his opposition papers that he was diagnosed as suffering from schizophrenia; has "borderline intellectual" functioning; [FN31] and is unable to read or write; therefore Plaintiff's submissions to the Court are written by others. Dkt. No. 39. Plaintiff also stated that at times he has been "prohibited from possessing any type of writing utensil." Dkt. No. 41. Plaintiff further stated that while at Central New York Psychiatric Center, "any legal work whatsoever" was discouraged and "not facilitate[d]." *Id.* In light of the foregoing, I find that the first factor weighs against dismissal of Plaintiff's complaint.

    FN31. Plaintiff submitted copies of medical records indicating that he was diagnosed as suffering from, *inter alia,* schizophrenia, paranoid type; has borderline intellectual functioning; and has an IQ of 71. Dkt. No. 5.

As to the second factor (whether plaintiff had received notice that further delays would result in dismissal), I find that Plaintiff has received notice that his failure to provide his current address may result in dismissal. *See* Dkt. No. 12 at 4 *(Order stating that "Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so will result in the dismissal of this action")* (emphasis in original); N.D.N.Y. L.R. 41.2(b) (stating, "Failure to notify the Court of a change of address in accordance with L.R. 10.1(b) may result in the dismissal of any pending action".) [FN32] As a result, I find that the second factor weighs in favor of dismissal of Plaintiff's

complaint.

    FN32. I note that, to assist *pro se* litigants, the Clerk of the Court for the Northern District of New York has provided to all correctional facilities in New York State copies of the Northern District's Local Rules of Practice and *Pro Se* Manual.

Regarding the third factor (whether defendants are likely to be prejudiced by further delay), I am unable to find, based on the current record, that Defendants are likely to be prejudiced by a delay in the proceedings. While any delay that occurs theoretically impairs the Defendants' memories, the preservation of evidence, and the ability to locate witnesses, [FN33] Defendants have not argued that any delay has occurred due to Plaintiff's failure to update his address. As a result, I find that the third factor weighs against dismissal of Plaintiff's complaint. [FN34]

    FN33. *See, e.g., Geordiadis v. First Boston Corp.,* 167 F.R.D. 24, 25 (S.D.N.Y.1996) ("The passage of time always threatens difficulty as memories fade. Given the age of this case, that problem probably is severe already. The additional delay that plaintiff has caused here can only make matters worse.").

    FN34. *See Cruz v. Jackson,* No. 94 Civ. 2600, 1997 WL 45348, at *2 (S.D.N.Y. Feb. 5, 1997) (declining to dismiss action for failure to prosecute or failure to comply with court orders where plaintiff had failed to meet discovery deadlines, and noting that the fact that plaintiff "has been in lock-down and transferred to another facility during the pendency of this action also counsels leniency toward [the plaintiff's] delays") (citing *Jones v. Smith,* 99 F.R.D. 4, 14-15 (M.D.Pa.1983) (granting *pro se* plaintiff final opportunity to comply with orders of court, despite repeated wilful, dilatory and contumacious tactics), *aff 'd* 734 F.2d 6 (3d Cir.1984)).

**10** Regarding the fourth factor (striking the balance

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard), I find that Plaintiff's right to receive a further chance to be heard in this matter, at this point, outweighs the need to alleviate congestion on the Court's docket. Moreover, Defendants point to no delay caused by Plaintiff's failure to update his address. As a result, I find that the fourth factor weighs against dismissal of Plaintiff's complaint.

With regard to the fifth factor (whether the judge has adequately assessed the efficacy of lesser sanctions), I find that a strong reminder to Plaintiff of his obligation to provide a current address might be effective and is warranted. Plaintiff, who alleges that he suffers from schizophrenia and is unable to read and write, Dkt. No. 39, has been responsive to prior Orders from the Court,[FN35] and has shown an interest in prosecuting this action. *See* Dkt. Nos. 39, 41 (Plaintiff's Opposition Papers). As a result, I find that the fifth factor weighs against dismissal of Plaintiff's complaint.

> FN35. *See* Dkt. Nos. 7-11 (Report-Recommendation and Order; Plaintiff's Inmate Authorization Forms; Application to Proceed *In Forma Pauperis;* and Signed Last Page of Complaint).

Weighing these five factors together, I conclude that they tip the scales against dismissing Plaintiff's complaint (one of the factors weighing in favor of such dismissal and four of the factors weighing against such dismissal).[FN36] Dismissal based on a lack of prosecution is a harsh remedy to be used only in extreme situations. The Court does not currently view the present case to be in such a situation. For these reasons, I recommend that Defendants' Motion to Dismiss based on Plaintiff's failure to provide a current address (Dkt. No. 36) be denied.

> FN36. *Minnette v. Time Warner,* 997 F.2d 1023, 1027 (2d Cir.1993); *see also Jacobs v. County of Westchester,* Dkt. No. 02-0272, 2005 WL 2172254, at * 3 (2d Cir. Sept. 7, 2005) (remanding case to district court to make further factual findings concerning the plaintiff's lack of responsiveness and concerning his confinement

in a prison psychiatric ward where district court dismissed for failure to prosecute).

**2. Responses to Scheduling Order**

Defendants argue that if the Court does not dismiss the complaint for a failure to prosecute, the Court should issue an order requiring Plaintiff to respond to paragraphs I(A)(1)(b) and (c) of the Court's mandatory pretrial discovery and scheduling order dated November 18, 2008 ("Scheduling Order"). Dkt. No. 36-8, Memo. of Law at pp. 3-4.

The Scheduling Order provided, in relevant part, as follows:

**I. Discovery**

**A.** *Documents.* Within sixty (60) days of the date of this order:

**1.** *Plaintiff(s)* shall provide to counsel for defendant(s) copies of all:

**a.** Documents and other materials which plaintiff(s) may use to support the claims in the complaint;

**b.** Correspondence, grievances, grievance appeals, and other documents relating to requests for administrative remedies or the inability or failure to exhaust such remedies; and

**c.** Complaints and petitions filed by plaintiff(s) in any other cases in any court relating to the same issues raised in the complaint in this action or, if such documents are not within the possession of plaintiff(s), plaintiff(s) shall provide to counsel for defendant(s) a list of any such legal proceedings stating the court in which the proceeding was filed, the caption of the case, and the court number.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

**\*11** Dkt. No. 26, at pp. 1-2.

Defendants admit that they received "what purported to be plaintiff's response to paragraph I(A)(1) of the [Scheduling Order]" in a letter to defense counsel from Plaintiff. Dkt. No. 36-2, Lombardo Decl., at ¶ 19 & Dkt. No. 36-6, Ex. C. In that letter, Plaintiff asserted the following:

> Pursuant to paragraph I(A) of the court's mandatory pretrial discovery and scheduling order dated Nov. 18, [20]08[:]

> a. Documents and materials which plaintiff will use to support the claims in this complaint is [sic] the complete Medical Records for the period of June 14, 2006 to present, and current Tier III documents and pictures surrounding the incident which you forwarded to me pursuant to mandatory pretrial discovery, in addition enclosed please find Lab work report of specimen done on plaintiff which will also be use[d].

> Plaintiff has complied with the court's mandatory pretrial discovery and scheduling order pursuant to paragraph I(A) so your office no longer has to seek dismissal of the complaint for failure to prosecute.

Dkt. No. 36-6, Ex. C.

Defendants view this letter as being nonresponsive to paragraphs I(A)(1)(b) and (c). However, regarding paragraph I(A)(1)(b), Plaintiff specifically stated in the above-quoted letter that he "will use the complete medical records for the period of June 14, 2006 to present, and *current Tier III documents and pictures surrounding the incident which you forwarded to me.*" Dkt. No. 36-6, Ex. C at p. 1 (emphasis added). Moreover, Plaintiff stated in his March 23, 2009 letter to defense counsel that he filed grievances while in Attica C.F., but that he was no longer "in possession of those grievances" because his property was lost while he was at Central New York Psychiatric Center. [FN37] Dkt. No. 39 at p. 2. Plaintiff also stated that he has "no money in his account," therefore he has been unable to obtain copies of his grievances, as well as medical records. *Id.* Accordingly, Plaintiff has responded

to paragraph I(A)(1)(b). He stated that he no longer possesses the grievances he filed at Attica C.F.; he is unable to afford copies; and he intends to use the documents that defense counsel sent to him. To the extent that defense counsel is arguing that Plaintiff must provide copies of the same documents defense counsel has already provided Plaintiff, Dkt. No. 36-7, Ex. D at p. 2, this argument is unavailing.

> [FN37.] Plaintiff also asserts that he no longer has a copy of the complaint in this action. Dkt. No. 41, at ¶ 8. Accordingly, the Clerk will be directed to provide a copy of the complaint to Plaintiff.

Regarding paragraph I(A)(1)(c), Plaintiff stated in his March 23, 2009 opposition letter that "[t]here is no other complaints or petitions filed by plaintiff in any other cases in any other court [sic]." Dkt. No. 39, at p. 2. Plaintiff reiterated this response in a supplemental opposition letter dated March 31, 2009 by stating that "there are no other known complaints, petitions, etc. filed by plaintiff in any other court with regards to the claims raised in [this case]." Dkt. No. 41,[FN38] at ¶ 6. Accordingly, Plaintiff has responded to paragraph I(A)(1)(c).

> [FN38.] To the extent that Plaintiff is seeking permission to amend his complaint via his supplemental opposition letter, (Dkt. No. 41), Plaintiff's request must be in the form of a motion. *See* N.D.N.Y. Local Rule 7.1.

**\*12** In light of the foregoing, Defendants' request for an order compelling responses to paragraphs I(A)(1)(b) and (c) of the Scheduling Order should be denied as moot.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 12(c) (Dkt. No. 27) be GRANTED in part and DENIED in part. The motion to dismiss should be granted to the extent that Plaintiff asserts claims for money damages against Defendants in their official capacities. The motion should be denied to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

the extent that Defendants moved to dismiss Plaintiff's Eighth Amendment claim against Defendant Rao, and moved to dismiss the complaint against Defendant Rao on the ground of qualified immunity; and it is further

**RECOMMENDED** that the Motion to Dismiss for Failure to Prosecute or in the alternative for an Order compelling Plaintiff's responses (Dkt. No. 36) be DENIED; and it is further

**ORDERED,** *that Plaintiff is required to promptly notify the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so may result in the dismissal of this action;*

**ORDERED,** that the Clerk update Plaintiff's address to reflect that he is currently incarcerated at Wende Correctional Facility; [FN39] and it is further

FN39. Defendants' letter to the Court dated August 21, 2009 indicates that Plaintiff is now incarcerated at Wende C.F. Dkt. No. 50.

**ORDERED,** that the Clerk serve (1) copies of the electronically-available-only opinions cited herein; [FN40] (2) a copy of the Complaint (Dkt. No. 1); and (3) a copy of this Report-Recommendation and Order on Plaintiff.

FN40. Those decisions include *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878 (S.D.N.Y. Nov. 17, 1997); *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119 (E.D.N.Y. Oct. 24, 2002); *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864 (2d Cir. Aug. 12, 2008); *Morgan v. Maass,* No. 94-35834, 1995 WL 759203 (9th Cir. Dec. 26, 1995); *Kimbrough v. City of Cocoa,* No. 6:05-cv-471, 2006 WL 2860926 (M.D.Fla. Oct. 4, 2006); *Beeks v. Reilly,* No. 07-CV-3865, 2008 WL 3930657 (E.D.N.Y. Aug.21, 2008); *Harris v. Westchester County Dep't of Corrections,* No. 06 Civ.2011, 2008 WL 953616 (S.D.N.Y. Apr. 3, 2008); *Robinson v. Middaugh,* 95-CV-0836, 1997 WL

567961 (N.D.N.Y. Sept. 11, 1997); *Cruz v. Jackson,* No. 94 Civ. 2600, 1997 WL 45348 (S.D.N.Y. Feb. 5, 1997); and *Jacobs v. County of Westchester,* Dkt. No. 02-0272, 2005 WL 2172254 (2d Cir. Sept. 7, 2005).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.
Hale v. Rao
Slip Copy, 2009 WL 3698420 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



73 F.3d 369, 1995 WL 759203 (C.A.9 (Or.))
(Table, Text in WESTLAW), Unpublished Disposition

(Cite as: 73 F.3d 369, 1995 WL 759203 (C.A.9 (Or.)))

NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA9 Rule 36-3 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Ninth Circuit.

Barbara M. MORGAN, personal representative of the Estate of Dennis Lee Morgan, Deceased, Plaintiff-Appellant,
v.
Manfred MAASS, Superintendent; Charles S. Reese; Michael H. Yoder, Trung Van Tran; Christine Cilley, et al., Defendants-Appellees.
No. 94-35834.

Argued and Submitted Nov. 14, 1995.
Decided Dec. 26, 1995.

Appeal from the United States District Court for the District of Oregon; No. CV-93-00448-HJF, Helen J. Frye, District Judge, Presiding.

D.Or., 1994 WL 423048.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

Before: BROWNING, RYMER and T.G. NELSON, Circuit Judges.

MEMORANDUM [FN*]

*1 We review a grant of summary judgment *de novo*. *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir.1994). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact. *Id.* The district court's decision to consider evidence in the context of summary judgment is reviewed for an abuse of discretion. *Maffei v. Northern Ins. Co. of N.Y.*, 12

F.3d 892, 897 (9th Cir.1993).

1. Admissibility of Morgan's statements to the appellant

The defendants argue that the alleged statements made by Morgan to the appellant in the hospital are inadmissible. We disagree.

First, Morgan's statements to the appellant fall within the Fed.R.Evid. 804(b)(2) exception to the hearsay rule. The appellant stated that Morgan discussed his death with her at the hospital and "said that he was prepared to go 'to the other side,' which is a reference he used to describe a spiritual afterlife." Thus, the impending death requirement of Rule 804(b)(2) is met. The alleged statements concern the circumstances of Morgan's death, e.g., whether he was given prompt medical attention. Thus, Rule 804(b)(2)'s requirement that the statements concern the circumstances of what the declarant believed to be impending death is met.

Second, the statements which constitute hearsay within hearsay fall within an exception to the hearsay rule as required under Fed.R.Evid. 805.

Morgan's statement that he told the guard at 4:00 a.m. that he was vomiting blood and needed to go to the hospital is not hearsay since the statement was offered not to prove the truth of the matter asserted, but only to prove that Tran was notified at that time. *See* Fed.R.Evid. 801(c). Thus, the district court did not abuse its discretion in considering this statement for the limited purpose of determining whether Tran had notice.

Morgan's statement that Tran told him to wait until sick line is also not hearsay because it is Tran's own statement being offered against Tran and is thus an admission by a party-opponent. *See* Fed.R.Evid. 801(d)(2). This statement is therefore admissible, and the district court did not abuse its discretion in considering the statement.

As to the use of Morgan's statements as evidence that Morgan was actually sick at 4:00 a.m., it is not clear that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 F.3d 369, 1995 WL 759203 (C.A.9 (Or.))
(Table, Text in WESTLAW), Unpublished Disposition

(Cite as: 73 F.3d 369, 1995 WL 759203 (C.A.9 (Or.)))

the district court even considered Morgan's statements for this purpose. In addition, there is other evidence in the record which indicates that Morgan was sick at 4:00 a.m. (e.g., Morgan's statement to Cilley that he had been sick since 4:00 a.m. and the hospital records that state that Morgan had been sick since 4:00 a.m.). Therefore, even if the district court did find that Morgan was sick at 4:00 a.m., there is other evidence from which this conclusion could have been drawn, and therefore it cannot be said that the district court abused its discretion.

2. Liability of Tran [FN1]

The district court found that because there was no evidence that Morgan would have lived had he received more prompt medical attention, any delay in receiving medical treatment that may have occurred due to Tran's acts or omissions did not harm Morgan. This finding is erroneous.

**\*2** To find that a jailer can leave an inmate bleeding internally in his cell for over five hours, assuming that he is going to die anyway at the exact same moment he otherwise would have died, violates the "evolving standards of decency that mark the progress of a maturing society" and therefore violates the Eighth Amendment. See *Estelle v. Gamble,* 429 U.S. 97, 102 (1976).

Furthermore, the pain, mental anguish and suffering that Morgan endured during the five hours after he allegedly told Tran that he needed to go to the hospital is more than sufficient to constitute sufficiently serious harm. See *Jones v. Johnson,* 781 F.2d 769, 771 (9th Cir.1986) (extreme discomfort and pain suffered by an inmate due to a delay in surgery stated a serious medical need); *McGuckin v. Smith,* 974 F.2d 1050, 1060 (9th Cir.1992) (delay of treatment that caused a prisoner to suffer a significant amount of pain and anguish caused "harm" upon which a § 1983 action could be based); *Kelley v. Borg,* 60 F.3d 664, 667 (9th Cir.1995) (unpleasant effects suffered by an inmate rendered unconscious due to exposure to fumes was enough to state a § 1983 claim even if the prisoner only suffered minimal damage). Therefore, the delay in medical treatment that allegedly resulted from Tran's conduct resulted in substantial harm to Morgan.

Finally, Tran's claimed conduct appears to constitute deliberate indifference to Morgan's serious medical needs. Morgan told Tran that he was vomiting blood and needed to go to the hospital at 4:00 a.m. Tran responded by telling Morgan to wait until sick line, which was not until 9:30 a.m. This raises at least a material issue of fact as to whether Tran's conduct constitutes deliberate indifference.

Tran argues that the appellant contradicts herself as to whether Morgan told Tran that he was vomiting blood and bleeding rectally. This argument lacks merit.

At her deposition, the appellant testified that Morgan told her "that he had tried to get them to take him to the hospital at about 4:30 that morning and that they told him to wait until sick line, which was around 9:30." The appellant also stated, "He said that he had been throwing up blood." Later in the deposition, the appellant stated that Morgan told her that "he had thrown up blood and that he had asked for help-asked them to take him to the hospital specifically at 4:00 or 4:30, and they told him to wait until sick line." Appellant was never specifically asked whether Morgan told the guard that he was vomiting blood.

In her affidavit, appellant stated that "[a]t 4:00 a.m., he said he told the guard who came by his cell that he was vomiting blood and that blood was in his bowel movements. He said the guard told him to wait until the sick line later in the morning."

Looking at her deposition as a whole, and at her affidavit, the appellant's versions of what Morgan stated to her are not inconsistent.

Because there is a material issue of fact as to whether Tran acted with deliberate indifference to Morgan's serious medical needs, the district court erred in granting Tran's motion for summary judgment.

3. Liability of Yoder

**\*3** Yoder argues that the appellant failed to show that he acted with "deliberate indifference" to Morgan's medical needs. We agree.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 F.3d 369, 1995 WL 759203 (C.A.9 (Or.))
(Table, Text in WESTLAW), Unpublished Disposition

(Cite as: 73 F.3d 369, 1995 WL 759203 (C.A.9 (Or.)))

"In determining deliberate indifference, we scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence...." *Wood v. Housewright,* 900 F.2d 1332, 1334 (9th Cir.1990). Prison officials act with deliberate indifference if they purposefully ignore or fail to respond to a prisoner's medical needs. *McGuckin,* 974 F.2d at 1060.

In the present case, once Yoder was informed of the medical emergency, he responded immediately by going up to Morgan's cell. Yoder testified that when he first saw Morgan, "He looked sick, but not overly sick. Not like, he didn't appear to be in medical distress or dying." Upon reaching the cell, Yoder asked Morgan whether he would be able to make it to the infirmary in a wheel chair, and Morgan said, "Yes." Yoder immediately contacted Health Services and explained the situation, attempting to get Morgan to the infirmary. Only when a nurse arrived on the scene approximately thirty minutes later was Yoder made aware that Morgan would need to be sent to the hospital instead of the infirmary. Yoder immediately made arrangements for an ambulance to take Morgan to the hospital.

The gist of appellant's claim against Yoder comes down to whether Yoder should have called an ambulance instead of trying to get Morgan to the infirmary. Based on the evidence, it is clear that Yoder did not believe that Morgan was in any immediate danger. He was attempting to secure medical treatment for Morgan, and when he was told that Morgan needed to be transported to the hospital, Yoder immediately made arrangements for an ambulance.

Because Yoder was attempting to get some type of medical help for Morgan, he was not "purposefully" ignoring or failing to respond to Morgan's medical needs and was thus not acting or failing to act with deliberate indifference. *See McGuckin,* 974 F.2d at 1060. Furthermore, although Yoder's failure to recognize the situation as a true emergency and immediately call an ambulance may have been negligent, "it did not rise to the level of deliberate indifference." *Wood,* 900 F.2d at 1334. Therefore, we hold that the district court did not err in granting summary judgment for Yoder.

4. Liability of Dr. Vargo

The appellant argues that Dr. Vargo's failure, as the prison doctor, to make jailers aware that Morgan was as sick as he was, and that he could experience such a catastrophic and fatal bleeding episode, constituted deliberate indifference to Morgan's serious medical needs. We disagree.

Deliberate indifference in the medical context goes well beyond negligence because it is the "unecessary and wanton infliction of pain" which the Eighth Amendment proscribes. *See Estelle,* 429 at 105-06. "While poor medical treatment will at a certain point rise to the level of constitutional violation, mere malpractice, or even gross negligence, does not suffice." *Wood,* 900 F.2d at 1334.

**\*4** In *Oritz v. City of Imperial,* 884 F.2d 1312, 1313 (9th Cir.1989), the prisoner had fallen and injured his head. Because of the emergency component of complications that could arise from a head injury, the treating doctor gave the prison officials a Patient After Care Sheet which listed the symptoms that would be displayed by the prisoner if complications arose, and directed the prison officials to immediately take the prisoner to a doctor or emergency room if any of the listed symptoms occurred. *Id.* When the prisoner began to exhibit the symptoms listed on the sheet, the prison officials failed to call the emergency room or the doctor. Instead, they called another doctor who prescribed sedatives for the prisoner over the phone. *Id.* These sedatives were inappropriate for head injuries. Two days after the initial fall, the prisoner was found unconscious. He was taken to the hospital where he died ten days later. *Id.* This court held that because the prison officials had ignored evidence of the complications to which they had been specifically alerted and had prescribed sedatives which were contraindicated without an examination, a material issue of fact existed as to whether the prison officials had acted with deliberate indifference. *Id.* at 1314.

In contrast, in the present case, there was no emergency component to Morgan's illness or to what Dr. Vargo knew at the time. Morgan's medical condition had

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

73 F.3d 369, 1995 WL 759203 (C.A.9 (Or.))
(Table, Text in WESTLAW), Unpublished Disposition

(Cite as: 73 F.3d 369, 1995 WL 759203 (C.A.9 (Or.)))

been unchanged for some period of time prior to May 6, 1991. The emergency situation could happen, but there is no evidence that it was imminent. Morgan had been educated regarding the processes of his illness and was capable of expressing himself, as he apparently did here. Thus, there was no apparent need to alert the staff of Morgan's medical condition.

Furthermore, the appellant has not presented any evidence which raises a material issue of fact as to whether Dr. Vargo acted with deliberate indifference. There is no evidence that Dr. Vargo provided inadequate medical care, much less that the quality of care he provided was so dismally beneath the prevailing standard of care that it supports an inference that Dr. Vargo acted with deliberate indifference. We therefore hold that the district court did not err in granting summary judgment for Dr. Vargo.

In conclusion, we affirm the district court's grant of summary judgment for Dr. Vargo and Yoder, but reverse the district court's grant of summary judgment for Tran.

AFFIRMED in part, REVERSED in part and REMANDED. No costs allowed.

FN* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.

FN1. The factual statements made concerning the conduct of Tran result from viewing the record in the light most favorable to Morgan. We are not holding that Tran or Morgan actually conducted themselves as we describe. Those factual determinations must await a trial.

C.A.9 (Or.),1995.

Morgan v. Maass
73 F.3d 369, 1995 WL 759203 (C.A.9 (Or.))
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jamal KEARSEY, Plaintiff,
v.
Adeyemi WILLIAMS, Defendant.
**No. 99 Civ. 8646 DAB.**

Sept. 1, 2005.

*MEMORANDUM & ORDER*

BATTS, J.

**\*1** Plaintiff Jamal Kearsey, proceeding *prose,* has filed the above-captioned case against Defendant Dr. Adeyemi Williams ("Dr.Williams") pursuant to 42 U.S.C. § 1983 alleging that Dr. Williams violated Plaintiff's Eighth Amendment rights by being deliberately indifferent to Plaintiff's serious medical needs. Defendant has moved to dismiss the Complaint for failure to exhaust administrative remedies, for failure to state a claim, and because Defendant is shielded by qualified immunity.[FN1] For the reasons stated herein, Defendant's Motion to Dismiss is DENIED.

> FN1. This Court granted Defendant's Motion to Dismiss for failure to exhaust administrative remedies in its June 6, 2002 Order but vacated that Order on September 20, 2004 upon Plaintiff's motion pursuant to Fed.R.Civ.P. 60(b). *See Kearsey v. Williams,* No. 99 Civ. 8646, 2004 WL 2093548 (S.D.N.Y. Sept. 20, 2004).

I. BACKGROUND

In his Complaint, Plaintiff alleges that while he was incarcerated at Rikers Island Correctional Facility ("Rikers"), Defendant, a doctor at Rikers, violated Plaintiff's Eighth Amendment rights by refusing to provide him with an asthma pump when Plaintiff experienced breathing difficulties. Specifically, on April 4, 1999, Plaintiff requested to speak with a doctor because the heat in his cell was aggravating his asthma. (Compl. at 3-4.) When Dr. Williams went to Plaintiff's cell, Plaintiff stated that his chest had "tighten[ed] up" and that he "couldn't breath[e]," and requested that Dr. Williams take him "downstairs" to get an asthma pump. (Id. at 4.) Dr. Williams declined to take Plaintiff downstairs but said that he would send a pump to Plaintiff's cell that evening. (Id.) After a period of time, a corrections officer called Dr. Williams and he also informed him of Plaintiff's medical condition. (Id.) Dr. Williams told the officer that he would bring the asthma pump. (Id.) Plaintiff alleges that Dr. Williams forgot to bring the pump. (Id.)

Plaintiff complained for a third time to Dr. Williams of his inability to breathe and stated that he was experiencing chest pain. (Id.) Once again, Dr. Williams responded by promising to send an asthma pump that evening. (Id.) Plaintiff subsequently asked for Defendant's name, to which Dr. Williams allegedly responded, "I won't send you anything now!" (Id.) Dr. Williams then handed Plaintiff a note with his name. (Id. at 5.) No pump was given to Plaintiff. Shortly after Dr. Williams left, Plaintiff borrowed an asthma pump from a fellow minute, although that pump was different from the one Plaintiff was used to. (Id.) Plaintiff complained of chest pains and breathing difficulties for the rest of the day. (Id.) On April 6, 1999, Plaintiff was having blood work done and spoke with a nurse about his medical condition. (Id.) The nurse ordered an emergency pump that arrived later in the day. (Id.)

On June 24, 1999, Plaintiff filed a Complaint pursuant to 42 U.S.C. § 1983 alleging that Defendant exhibited deliberate indifference to his serious medical needs in violation of Plaintiff's Eighth Amendment rights. Defendant has filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Plaintiff failed to exhaust administrative

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), and, in particular, the exhaustion procedure established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, that Plaintiff failed to state a cause of action for which relief can be granted, and that Defendant is shielded from liability based on the doctrine of qualified immunity. (Def.'s Mem. Law at 1, 3, 20.) On June 6, 2002, this Court issued an Order granting Defendant's Motion to Dismiss on the ground that Plaintiff failed to comply with the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Kearsey v. Williams,* No. 99 Civ. 8646, 2002 WL 1268014, at *2 (S.D.N.Y. June 6, 2002).

***2** Plaintiff filed a Motion for Relief from Judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.[FN2] Plaintiff argued that the Court had erred in holding that he was required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, because those procedures are required only of inmates at state-run facilities, whereas Rikers, as a municipally-run facility, has different grievance procedures. *Kearsey,* No. 99 Civ. 8646, 2004 WL 2093548, at *2 (S.D.N.Y. Sept. 20, 2004). In its September 20, 2004 Order, the Court vacated its dismissal Order, finding Plaintiff was not required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Id.* at *4.

FN2. Plaintiff was represented by counsel when he filed the 60(b) Motion.

Because the Court's June 6, 2002 Order did not reach the additional grounds in Defendant's Motion to Dismiss, the remaining motions were *subjudice.* In this Order, the Court considers Defendant's remaining arguments: that Plaintiff has failed to state a cause of action and that Defendant is entitled to qualified immunity.

## II. DISCUSSION

### A. Rule 12(b)(6) Standard

In a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995) (citations omitted). "The district court should grant such a motion only if, after viewing [the] plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). A court's review of such a motion is limited and "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Burnheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). In fact, it may appear to the court that "a recovery is very remote and unlikely but that is not the test." *Branham v. Meachum,* 72 F.3d 626, 628 (2d Cir.1996).

These liberal pleading standards "appl[y] with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *prose."Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). It is well-settled that *prose* complaints are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 521 (1972).

### B. Eighth Amendment

Defendant moves to dismiss the Complaint on the grounds that Plaintiff has failed to state a cause of action under 42 U.S.C. § 1983.

### 1. Standard for § 1983 deliberate indifference claim

Section 1983 of Title 42, United States Code, enables a plaintiff to bring a cause of action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Thus, a plaintiff bringing a § 1983 action must

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

demonstrate that "the conduct complained of was committed by a person acting under color of state law ... [and that] this conduct deprived a person of rights ... secured by the Constitution or laws of the United States." *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Development Agency,* 77 F.3d 26, 29-30 (2d Cir.1996) (quoting *Parratt v. Taylor,* 451 U.S. 527, 535 (1981)) (internal quotations omitted). Section 1983 is not in itself "a source of substantive rights," but instead "provides a method for vindicating federal rights elsewhere conferred." *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)).

**\*3** One such source of federal rights is the Eighth Amendment of the Constitution, which states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In *Estelle v. Gamble,* the Supreme Court held that prison employees' "deliberate indifference [to an inmate's] serious medical needs" violates the inmate's Eighth Amendment rights and is actionable under § 1983. *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). A plaintiff pursuing a § 1983 claim for deliberate indifference to serious medical needs must meet a two-prong standard by demonstrating a serious medical need (the objective prong) and by showing that the defendant employee possessed the requisite culpable mental state (the subjective prong). *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

2. Serious medical need

The objective prong of the deliberate indifference standard requires a showing of a "sufficiently serious" medical need. *Hathaway,* 99 F.3d at 553 (internal quotations and citations omitted). While "it is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining 'seriousness' at the pleading stage," several factors are helpful in determining the seriousness of a medical condition. *Chance,* 143 F.3d at 702-03 (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1372 (7th Cir.1997)).

A serious medical need is generally characterized by "a condition of urgency that may result in degeneration or extreme pain" or "the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702 (citation omitted). Whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment" reflects on the seriousness of the medical need, as does the effect of the condition on the inmate's "daily activities" and the extent to which the condition causes "chronic and substantial pain." *Id.* (citation omitted). The refusal to treat a patient suffering from what ordinarily would not be considered a serious medical condition also raises Eighth Amendment concerns if the condition is easily treatable and degenerative. *See Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (holding that "the refusal to treat an inmate's tooth cavity unless the inmate consents to extraction of another diseased tooth constitutes a violation of the Eighth Amendment"). The constitutional implications of a decision not to treat an inmate's medical condition depend on the specific facts of the case-"a prisoner with a hang-nail has no constitutional right to treatment, but ... prison officials [who] deliberately ignore an infected gash ... might well violate the Eighth Amendment." *Id.* at 137-37 (internal quotations and citations omitted).

**\*4** While the failure to treat an inmate's generalized asthmatic condition may not implicate the Eighth Amendment, "an actual asthma attack, depending on the severity, may be a serious medical condition." *Scott v. DelSignore,* No. 02 Civ. 029F, 2005 WL 425473, at \*9 (W.D.N.Y. Feb. 18, 2005); *see also Patterson v. Lilley,* No. 02 Civ. 6056, 2003 WL 21507345, at \*3-4 (S.D.N.Y. June 30, 2003). Indeed, "it is common knowledge that a respiratory ailment, such as asthma, can be serious and life-threatening. *Whitley v. Westchester County,* No. 97 Civ. 0420, 1997 WL 659100, at \*4 (S.D.N.Y. Oct. 22, 1997). An acute asthma attack is inarguably a "condition of urgency" that may cause "substantial pain" and that "reasonable doctor[s] or patient[s] would find important and worthy of comment or treatment." *Chance,* 143 F.3d at 702 (citation omitted); *see Whitley,* No. 97 Civ. 0420(SS), 1997 WL 659100, at \*4.

Plaintiff has alleged that on three separate occasions, he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

informed Defendant that he was unable to breathe. (Compl. at 4-5.) He also complained that his chest had "tighten[ed] up," and, later, that he was experiencing "chest pains." (Id.) Plaintiff resorted to using a fellow inmate's inhaler when Defendant refused to provide him with one, which suggests the seriousness of his need. (Id. at 5.) Moreover, by alleging in his Complaint that his asthma "started to act up," Plaintiff describes a time-specific incident more in line with an asthma attack than with a generalized asthmatic condition. (Id. at 4.)

Defendant cites *Reyes v. Corrections Officer Bay,* No. 97 Civ. 6419, 1999 WL 681490 (S.D.N.Y. Sept. 1, 1999), as a case similar to this one where the court found that the plaintiff did not allege a sufficiently serious medical condition. However, unlike the plaintiff in *Reyes,* who went ahead with his scheduled visit with his family after complaining of an asthma attack, Plaintiff continued to complain to officers of his condition. Plaintiff resorted to self-medication, by borrowing an asthma pump from a fellow inmate in order to alleviate his condition. In light of these facts, it can hardly be said that Plaintiff was merely suffering from "discomfort."

Accordingly, the Court finds that in his Complaint, Plaintiff alleges facts that he experienced an asthma attack, serious enough to constitute a sufficiently serious medical need for purposes of an Eighth Amendment claim.

3. Deliberate indifference

To satisfy the subjective prong of the deliberate indifference standard, Plaintiff must prove that the prison official was aware of, and consciously disregarded, the prisoner's medical condition. *Chance,* 143 F.3d at 703; *see also Farmer,* 511 U.S. at 837. The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance,* 143 F.3d at 702 (quoting *Farmer,* 511 U.S. at 837). While purposefully refusing to treat a serious medical condition constitutes deliberate indifference, it need not be the official's purpose to harm the inmate; "a state of mind that is the equivalent of criminal recklessness" is sufficient. *Hathaway,* 37 F.3d at 553.

*5 A physician's mere negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle,* 429 U.S. at 105-06; *Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

In the instant case, Plaintiff informed Defendant on a number of occasions that he was unable to breathe and that he was experiencing chest pains. (Compl. at 4.) While Defendant's initial decision not to take Plaintiff downstairs for immediate treatment is the sort of prisoner-physician dispute regarding the particularities of medical care that is outside the scope of the Eighth Amendment, the unmistakable inference to be drawn from Plaintiff's allegation that Defendant refused to provide an asthma pump when Plaintiff asked for Defendant's name is that Defendant withheld medical care as retaliation or punishment for Plaintiff's conduct. (Id.) Because consciously delaying treatment in order to punish or retaliate against an inmate meets the subjective standard for deliberate indifference, the Court finds that the Complaint adequately alleges that Defendant acted with the requisite culpable mental state in refusing to treat Plaintiff's asthma attack.

C. Qualified Immunity

Defendant's final argument for dismissal is that, as a government official, Dr. Williams is entitled to qualified immunity.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

At the outset, the Court notes that while a defendant may assert a qualified immunity defense on a Rule 12(b)(6) motion, "that defense faces a formidable hurdle when advanced on such a motion." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004). This is because "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (internal quotations and citations omitted). The plaintiff thus benefits from all reasonable inferences against the defendant's qualified immunity defense on a Rule 12(b)(6) motion. *Id.*

The defense of qualified immunity protects public officers, including prison physicians, from civil actions related to their conduct while they are acting in an official capacity so long as they do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003). Such a defense "serves important interests in our political system. It protects government officials from liability they might otherwise incur due to unforeseeable changes in the law governing their conduct." *Sound Aircraft Services, Inc. v. Town of East,* 192 F.3d 329, 334 (2d Cir.1999). Qualified immunity also serves the important public interest of "protecting public officials from the costs associated with the defense of damages action ... [including] the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from accepting public positions." *Crawford-El v. Britton,* 523 U.S. 574, 590 at fn. 12 (1998).

**\*6** Qualified immunity shields a defendant from liability "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Englarged Sch. Dist.,* 293 F.3d 246, 250 (2d Cir.2001); *Brosseau v. Haugen,* 125 S.Ct. 596, 599 (2004) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted"); *see*

*alsoHarlow,* 457 U.S. at 818-19.

"[A] court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 603, 609 (1999); *see also* *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). Determining the constitutional question first serves two purposes: it spares the defendant of unwarranted demands and liability "customarily imposed upon those defending a long drawn-out lawsuit" and determining the constitutional question first "promotes clarity in the legal standards for official conduct, for the benefit of both the officers and the general public ." *Id.*

If a deprivation of a constitutional right has been alleged, a court must determine whether the constitutional right was clearly established by determining: (1) if the law was defined with reasonable clarity, (2) if the Supreme Court or the law of the Second Circuit affirmed the rule, and (3) whether a reasonable defendant would have understood from existing law that the conduct was lawful. *See* *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 634, 640 (1987).

As the Supreme Court made clear in *Saucier,* determining whether the right in question was clearly established requires particularized, case-specific analysis. *Id.* at 201-02. The case-specific nature of the inquiry does not mean that official conduct is protected by qualified immunity whenever "courts had not agreed on one verbal formulation of the controlling standard." *Id* . at 202-03. A "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct" even if courts have not ruled on the constitutionality of the specific act in question, and previously decided cases with comparable but not identical facts influence the clarity of the right in question. *Hope v. Pelzer,* 536 U.S. 730 at 741 (2002) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). The fundamental question is whether "the state of the law" at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

the time of the alleged violation gave the defendant "fair warning" that his conduct was unconstitutional. *Id.*

**\*7** Even if the right is clearly established, "defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established protection." *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998). "[R]easonableness is judged against the backdrop of the law at the time of the conduct.... [T]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau,* 125 S.Ct. at 599.

In the present matter, the Court has already determined that Plaintiff's allegations, taken as true, indicate that Defendant violated Plaintiff's Eighth Amendment rights by refusing to treat Plaintiff's asthma attack in retaliation for Plaintiff's request for Defendant's name. *See supra* at 10-13.

With regard to whether the right allegedly violated was clearly established at the time of the violation, neither the Supreme Court nor the Second Circuit has held that an asthma attack constitutes a serious medical condition for purposes of a deliberate indifference claim. In considering whether Defendant nonetheless had fair warning of the unconstitutionality of the conduct he is alleged to have engaged in, the Court notes that the Second Circuit has repeatedly held as unlawful denials of treatment that "cause or perpetuate pain" falling short of torture and not resulting in death. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Among the conditions the Second Circuit has deemed serious for Eighth Amendment purposes are a tooth cavity, *Harrison,* 219 F.3d at 137; a degenerative hip condition, *Hathaway,* 99 F.3d 550, 551-52; a painful tissue growth, *Brock,* 315 F.3d at 161; a ruptured Achilles tendon that caused pain and swelling, *Hemmings v. Gorczyk,* 134 F.3d 104, 106-07 (2d Cir.1998); and an eye condition that led to blindness in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 87 (2d Cir.1996). These various conditions, held to be sufficiently serious, are not life-threatening, although they are painful. An asthma attack, however, can be both painful and fatal. Given the state of the law in the Second Circuit, Defendant had ample warning that the law prohibits a prison doctor from

consciously withholding medical care from an inmate with a painful and potentially fatal medical condition.

The Court finds that at this early stage of litigation, Defendant has not shown that he is entitled to qualified immunity.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is DENIED.

Defendant shall file an Answer to the Complaint within thirty (30) days of this Order.

SO ORDERED.

S.D.N.Y.,2005.
Kearsey v. Williams
Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Gary GILLARD, Plaintiff,
v.
Michael ROVELLI, et al., Defendants.
No. 9:09-CV-0860 (NAM/GHL).

Sept. 29, 2010.
Gary Gillard, Attica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Roger W. Kinsey, Esq., of Counsel, Albany, Ny, for Defendants.

### *REPORT-RECOMMENDATION and ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Gary Gillard alleges that Defendants subjected him to excessive force, threatened to tamper with his food and interfered with the delivery of sealed meals, denied him adequate medical care, and failed to properly respond to his grievances. Currently pending before the Court are Defendants' motion to vacate the text order entered March 10, 2010, (Dkt. No. 52), Plaintiff's objection to that request (Dkt. No. 55), Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. No. 42), and Plaintiff's cross-motion for summary judgment (Dkt. Nos. 72 and 77). For the reasons that follow, I order that Defendants' request to vacate the text order be granted, order that Plaintiff's objection to Defendants' request be denied, recommend that Defendants' motion to dismiss be granted in part and denied in part, and recommend that Plaintiff's

cross-motion for summary judgment be denied.

### I. BACKGROUND

In broad terms, Plaintiff's complaint involves four issues: the use of excessive force against him by inmate Perez and several DOCS employees, the denial of medical care for ailments he suffered prior to the excessive force incident and injuries he sustained as a result of the excessive force incident, Defendants' threats to tamper with Plaintiff's food, and the handling of grievances Plaintiff filed as a result of these issues.

### A. Excessive Force, Associated Grievances, and Associated Medical Care.

On December 24, 2008, Plaintiff wrote to Defendants David Rock (Superintendent of Great Meadow Correctional Facility), P. Heath (First Deputy Superintendent), and C.F. Kelly (Deputy of Security) advising them that there was a conspiracy between Defendant Correction Officer Michael Rovelli and other correctional officers to arrange a vigilante gang assault on or murder of Plaintiff. (Dkt. No. 1 ¶ 36.) On December 26, 2008, Plaintiff received a letter from a correctional facility specialist stating that his letter had been forwarded to Defendant David Rock. *Id.* ¶ 38. On January 3, 2009, Plaintiff received a letter from Captain Eastman acknowledging receipt of Plaintiff's complaint. (Dkt. No. 1 ¶ 40.)

On January 6, 2009, Plaintiff wrote a letter to Defendant Richard Roy of the Inspector General's office describing Defendant Rovelli's continued threats and harassment and expressing fear about what would happen to him when he was released from keeplock on January 10, 2009. *Id.* ¶ 41. On January 8, 2009, Vernon Fonda of the Inspector General's office informed Plaintiff that his grievance was being forwarded to Defendant David Rock for further action. *Id.* ¶ 42.

Plaintiff alleges that on February 4, 2009, an inmate "cut the plaintiff in the hearing room on behalf of Michael Rovelli." (Dkt. No. 1.¶ 43.)

**\*2** On February 5, 2009, Defendant Rovelli told

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

Plaintiff that "it's not over yet mother fucker, go tell you rat bitch mother fucker remember it[']s not over." *Id.* Later that day, Defendant Rovelli shouted at Plaintiff "go rat [,] Gary you fuck[i]n' rat." *Id.* ¶ 44.

On February 11, 2009, Defendant Rovelli came to Plaintiff's cell and said "I have the power not you. I brought you back. It's not over yet and the next one will be better[,] you piece of shit." *Id.* ¶ 45. Thereafter, Defendant Rovelli had Defendant Correction Officer M. Rock assist him in denying food to Plaintiff in order to "keep him weak so he could not defend himself against the setup contract [h]it." *Id.* ¶ 46.

On April 25, 2009, Plaintiff went to the big recreation yard for the first time in about two months. *Id.* ¶ 47. Two inmates informed him that Defendant M. Rock had told Defendant Rovelli that Plaintiff was in the yard and that "today was a good day to get him ." *Id.* As Plaintiff walked around the yard, he noticed Defendant Rovelli glaring at him. *Id.* ¶ 48. Defendant Rovelli went to a table where Defendant inmate Eric Perez was sitting. *Id.* Shortly thereafter, Defendant Perez attacked Plaintiff without warning. *Id.* Plaintiff attempted to defend himself and hoped the officers would stop the attack. (Dkt. No. 1 ¶ 49.) Instead, Defendant Rovelli forced his knee into Plaintiff's head and said "I told you I would get you[.] You just got beat by a fagg[o]t[,] you can't fight." *Id.* Defendant Rovelli then instructed Defendant Corrections Officer Frank Flores to take Plaintiff "into beat up Room # 1[,] I'll be right there." *Id.* ¶ 50.

Once in the room, Plaintiff was placed with his toes and face to the wall. *Id.* ¶ 51. Defendant Sergeant Nicholas Deluca entered the room and said "Perez should have put [six] inches of ste[e]l into you, you piece of shit, but we will finish what he started." *Id.* ¶ 52. Then Defendant Rovelli came in, said "you can't fight, you got beat by a fagg[o]t," and slammed Plaintiff's face into the wall twice. *Id.* ¶ 53. Plaintiff's "lights went out" and he "could not see for a few seconds but heard [Defendant] Rovelli state his face was bleeding as well as the plaintiff[']s." *Id.* Plaintiff was then "beaten to the flo[or]" by Defendants Deluca and Flores and Defendant Correction Officer Shattuck as blood ran nonstop from two cuts around Plaintiff's right eye. *Id.* ¶ 54. Plaintiff tried to "cover up into the wall to

stop the blows from reaching [his] face," but Defendant Rovelli grabbed the hood of Plaintiff's sweat suit and exposed his face so that Defendant Rovelli and Defendants Deluca, Flores, and Shattuck could hit it. *Id.* ¶ 55. This continued for fifteen or twenty minutes. *Id.* Plaintiff's hands were cuffed behind his back the entire time. *Id.* Defendant Sergeant Colin Fraser, Defendant Sergeant Michael Hoy, and Defendant Correction Officer H. Foster joined in by kicking Plaintiff in the back, head, buttocks, legs, spine, and shoulders. *Id.* ¶ 56.

**\*3** Defendants Deluca and Shattuck forced Plaintiff onto his feet "due to the large amount of blood all over the floor and [P] laintiff s clothing" and took him to a different room. *Id.* ¶ 57. There, Defendant Shattuck pinned Plaintiff against a sink and punched Plaintiff in the ribs and back while Defendant Deluca hit Plaintiff in the face, eyes, nose, and jaw. (Dkt. No. 1 ¶ 57.)

Once the blood was cleaned up in the first room, Defendants Deluca and Shattuck returned Plaintiff there and punched him in the face, knocking him to the floor. *Id.* ¶ 58. Defendants Deluca and Shattuck continued to kick and stomp Plaintiff's legs, ankles, ribs, and chest. *Id.* As this was happening, Defendant Fisher Nesmith opened the door and said "[A]re you done yet[?] If not, take your time." *Id.* ¶ 59. Defendant Nesmith then slammed the steel door into Plaintiff's head as he lay "on the floor bloody and broken up." *Id.*

After the beating was over, Plaintiff was taken to an examination room. There, Defendant J. Leos "did a vis[ua]l inspection" of Plaintiff and documented some of Plaintiff's injuries. *Id.* ¶ 60. Plaintiff alleges that these injuries included broken ribs, broken left hand, and broken eardrum. *Id.* ¶ 62. Defendant Leos did not say anything or ask any questions. *Id.* ¶ 60. He did not give Plaintiff any medical assistance other than to wash the blood off of Plaintiff's face and head. *Id.* Defendant Leos entered a false time on his report to "cover up for beating." *Id.* Defendant Nesmith then attempted to stitch the cuts around Plaintiff's eye, but Plaintiff refused treatment because Defendant Nesmith had participated in the use of excessive force. *Id.* ¶ 61.

Pictures were taken of Plaintiff's injuries. *Id.* ¶ 63.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

Defendant Foster and Defendant Sergeant Nabozny then escorted Plaintiff to the Special Housing Unit ("SHU"). *Id.*

After the beating, Plaintiff saw Defendant Counselor Brian McAllister. *Id.* ¶ 65. Plaintiff asked Defendant McAllister to contact Plaintiff's family and inform them of his injuries. *Id.* Later, Plaintiff's family contacted the prison and Defendant McAllister refused to give them any information. *Id.* ¶ 66.

Sometime after the alleged use of excessive force, Plaintiff was taken to the medical unit, where he was seen by Defendant Janet Collins. (Dkt. No. 1 ¶ 70.) She informed him that his "left eardrum had a hole in it but it should heal in time" and gave him ibuprofen for pain. *Id.* Plaintiff asked for x-rays of his face, neck, back, and left hand and an H.I.V. test due to the "cutting" on February 4, 2009. *Id.* Defendant Collins told Plaintiff that the pain "was from getting old" and denied his request for x-rays. *Id.*

Plaintiff alleges that in order to cover up the use of excessive force, Defendant Lieutenant K.H. Smith, Defendant Lieutenant Peter Besson, and Defendants Kelly, Foster, Flores, Shattuck, Rovelli, Hoy, and Deluca filed false misbehavior reports charging Plaintiff with fighting, violent conduct, refusing a direct order, and assault on staff. *Id.* ¶ 67.

**\*4** Plaintiff filed three grievances regarding the use of excessive force and the medical care he received thereafter. *Id.* ¶ 68. No one responded. *Id.*

**B. Medical Issues Predating the Alleged Use of Excessive Force**

On October 20, 2008, Plaintiff filed a grievance because he was denied access to sick call. (Dkt. No. 1 ¶ 83.) Plaintiff alleges that his grievance was denied "at all levels of [a]ppeal." *Id.*

On March 26 and 29, 2009, Plaintiff submitted requests to be seen at sick call to receive medication and an AIDS/HIV test due to being cut by an inmate. *Id.* ¶¶ 84, 85.

On April 8, 2009 Plaintiff filed another grievance. *Id.*

¶ 86.

On April 10, 2009, Plaintiff was seen by Defendant Silverberg but was told it was a "[five] year physical" rather than an appointment to address Plaintiff's concerns. *Id.* ¶ 87. Plaintiff then refused treatment. *Id.* Afterward, Plaintiff filed another grievance regarding the denial of treatment for his medical concerns. (Dkt. No. 1 ¶ 88.)

On April 14, 2009, Plaintiff was seen by Defendant Lindemann who informed Plaintiff that because he refused the five year physical he would receive no more treatment. *Id.* ¶ 89. At Plaintiff's request Defendant Lindemann checked Plaintiff's throat but found nothing. *Id.* Plaintiff claims he had been "hacking all day every day" for "over [one] year." *Id.* Afterward, Plaintiff filed another grievance regarding medical care. *Id.* ¶ 90.

On April 17, 2009, Plaintiff received a response from the Superintendent's office stating that after a review of Plaintiff's medical records, Plaintiff had received the opportunity to address his concerns and had received "[a]dequate medical care as well as medication." *Id.* ¶ 93.

Plaintiff alleges that he was called to see Defendant Silverberg on April 24, 2009, but that he was "forced to sit 20 minutes" after the Defendant Nurse Labrum took his vitals by Defendant Silverberg, who "was in a room doing nothing just to make the plaintiff suffer." (Dkt. No. 1 ¶ 95.) When Defendant Silverberg "finally" called Plaintiff into the examination room, he said "so, we are going to look at your throat today." *Id.* ¶ 96. When Plaintiff asked "what about the ears, headaches, and HIV test," Defendant Silverberg said "only the throat[,] one thing at a time." *Id.* Plaintiff "objected and stated it's been over 1 year and every time is denied the review of issues and concern[ ]s of matters that are not getting check out ever." *Id.* Defendant Silverberg then looked into Plaintiff's throat and said he did not see anything. *Id.* ¶ 97. Plaintiff asked him to get "the stix" and look at the back of his throat. *Id.* Without putting on a glove, Defendant Silverberg grabbed a "stix," handled it from "one end to the other" and told Plaintiff to open his mouth. *Id .* When Plaintiff objected "to this unhygienic act," Defendant Silverberg "threw the stix to the floor and said do not come [b]ack ever to sick call." *Id.*

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

**\*5** Plaintiff alleges that Defendant David Rock was "continuously ... informed of the medical needs of the [P]laintiff and the deliberate black balling by [the] medical department, [but] has refused to stop, correct or grant any medical relief and continued to file false response[s] to all matters of concern thus causing the [P]laintiff to live in continued pain day and night without relief." (Dkt. No. 1 ¶ 98.)

**C. Issues with Plaintiff's Food**

After the use of excessive force, Defendant Deluca told Plaintiff that he should not eat prison food because "we control everything[,] even the inmates who make your food." *Id.* ¶ 64. Plaintiff went on a hunger strike because of this threat concerning his food. *Id.* ¶¶ 69, 78, 79. In response, Defendant Heath ordered that Plaintiff receive sealed kosher meals. *Id.* ¶ 69. On May 1, 2009, "the meals w[ ]ere stopped by someone overriding that order" and Plaintiff went back on hunger strike. *Id.* ¶ 71.

Defendant David Lindemann came to Plaintiff's cell on May 5, 2009, "threatening the plaintiff and demanding the plaintiff come to the gate or he will have the plaintiff [d]ragged to the [h]ospital to be force[ ] fe[ ]d." (Dkt. No. 1 ¶ 72.) A few minutes later, four officers and a sergeant ordered Plaintiff out of his cell and force-walked him to the medical unit. *Id.* Plaintiff was "force[d]" to see Defendant Doctor Howard Silverberg, who "has continued to file false information into plaintiff's medical file, refuse to give medical treatment or medication for [i]llness.... Silverberg ask[ed] [whether] I[was] going to eat the food I stated no he said Good we get to force feed you, you will not enjoy that I assure you and walked out ordering staff to place me in Isolation Room # 2." (Dkt. No. 1 ¶ 73.) Defendant Deluca came into the room. *Id.* ¶ 74. He said he hated Plaintiff and hoped that he would die. *Id.* He also informed Plaintiff that he "can't wait to start the force feeding as he will be there two times a day to put shit down the plaintiff's throat." (Dkt. No. 1 ¶ 74.) Defendant Heath came to the hospital "seeking to resolve the [h]unger [s]trike [i]ssue and state[d] what[ ]ever the doctor states will be the outcome if he orders medical meal then you will get it." *Id.* ¶ 75.

On "May 7, 2009, Doctor Carandy came to talk to

plaintiff with ... other officers [and] stated he would give [d]iet meal sealed exrays (sic) and medication for pain ... Carandy stated if we don[']t give him the meal it will only start the hunger strike all over again." (Dkt. No. 1 ¶ 76.)

On May 8, 2009, Defendant Nurse Terry "in retaliation stated the plaintiff refused [x-rays] and threatened him he would be out of there that day." *Id.* ¶ 77. Plaintiff was ultimately given sealed diet meals three times a day but was "forced to eat it with a tube of toothpaste due to officers refusing to give a spoon in [r]etaliation." *Id.* ¶ 78.

**\*6** On May 11, 2009, Plaintiff was returned to the SHU. *Id.* ¶ 79. Once Plaintiff was returned to the SHU, Defendant Deluca and Defendant Terry stopped deliveries of Plaintiff's special meals. *Id.* ¶ 76. Plaintiff "lived on water [,] milk[,] sugar and sealed [i]tems that came with different meals starving in fear of being poisoned." *Id.*

**II. DEFENDANTS' MOTION TO VACATE THE COURT'S MARCH 10, 2010, ORDER**

On February 5, 2010, Plaintiff requested the entry of default against Defendants Shattuck, Poirier, Fischer, Nesmith, Lindemann, Labrum, Kelly, Flores, and Aubin. (Dkt. No. 47.) On March 10, 2010, I granted Plaintiff's request in part and denied it in part. (Text Order of Mar. 10, 2010.) Noting that Defendants Kelly, Nesmith, Lindemann, Fischer, and Labrum are explicitly mentioned in Defendants' memorandum of law regarding motion to dismiss, I denied the request as to those Defendants. *Id.* However, I granted the request as to Defendants Flores, Shattuck, Aubin, and Poirier because they had not answered the complaint and were not mentioned in Defendants' notice of motion to dismiss (Dkt. No. 42), the proof of service of the motion to dismiss (Dkt. No. 42), or anywhere in Defendants' memorandum of law filed in support of the motion to dismiss (Dkt. No. 42-1). (Text Order of Mar. 10, 2010.) It was therefore "unclear whether [they] are included in the motion to dismiss." *Id.*

On March 12, 2010, Defendants filed a request to set aside the default. (Dkt. No. 52.) In that letter, defense counsel stated:

I had thought that by specifically indicating that the motion was being made on their behalf by expressly

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

stating as much with the Court's electronic filing system, that it would be clear the motion was being made on behalf of all the persons I so designated ... I verily believed that by using the Court-supplied filing system and expressly indicating therein that I was filing the motion on behalf of all these 28 clients ... that those contemplating the motion would realize that the motion to dismiss was being made on behalf of all 28 of the individuals indicated. I did not realize that by expressly indicating that the motion was being filed on their behalf with the electric filing system that there could be confusion as to on whose behalf I was making the application.

*Id.* at 1.

The twenty-eight names that counsel listed in the entry on the Court's electronic filing system included two defendants (M. Rock [FN1] and Brian Fischer [FN2]) who have never been served. The list also included one Defendant (David Rock) for whom the Court did not receive an acknowledgment of service form until six weeks after the motion to dismiss was filed. (Dkt. No. 58.) Moreover, the list did not include one Defendant (Terry), who has not been served [FN3] but about whom defense counsel asserted arguments in the memorandum of law. (Dkt. No. 42-1 at 11.) Thus, the list that defense counsel cites as being "clear" was inaccurate and, thus, unreliable.

FN1. When Plaintiff completed USM-285 forms for service of the complaint, he indicated that Defendant M. Rock's true name was Todd Martineau. (Dkt. No. 11.) The Clerk advised Plaintiff that he would need to amend his complaint to substitute Todd Martineau's name before he could be served with the complaint. *Id.* To date, Plaintiff has not amended his complaint to name "Todd Martineau" or filed any forms requesting service on "M. Rock." Therefore, Defendant "M. Rock" has not been served and has not appeared in the action.

FN2. The summons for Defendant Fischer was returned unexecuted, accompanied by a note from the United States Marshal for the Northern District of New York indicating that Defendant

Fischer had not returned the Acknowledgment of Receipt of Summons and Complaint by Mail form within thirty days of the initial mailing of the summons. (Dkt. No. 62.) The note instructed Plaintiff to submit a new summons and complaint form to serve Defendant Fischer and warned that failure to do so could result in dismissal of the complaint against Defendant Fischer. *Id.*

FN3. The summons for Defendant Terry was returned unexecuted, accompanied by a note from the Inmate Records Coordinator stating that she was unable to identify Nurse Terry and would need more information. (Dkt. No. 29.) On February 3, 2010, the Clerk forwarded a copy of the note to Plaintiff and asked him to provide any additional information about the defendant to the Court. (Dkt. No. 46.)

*7 In light of this ambiguity, before granting the request for entry of default, the Court thoroughly reviewed Defendants' memorandum of law and found no mention of Defendants Flores, Shattuck, Aubin, or Poirier. The Court found this omission particularly striking in the case of Defendants Aubin and Poirier, who easily could have been included (as discussed more fully below) in the section of the memorandum of law discussing lack of personal involvement. Further, it appeared to the Court that Defendants' motion, despite not being labeled as such, was only a partial motion to dismiss because it did not assert any reasons for dismissing Plaintiff's excessive force claims. Thus, it was reasonable to conclude that perhaps the motion had not been filed on behalf of every Defendant. Based on this ambiguity, and the apparent confusion it caused Plaintiff (a *pro se* civil rights litigant, to whom I must grant special solicitude), entry of default was appropriate as of March 10, 2010.

However, I now grant Defendants' motion to set aside the default. Pursuant to Rule 55(c) of the Federal Rules of Civil Procedure, "[t]he court may set aside an entry of default for good cause ..." [FN4] It is well-settled in the Second Circuit that defaults are not favored, and that there is a strong preference for resolving disputes on their merits. *See Brien v. Kullman Indus., Inc.,* 71 F.3d 1073, 1077 (2d Cir.1995); *Traguth v. Zuck,* 710 F.2d 90, 94 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

Cir.1983). In light of Defendants' clarification of their ambiguous motion, I find that they have established good cause to set aside the default, and I therefore order the Clerk to vacate the text order of March 10, 2010, and the entry of default (Dkt. No. 51).

> FN4. Rule 60(b) provides, *inter alia,* that in the case of "mistake, inadvertence, surprise or excusable neglect," a court may relieve a party from a final judgment, order or proceeding. Fed.R.Civ.P. 60(b).

### III. DEFENDANTS' MOTION TO DISMISS

### A. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." Id. at 1950 (internal citation and punctuation omitted).

**\*8** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as

true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

### B. Medical Care

Plaintiff alleges that Defendants Silverberg, Nesmith, Lindemann, Labrum, Leos, and Collins violated his Eighth Amendment rights by failing to provide him with adequate medical care.[FN5] (Dkt. No. 1 ¶¶ 60, 61, 68, 70, 72-73, 76-77, 87-89, 94-98.) Plaintiff's claims against Defendants Leos, Nesmith, and Collins relate to medical care for injuries sustained as a result of the alleged use of excessive force. Plaintiff's claims against Defendants Silverberg, Lindemann, and Labrum relate to medical care prior to the incident. Defendants argue that Plaintiff has failed to state an Eighth Amendment claim.[FN6] (Dkt. No. 42-1 at 5-11.)

> FN5. Defendants' motion to dismiss does not explicitly address the Eighth Amendment medical claims against Defendants Labrum or Nesmith.

> FN6. Defendants assert that the complaint also alleges that Defendants McAllister, Deluca, Heath, and Holland violated Plaintiff's Eighth Amendment right to adequate medical care. (Dkt. No. 42-1 at 11.) The complaint does not appear to allege that Defendant McAllister was involved in Plaintiff's medical care. Rather, it alleges that Defendant McAllister was a corrections counselor (Dkt. No. 1 ¶ 31) who failed to inform Plaintiff's family about his injuries. (Dkt. No. 1 ¶¶ 65-66.) The complaint does not appear to allege that Defendant Deluca was involved in Plaintiff's medical care. Although allegations about him appear in a section of the complaint titled "Statement of Facts, Misuse of Force, Denial of Medical Care," those allegations involve excessive force, threats, false misbehavior reports, and issues with Plaintiff's food. (Dkt. No. 1 ¶¶ 52, 54-55, 57-58, 64, 67, 69, 74, 76.) The complaint does not appear to allege that Defendant Heath was involved in Plaintiff's medical care. Rather it alleges that he

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

was informed about Defendant Rovelli's threats against Plaintiff and was involved in issues regarding Plaintiff's food. (Dkt. No. 1 ¶¶ 36, 39, 69, 75.) Regarding Defendant Holland, the complaint alleges only that he failed to investigate the "setup, [b]eating[,] and complaints." (Dkt. No. 1 ¶ 80.)

The Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Farmer,* 511 U.S. at 832 (citing *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)). There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). Defendants argue that Plaintiff has not stated a claim as to either element. (Dkt. No. 42-1 at 10-11.) I will address Plaintiff's pre-excessive force claims and post-excessive force claims separately.

1. *Medical Care for Injuries Sustained in Alleged Excessive Force Incident*

Plaintiff alleges that Defendants Leos, Nesmith, and Collins were deliberately indifferent to the following injuries that Plaintiff sustained in the alleged excessive force incident: (1) a loss of consciousness that lasted for a few seconds; (2) two cuts around his right eye, which bled profusely; (3) broken ribs; (4) broken hand; and (5) broken ear drum. (Dkt. No. 1 ¶¶ 53, 54, 62, 70.)

*\*9* Defendants argue that the complaint fails to satisfy the objective prong of the Eighth Amendment inquiry because Plaintiff "fails to articulate a serious medical need." (Dkt. No. 42-1 at 10.) A "serious medical condition" is "a condition of urgency, one that may

produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

Defendants address only Plaintiff's allegation that he suffered two cuts around his eye, arguing without citation to authority that the allegation does not "present or describe a serious medical need ." (Dkt. No. 42-1 at 10.) I find that the complaint alleges facts plausibly suggesting that Plaintiff suffered injuries that could "produce death, degeneration, or extreme pain" as a result of the alleged use of excessive force. *See Jackson v. Johnson,* 118 F.Supp.2d 278, 291 (N.D.N.Y.2000) (loss of consciousness is a serious medical condition); *Ellis v. Guarino,* No. 03 Civ. 6562, 2004 U.S. Dist. LEXIS 16748, at*33-34, 2004 WL 1879834, at *11 (S.D.N.Y. Aug. 24, 2004) ("When Plaintiff arrived at the SHU followed the alleged attacks ... he allegedly had swelling on his face, contusions in both ears and on his forehead, abrasions on his shoulder, a one millimeter laceration in his right eye, and suffered from blurred vision, headaches, dizziness and ringing in his ears, the latter two of which continued for several days thereafter.... Such injuries clearly constitute a serious medical condition for Eighth Amendment purposes."); *Griffin v. Donelli,* No. 05-CV-1072 (TJM/DRH), 2010 U.S. Dist. LEXIS 125271, at *22, 2010 WL 681394, at *8 (N.D.N.Y. Feb. 24, 2010) (*citing Torres v. New York City Dep't of Corrs.,* No. 93-CV-6296 (MBM), 1995 U.S. Dist. LEXIS 1698, at *4, 1995 WL 63159, at *1 (S.D.N.Y. Feb. 15, 1995)) (stating that a broken rib "could present a serious medical need" if treatment was not properly administered); *Bryan v. Endell,* 141 F.3d 1290, 1291 (8th Cir.1998) (broken hand is a serious medical condition); *Odom v. Kerns,* No. 99-CV-10668, 2008 U.S. Dist. LEXIS 47336, at *27-28,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

2008 WL 2463890, at * 8 (S.D.N.Y. June 18, 2008) (ruptured eardrum is a serious medical condition).

Defendants argue that Plaintiff's complaint does not state a claim as to the subjective Eighth Amendment prong because the "shear number of examinations, discussions and attempts to aid [P]laintiff forecloses any allegation of indifference, deliberate or otherwise...." (Dkt. No. 42-1 at 11.)

**\*10** Medical mistreatment rises to the level of deliberate indifference where it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle v. Gamble,* 429 U.S. 97, 105-06 (1976). Moreover, a complaint that "a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* at 106. Stated another way, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith,* 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

I find that Plaintiff has alleged facts plausibly suggesting that Defendant Leos was deliberately indifferent to his serious medical needs. Plaintiff alleges that "[a]fter the beating was over the plaintiff was ... taken to [an] exam room where J. Leos did a visual inspection of the plaintiff[']s body documenting all of the injur[ie]s

not saying anything of asking any questions and gave no medical assistance other than wash the blood off the face and head of the plaintiff." (Dkt. No. 1 ¶ 60.) Plaintiff alleges that Defendant Leos entered a false time on his medical note in order to cover up the beating. *Id.* Accepting Plaintiff's allegations that his ribs, hand, and eardrum were broken as a result of the alleged excessive force incident as true, as I must for the purposes of this motion, the complaint plausibly suggests that Defendant Leos was aware of facts from which he could have drawn the inference that Plaintiff had a serious medical need, actually drew that inference, and ignored that medical need. Therefore, I recommend that the Court deny Defendants' motion to dismiss the Eighth Amendment medical claim against Defendant Leos.

Plaintiff has not stated an Eighth Amendment medical claim against Defendant Nesmith or Defendant Collins. Plaintiff admits that he refused treatment when Defendant Nesmith attempted to stitch the cuts around Plaintiff's eye. (Dkt. No. 1 ¶ 61.) Given Plaintiff's allegations about Defendant Nesmith's earlier conduct, Plaintiff's refusal is understandable. However, it negates his allegation that Defendant Nesmith was deliberately indifferent to his serious medical needs. *See Rivera v. Goord,* 253 F.Supp.2d 735, 756 (S.D.N.Y.2003). Plaintiff's allegations regarding Defendant Collins amount to mere disagreement regarding proper treatment, which is insufficient to establish deliberate indifference. *Estelle,* 429 U.S. at 107 ("[T]he question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice...."). Therefore, I recommend that the Court grant Defendants' motion to dismiss the Eighth Amendment medical claim against Collins and that the Court *sua sponte* dismiss the Eighth Amendment medical care claim against Defendant Nesmith.

**\*11** Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted). Because Plaintiff has admitted that he refused care from Defendant Nesmith, I recommend that the Court dismiss the Eighth Amendment medical claim against Defendant Nesmith without leave to amend. However, I recommend that the medical claim against Defendant Collins be dismissed without prejudice.

2. *Medical Care For Conditions That Pre-Dated the Alleged Use of Excessive Force*

Plaintiff alleges that Defendants Silverberg, Lindemann, and Labrum were deliberately indifferent to medical conditions that predated the alleged use of excessive force. (Dkt. No. 1 ¶¶ 70, 87, 89, 95-97.) Those conditions were: (1) a need for H.I.V. testing "due to cutting on February 4, 2009"; (2) a need for asthma medication; (3) a "cough in throat due to bum[p]s growing in throat area" that lasted over a year; (4) a rash on his face; (5) a need for nose spray; (6) elbow pain that lasted for five years; (7) lower back and spine pain; (8) left ankle pain; and (9) a need for glasses. (Dkt. No. 1 ¶¶ 84-85, 89, 92.)

Defendants argue that these claims should be dismissed because Plaintiff has not sufficiently alleged any serious medical need or deliberate indifference. (Dkt. No. 42-1 at 5-11.) Defendants are correct. Plaintiff has not alleged facts plausibly suggesting that any of these conditions were injuries that a reasonable doctor or patient would find important and worthy of comment or treatment, that they affected his daily activities, or that they caused chronic and substantial pain. *Chance,* 143 F.3d at 702-03; *Sledge v. Kooi,* 564 F.3d 105, 107, 108 (2d Cir.2009) (asthma not a serious medical condition); *Lewal v. Wiley,* 29 Fed. App'x 26, 29 (2d Cir.2002) (persistent rash is not a serious medical condition); *Veloz v. New York,* 35 F.Supp.2d 305, 309, 312 (S.D.N.Y.1999) (prisoner's foot problem, which involved arthritis and pain, did not constitute a serious medical need); *Veloz v. New York,* 339 F.Supp.2d 505, 522-26 (S.D.N.Y.2004) (plaintiff's chronic back pain and mild to moderate degenerative arthritis of spinal vertebrae did not establish a serious medical need; *but see Sereika v. Patel,* 411 F.Supp.2d 397, 406

(S.D.N.Y.2006) (allegations of "severe pain ... [and] reduced mobility ..." in the shoulder are sufficient to raise a material issue of fact as to a serious medical need).

Even if Plaintiff had alleged facts plausibly suggesting the existence of a severe medical condition, I would recommend dismissing the claims against Defendants Lindemann, Labrum, and Silverberg because Plaintiff has not sufficiently alleged deliberate indifference. Plaintiff alleges merely that at his request, Defendant Lindemann checked his throat and found nothing. Although he told Plaintiff that Plaintiff could not receive further treatment, Plaintiff did in fact see a doctor again only ten days later. Regarding Defendant Labrum, Plaintiff alleges only that she took his vital signs and had him wait twenty minutes to see Defendant Silverberg. Although Plaintiff alleges that Defendant Silverberg behaved somewhat unprofessionally, these allegations as currently pleaded do not rise to the level of deliberate indifference. Therefore, I recommend that the Court dismiss the Eighth Amendment medical claims against Defendants Lindemann, Labrum, and Silverberg without prejudice.

**C. Personal Involvement**

**\*12** Defendants argue that the complaint does not plausibly allege that Defendants Fischer,[FN7] Roy, David Rock, Heath, Nabozny, or Kelly[FN8] were personally involved in any alleged constitutional violation. (Dkt. No. 42-1 at 12-14.) With the exception of Defendant Kelly, Defendants are correct.

> FN7. As noted above, according to the Court's records Defendant Fischer has not been served in this action. (Dkt. No. 62.)

> FN8. Defendants also argue that "Plaintiff has merely alleged *respondeat superior* liability" against Defendant Collins and that Plaintiff "names Defendant Labrum but makes no further allegation." (Dkt. No. 42-1 at 12-13.) This is inaccurate. As discussed above, Plaintiff claims that each of these Defendants violated his Eighth Amendment right to adequate medical care.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a cause of action under 42 U .S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[FN9]

> **FN9.** The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531 (S.D.N.Y.2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The complaint does not include any allegations about Defendants Fischer, Aubin, or Poirier.[FN10] Therefore, I recommend that the claims against these Defendants be dismissed for lack of personal involvement.

> **FN10.** As discussed above, Defendants did not explicitly argue that the action against Defendants Aubin and Poirier should be dismissed. Mroreover, although Defendants

argue that Defendant Fischer was not personally involved, Defendant Fischer has not yet been served in this action. (Dkt. No. 62.) I recommend that the Court dismiss these Defendants *sua sponte* without prejudice.

Regarding Defendants Roy and Heath, the complaint alleges only that they failed to respond to Plaintiff's letters and grievances. (Dkt. No. 1 ¶¶ 36, 39, 41, 69, 75.) A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy that violation after learning of it through a report or appeal" or "exhibited deliberate indifference ... by failing to act on information indicating that the violation was occurring." *Rivera v. Goord,* 119 F.Supp.2d 327, 344-45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Similarly, "an allegation that an official ignored a prisoner's letter of protest and request for investigation of allegations made therein is insufficient to hold that official liable for the alleged violations ." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (quoting *Greenwald v. Coughlin,* No. 93 Civ. 6551, 1995 U.S. Dist. LEXIS 5144, at *11, 1995 WL 232736, at * 4 (S.D.N.Y. Apr. 19, 1995)). Therefore, I recommend the claims against Defendants Roy and Heath be dismissed for lack of personal involvement.

**\*13** The complaint alleges that Defendant David Rock ignored several grievances (Dkt. No. 1 ¶¶ 36, 39) and that his response to a grievance regarding medical care pre-dating the excessive force incident was unsatisfactory (Dkt. No. 1 ¶ 93). As discussed in the previous paragraph, the allegation that Defendant David Rock failed to respond to grievances is insufficient to plausibly suggest that he was personally involved in any constitutional violation. As discussed above in Section III(B)(2), Plaintiff has not stated an Eighth Amendment claim regarding medical care pre-dating the excessive force incident. Thus, Defendant David Rock was not made aware of an Eighth Amendment medical violation and was not personally involved with any constitutional violation. Therefore, I recommend that the Court dismiss the claims against Defendant David Rock without prejudice.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

Regarding Defendant Nabozny, the complaint alleges, in full, that "Pictures were taken of the plaintiff's injuries with 2 different cameras as the visual inspection and pictures being take[n] w[ ]ere all on video the the (sic) video escorted the plaintiff to ... Special Housing Unit by Defendant Foster and Defendant Nabozny." (Dkt. No. 1 ¶ 63) (syntax in original). This is insufficient to allege Defendant Nabozny's personal involvement in any constitutional violation and I therefore recommend that Defendants' motion to dismiss the claim against Defendant Nabozny be granted. Defendants argue that "Plaintiff has merely alleged *respondeat superior* liability" against Defendant Kelly. (Dkt. No. 42-1 at 13.) This is not accurate. The complaint alleges that Defendant Kelly participated in writing false misbehavior reports to cover up the excessive force incident. (Dkt. No. 1 ¶ 67.) This allegation is potentially sufficient to state a claim against Defendant Kelly for retaliation. *See Snyder v. McGinnis, No. 03-CV-0909, 2004 U .S. Dist. LEXIS 17976, at *24-26, 2004 WL 1949472, at *8 (W.D.N.Y. Aug. 31, 2004).* Therefore, I recommend that the Court deny Defendants' motion to dismiss the claim against Defendant Kelly for lack of personal involvement.

**D. Claim Against Defendant McAllister**

Plaintiff alleges that Defendant McAllister violated his legal rights by failing to communicate with his family regarding his injuries. (Dkt. No. 1 ¶¶ 65-66.) Defendants move to dismiss this claim, arguing that "[v]iolations of state law or regulations in themselves do not state a viable section 1983 claim." (Dkt. No. 42-1 at 14.) Neither Plaintiff nor Defendants have identified what policy Defendant McAllister's actions may have violated. In any case, I find that the complaint does not plausibly suggest that Defendant McAllister violated any constitutional right and therefore recommend that the Court grant Defendants' motion to dismiss the claim.

**E. Threats**

Plaintiff alleges that, at various times, Defendants Rovelli, Deluca, Lindemann, and Silverberg threatened him. (Dkt. No. 1 ¶¶ 43-45, 64, 72-74.) Defendants argue that Plaintiff's allegations that Defendants Deluca, Lindemann, and Silverberg threatened him do not state a constitutional claim. [FN11] (Dkt. No. 42-1 at 14-16.)

Defendants' motion does not address the allegations that Defendant Rovelli threatened Plaintiff.

> [FN11.] Defendants also characterize the allegations in Paragraph 75 of the complaint regarding Defendant Heath's statement that "what ever the doctor states will be the outcome if he orders medical meal you will get it" as an allegation that Defendant Heath threatened Plaintiff. (Dkt. No. 42-1 at 15.) It does not appear to the undersigned that Plaintiff alleges that Defendant Heath threatened him. However, to the extent that the complaint can be read to assert such a claim, I recommend that it be dismissed with prejudice.

**\*14** "It is well established that mere threatening language and gestures of a custodial officer do not ... amount to constitutional violations." *Alnutt v. Cleary,* 913 F.Supp. 160, 165 (W.D.N.Y.1996) (punctuation omitted). Therefore, to the extent that Plaintiff alleges that Defendants Rovelli, Deluca, Lindemann, and Silverberg violated his constitutional rights simply by threatening him, I recommend that the Court dismiss those claims with prejudice.

**F. Claim Against Defendant Holland**

The complaint alleges that Defendant Holland [FN12] was "allegedly investigating the setup, [b]eating and complaints which was not the fact at all." (Dkt. No. 1 ¶ 80.) Prisoners do not have a due process right to a thorough investigation of grievances. *Torres v. Mazzuca,* 246 F.Supp.2d 334, 341-42 (S.D.N.Y.2003).

> [FN12.] Defendant Holland is listed in the complaint as "Hollin." Defendants note that "Holland" is the correct spelling. (Dkt. No. 42-1 at 13 n. 2.)

The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

procedures do[ ] not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

*Shell v. Brzezniak,* 365 F.Supp.2d 362, 369-370 (W.D.N.Y.2005). Therefore, I recommend that the Court dismiss the claim against Defendant Holland.

## G. Eleventh Amendment

Plaintiff sues Defendants "in [their] individual and official capacities." (Dkt. No. 1 at 1-3.) Defendants move to dismiss the official-capacity claims, arguing that any claims for damages against them in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 42-1 at 16-17.) Defendants are correct.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142-47 (1993); *Pennhurst State Sch. & Hosp.,* 465 U.S. at 101-06.

**\*15** The Eleventh Amendment bars suits for damages against state officials acting in their official capacities.[FN13] All DOCS employees are state officials for the purposes

of the Eleventh Amendment. *See e.g. Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. New York State Corr. Officers,* No. 99 CIV 9555, 2000 WL 1154311, at *2 (S.D.N.Y. Aug. 14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Therefore, I recommend that the Court dismiss the claims for damages against Defendants in their official capacities.

FN13. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989) ( "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity."); *see also*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

*Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb. 6, 2007) (Sharpe, J.) (citing cases).

**H. Conspiracy**

Plaintiff alleges that Defendants Rovelli, M. Rock, Perez, Flores, and Deluca conspired to use excessive force against him. (Dkt. No.1 ¶¶ 36, 41, 43-46, 48, 50, 52.) Defendants move to dismiss Plaintiff's conspiracy claims, arguing that they are barred by the intracorporate conspiracy doctrine. (Dkt. No. 42-1 at 19-20.) Defendants are correct.

The intracorporate conspiracy doctrine states that employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U .S. Dist. LEXIS 3164, at *5, 1999 WL 151702, at *2 (E.D.N.Y. Mar. 17, 1999). "This doctrine applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). There is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06-2951, 249 Fed. App'x 217 (2d Cir. Sept. 28, 2007). "[P]ersonal bias does not constitute personal interest and is not sufficient to defeat the intracorporate conspiracy doctrine." *Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 76 (E .D.N.Y.2002) (quoting *Bond,* 1999 WL 151702, at *2). However, in an unrelated action, I have found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept. 25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005).

Here, Plaintiff has not alleged what motivated Defendants to conspire against him. "[A] complaint that does not set forth factual allegations showing that any of the individual defendants acted with independent motives is subject to dismissal for failure to state a claim." *Freeman v. Santos,* No. 9:09-CV-0414, 2010 U .S. Dist. LEXIS 23742, at *8, 2010 WL 982893, at *3 (N.D.N.Y. Mar. 15, 2010) (quoting *Perrin v. Canandaigua City Sch. Dist.,* No. 09-CV-6153, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241, at *2 (W.D .N.Y. Nov. 21, 2008)). [FN14] Therefore, I recommend that the Court dismiss Plaintiff's conspiracy claims without prejudice.

> FN14. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**I. Pendent State Claims**

*16 Defendants argue that Plaintiff's state law claims should be dismissed pursuant to Section 24 of New York's Correction Law. (Dkt. No. 42-1 at 21-22.) Defendants are correct. That section provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24(1)-(2). Effectively, this statute precludes inmates from bringing civil suits against "corrections officers in their personal capacities" in New York state courts. *Cepeda v. Coughlin,* 128 A.D.2d 995, 997 (N.Y.App.Div.3d Dept.1987). This bar also applies to pendent state law claims in federal court because "[i]n applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

omitted). "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction ... must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Baker, 77 F.3d at 15.*

In 2009, the United States Supreme Court held that section 24 is unconstitutional to the extent that it precludes inmates from pursuing § 1983 claims. *Haywood v. Drown, --- U.S. ----, 129 S.Ct. 2108 (2009).* However, at least two judges in this District have observed that because *Haywood* 's focus is on civil rights claims, the decision "does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim." *Crump v. Ekpe,* No. 9:07-CV-1331, 2010 U.S. Dist. LEXIS 10799, at *61, 2010 WL 502762, at * 18 (N.D.N.Y. Feb. 8, 2010) (Kahn, J. and Peebles, M.J.); *May v. Donneli,* No. 9:06-CV-437, 2009 U.S. Dist. LEXIS 85495, at *13, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) (Sharpe, J. and Treece, M.J.).[FN15] Therefore, I recommend that the Court dismiss Plaintiff's pendent state law claims.

> FN15. The Court will provide Plaintiff with a copy of these unpublished decisions in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**J. Claims Not Addressed by Defendants**

Defendants' motion to dismiss does not address Plaintiff's excessive force claims, retaliation claims, or Eighth Amendment conditions of confinement claims regarding the provision of food. I find that those claims are sufficient to survive *sua sponte* review and therefore recommend that Defendants be directed to answer those claims.

**IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**\*17** In his opposition to Defendants' motion to dismiss, Plaintiff purports to move for summary judgment against both the State Defendants and Defendant inmate Perez. (Dkt. Nos. 72 and 77.) As the state Defendants note (Dkt. No. 75), Plaintiff's "motion" is not accompanied by a notice of motion, a statement of material facts, or a

memorandum of law. In addition, Plaintiff did not serve the exhibits to his "motion" on Defendants. Therefore, I recommend that Plaintiff's motion for summary judgment (Dkt. Nos. 72 and 77) be denied.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' request (Dkt. No. 52) to vacate the text order of March 10, 2010, is **GRANTED.** The Clerk is directed to vacate the text order and the entry of default (Dkt. No. 51); and it is further

**ORDERED** that Plaintiff's objection (Dkt. No. 55) to Defendants' request is **DENIED;** and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Freeman v. Santos,* No. 9:09-CV-0414, 2010 U.S. Dist. LEXIS 23742, 2010 WL 982893, at *3 (N.D.N.Y. Mar. 15, 2010); *Crump v. Ekpe,* No. 9:07-CV-1331, 2010 U.S. Dist. LEXIS 10799, at *61, 2010 WL 502762, at* 18 (N.D.N.Y. Feb. 8, 2010); and *May v. Donneli,* No. 9:06-CV-437, 2009 U.S. Dist. LEXIS 85495, at *13, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009); and it is further

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 42) be **GRANTED IN PART AND DENIED IN PART.** I recommend that the following claims be dismissed with prejudice: (1) the Eighth Amendment medical claim against Defendant Nesmith; (2) the claim against Defendant McAllister; (3) any claim that Defendants Rovelli, Deluca, Lindemann, and Silverberg violated Plaintiff's constitutional rights simply by threatening him; (4) the claim against Defendant Holland; (5) any claims for damages against Defendants in their official capacities; and (6) the pendent state law claims. I recommend that the following claims be dismissed without prejudice: (1) the Eighth Amendment medical claims against Defendants Collins, Lindemann, Labrum, and Silverberg; (2) the claims against Defendants Fischer, Roy, David Rock, Heath, and Nabozny; and (3) the conspiracy claims. I recommend that Defendants be directed to answer the Eighth Amendment medical care claim against Defendant Leos; and it is further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

**RECOMMENDED** that Defendants be directed to answer the following claims not addressed by their motion to dismiss: (1) the retaliation claims against Defendants Smith, Besson, Kelly, Foster, Flores, Shattuck, Rovelli, Hoy, and Deluca; (2) the excessive force claim against Defendants Rovelli, Deluca, Flores, Shattuck, Fraser, Hoy, Foster, and Nesmith; and (3) the Eighth Amendment conditions of confinement claims regarding issues with Plaintiff's food; and it is further

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. Nos. 72 and 77) be **DENIED.**

**\*18** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Gillard v. Rovelli
Slip Copy, 2010 WL 4905240 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Robert del CARPIO, Plaintiff,
v.
Hans WALKER, Superintendent; Edward Dann, Deputy
Superintendent; Lt. Battle, Officer of the Adjustment
Committee; Officer York; Officer Kimak, Auburn Corr.
Facility, Defendants.
**No. Civ.A.95CV1502RSPGJD.**

Oct. 15, 1997.

Robert del Carpio, Federal Medical Center, Lexington, Kentucky, pro se.

Dennis C. Vacco, New York State Attorney General, The Capitol, Albany, New York, for defendants, Lisa Renee Harris, Assistant Attorney General, of Counsel.

**ORDER**

POOLER, J.

**\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge Gustave J. Di Bianco, duly filed on the 18th day of September, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no party having submitted objections [FN1] thereto, it is

FN1. I note that the magistrate judge's report

recommendation was returned to the court undelivered because the plaintiff is no longer at the address listed in the court's file, which is the last address plaintiff instructed the court to use. By Order filed November 22, 1995, Magistrate Judge Gustave Di Bianco ordered that plaintiff "promptly notify the Clerk's Office of any change in his address." Dkt. No. 3 at 4. The same order provided that "failure to keep such office apprised of [plaintiff's] current address will result in the dismissal of the instant action." *Id.* I do not rely on plaintiff's failure to notify the court of his current address as a basis for dismissing the action; I merely note that plaintiff cannot in the future claim, in reliance on his failure to receive a copy of the report-recommendation, that he was deprived of the opportunity to file objections due to any fault of the court.

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The defendant's motion is granted and the action dismissed for the reasons set forth in the Magistrate Judge's Report.

3. The Clerk serve a copy of this Order on the parties by regular mail.

IT IS SO ORDERED.
GUSTAVE J. DI BIANCO, Magistrate J.

**REPORT-RECOMMENDATION**

This matter has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, United States District Judge pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In the instant civil rights complaint, the plaintiff alleges that while he was incarcerated, defendants York and Battle harassed plaintiff and filed false misbehavior reports against him in retaliation for the exercise of his right to redress grievances and the right to practice his religion in violation of the First and Fourteenth Amendments of the Constitution. Plaintiff also alleges Eighth Amendment violations as a result of defendants' actions.

The complaint seeks both injunctive and monetary relief.

Presently before the court is the defendants' motion for summary judgment pursuant to FED.R.CIV.P. 56. For the following reasons, the undersigned will recommend granting the defendants' motion and dismissing the complaint.

### DISCUSSION

#### 1. Summary Judgment

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED.R.CIV.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

#### 2. Facts

In his complaint, plaintiff alleges a chronology of events, commencing in May of 1995. Plaintiff states that he wrote letters to Superintendent Walker about defendants York and Kimak. Plaintiff alleges that these two defendants constantly harassed plaintiff. Plaintiff then alleges that after he complained of their actions to prison officials, defendants York and Kimak participated in filing false misbehavior reports against plaintiff in retaliation for his complaints. Plaintiff also alleges that defendant York forced plaintiff to continue working when York knew that plaintiff's heart condition would not permit him to do as York asked. Plaintiff also claims that defendant York refused to feed the plaintiff. Plaintiff refers to three misbehavior reports that he alleges were fabricated.

**\*2** Plaintiff states that he has written to Superintendent Walker many times, but Walker has failed to remedy the situation. Plaintiff states that due to Walker's failure to remedy the problem, York and Kimak believe that they can continue to harass the plaintiff without adverse consequences. Plaintiff claims that Deputy Superintendent Dann failed to properly investigate plaintiff's allegations against York and Kimak. Plaintiff states that Lieutenant Battle was a hearing officer involved in the allegedly retaliatory misbehavior charges.[FN1] Plaintiff claims that defendant Battle did not properly evaluate or credit the plaintiff's testimony or the testimony of plaintiff's witnesses.

> FN1. The court notes that Lieutenant Battle was the hearing officer in only *one* of the plaintiff's disciplinary hearings. Lieutenant Perkins presided over the other two disciplinary hearings. Plaintiff did not sue Lieutenant Perkins.

#### 3. Respondeat Superior

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), and that the doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

Defendants Walker and Dann argue that the plaintiff has not alleged sufficient personal responsibility to survive a motion for summary judgment. Clearly, neither Walker nor Dann directly participated in the alleged violations. Plaintiff seeks to establish personal responsibility by claiming that these defendants failed to remedy the violations after learning of them through a report or appeal.

Plaintiff alleges that he began writing to defendant Walker in May of 1995 about harassment by defendant York. It is true that personal responsibility of a supervisory official may be established if the official learns of the violation through a report or appeal and fails to remedy the situation. *Williams, supra.* However, the letter or complaint must alert the supervisory official to the constitutional violation of which the plaintiff complains. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Watson v. McGinnis,* 964 F.Supp. 127, 129-30 (S.D.N.Y.1997).

**\*3** In the instant case, the plaintiff's complaints to defendant Walker about York and Kimak relate to the alleged harassment that the plaintiff was suffering. There is no evidence that the Superintendent or Deputy Superintendent Dann knew anything about the plaintiff's allegation of retaliatory misbehavior reports. Thus, they could not be held liable for any claims of retaliation. The grievances that the plaintiff submitted were all investigated as shown by the defendants' exhibits. One of the grievances dealt with an allegation of "false keeplock."

[FN2] Defendants' Exhibit C. A review of the documents relating to the grievance and all the appeals associated therewith, shows no evidence that defendants Walker or Dann were ever informed of the situation. In fact, the grievance is signed by an individual named Duncan in the space reserved for the Superintendent's signature. Defendants' Exhibit C at p. 6. Attached to the grievance papers are all the memoranda regarding the investigation of the issue.

> [FN2.] This was the June 6, 1995 grievance mentioned in plaintiff's complaint.

Defendants' Exhibit J contains plaintiff's June 11, 1995 letters [FN3] to defendant Walker. The letters stated that defendants York and Kimak were trying to cause the plaintiff to have a heart attack by their harassment. The harassment included not releasing the plaintiff for "chow" and preventing plaintiff from timely visits to the law library. Plaintiff mentioned a false misbehavior charge, but stated that this allegation was being handled in the Cayuga County Court.

> [FN3.] There are two letters in Exhibit J. Both are dated June 11, 1995. One is typed and one is handwritten.

One of plaintiff's June 11 letters was given to Deputy Superintendent Dann, who asked Lieutenant Jackson to investigate the issues raised. Defendants' Exhibit K includes documents relative to Lieutenant Jackson's investigation of the matter, including memoranda of interviews of the officers involved. Although the investigation did not achieve the result desired by the plaintiff, this does not constitute the requisite personal involvement by Walker or Dann in any alleged constitutional violations.

In fact, defendant Dann wrote plaintiff a memorandum stating the results of Lieutenant Jackson's investigation. Defendants' Exhibit K. The memorandum stated that although no merit had been found in plaintiff's claims, Sergeant Lupo was told to speak with the plaintiff to make sure his concerns were addressed. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**4. Due Process**

The complaint in this action focuses upon defendant York and Kimak's retaliatory misbehavior reports, however, in passing, the plaintiff also states that Lieutenant Battle "closed his eyes to the evidence," did not properly evaluate the plaintiff's testimony, and "covered" for the officers. These claims could be interpreted as raising a procedural due process claim in addition to the substantive retaliation claim.

The court would first point out that there were three allegedly retaliatory misbehavior reports. Lieutenant Battle was the hearing officer only at *one* of the hearings. Lieutenant Perkins was the hearing officer for the other two hearings. Plaintiff does not mention Perkins in the complaint at all. Thus, the undersigned will consider a procedural due process claim on the one hearing over which defendant Battle presided which took place on July 17, 1995. Defendants' Exhibit S. The formal charge was served on plaintiff on July 13, 1995, and charged plaintiff with refusing a direct order and being out of place. *Id.* at p. 3 (transcript of disciplinary hearing). Officer Kimak was the individual signing the misbehavior report. Defendants' Exhibit R.

**\*4** In order for a plaintiff to be awarded damages under section 1983 for an alleged violation of procedural due process, the court must find that as a result of conduct performed under color of state law, plaintiff was deprived of life, liberty, or property without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In the instant case, there is no dispute that the defendants acted under color of state law. In *Bedoya,* the Second Circuit indicated that "[w]hat remains is a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined in keeplock ...; and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Id.* at 351-52 (citing *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460-61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

In order to determine whether a liberty interest existed, courts, until recently, were relying on the Supreme Court decision in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Supreme Court noted that a state could create a liberty interest through a statute or regulation by utilizing language of unmistakably mandatory character, limiting the discretion of the decision maker. *Id.* After the decision in *Hewitt,* lower courts, as well as the Supreme Court, focused more upon the language of the statute or regulation, rather than upon the character of the deprivation. *See e.g., Kentucky Dep't of Corrections, supra; Hernandez v. Coughlin,* 18 F.3d 133 (2d Cir.1994) (finding no liberty interest after examining regulations associated with the Family Reunion Program), *cert denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994); *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.1988) (finding liberty interest in remaining free from administrative segregation based on New York regulations); *Gittens v. LeFevre,* 891 F.2d 38, 41 (2d Cir.1989) (finding a liberty interest in remaining free from keeplock based on language of the regulations).

The Supreme Court has held that the *Hewitt* analysis is not applicable and has led to undesired results in prison cases. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Courts may no longer rely *solely* upon the language of the regulations when determining whether a liberty interest exists. *Id.* at 2300. The Court stated in Sandin that "the search for a negative implication from mandatory language in prison regulations has strayed far from the real concerns under-girding the liberty protected by the Due Process Clause." *Id.* The court also stated that it was *returning* to the principles established in *Wolff* and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). *Id.* Ultimately, the court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

**\*5** *Sandin* rejected the notion that any action taken by prison personnel for punitive reasons encroaches on a liberty interest. *Id.* at 2301. The court referred to as "dicta" statements in other cases implying that solitary confinement automatically triggers due process protections. *Sandin,* 115 S.Ct. at 2301 (citing *Wolff,* 418 U.S. at 571 n. 19; *Baxter v. Palmigiano,* 425 U.S. 308, 323, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). Applying this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

standard to the facts in *Sandin,* the court determined that Conner's discipline in segregated confinement for 30 days did **not** present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

In determining what constituted "atypical and significant" deprivations, the *Sandin* court compared disciplinary segregation with other forms of segregation; compared the plaintiff's confinement with conditions in general population to see whether the inmate had suffered a major disruption in his environment; and examined whether the **length** of the inmate's sentence was affected. *Id.*

The Second Circuit has not yet squarely addressed the issue of whether after *Sandin* an inmate facing a disciplinary hearing has a liberty interest, protected by due process. The Second Circuit has *implied* that whether a deprivation is atypical and significant involves fact finding. *See* Frasier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996) ("[t]he extensive fact-finding of the district court permits us to measure Frasier's SHY claim by the standard of *Sandin* ); Samuels v. Mockry, 77 F.3d 34, 38 (2d Cir.1996) (assessment as to whether inmate had a protected liberty interest may require fact finding).

Some courts in New York have also read *Sandin* narrowly and have distinguished the holding when applying the *Sandin* factors and distinguishing the situation experienced by inmate Conner to that experienced by New York inmates who face Tier III disciplinary hearings. *See* Campo v. Keane, 913 F.Supp. 814, 820-21 (S.D.N.Y.1996); *see Moolenaar v. Finn,* No. 94 Civ. 6778 n. 4 (S.D.N.Y. March 14, 1996) (commenting that the case involved a Tier II hearing with no **possibility** of loss of good time and contrasting Tier III hearings where such loss is possible). As noted by the courts in *Campo* and *Moolenaar,* a recognized Second Circuit principle is that due process rights must be determined with respect to the "potential penalty". Campo, 913 F.Supp. at 821 (citing McKinnon v. Patterson, 568 F.2d 930, 939 (2d Cir.1977), *cert denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). Some courts, however, have squarely rejected the potential penalty theory, opting instead to examine the facts and length of each confinement to determine whether the confinement was atypical and significant. *See Marino v.. Klages,* No. 95-CV-1475 (N.D.N.Y. March 27, 1997) (declining to adopt the

potential penalty approach); Delany v. Selsky, 899 F.Supp. 923, 927-28 (N.D.N.Y.1995) (considering length of confinement together with plaintiff's unusual physical problems).

**\*6** In the instant case, the plaintiff was subjected only to a **Tier II** hearing, in which the maximum possible penalty he could receive was 30 days of segregated housing or keeplock. *See* N.Y.Comp.Codes R. & Reg. Tit. 7 § 254.7(a)(iii) and (vi). There is no possibility in a Tier II hearing of a loss or even a recommended loss of good time. Regardless of the disposition, the length of an inmate's sentence cannot be affected as a result of a Tier II hearing. Even under the potential penalty approach, this plaintiff, who was only sentenced to five days of keeplock for the hearing that he is challenging would not have a liberty interest in being free from that confinement. Thus, any procedural due process claim against Lieutenant Battle, based on the July 17, 1995 disciplinary hearing may be dismissed.

**5. Verbal Harassment**

Plaintiff states that defendants York and Kimak harassed him "to death." Verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation. Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir.1986); Brown v. Croce, 967 F.Supp. 101, 104 (S.D.N.Y.1997). Thus, any claims of general verbal harassment by either defendant may be dismissed.

**6. Retaliation**

Even after the Sandin decision, a claim that a false misbehavior report was filed in retaliation for the exercise of a constitutional right, is still actionable as a violation of **substantive due process.** The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. Jones v. Coughlin, 45 F.3d 677, 679-80 (2d Cir.1995); Franco v. Kelly, 854 F.2d 584, 589-90 (2d

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

Cir.1988). In cases where the defendants' actions are taken for both retaliatory and legitimate reasons, ultimately the defendants must show that they would have taken the same action absent the retaliatory motive. *Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir .1994).* Courts recognize, however, that claims of retaliation may be prone to abuse. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). The court in Flaherty described three situations where retaliation is claimed, each situation requiring a different approach by the court. *Id.* The court stated that a retaliation claim supported by specific and detailed allegations must be pursued with full discovery. *Id.* Whereas, a claim that contains "completely conclusory" allegations may be dismissed on the pleadings alone. *Id.* The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.*

In the instant case, the plaintiff alleges that officers York and Kimak filed the false misbehavior reports in retaliation for plaintiff's complaints and grievances against them. Plaintiff also alleges that defendant York retaliated against plaintiff for the exercise of a First Amendment right to practice his religion. This latter claim is not explained by the plaintiff. He does not allege specifically what First Amendment right he was exercising or how the defendants' actions were in retaliation for the exercise of that right.

**\*7** Defendants have submitted all the records relating to the disciplinary hearings. With respect to the charges, a review of the transcripts of the disciplinary hearings shows that the plaintiff was given the opportunity to explain his behavior at the disciplinary hearing. *See e.g.* Defendants' Exhibit M at p. 4. Exhibit M is the transcript of the disciplinary hearing that took place on June 11, 1995 for a misbehavior that occurred on June 7, 1995. The misbehavior involved the plaintiff failing to obey an order to continue working. The plaintiff admitted that he did not continue working when defendant York told him to continue. *Id.* Plaintiff stated that his medical condition was preventing him from continuing. *Id.* Essentially, the plaintiff admitted his behavior, but alleged a defense that his medical condition prevented him from following the officer's order.

Thus, the misbehavior report was not **false.** Rather, the plaintiff had an explanation for his misbehavior that the hearing officer did not believe. In fact, hearing officer Perkins adjourned the hearing to "check into [[[plaintiff's] medical profile." *Id.* at p. 5. The hearing was reconvened on July 12, 1995, and Lieutenant Perkins had reviewed the plaintiff's medical record. *Id .* at p. 6. Perkins determined that although the plaintiff did have a health problem, there was no indication that he could not work. *Id.* Whether the hearing officer made the correct decision is not the issue. It is clear that at worst, there could have been a dual motivation for defendant York's misbehavior report, and plaintiff did admit failing to obey the officer's order, albeit with reason.

The misbehavior report of July 8, 1995 resulted in a hearing on July 12, 1995. First, the officer fling the misbehavior report was Officer Hoey. The misbehavior report involved unauthorized legal assistance and unauthorized legal exchange. Defendants' Exhibit P (transcript of July 12 hearing). A frisk of the plaintiff's cell resulted in finding 81 pages of legal work that belonged to other inmates. Plaintiff did not dispute that the legal papers were in his cell, but argued that he was using the other individuals' papers to work on his own legal matters. *Id.* at p. 3. The hearing officer simply did not believe the plaintiff's explanation. *Id.* at p. 5.

Neither defendant York nor defendant Kimak was directly involved in the search or the misbehavior report of July 7, 1995. Thus, there is no evidence that this misbehavior report was false and in retaliation for any constitutional right exercised by the plaintiff.

The final misbehavior report was authored by defendant Kimak and involved refusal to obey an order and being out of place. The disciplinary hearing was held on July 17, 1995. Defendants' Exhibit S (transcript of disciplinary hearing). The misbehavior report stated that when plaintiff was returning from his shower, he refused to obey Officer Kimak's order get back into plaintiff's cell. Defendant Kimak stated in the report that plaintiff had stopped at one of the cells and placed his hands inside. *Id.* at p. 3. Plaintiff alleged at the hearing that he was returning from the shower, but he did not stop at anyone's cell and did not disobey any orders. *Id.* at p. 4. Plaintiff also told the hearing officer that defendant Kimak's actions were in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

retaliation for plaintiff's complaints against Kimak. *Id.* at pp. 4-5. Plaintiff called two inmate witnesses to testify at the hearing. *Id.* at p. 7. His first witness was very unclear, but essentially testified that he did not hear the officer give plaintiff an order. *Id.* The second inmate was more articulate and stated that after plaintiff exited the I shower, he always went straight back to his cell. *Id.* at p. 12. Moore testified that he did not hear any order given. *Id.* However, Lieutenant Battle found the witnesses incredible and found plaintiff guilty of the misbehavior. It would appear that the only evidence of retaliation is the plaintiff's allegation of complaints against Kimak and York. A review of the documents I relating to the misbehavior reports shows that even if the plaintiff's statements are credited, the misbehavior reports could have been written for valid reasons as well as invalid reasons. Thus, the plaintiff cannot maintain an action for retaliation in the instant case.

**7. Eighth Amendment**

**\*8** Plaintiff makes some vague allegations that the defendants forced him to work when he was not capable. Plaintiff admitted at his disciplinary hearing that he wanted to work but needed to take a break. Lieutenant Perkins looked through the plaintiff's medical records and found no limitations with respect to the work he could do. The medical record did note a heart condition.

The Eighth Amendment prohibits the infliction of cruel and unusual punishments, including punishments that involve the unnecessary and wanton infliction of pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). In order to state a claim based on inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A plaintiff must allege that his access to physicians for necessary medical care was unreasonably delayed or denied or that prescribed medical treatment was not administered. *Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982) (citing *Todaro v. Ward,* 431 F.Supp. 1129, 1133 (S.D.N.Y.), *aff'd,* 565 F.2d 48 (2d Cir.1977)). Plaintiff's claims, although not specifically involving medical care, do involve allegations that the defendants violated the doctor's orders, and are governed by the same

deliberate indifference standard. Deliberate indifference, whether evidenced by medical staff or by officials who allegedly disregard the instructions of the medical staff requires more than negligence, but less than conduct taken for the very purpose of causing harm. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). In order for a prison official to act with deliberate indifference, the official must know of and disregard an excessive risk to inmate health and safety. *Id.* at 1979. The official must both be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* In the instant case, defendant York allegedly told the plaintiff to keep working when plaintiff stated that he needed a break. The defendant could not have been deliberately indifferent since there was no medical limitation on plaintiff's work in his medical file. Thus, York could not have known about and disregarded a serious risk to plaintiff. Additionally, according to the misbehavior report, the plaintiff had already taken a break when defendant York told plaintiff to keep working. Thus, based on the undisputed facts, there is no evidence that defendant York violated the plaintiff's Eighth Amendment rights relating to his medical condition. Plaintiff also indicated in his complaint that defendant York refused to let plaintiff out of his cell to be fed. Plaintiff wrote a grievance on June 29, 1995 regarding being released "for chow." Defendants' Exhibit D. However, it does not appear that Officer York was involved in the incident. In fact, the grievance was resolved informally. Thus, the plaintiff does not state any Eighth Amendment claim for a retaliatory denial of food or for any denial of food.

**\*9 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the defendants' motion for summary judgment (docket # 15) be **GRANTED,** and the complaint be **DISMISSED.**

Pursuant to 28 1 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R .Civ.P. 6(a),
6(e), 72.

N.D.N.Y.,1997.
Carpio v. Walker
Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.